**U.S.C.A. NO.  14-10092**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ALBERT HOOD
Defendant-Appellant.


On Appeal From The United States District Court
For The Eastern District of California


Honorable Anthony W. Ishii
United States District Judge


U.S.D.C. No. 1:11-cr-00443 AWI


**OPENING BRIEF OF APPELLANT**


MARC C. AMENT
Attorney at Law
1539 E. Starpass Drive
Fresno, CA 93730-3448
(559) 978-4429

Attorney for Defendant-Appellant
ALBERT HOOD

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES……………………………………  iii

I. JURISDICTIONAL STATEMENT…………………………….  1

II. BAIL STATUS……………………………………………..  1

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW………..  1

IV. STATEMENT OF THE CASE…………………………………  1

    A.    Nature of the Case…………………………………………… 1

    B.    Course of Proceedings………………………………………… 2

    C.    Disposition Below…………………………………………… 2

V. STATEMENT OF FACTS..…………………………………  3

    A.  Mr. Hood's Background…………………………………  3

    B.  Offense Conduct…………………………………………  8

    C.  Sentencing…………………………………………………  11

        1.  Advisory PSR……………………………………………  11

        2.  Sentencing Hearing………………………………………  13

VI. SUMMARY OF ARGUMENT………………………………....  14

VII.   ARGUMENT…………………………………………………..   14

    A.   The District Court Committed Procedural Error in
       Sentencing Mr. Hood to a Prison Term of 96 Months……….   14

       1.   Standard of Review……………………………………   14

       2.   The District Court Erred Procedurally when it
           Sentenced Mr. Hood to a Prison Term of 96 Months…..   15

VIII.   CONCLUSION…………………………………………………...   17

    CERTIFICATE OF RELATED CASES…………………………….   18

    CERTIFICATION OF COMPLIANCE PURSUANT TO
    FED.R.APP.P 32(A)(7)(C) AND NINTH CIRCUIT RULE 32-1
    FOR CASE NO. 14-10092...................................................................   19

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

### FEDERAL CASES

*Gall v. United States,* 552 U.S. 38 (2007)……………………………….   14, 15

*Rita v. United States,* 551 U.S. 338 (2007) ……………………………...   14

*United States v. Carty,* 520 F.3d 984 (9th Cir. 2008) (*en banc*)…………   14, 15

*United States v. Shi,* 925 F.3d 709 (9th Cir. 2008)……………………….   15

*Aguilar v. Adams*, 2009 U.S. Dist. LEXIS 41335 (E.D. Cal. 2009)..............   4

### STATE CASE

*People v. Aguilar*, 2008 Cal. App. Unpub. LEXIS 3226
(Cal. App. 5th Dist. 2008)……………….....................................................   4, 5, 7

### FEDERAL STATUTES

**<u>United States Code</u>**

18 U.S.C. § 922 (g)(1)………………………………………………...   1, 2, 12
18 U.S.C. § 3231…………………………………………………….....   1
18 U.S.C. § 3553(a)……………………………………………………   14, 15
18 U.S.C. § 3553(a)(1)…………………………………………………   6, 16
18 U.S.C. § 3742(a)……………………………………………………   1
28 U.S.C. § 1291……………………………………….………………   1

### FEDERAL RULES

**<u>Federal Rules of Appellate Procedure</u>**

Fed. R. App. P. 32(a)………………………………………………......   19

**Circuit Rule**

Rule 28-2.6…………………………………………………………… 18

Rule 32-1………………………………………………………....... 19

**United States Sentencing Guidelines**

§ 2K2.1…………………………………………………….. 12

§2K2.1(b)(4)(A)…………………………………………. 12

§ 3E1.1…………………………………………………….. 12

§ 5G1.1(c)…………………………………………………12


# STATE CODES AND STATUTES

**California Penal Code**

Section 12021(a)(1) (2009)………………………………….. 1, 2

## I.      Jurisdictional Statement

Albert Hood was tried, convicted and sentenced in federal court for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  The district court had jurisdiction over the case pursuant to 18 U.S.C. § 3231.  Because this is a direct appeal from a final district court judgment in a criminal case, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.  In addition, because Mr. Hood appeals his sentence, this court has jurisdiction under 18 U.S.C. § 3742(a).

The district court filed and entered its Judgment and Commitment in the criminal docket on February 26, 2014.  ER I p. 1, CR 2.[1]

## II.     Bail Status

Mr. Hood is in the custody of the Federal Bureau of Prisons and has a projected release date of November 22, 2018.

## III.    Statement of Issue Presented for Review

A.      The district court did not apply enough of a reduction under § 3553(a)(1) but it should have, reviewed for reasonableness.

## IV.     Statement of the Case

### A.      Nature of the Case

filed a criminal complaint against Mr. Hood charging him with California

---

1  Through this brief, "ER I" refers to Volume 1 of the Excerpts of Record, "ER II" refers to Volume II of the Excerpts of Record, "CR" refers to the district court clerk's docket, and "RT" refers to the Reporter's Transcript.

Penal Code § 12021(a)(1), being in possession of firearm by a felon, and other charges out of an incident on December 4, 2011.

On December 22, 2011, the government filed an indictment charging Mr. Hood with one count of 18 U.S.C. § 922(g)(1): being a felon in possession of a firearm, out of the same incident.

### B.     Course of Proceedings

Mr. Hood made his initial appearance and entered a plea of not guilty in federal court on August 15, 2012. He had a federal jury trial on October 16 and 17, 2013.

### C.     Disposition Below

Mr. Hood pleaded no contest in state court to the charge of being in possession of a firearm by a felon, on February 15, 2012. On August 13, 2012, the state court sentenced him to 16 months in state prison. Advisory Guideline Presentence Investigation Report ("PSR") p. 14.

A federal jury found Mr. Hood guilty of Count One. ER II p. 62, CR 56. The district court imposed a sentence of 96 months on Count One. ER II pp. 345, CR 78 (RT of sentencing p. 11).

The federal court also sentenced Mr. Hood to 36 months of supervised release on the count. ER II pp. 345, CR 78 (RT of sentencing pp. 12-13).

## V.    Statement of Facts

### A.    Mr. Hood's Background

Mr. Hood was born in Fresno, California on April 25, 1964 to Leslie and Juanita Hood. He had a happy childhood, but his parents were divorced when he was nine years old. He was raised after that mostly by his mother, who worked two jobs to support the family. His mother remarried, to Billy Burnett. They are still married, now for 36 years. He has two brothers and one sister and many step-brothers and step-sisters. His father is a retired long-haul truck driver. His relationship with his family is good, and he gets along with them. PSR pp. 20-21.[2] The Fresno police report in this case states that he is African-American, 5 feet 10 inches, weighs 240 pounds. He has tattoos with his mother's name, his two wives' names, and his own last name, and a Playboy Bunny. ER 54, CR 23-1 p. 2.

Mr. Hood was married to Joan Crawford, and they had one child, Albert Junior, who is 24 years old. His aspiration is to join the military. He has three other children from three different women, all under the age of seven years old. He had an on again off again relationship with Felicia Tobias since 1999. PSR p. 21.

During Mr. Hood's interview with the federal probation officer in this case, he disclosed that he was shot by Fresno Bulldog gang members in September

2  Filed under seal.

3

2005.  He was with his son Albert Jr., who was 15 years old at the time, when gang members approached them and began shooting.  He states that he stood between the shooter and his son to protect his son.  Mr. Hood was shot three times.  Mr. Hood testified against the shooter and an accomplice in their trial for attempted murder, and since then he has been victim of retaliation attempts.  ER 8, CR 25 (RT of hearing p. 14).

The two men that Mr. Hood testified against were Juan Aguilar and Manuel Lopez.  They were both convicted by a jury on November 9, 2006 in Fresno Superior Court.  *Aguilar v. Adams*, 2009 U.S. Dist. LEXIS 41335 (E.D. Cal. 2009).  *People v. Aguilar*, 2008 Cal. App. Unpub. LEXIS 3226 (Cal. App. 5Th Dist. 2008).

There were four percipient witnesses who testified at the trial of Aguilar and Lopez.  The first was Lopez's younger sister, Margarita.  Then Felicia Tobias, Mr. Hood's girlfriend.  Then Mr. Hood, and then his son, Albert Jr.  Lopez lived with his sister, their grandmother, Aguilar and Aguilar's mother.  Aguilar was the father of Margarita's children.  Margarita lived on East Illinois Avenue in a neighborhood just north of East Tulare Avenue and west of North Cedar Avenue. Alfred's house was on the same street three blocks away from Margarita's house. This neighborhood is just north of East Tulare Avenue and west of North Cedar Avenue. *Aguilar v. Adams* and *People v. Aguilar*.

4

Dr. Davis, of University Medical Center in Fresno treated Mr. Hood for his wounds on September 27, 2005.  One bullet entered, went through and exited his right arm.  Another bullet hit his right chest.  Another his right back.  The bullet that hit his right chest caused injuries to his internal organs.  Specifically, this bullet pierced his liver, right diaphragm, and kidneys.  The injuries from the gunshot wounds were life-threatening.  Without the medical attention he received, Mr. Hood would have died.  *People v. Aguilar.*

A Fresno superior court jury found both Lopez and Aguilar guilty of attempted premeditated and deliberate murder, and various enhancements and other crimes related to the attempted murder including using a gun, and acting in concert in the commission of the crime.  Both defendants admitted their prior convictions in a court trial.  Lopez was sentenced on December 20, 2006 to 31 years determinate plus life with the possibility of parole.  Aguilar was sentenced to life in prison with the possibility of parole consecutive to four years for the hate crimes enhancement.  *People v. Aguilar.*

Both men appealed their sentences to the state Court of Appeals, which affirmed their judgments on April 21, 2008.  Aguilar filed a petition for review in the California Supreme Court, which summarily denied the petition on July 30, 2008.  *People v. Aguilar.*

Mr. Hood stated that he denies any gang associations.   He has never been in

5

any gang. But in his area of town everyone knows someone in a gang. The Fresno
Police Department report on the current offense indicates that he associates with
the Blood gang. PSR p. 21.

Mr. Hood suffers from leg pain and back pain for which he is given Vicodin
or Motrin. His hands and legs go numb at times. His pain is from the injuries he
incurred when he was shot in 2005. The last bullet was expelled when he was in
custody for the current offense. He began using cocaine when he was 36 years old,
and until 2010 he smoked it daily. He denies any other illicit drugs and he only
consumes beer on social occasions. PSR pp. 21-22.

Mr. Hood worked as a diesel mechanic for Kimbel Toppers in Visalia from
2002 until the time he was shot in 2005. He earned $20 an hour working more
than 40 hours a week. He said that one thing that helped him escape from the
Fresno Bulldog gang was relocating to McQueen, Arizona. Moving there helped
him overcome his cocaine habit, and protected him from the Fresno Bulldog gang
members who were after him, in retaliation for his testifying against gang members
who shot him in 2005. While he was in Arizona he quit using drugs and he
obtained part-time employment as a sales associate at Auto Zone.

However, he had to return to Fresno to take care of problems with his
driver's license, and he met with his Fresno County probation officer, who filed a
violation of probation against him for leaving the state of California. Mr. Hood

6

told the federal probation officer he hopes to return to Arizona where he can have a safer more law-abiding lifestyle.  PSR pp. 21-22, 26.

Mr. Hood's home was in the middle of Fresno Bulldog territory on E. Illinois Avenue.  He was buying the house.[3]  He stubbornly held onto the property for quite some time, but he realized it was not worth it.  ER 8, CR 25 (RT of hearing, p. 32).

He completed ninth grade, but he had poor grades, and was kicked out for fighting.  He is currently getting his GED.  He had vocational training in welding and as a diesel mechanic, and he has earned his Class A driver's license.  PSR p. 22.

Most of Mr. Hood's past criminal convictions were for driving on suspended license, DUI, or misdemeanor fighting.  At age 27 and 30 he was convicted of misdemeanor spouse abuse, receiving 7 days and 180 days in jail.  But in 1999 he went to state prison for two years for spousal abuse, and to prison for vehicle theft for 16 months concurrent with the spousal abuse case.  In 2008 he was acquitted by a state jury in a sexual assault case.

In 2010 he was convicted of assault with a means likely to produce great bodily injury, and possession of a firearm by a felon, with one year in county jail. The state court judge on that case gave him the grant of felony probation with the understanding that he would leave the state.  He went to Arizona, and did well

3  *People v. Aguilar.*

7

there, getting a job.  But he did not go through the Interstate Compact, it was not done right, and when he came back to California to get his license, the Fresno County probation officer made him stay in California, and that is when his house got shot up.  ER 8, CR 25 (RT of hearing, pp. 20-21).

In 2012 the one year in county jail was changed to two years in prison on August 13, 2012.  That day he was convicted of possessing a firearm by a felon, in state court, for the same conduct as the basis for his current federal conviction.  His release date is July 23, 2015 on both cases.  PSR pp. 6-20.

**B.     Offense Conduct**

The offense conduct was on December 4, 2011.  Fresno Police Officer Kenneth Webb was in uniform in a marked police car, assigned to the Violent Crime Impact Team.  At approximately 8:30 PM he was in the area of Fresno and Grant Streets, looking up Fresno from Grant.  He saw a white car cut off two other cars that were southbound on Fresno Street.  The white vehicle was leaving a parking lot and pulled onto Fresno Street.  The officer drove after the white car, and caught up with it as it reached 2014 East White.  Officer Webb said he turned on his overhead red and blue lights.  ER 122, CR 76 (RT of trial p. 132-133).

According to Fresno Police Department report 11-084918, Mr. Hood was wearing blue pants, a white shirt, with a red blue and white colored jacket, a red baseball cap and red shoes.  ER 8, CR 23-1 p. 2.  But at his hearing to revoke the

8

detention hearing, his attorney at the time, Charles Lee, an assistant federal defender, said that Mr. Hood was wearing a wristband from the Fresno jail which had on it a picture of him at the time he was arrested.  The picture shows a blue jacket that had on it an NBA logo that was red, white, and blue.  ER 8, CR 25 (RT of proceedings p. 8).

Officer Webb got out of his car and walked toward the white car.  Mr. Hood, driver of the white car, got out and ran away.  Officer Webb ordered him to get back into his car, but he looked at him, and ran toward the front yard of 2014 East White.  He ran through the front yard around the west corner of the house, and there the officer says that he saw an object fall to the ground.  It was dark, and the front yard was not illuminated.  Officer Webb said that Mr. Hood ran toward the backyard, and the officer lost sight of him.  Officer Webb heard the sound of something hitting on the back door, and there was yelling, he said.  ER 122, CR 76 (RT of trial pp. 134, 148).  The nearest light was the next block over, on Belmont, the main street south of East White.  When Officer Webb went toward the backyard, he turned on his flashlight.  ER 122, CR 76 (RT of trial pp. 149-150).

Officer Webb broadcast over his radio his location, as well as the fact that Mr. Hood was running from him.  After he took Mr. Hood in to custody on the ground, and put handcuffs on him, Officer Webb saw someone opened the back door.  Mr. Hood told the officer that it was some relative.  The officer then escorted

9

Mr. Hood to his police car, on the same route that they had come from the front

yard earlier.  He saw that the object on the ground was a firearm.  ER 122, CR 76

(RT of trial pp. 133-134, 153).  The firearm was a Ruger, model Vaquero .44

caliber revolver with five rounds of ammunition.  ER 8, CR 23-1 p. 4.  Sgt. Joe

Alvarez said he responded to a call for assistance broadcast by Officer Webb about

8:40 PM, and he arrived at the house in 20 to 30 seconds.  Officer Webb saw Sgt.

Alvarez one or two minutes after he arrived.  ER 122, CR 76 (RT of trial pp. 134-

135, 162).

    Officer Webb did not attempt to take any fingerprints off the weapon, nor

did he instruct Sgt. Alvarez to do so.  Nor did he order any other kind of testing,

including DNA testing.  ER 122, CR 76 (RT of trial pp. 146, 152).  He did not take

photos of the scene at the time, but he took some photos during the week of the

trial, and in the daytime.  He did not look at the front door and the bullet holes

there.  ER 122, CR 76 (RT of trial p.151).

    At some point Officer Webb got a cell phone out of the car that Mr. Hood

drove.  It was a clamshell-flip cell phone with pictures on it, and it included gang-

related pictures related to the Bloods gang.   ER 8, CR 23-1 p. 6, and PSR p. 7.

But that was not Mr. Hood's cell phone.  His was a pay-as-you-go cell phone that

does not have a camera or camera features.  Mr. Hood had just been to the liquor

store to make a payment on his own cell phone, the one without a camera or

10

camera device.  ER 8, CR 25 (RT of proceeding p. 8).

Officer Webb interviewed Mr. Hood in the back of his patrol car, first advising him of his *Miranda* rights.  Mr. Hood continued to speak to Officer Webb during the booking process at the Fresno jail.  There Mr. Hood said that he had to pay his cell phone bill, and that he went to a liquor store.  ER 8, CR 23-1 p. 6.  He said that he does not like to go there, because he has been harassed and assaulted by "youngsters" in the area.  He said that he went there only when he needed to.  Mr. Hood said that he did not have a gun.  ER 122, CR 76 (RT of trial pp. 142-144).  The police did not fingerprint the gun or use any DNA tests. According to the report, Mr. Hood may have invited Officer Webb to fingerprint the gun.  ER 122, CR 76 (TR of trial p. 154).

In the government's Memorandum in Opposition to Defendant's Motion for Revocation of Detention Order, the government said that Mr. Hood was identified by two detectives as being in possession of a backpack that contained the firearm.  ER 8, CR 23 p. 5.  This statement was later refuted by the prosecution in this case.

C.     **Sentencing**

1.     **Advisory PSR**

In the Advisory Presentence Investigation Report, the probation officer determined that under § 2K2.1 of the 2013 Federal Sentencing Guidelines Manual, the base offense level for a violation of 18 U.S.C. § 922(g)(1) was 24.  PSR p. 5.

To the base offense level of 24, the probation officer added 2 levels because the firearm was stolen, bringing the offense level to 26.  U.S.S.G. § 2K2.1(b)(4) (A).  Although Mr. Hood admitted to the probation officer that he was in possession of a firearm for protection, he earlier denied that he had possession of the gun, to law enforcement officers and the government's attorney during the investigation and prosecution of the case.  Further, he failed to plead guilty, which resulted in a burden on the government to prepare for a jury trial.  The probation officer said that a reduction for acceptance responsibility was not applicable.  U.S.S.G. § 3E1.1.  PSR pp. 5-6.

The PSR stated that based on an offense level of 26 and a criminal history category of VI, the Guideline range was 120 to 150 months.[4]  PSR p. 28.  The PSR did note the statutory maximum sentence is 10 years.  PSR p. 28.  The PSR said that there were some circumstances in Mr. Hood's background, including a supportive family, but these circumstances did not overcome his dangerous criminal history which has spanned decades and continued with this case.  PSR pp. 27-28.

The PSR stated that Mr. Hood had a cell phone revealing several gang-related pictures referencing the Bloods gang.  PSR p. 4.

---

[4]    Under U.S.S.G. 5G1.1(c), if the Guideline range is 120-150 months, and the statutory range is 0 to 10 years, the Guideline range is 120 months.

## 2.    Sentencing Hearing

At the sentencing hearing, the defense asked the court to impose a sentence below the recommended Sentencing Guideline range of 120 months, to 60 months or 72 months.  ER II p. 345, CR 78 (RT of Sentencing Hearing, p. 6).  The government opposed this request.

The district court found that Mr. Hood's total offense level was 26, and his criminal history category was VI.  His Guideline range was 120 to 150 months.[5] The court noted the statutory provisions had a range of zero to 10 years.   ER II p. 345, CR 78 (RT of Sentencing Hearing, p. 9).

The court found that Mr. Hood's background was compelling.  He stood up and testified in court against his attackers in 2005, put himself and his family in danger.  The court stated that it is regrettable, but he still was not allowed to carry a firearm.  But under the circumstances, the extreme danger to Mr. Hood and his son from members of the Fresno Bulldog gang was still not a necessity defense, but there are mitigating factors, and Mr. Hood otherwise had not been in the state of California but for fulfilling his requirements under probation.  The court found that with those mitigating factors, a reasonable sentence was 96 months.  ER II pp. 345, CR 78 (RT of Sentencing Hearing pp. 10-11).

The court also imposed 36 months of supervised release with all the

[5]The Guideline range was 120 months.

conditions recommended in the Advisory Presentence Investigation Report.  ER II

p. 345, CR 78 (RT of sentencing hearing pp. 12-13).

## VI.    Summary of the Argument

At sentencing, the district court did not give enough of a reduction under 18

U.S.C. § 3553(a)(1), to Mr. Hood because of the September 27, 2005 incident with

the Fresno Bulldog gang, his testimony at the trial of two of their members, and his

continuing extreme danger from the gang.

## VII.   Argument

### A.    The District Court Committed Procedural Errors in Sentencing Mr. Hood to a Prison Term of 96 Months.

#### 1.    Standard of Review

A district court's sentencing decisions are reviewed for abuse of discretion.

*See Gall v. United States,* 552 U.S. 38, 49 (2007); *United States v. Carty,* 520 F.3d

984, 993 (9th Cir. 2008) (*en banc*).  Sentences are reviewed for reasonableness,

and only a procedural error or substantively unreasonable sentence is set aside.

*Gall*, 552 U.S. at 46; *Rita v. United States*, 551 U.S. 338, 351 (2007).  Procedural

error includes failing to consider the factors set forth in § 3553(a) and failing to

explain a selected sentence.  *See Carty*, 520 F.3d at 993.  In considering the

substantive reasonableness of a sentence, the totality of circumstances is

considered.  *See id.*  Once a sentence is selected, the district court must sufficiently

explain the sentence to permit meaningful appellate review.  *See id*. at 992.

If a district court finds a non-Guidelines sentence appropriate, it must consider the extent of the deviation "and ensure that the justification is sufficiently compelling to support the degree of the variation." *Id.* at 991 (quoting *Gall*, 552 U.S. at 50). The degree of variation is just one consideration. Once a sentence is selected, the district court must sufficiently explain the sentence to permit meaningful appellate review. *Id*. at 992. Due deference is given "to the district court's decision that the § 3553(a) factors, on the whole, justify the extent of the variation." *Id*. at 993 (quoting *Gall*, 552 U.S. at 51); *see also United States v. Shi*, 925 F.3d 709, 732-33 (9th Cir. 2008).

A district court's factual findings in the sentencing phase are reviewed for abuse of discretion. *See Gall*, 552 U.S. 49; *Carty*, 520 F.3d at 993.

### 2. The District Court Erred Procedurally when it Sentenced Mr. Hood to a Prison Term of 96 Months.

The district court sentenced Mr. Hood to 96 months. The court erroneously cited the Guideline range to 120 to 150 months. In fact the bottom and top of the Guideline range was 120 months.

At sentencing the defense requested a sentence of 60 months or 72 months, based on Mr. Hood's September 2005 encounter with members of the Fresno Bulldog gang, his later testimony against them in their trial for attempted murder, his further threats from Bulldog gang members until the time he went to prison on this current case, and his wanting to return to Arizona to have a better life free from

15

Fresno gang activity.

Sometimes a defendant may commit a crime in order to avoid perceived greater harm. In such circumstances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish societies interest in passing the conduct. Sometimes a defendant committed an offense because of serious coercion and duress, under circumstances not amounting to a complete defense.

In applying § 3553(a)(1), the district court should have placed more weight on the history and characteristics of the defendant. The district court made some allowance for the 2005 attack on Mr. Hood and his son, and his subsequent testimony at the trial of two Fresno Bulldog gang members for attempted murder, but not enough. The district court did not place any weight on the subsequent trial for the Bulldog gang members, and Mr. Hood's continued threats by members of the gang. The district court should have sentenced Mr. Hood to no more than 60 months in prison.

The court committed procedural error in citing a Guideline range up to 150 months as the top of the range. The top of the range was 120 months.

16

## VIII.  Conclusion

For the foregoing reasons, Mr. Hood asks that this Court vacate his sentence

and remand the case to district court for new sentencing proceedings.

Dated: July 3, 2014

Respectfully submitted,

*s/ Marc C. Ament*
MARC C. AMENT
Attorney at Law

Attorney for Defendant-Appellant
ALBERT HOOD

## STATEMENT OF RELATED CASES

Counsel is not aware of any related cases pending in this Court within the meaning of Circuit Rule 28-2.6.

Dated: July 3, 2014

Respectfully submitted,

*/s/ Marc C. Ament*
MARC C. AMENT
Attorney for Defendant-Appellant
ALBERT HOOD

18

## CERTIFICATION OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR CASE NO. 14-10092

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)

(7)(B) because this brief contains no more than 3, 902 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type of style

requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a

proportionally spaced typeface 14-point Times New Roman type style.

Dated: July 3, 2014


*/s/ Marc C. Ament* _____
MARC C. AMENT
Attorney for Defendant-Appellant
ALBERT HOOD

## <u>CERTIFICATE OF SERVICE</u>

UNITED STATES OF AMERICA,    )        U.S.C.A. No. 14-10092
    *Plaintiff-Appellee,*    )        U.S.D.C. No. 1:11-cr-00443 AWI
                         )
        v.    )
                         )
ALBERT HOOD    )
    *Defendant-Appellant,*    )
_____ )

I hereby certify that on July 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 3, 2014                    */s/ Marc C. Ament*
                                              Marc C. Ament

**U.S.C.A. NO.  14-10092**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ALBERT HOOD
Defendant-Appellant.


On Appeal From The United States District Court
For The Eastern District of California


Honorable Anthony W. Ishii
United States District Judge


U.S.D.C. No. 1:11-cr-00443 AWI

---

**EXCERPTS OF RECORD**

---

**VOLUME 1 OF 3**
**Bates-Stamped 1 through 61**

MARC C. AMENT
Attorney at Law
1539 E. Starpass Drive
Fresno, CA 93730-3448
(559) 978-4429
Attorney for Defendant-Appellant
ALBERT HOOD

# TABLE OF CONTENTS

|  |  | **Docket No.** | **Page(s)** |
|---|---|---|---|
| 1. | Notice of Appeal | | |
|  | (filed 2/26/14)………………………… | 67 | 1 |
| 2. | Judgment | | |
|  | (filed 2/26/14)........................................... | 69 | 2 |
| 3. | <u>Reporter's Transcripts of Proceedings</u> | | |
|  | Defendant's Motion to Revoke Detention | | |
|  | Order | | |
|  | (held 10/15/13)........................................ | 51 | |
|  | (filed 5/19/14)........................................ | 75 | 8 |
| 4. | Government's Opposition to Defendant's | | |
|  | Motion for Revocation of Detention Order | | |
|  | (filed 10/10/12)........................................... | 23 | 44 |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA AT FRESNO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NOTICE OF APPEAL |
| *Plaintiff,* | ) | |
| vs. | ) | No. 1:11-cr-00443-AWI-1 |
| ALBERT HOOD, | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

Notice is given that ALBERT HOOD appeals to the United States Court of Appeals for the Ninth Circuit from the:

( )    Conviction only (Fed. R. Crim. P. 32(b))
(X)    Conviction and Sentence
( )    Sentence only
( )    Orders (specify

Bail status:  custody.

/s/ *Marc C. Ament*
MARC C. AMENT
Attorney at Law
Dated:  February 20, 2014                    1539 East Starpass Drive
Fresno, CA 93730-3448

Phone number: (559) 978-4429

Name of Court Reporter: Gail Thomas
Transcript required:    (X) YES        ( ) NO
(If transcript is required, complete Transcript Order Form CA9-036; contact court reporter immediately to make arrangements for transcript.)

AO 245B-CAED(Rev. 09/02)Sheet 1 - Judgment in a Criminal Case    Case 1:11-cr-00443-AWI    Document 69    Filed 02/26/14    Page 1 of 6

# UNITED STATES DISTRICT COURT
## Eastern District of California

UNITED STATES OF AMERICA

v.

**ALBERT HOOD**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: **1:11-cr-00443-001**

Defendant's Attorney: Linden Lindahl, Appointed

## THE DEFENDANT:

( )  pleaded guilty to count(s) ___ .
( )  pleaded nolo contendere to count(s) ___ which was accepted by the court.
(✔)  was found guilty on count(s) _1_ after a Jury Verdict

Accordingly, the court has adjudicated that the defendant is guilty of the following offense (s):

| TITLE & SECTION | NATURE OF OFFENSE | OFFENSE ENDED | COUNT |
|---|---|---|---|
| 18 USC § 922(g)(1) | Felon in Possession of a Firearm | 12/4/2011 | 1 |

The defendant is sentenced as provided in pages 2 through _6_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

( )  The defendant has been found not guilty on count(s) ___ and is discharged as to such count(s).
( )  Count (s) ___ dismissed on the motion of the United States.
( )  Indictment is to be dismissed by District Court on motion of the United States.
(✔)  Appeal rights given.        ( )        Appeal rights waived.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

2/18/2014
Date of Imposition of Judgment

/s/ Anthony W. Ishii
**Anthony W. Ishii**, District Judge
Name & Title of Judicial Officer

2/26/2014
Date

AO 245B-CAED (Rev. 09/2011) Judgment in a Criminal Case Sheet 2 — Imprisonment

DEFENDANT: **ALBERT HOOD**
CASE NUMBER: **1:11-cr-00443-001**

ID: 9155101    DktEntry: 5-2    Page: 5 of 64    (30 of 406)

Page 2 of 6

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
___96 months___ .

( )    No TSR: Defendant shall cooperate in the collection of DNA.

(✔)    The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that the defendant be incarcerated in a Arizona facility, but only insofar as this accords with security classification and space availability. The Court recommends the defendant participate in the 500-Hour Bureau of Prisons Substance Abuse Treatment Program.

(✔)    The defendant is remanded to the custody of the United States Marshal.

( )    The defendant shall surrender to the US Marshal for this district

        ( )    at ___ on ___.

        ( )    as notified by the United States Marshal.

( )    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

        ( )    before ___ on ___.

        ( )    as notified by the United States Marshal.

        ( )    as notified by the Probation or Pretrial Services Officer.

    If no such institution has been designated, to the United States Marshal for this district.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

    Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

                           _____
                           United States Marshal

                           _____
                           By Deputy US Marshal

DEFENDANT: **ALBERT HOOD**      Case 1:11-cr-00443-AWI     Document 69     Filed 02/26/14     Page 3 of 6      Page 3 of 6
CASE NUMBER: **1:11-cr-00443-001**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : __36 months__ .

The defendant must report to the probation office in the district to which the defendant is released within seventy-two hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed four (4) drug tests per month.

( )    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse.

(✔)    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

(✔)    The defendant shall cooperate in the collection of DNA as directed by the probation officer.

( )    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.), as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of qualifying offense.

( )    The defendant shall participate in an approved program for domestic violence.

If this judgment imposes a fine or a restitution obligation, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments section.

The defendant must comply with the standard conditions that have been adapted by this court as well as with any additional conditions on the Probation page.

## STANDARD CONDITIONS OF SUPERVISION

1.    The defendant shall not leave the judicial district without permission of the Court or probation officer;
2.    the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3.    the defendant shall answer truthfully all inquiries by the probation officer and follow instructions of the probation officer;
4.    the defendant shall support his or her dependents and meet other family responsibilities;
5.    the defendant shall work regularly at a lawful occupation unless excused by probation officer for schooling, training or other acceptable reasons;
6.    the defendant shall notify the probation officer ten days prior to any change in residence or employment;
7.    the defendant shall refrain from excessive use of alcohol;
8.    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9.    the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10.    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere, and shall permit confiscation of any contraband observed in plain view by the probation officer;
11.    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12.    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court; and
13.    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Case 1:11-cr-00443-AWI   Document 69   Filed 02/26/14   Page 4 of 6
ID: 9155101      DktEntry: 5-2      Page: 7 of 64    (32 of 406)
AO 245B-CAED (Rev. 09/2011) Sheet 3 - Supervised Release

DEFENDANT: **ALBERT HOOD**

CASE NUMBER: **1:11-cr-00443-001**

# SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall submit to the search of his person, property, home, and vehicle by a United States probation officer, or any other authorized person under the immediate and personal supervision of the probation officer, based upon reasonable suspicion, without a search warrant. Failure to submit to a search may be grounds for revocation. The defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

2.  As directed by the probation officer, the defendant shall participate in an outpatient correctional treatment program to obtain assistance for drug or alcohol abuse.

3.  As directed by the probation officer, the defendant shall participate in a program of testing (i.e. breath, urine, sweat patch, etc.) to determine if he has reverted to the use of drugs or alcohol.

4.  As directed by the probation officer, the defendant shall participate in a co-payment plan for treatment or testing and shall make payment directly to the vendor under contract with the United States Probation Office of up to $25 per month.

DEFENDANT: **ALBERT HOOD**          Case 1:11-cr-00443-AWI     Document 69     Filed 02/26/14     Page 5 of 6
CASE NUMBER: **1:11-cr-00443-001**                                                                    Page 5 of 6

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments on Sheet 6.

|  | Assessment | Fine | Restitution $ |
|---|---|---|---|
| TOTALS | $100 | $ | |

( )  The determination of restitution is deferred until ___ . An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination.

( )  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment colunm below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Totals | $____ | $____ | |

( )  Restitution amount ordered pursuant to plea agreement $ ___

( )  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

( )  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

( )  The interest requirement is waived for the     ( ) fine     ( ) restitution

( )  The interest requirement for the     ( ) fine     ( ) restitution is modified as follows:

( )  If incarcerated, payment of the fine is due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

( )  If incarcerated, payment of the restitution is due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B-CAED (Rev. 09/2011) Sheet 6-2 Schedule of Payments

DEFENDANT: **ALBERT HOOD**

CASE NUMBER: **1:11-cr-00443-001**

Page 6 of 6

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A.    (✔)    Lump sum payment of $ __100.00__ due immediately, balance due

         ( )    Not later than ___, or

         ( )    in accordance    ( ) C,    ( ) D,    ( ) E,or    ( ) F below; or

B.    ( )    Payment to begin immediately (may be combined with    ( ) C,    ( ) D,    or ( ) F below); or

C.    ( )    Payment in equal ___ (e.g. weekly, monthly, quarterly) installments of $ ___ over a period of (e.g. months or years), to commence (e.g. 30 or 60 days) after the date of this judgment; or

D.    ( )    Payment in equal ___ (e.g. weekly, monthly, quarterly) installments of $ ___ over a period of ___ (e.g. months or years), to commence ___ (e.g. 30 or 60 days) after release from imprisonment to a term of supervision; or

E.    ( )    Payment during the term of supervised release will commence within ___ (e.g. 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendants ability to pay at that time; or

F.    ( )    Special instructions regarding the payment of crimimal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

( )    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

( )    The defendant shall pay the cost of prosecution.

( )    The defendant shall pay the following court cost(s):

( )    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII, CHIEF JUDGE

UNITED STATES OF AMERICA,    ) 1:11-cr-443 AWI
                             )
          Plaintiff,         ) DEFENDANT'S MOTION TO REVOKE
                             )
     vs.                     ) DETENTION ORDER
                             )
ALBERT HOOD,                 )
                             )
          Defendant.         )
_____)

Fresno, California              Monday, October 15, 2012

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

2

APPEARANCES OF COUNSEL:

For the Government:          **KIM SANCHEZ**
                            Assistant U.S. Attorney
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721

For the Defendant:           **CHARLES LEE**
                            Assistant Federal Defender
                            2300 Tulare Street
                            Suite 330
                            Fresno, California 93721

3

## INDEX

**DEFENDANT'S WITNESSES**:

**BRUCE HOOD**                                                    11
DIRECT EXAMINATION                                               11
BY MR. LEE
CROSS-EXAMINATION                                                15
BY MS. SANCHEZ
REDIRECT EXAMINATION                                             19
BY MR. LEE

4

1   Monday, October 15, 2012                Fresno, California

2                                           2:10 p.m.

3

4       THE CLERK:  Number 16 on the calendar, CR-11-443 AWI,

5   United States versus Albert Hood, defendant's motion to revoke

6   detention order; for status conference.

7       MR. LEE:  Good afternoon.  Charles Lee on behalf of

8   Mr. Hood.  He is present in custody.

9       MS. SANCHEZ:  Good afternoon.  Kim Sanchez

10  representing the United States.

11      THE COURT:  All right, this is the date and time set

12  for defendant's motion for revocation of detention order, and

13  let me go ahead and proceed.  On behalf of defense?

14      MR. LEE:  Yes, thank you, Your Honor.

15      Your Honor, we have submitted obviously our motion.

16  I know the Court's in receipt of it.  And at this time, we

17  submitted two additional exhibits I'd like to get to those at

18  the proper time in the argument.

19      THE COURT:  Sure.

20      MR. LEE:  And, Your Honor, today, I would like to

21  focus just on the danger element.  I have spoken with Miss

22  Sanchez.  The Government is not seeking detention on flight at

23  this time.

24      THE COURT:  Okay.

25      MR. LEE:  And, Your Honor, speaking to the element of

5

1   danger in this case, first, I'd like to turn to Mr. Hood's
2   criminal history.  He has three prior felony convictions.  Two
3   of them are well over a decade old.  They're from 1999, where
4   he concurrently was sentenced on an auto theft as well as a
5   corporal injury to a spouse or cohabitant.  He is no longer
6   with that woman.  It's been a long time since they've had
7   contact, so -- and, again, those are very old cases.
8         He did have the 2010 conviction for assault, which he
9   received a grant of felony probation.  And I'd like to discuss
10  that case in more detail, but I think it's indicative that the
11  Court understand Mr. Hood's background first.
12        And, Your Honor, the key date in Mr. Hood's history
13  is 2005.  In 2005, Mr. Hood was living in East Fresno.  He was
14  married at the time to a Mexican-American woman.  This was
15  Bulldog territory.  That fact led to friction.  Mr. Hood was
16  just harassed and intimidated because of that circumstance.
17        In 2005, Mr. Hood was walking near his home with his
18  son, Albert Jr.  At the time, there were some Bulldog gang
19  members.  They verbally accosted the two and threatened the
20  two.  A short time later, after these Bulldogs had been
21  drinking, there was a fistfight that ensued.  One of the
22  Bulldogs then pulled out a gun and pointed it toward Albert
23  Jr.  Mr. Hood interceded.  He got in between, and he took
24  three bullets to the stomach.  Those bullets remained lodged
25  in him, and, in fact, until very recently, one of the bullets

6

1   made its way out of the system as he was here in the Fresno

2   County Jail.

3          Mr. Hood testified against these two Bulldogs.  They

4   both received life sentences.  They both were charged with

5   attempted murder.  They were gang and hate crime enhancements.

6   Based on that testimony that Mr. Hood did, that triggered a

7   number of things, including continued threats and harassment

8   from Bulldog gang members.

9          I know the Court has the Government's opposition,

10  which denotes a number of law enforcement contacts and a

11  number of contacts that have no corresponding conviction to

12  him.  I know those are concerns to the Court, but I think

13  it's, again, important for the Court to understand Mr. Hood's

14  background to look at that in the proper context.

15         After this conviction occurred, Mr. Hood was accused

16  of sexual assault, and he was acquitted after a jury trial on

17  that case.  During the cross-examination of that trial,

18  testimony was elicited that the alleged victim was both the

19  girlfriend of a Bulldog gang member, as well as the sister of

20  a Bulldog gang member.  Mr. Hood also informs me one of the

21  robbery charges he was initially suspected of was a Bulldog

22  gang member that came into his door and tried to dissuade

23  Mr. Hood from testifying at that trial.  And when Mr. Hood's

24  family got the better of this Bulldog gang member, this

25  Bulldog gang member went to the cops and reported he was

7

1    robbed.  But after investigation, it was, in fact, that

2    Bulldog who was convicted of dissuading a witness and sent to

3    prison.

4         So, again, Your Honor, this 2005 date is important.

5    Since that testimony, Mr. Hood has constantly been under

6    threats from these Bulldogs.

7         I'd like to turn the Court's attention to Exhibit B.

8    That is a letter Mr. Hood has received while here at the

9    Fresno County Jail, which labels him as a snitch, which is

10   another threat to him, that he even now in 2012, seven years

11   after that case, continues to receive these threats.  And,

12   Your Honor, we don't say Mr. Hood is blameless in everything.

13   He does have some convictions, but the number of law

14   enforcement contacts, the number of arrests in this case needs

15   to be viewed in the proper context of what occurred after that

16   2005 case.

17        There is also allegations of gang involvement, and

18   Mr. Hood has not and has never been any part of any gang.  He

19   doesn't have any gang tattoos.  Every time he's booked into

20   the Fresno County Jail, he has never claimed any gang

21   affiliations.  He has never been housed in any gang housing.

22   He does know people who are part of gangs, and I think the

23   Government is going to try to play up his associations.  And I

24   would submit to the Court, someone who lives in his neck of

25   the woods, it's incredibly hard not to know people that are

8

1   somehow affiliated with gangs.

2           Mr. Hood is 48 years old, and in the Government's

3   opposition, they denote he was wearing red when he was

4   arrested.  And, Your Honor, I -- there's a picture on

5   Mr. Hood's wristband.  It shows him in his street clothes when

6   he was arrested.  It shows him in a white T-shirt with a blue

7   jacket.  The only red we can fathom is that this jacket was an

8   NBA jacket, and in the NBA logo, it's red, white, and blue.

9   There's a small patch of red in there, and Mr. Hood informs me

10  that's the only red he was wearing.

11          There's also an issue as to the cell phone.  In the

12  police report which the Government's attached as their as

13  Exhibit A on their motion, they claim Mr. Hood's cell phone

14  had pictures of people making gang poses and gang signs, and,

15  Your Honor, what we would submit to the Court is that police

16  report also notes that Mr. Hood is not the registered owner of

17  that vehicle.  There were two cell phones here.  Mr. Hood's

18  cell phone is a pay-as-you-go type of phone.  It does not have

19  any camera feature.

20          There was a second cell phone in the car.  It was a

21  clamshell-flip type of cell phone.  That's the one that

22  pictures were on.  That is not Mr. Hood's cell phone.  So,

23  again, Your Honor, Mr. Hood has never been a part of any gang.

24  Over the years, the Court's seen the number of charges.  There

25  have never been any gang enhancements.  There have never been

9

1    any gang allegations against Mr. Hood himself.  He denies that

2    this was his cell phone.  Again, he had a separate cell phone,

3    and that these pictures, he has no associations with.  It's

4    not any of his pictures, it's not his phone.

5            And, Your Honor, turning to the Government's section

6    where they are discussing the weight of the evidence as one of

7    the factors the Court should consider, that is correct.  It is

8    the least important factor, but one the Court should consider.

9    On page 5, they discuss that the defendant was identified by

10   two detectives as being in possession of a backpack that

11   contained the firearms.  I don't know where that's coming

12   from.  There was an officer that pulled Mr. Hood over.  There

13   is no backpack that I can see anywhere.  I believe that's just

14   wrong.

15           In any event, what we have submitted to the Court as

16   Exhibit C is a number of pictures that show bullet holes to

17   Mr. Hood's residence.  This case occurred -- Mr. Hood was

18   arrested in December of 2011.  Those bullet holes are from

19   November of 2011.  So his home was shot up a short period of

20   time before he was arrested on this instant case.

21           So, Your Honor, I think the weight of the evidence, I

22   know this is not the proper forum to try the case, but there

23   is evidence to support a necessity defense in Mr. Hood's -- in

24   Mr. Hood's case.  So I don't believe the weight of the

25   evidence is overwhelming or by any means not in contention

10

1    here.

2            Your Honor, under the *United States v. Salerno* case,

3    and that's a Supreme Court case at 481 U.S. 739, what is

4    required is for the Government to show by a clear -- I'm

5    sorry, by clear and convincing evidence that the defendant's

6    future conduct, quote, presents an identifiable and

7    articulable threat toward an individual or the community.  And

8    the *Salerno* case at 751 discusses that, that we need

9    specificity who would be in danger, or what particular

10   community would be in danger.  And part of the Supreme Court's

11   reasoning is defined as statute constitutional, as not be

12   overbroad in either the identification of that, the

13   specificity of the individual or individuals that would be in

14   danger.

15           I would submit to the Court, Your Honor, that

16   Mr. Hood's problems arose in 2005 when he testified against

17   those Bulldog gang members.  He has no firearm offense prior

18   to 2005, and it is his friction with those Bulldogs as they're

19   constantly threatening him and harassing him, which is the

20   only community that Mr. Hood has any specter of dangerousness

21   with.

22           And, Your Honor, under the Bail Reform Act, if the

23   Court finds that Mr. Hood is a danger, then the Bail Reform

24   Act then tells us to use the least restrictive additional

25   conditions that would reasonably assure the safety of the

17

Hood - D

11

1  community.

2           And, Your Honor, I would at this time like to call

3  Pastor Bruce Hood to the stand.

4           THE COURT:  Sure.

5           THE CLERK:  Come right up here, sir.  Raise your

6  right hand.

7                        **BRUCE HOOD**,

8  called as a witness on behalf of the Defendant, having been

9  first duly sworn, testified as follows:

10          THE CLERK:  Take the witness stand right up here.

11  May I have your full name, sir.

12          THE WITNESS:  Bruce Hood, H-O-O-D.

13          MR. LEE:  I'm sorry, did he take the oath?

14          THE CLERK:  Yes.

15          MR. LEE:  Thank you.

16                      DIRECT EXAMINATION

17  BY MR. LEE:

18  **Q.**  Mr. Hood, can you tell us how you're currently employed?

19  **A.**  I'm a -- I pastor a church in West Fresno.

20  **Q.**  And, Pastor Hood, can you tell us about your background.

21  **A.**  Well, I served at the Rescue Mission as a chaplain for

22  about 10 years.  I came out of a life of trouble, but in 1990,

23  I came out of all that troublesome lifestyle and work --

24  served at the Rescue Mission for 10 years, and now I pastor a

25  church and have rehab homes open for men and women going

Hood - D

12

1   through colorful times in life, and I also serve as a Fresno

2   police chaplain in West Fresno.

3   Q.  Can you tell us about the ministry you're at now.  What is

4   it called?

5   A.   Feed My Sheep Ministries.

6   Q.  And you said there was a home.  Can you describe the home

7   for men?

8   A.   Yes.  Actually we just -- we have a home where we have men

9   that have problem lives, and that home is set up and designed

10  to take them through steps of rehabilitation, to discipline

11  their lives, to be productive in the community, and just to do

12  the right things and live right.

13  Q.  And how many -- about how many men are at this program

14  right now?

15  A.  We have probably about -- well, we actually have two homes

16  in West Fresno.  Out of the two homes, we probably have about

17  14, 15 men.

18  Q.  And so the men live at the home?

19  A.  Yes, they do.  All of them are inpatient there.

20  Q.  Is there a constant supervision?

21  A.  24 hours a day.

22  Q.  And can you describe a typical day at the program?

23  A.  Men are usually up at 6:00 in the morning.  They have

24  devotions and chores and breakfast.  We have -- we have two

25  places where we have the men volunteering to keep them active

19

Hood - D

13

1    and doing things.  We're either at our thrift store, and then

2    downtown, we have an office where we make and create and do

3    graphics, T-shirts, and banners, and we teach those men those

4    skills on those type of things.  AA meetings twice a week.  We

5    have citywide AA meetings.  We have on the staff, we have a

6    counselor, certified counselor, that counsels with the men

7    once, twice, however many times a week that's needed.

8    Q.  Okay.  And so you just discussed a little bit about there

9    is an alcohol and drug component, a rehabilitative counseling

10   and testing?

11   A.  Yes, it is.  We do drug tests randomly, and all the men,

12   you know -- what it is, I'm there hands-on with the men.  I'm

13   full time in the community.  We serve the community over

14   there.  We have big food distributions, and there's a lot of

15   things that we just do for the community.  So all the men are

16   involved in those kind of activities.  And so I'm hands-on

17   with the men 24 hours -- you know, all day, just about every

18   day.

19            And I've been in that field of drug and alcohol.

20   Serving at the Rescue Mission for 10 years as a chaplain, I

21   was over the men there, with about 91 men on the program.  And

22   so I learned a lot about what I'm doing there at the Fresno

23   Rescue Mission, and now I'm able to be there in West Fresno,

24   and, you know, I can generally tell when the men are doing

25   something, or it's something different about their character

Hood - D

14

1    or their life, and that's when we ask for a drug test.

2    Q.  You've mentioned there was a thrift store as well as a

3    printing shop.  If the men go there, they're also supervised

4    there as well?

5    A.  Yes, they are.

6    Q.  And so wherever they go as part of the program, they are

7    monitored?

8    A.  Always supervised and monitored.

9    Q.  And everyone is subject to random drug testing?

10   A.  Yes.

11   Q.  And does everyone get drug or alcohol counseling as well?

12   A.  Yes, they do, uh-huh.  We go through the -- we actually go

13   through all the treatment steps of drug and alcohol for

14   treatment of that problem.

15   Q.  And let's talk about gangs.  I mean, gangs are part of the

16   community; correct?

17   A.  Yes, they are.

18   Q.  And you interact with gang members at sometimes?

19   A.  Yes.  At times in life, you know, they're there.  They're

20   out there.

21   Q.  Do gang members ever give problems to your program?

22   A.  Never had no problem at all with not one gang member.

23   Q.  Are there any gang members in your program?

24   A.  Not that I know of.  We screen the men very closely as

25   they're coming in because those are the things that we're

Hood - X

15

1  concerned about, gang members coming in and, you know, and
2  that can create a lot more problems.  So we really, really
3  screen the men as they're coming in.
4  Q.  So you're very conscious of it, and you want to prevent
5  any problems from occurring?
6  A.  Yes, I am.  Uh-huh.
7  Q.  Is there any problem with having a person in your program
8  being electronically monitored at the same time?
9  A.  Not at all.
10  Q.  And how long is the -- does the program run?
11  A.  We have a one-year program, and it can go longer if
12  needed.  We have men there that's graduated the program.
13  They've been there with us for three years.
14  Q.  And three years actually living at the program?
15  A.  Living there at the program, uh-huh.  They just decide to
16  stay, you know, and so we let them stay.
17  Q.  So the program can be extended as needed?
18  A.  Sure it can.
19        MR. LEE:  Thank you.  Nothing further at this time.
20        THE COURT:  Cross-examination?
21                  CROSS-EXAMINATION
22  BY MS. SANCHEZ:
23  Q.  Good afternoon, Pastor Hood.
24  A.  Uh-huh.
25  Q.  Can you tell the Court what kind of security there is at

Hood - X

16

1   the program that you run?

2   A.   Well, we have -- each home, there is two house managers

3   that -- that are on duty.  When one is off, another one comes

4   on.  And those house managers are up in the middle of the

5   night, doing bed checks and things like that during the night.

6   During the day, all the men are up, and they're all assigned

7   to certain workplaces.  And at those workplaces, there is

8   generally a supervisor that's paying attention to them

9   throughout the day.

10  Q.   When you say generally supervised, what do you mean?

11  A.   Well, just -- they're there -- the places where the men

12  are at are all work locations.  And so all the men have a job

13  responsibility.  And so on those job responsibilities, there

14  is automatically supervision that comes with that to make sure

15  the things that need to be getting done are done.

16  Q.   Okay.  And when members of the program come and go, do

17  they sign in or sign out?

18  A.   Yes.  Whenever the men have, like, a doctor's

19  appointments, we -- court, probation, we always -- we keep

20  real close contact with probation and court and all those

21  things like that.  When the men got to go to appointments like

22  that, there is a signing-in-and-signing-out process.

23  Q.   And you're Albert Hood's uncle; is that correct?

24  A.   I'm Albert Hood's uncle.

25  Q.   So are you familiar with the problems that he's had with

17

1   the Bulldogs?

2   **A.**   Yes, I am.

3   **Q.**   Are you also familiar with the issues that he's had

4   historically over, say, the last 20 years with domestic

5   disputes with various girlfriends that he's had?

6   **A.**   Yes.  I'm very familiar with Albert's whole life.

7   **Q.**   And understanding that your nephew's defense attorney has

8   presented arguments to the Court or evidence showing why your

9   nephew would need a gun, how could you change that through

10  your program?  How could you change his need for --

11  **A.**   I really can't answer that because I really don't know how

12  we can change that other than just be a good example for

13  Albert and keep him in a place where people are doing the

14  right things.  And through counseling, hopefully, we can get

15  Albert to understand some kind of way, he's just got to stop

16  picking up guns.  There's another way he's going to have to

17  get protection for his life.  I really don't know -- I don't

18  have the answer.  The only thing I can do is just lead him and

19  guide him.

20  **Q.**   I appreciate your candor.

21         How -- are there facets of your program that would

22  assist in controlling what appears to be this history of

23  domestic disputes that Albert has, or confrontations with a

24  variety of people including significant others and just other

25  people in the neighborhood?

Hood - X

18

1   A.   You know, the way we operate, if we can't control the men

2   there, then we have to call the police.  And we don't -- we

3   don't never hesitate at all.  And even with Albert, Albert

4   knows if he was granted the right to come, it ain't going to

5   be no different with him.  He's going to have to pull his own

6   rope.  He's going to have to do what's right, or else we'll

7   call on him just like anyone else.

8   Q.   Have you tried to help Albert in the past?

9   A.   I've often spoke with Albert, yes.  Always, you know,

10  family, you know, we always try to help our family members.

11  And I spoke with Albert, and Albert, many times, he laid his

12  head down and just sit there and just kind of cried and

13  thought about it, and he's -- he's put forth some kind of

14  effort for me to understand that he really does want help.  I

15  think he does.  But it's just getting to that place where he

16  receives help.

17  Q.   Has he ever tried your program before?

18  A.   He's -- he's came around the program, but not actually

19  came in and submitted himself.  He's been around me, you know,

20  at times, different times.

21  Q.   Has he ever lived in your program?  Has he ever stayed

22  overnight there?

23  A.   I think he did once or twice, yeah.

24  Q.   And could you identify what caused him not to stick with

25  it?

19

1   A.  You know, I really can't answer that question.  He's been

2   there -- he's been around me.  He just -- he's never made a

3   commitment to actually -- to come in.  But he has been around

4   me somewhat as we -- as I go throughout different things I go

5   through.  He's come often, and he's helped me with when we

6   distribute out food to the community, and things like that at

7   the church, and he's come around to rehab homes and around all

8   of our operation.  He's been around us.

9   Q.  And over what period of time on and off has he been around

10  to help?

11  A.  It's been sometime ago.  I can't really pinpoint.

12  Q.  Did he begin before he had gotten shot or after?

13  A.  I think it was after.

14       MS. SANCHEZ:  Okay, I don't have any other questions.

15  Thank you, Pastor Hood.

16       THE COURT:  Redirect?

17                    REDIRECT EXAMINATION

18  BY MR. LEE:

19  Q.  Pastor Hood, if Albert was released to your program, could

20  you envision any scenario where he would come into contact

21  with any Bulldog gang members?

22  A.  We -- we never had any problem at all with Bulldog gang

23  members or even other gang members.  They just -- they don't

24  come around.  I wouldn't see no reason at all why Albert would

25  be in contact with them.

26

20

1   **Q.** Okay. And, again, how long have you had the Feed My Sheep
2   Ministries?

3   **A.** We've been in operation now for about eight years.

4   **Q.** Over those eight years none of the gangs in that community
5   have given you any problem?

6   **A.** None at all.

7   **Q.** Also if he was released to your program, he would be at a
8   home just comprised of men; correct?

9   **A.** Just comprised of men, yes, sir.

10         MR. LEE: Thank you. Nothing further at this time.

11         THE COURT: Anything further?

12         MS. SANCHEZ: No further questions, Your Honor.

13         THE COURT: All right, thank you. You can step down.
14   Thank you.

15         MR. LEE: Your Honor, Mr. Hood has come to some
16   realizations in his life. He's 48 years old now. For quite
17   some period of time, he was purchasing this home in East
18   Fresno, which just led to all sorts of problems in his life,
19   that physical location. He was being stubborn, he was buying
20   it. He wanted that home. But he has come to the realization
21   that it's not worth it, that a home is replaceable, that
22   family members are not.

23         And what's significant, Your Honor, in the 2010 case,
24   that was an assault charge. The facts of that case are in
25   dispute. Judge Nunez was a state court judge, who offered him

21

1    a grant of felony probation at the time with the understanding

2    that he would leave the state, he would leave the area, I

3    think, that he leave.  And that was best for all parties.  So

4    he was given that probation.  He left.  He went to Arizona.

5    By all accounts, he was doing well there.  He was staying out

6    of trouble.  He got a job at a car part warehouse, and he was

7    doing well.

8         The employer actually wanted to give him additional

9    responsibilities.  The problem was, Mr. Hood's license in

10   California, there was a number of tickets that he had to clear

11   up to get his license.  So when he came back to Fresno, he

12   checked in with probation, as Judge Nunez told him to do.

13   Probation, upon looking at his history, figured out that Judge

14   Nunez had allowed Mr. Hood to leave the state without going

15   through the Interstate Compact, it wasn't done properly, and

16   ordered Mr. Hood to stay.  So he -- so he followed probation's

17   orders, and he stayed, and that's when his shot -- his house

18   was shot up again.

19        Your Honor, present in court is also Linden Lindoll

20   who is Mr. Hood's state attorney.  If the Court has any

21   details of that, Mr. Lindoll was with Mr. Hood through all

22   stages including that visit with probation, where probation

23   told Mr. Hood you must come back to Fresno.  The Interstate

24   Compact wasn't followed, and you need to remain here until you

25   have permission to leave.

22

1          So, Your Honor, Mr. Hood's been making efforts to do

2     better, to remove himself from this -- this terrible

3     situation.  He finds himself here in Fresno.  And I would

4     point -- I would point to -- the Court to *United States v. Hir*

5     case.  We cited that in our papers.  It's the Ninth Circuit

6     case from 2008 at 517 F.3d 1081.  There the Ninth Circuit

7     states that, "Undoubtedly, the safety of the community can be

8     reasonably assured without being absolutely guaranteed. . . .

9     Requiring that release conditions guarantee the community's

10    safety would fly in the teeth of Congress' clear intent that

11    only a limited number of defendants be subject to pretrial

12    detention."

13          Well, we submit to the Court that Mr. Hood is not one

14    of those people that Congress -- one of those limited number

15    of defendants that Congress envisioned because there are

16    conditions which would reasonably assure the safety of the

17    community.

18          Pastor Hood just testified that at his ministry,

19    Mr. Hood would be under 24-hours-a-day surveillance.  One of

20    the proposed conditions would be electronic monitoring, so

21    Pretrial would be aware instantly if he left the program for

22    any reason without permission.

23          Pastor Hood also discussed that over the eight years,

24    none of the neighborhood gangs have given his ministry a

25    problem.  Mr. Hood would not have contact with any gang

29

23

1  members, and that, Your Honor, I'd submit is the persons or
2  community that -- the specific community that Mr. Hood has
3  issues with.  So if we segregate him from that community, if
4  we prevent contact from the community, that would be a
5  condition which would reasonably assure the safety of the
6  community.  And we ask the Court to release Mr. Hood on such
7  conditions.
8          THE COURT:  All right.  Government.
9          MS. SANCHEZ:  First, I apologize to the Court.
10  Mr. Lee is correct, that on page 5, the second paragraph of
11  when the evidence should not be in there, and I just move to
12  strike that.
13          There are a number of issues that cause -- there are
14  a number of issues that make it impossible to impose
15  conditions that would assure the safety of the community,
16  reasonably assure the safety of the community.  The issues in
17  this case aren't with gang contact alone, although I -- the
18  Government concedes that the defense has presented evidence
19  that as a result of the defendant's testimony in the state
20  case, that has caused him issues.  But as indicated in the
21  Government 's response, the defendant has a lengthy history of
22  arrests as well as convictions, both misdemeanor and felony,
23  that relate to assaults of behavior, even before, predating
24  the 2005 shooting that the defendant suffered.  And in going
25  through those, they don't only relate to conflicts with gang

24

1    members.

2         In the Government's responding papers, I attached an

3    exhibit of a police report from the defendant's last

4    conviction from 2010, and there is no indication in that

5    police report that that assault had anything to do with gang

6    affiliation of the victims.  The victims were Hispanic, but

7    there is no indication in that report that they were gang

8    members.

9         There obviously was some confrontation between the

10   defendant and the victim or at least one of the parties who

11   were with the victim in that case that resulted in the

12   defendant assaulting the victim, to which the defendant

13   pleaded guilty, and at the same time, admitted that he also

14   had a sawed-off shotgun that police officers seized from his

15   residence.

16        Again, while there's been inference in evidence

17   presented that the defendant has to possess a firearm to

18   combat the constant threat of retaliation by Bulldog gang

19   members, that's simply not sufficient, and it doesn't protect

20   the community while it may protect the defendant from what may

21   happen when he uses the firearm.  And the fact of the matter

22   is that he still is prohibited from possessing the firearm,

23   and he does so despite the fact that he knows he's not to

24   possess a firearm and despite the fact that he has suffered

25   prosecution for having a firearm.

25

1          I had requested that the police department print all

2     of the reports relating to this defendant that they had from

3     the beginning of time that hadn't either been destroyed or

4     couldn't be found, and some of those reports relate to the

5     arrests and the convictions that the defendant has suffered.

6     But even just sitting here, waiting for this case to be heard,

7     I came across multiple reports that didn't result in

8     convictions or arrests, but were law enforcement contacts that

9     suggest a stronger, more significant issue with the defendant

10    than simply drug use or having contact with gang members.  For

11    example, there was a report from 2004 where the police

12    responded because an individual had been assaulted.  They

13    spoke with the defendant.  The defendant said that he had

14    given $40 to the victim's son to buy him drugs, he said,

15    because he was a drug user.

16          He said the victim in that case had wielded some type

17    of bat or a stick as the defendant was walking away, so the

18    defendant turned around, attacked the victim, struck him in

19    the face several times, knocked him to the ground, and then

20    kicked him one or two times before the defendant left.  The

21    defendant said that he thought that it was excessive to

22    continue to kick the victim when he was down, but he didn't

23    care about the criminal law because he was subject to the

24    quote, N-I-G-G-A law.

25          There are also multiple reports, both related to

26

1   arrests and to convictions, where the defendant engages in
2   assaultive behavior regarding domestic violence incidents, and
3   it seems a clear pattern that the defendant cannot control his
4   temper that causes him to be assaultive towards other people.
5   That is not related in any way to the gang contact problem.
6          The defendant also has a serious drug abuse problem,
7   that when he was arrested, and it was indicated in the
8   Pretrial Services report in December of 2011, he admitted to
9   daily drug use, being addicted to crack cocaine.  He also has
10  had multiple violations of supervision, be it probation or
11  parole.  So the defendant has shown that he fails to comply
12  with court orders.
13         In addition to being arrested, while under some sort
14  of supervision or having charges pending -- and while I have a
15  great deal of respect for Pastor Hood's ministry and his
16  program, I don't believe that that's adequate or sufficient to
17  protect the community because electronic monitoring -- and
18  even if there was 24-hour supervision, that's not going to
19  address the assaultive behavior that this defendant has a
20  history of.  Electronic monitoring is not going to stop him
21  from doing that, and given that the history -- the defendant
22  has such a lengthy history, as is the case in this case, I
23  don't believe that the program can address that adequately or
24  reasonably assure the safety of the community or any other
25  person.  And the defendant apparently has had the opportunity

27

1    to engage in that ministry before and that program before, and

2    he's not embraced that.

3         While he may -- he may have the best intentions at

4    this point in time, I believe that it's an unjustifiable risk

5    to release him to that program, and the Government would

6    request that the Court keep him detained.

7         THE COURT:  All right.  Okay, and do we have any

8    information from the Pretrial Services?

9         MR. LEE:  Your Honor, it's Miss Serrano's case.  I

10   don't see her present.

11        MS. SANCHEZ:  And I know that court is ongoing

12   downstairs in Judge McAuliffe's, so I'm not sure if she's down

13   there.

14        THE COURT:  Okay, because I don't have a copy of the

15   Pretrial Services report and recommendation that was presented

16   initially.

17        MS. SANCHEZ:  I don't have a copy of it, Your Honor.

18   I'm sorry.

19        THE COURT:  No, I wouldn't expect either side to have

20   a copy.  See if we can get --

21        (Pause in the proceedings.)

22        THE COURT:  Okay, well, let me pass this for a

23   moment, then.  We've got an e-mail message to Pretrial

24   Services office, to see if she can come up here and give me a

25   copy of whatever their report was initially.  So let me just

28

1    pass it for the moment, Your Honor.

2            MS. SANCHEZ:  Thank you, Your Honor.

3            (Recess.)

4            THE CLERK:  Number 16 on the calendar, CR-11-443 AWI,

5    United States versus Albert Hood for the hearing of

6    defendant's motion to revoke detention order.

7            THE COURT:  All right.  And then back on the record

8    on this matter.  I have received the original Pretrial

9    Services report.  That was dated August the 21st, and also the

10   supplemental report, which was prepared August 22nd.  I have

11   reviewed both of those documents.

12           All right, anything further on behalf of defense,

13   then?

14           MR. LEE:  Your Honor, if I could respond to a few of

15   these items.  Miss Sanchez discussed the facts of a 2007 case

16   with the Court.  I think it's notable that he was never

17   charged with that case.  There was never even a charge filed.

18   Mr. Hood disputes the fact that this was a drug-related

19   offense.  He says that he was first assaulted.  In any event,

20   it did not result in any type of conviction.

21           Your Honor, I would also like to respond to a few of

22   the items Miss Sanchez brought up.  She placed a certain

23   specter of -- that Mr. Hood has committed domestic violence in

24   the past.  His last conviction for that was 1999.  He has

25   since had anger management batter's treatment counseling, and

29

1  since that last 1999 conviction has not had any of those type

2  of arrests or convictions.

3          And Miss Sanchez, again, talked about this lengthy

4  history of arrests and convictions, but if we look at his

5  actual record, there is only three felonies, with two

6  occurring concurrently in 1999.  Since that time period, he's

7  only had the 2010 felony, that assault case.

8          What's significant about that case, Miss Sanchez told

9  the Court there was no Bulldog gang members involved.  We

10  dispute that.  The facts of that conviction are in dispute.

11  What actually happened -- what's not in dispute, what the

12  victims report in that case, what Mr. Hood tells us is those

13  Hispanic persons used racial epithets.  And I submit to the

14  Court, if they in fact -- they reported to the police, they

15  told them, "Hey, we used these racial slurs."  That's not a

16  situation where someone discloses that they're also a gang

17  member when they're going to the police for help.

18          In any event, Your Honor, I know the prosecutor has

19  argued the facts of this case, that there was allegedly

20  somebody that was called out that had a gun, and that

21  Mr. Hood, then, used this gun to pistol-whip someone.  I don't

22  think that is supported by the evidence, and, in fact,

23  specifically Mr. Hood was charged with assault with a firearm.

24  When he pled, that charge was amended to not include the

25  firearm.

36

30

1          There was also, I believe, some misunderstanding

2     about the section concerning Mr. Hood's drug use in the

3     Pretrial Services report where Mr. Hood tells me he informed

4     them he had prior use, not daily use, as reflected in the

5     report.  I think it's also significant Mr. Hood has no

6     drug-related convictions.  But additionally, Your Honor, that

7     there is a sufficient condition, and that is part of what the

8     ministry does.  You heard from Pastor Hood, that there is

9     mandatory random drug testing as well as drug treatment.

10          So, again, Your Honor, we need the specific persons

11    or community which would be at risk of danger from Mr. Hood,

12    and that specificity, we have shown that there are conditions

13    that can ameliorate that.  That this program, Pastor Hood has

14    been running this ministry for eight years, that gangs in this

15    part of town do not come to this program, do not hassle them,

16    that Mr. Hood would not have contact with the Bulldog gang

17    members that he has had issues with and continues to have

18    issues with today because of this incident in 2005, and that

19    this condition would be sufficient to reasonably assure the

20    safety of the community.  We ask the Court to impose such

21    condition.

22          THE COURT:  All right, anything else on behalf of the

23    Government, then?

24          MS. SANCHEZ:  Your Honor, just a few points of

25    clarification.

37

31

1          Even in the report from the defendant's conviction

2     from the ADW or assault with a deadly weapon, the defendant

3     statement acknowledges that he couldn't leave it alone.  And

4     when he was walking away, he saw a bottle on the road, and he

5     turned around and went back.  The Hispanic males, who even the

6     defendant didn't report at that time to the police, were

7     Bulldogs, said, "I knew you couldn't leave it alone," and he

8     said, "No, I can't, Homey."

9          So regardless of whether they were Bulldogs, or they

10    were Hispanic males that had -- this was racially motivated or

11    not, the defendant has a problem with controlling his temper.

12    And there is a broader category of individuals, the people in

13    the community at large who come in contact with the defendant,

14    who may be in the area when he can't control his temper that

15    are at risk by releasing the defendant at this point in time.

16    I didn't mean to suggest, and I don't think that I did, that

17    the defendant had enrolled in his uncle's program previously,

18    but he has had the opportunity to be around that program.  He

19    could have enrolled if he wanted to.  He chose not to.

20          And he does have this lengthy history.  I didn't

21    propose that the 2007 case I cited was a case for which the

22    defendant was arrested.  It was another example of a report

23    that was taken by the police, a law enforcement contact that

24    was a report of this defendant engaging in combative

25    assaultive behavior beyond his arrests and his convictions.

38

32

1          So I think that the best predictor of what this
2   defendant is going to do is his pattern of past behaviors
3   because there is nothing to suggest that anything at this
4   point in time has changed that would change his behavior and
5   ensure the safety of the community.
6          And I ask that the Court follow the recommendation of
7   Pretrial Services.  Thank you.
8          MR. LEE:  Your Honor, if I could just briefly respond
9   to that.  I dispute that contention that there is nothing that
10  shows Mr. Hood's conduct has changed.  He did move.  He did
11  realize he was in a bad situation.  As long as he was in east
12  side Fresno, around these Bulldog gang members after he
13  testified against them, there was going to be a problem.  So
14  he made that effort.  He moved to Arizona.  He got himself out
15  of that situation.  He made the efforts to change his life.
16         And, again, as we told the Court, he stubbornly held
17  onto this property he was buying for quite some period of
18  time, but he realized it's just not worth it.  That property
19  can be replaced, that family members and other things cannot.
20  So he made this effort, Your Honor.  And, again, this program
21  would segregate him from the people that he's had problems
22  with, and so, therefore, it's a condition which would
23  reasonably assure the safety of the community.
24         THE COURT:  All right.  Okay, in this case, I have
25  received and reviewed the papers filed by the parties in this

33

1  case.  I did review the bail memorandum and the supplemental
2  bail memorandum.
3          With respect to the various factors regarding the
4  clear and convincing evidence that defendant does pose a
5  danger to the community, as far as the nature and circumstance
6  of the crime, clearly after -- and I will -- I'm not going to
7  go into any great detail regarding Mr. Hood's past history.
8  That's pretty well been covered by both sides, and I clearly
9  have taken all of that into consideration.
10          But it is a concern that after all of that history,
11 that he is now charged with essentially a weapons violation,
12 and the allegation is that being confronted by law
13 enforcement, that he ran and threw a gun or firearm in the
14 process, and it turns out that the firearm was stolen.  And it
15 does appear at least -- for the purposes of the hearing, that
16 the weight of the evidence is very strong in this case.  It is
17 a possession charge.
18          And the other factor, of course, which both sides,
19 again, have discussed in detail, and is obviously a dispute as
20 to how to interpret that criminal history, but in this case, I
21 do find that it does have the prior convictions.
22          There are two, of course, as defense counsel has
23 indicated, are relatively old, relative that they were year
24 2000 convictions.  There was a 2010 conviction, which is
25 relatively recent.  And regardless of the underlying facts,

34

1   again, there was an issue regarding a firearm there.  And,
2   again, without going into detail, again, the prior
3   convictions, the previous violations, the numerous contacts --
4   and, again, I'll discount or disregard the 2007 recitation, so
5   that that doesn't impact the Court's decision.

6           The indications are that Mr. Hood suffered parole or
7   probation violations, 2003, 2004, 2005, 2011, 2012.  And so
8   it's clear, based upon the prior history, that Mr. Hood
9   unfortunately still, because of temperament and issues
10  regarding the firearms, is a danger to the community.

11          I want to commend Pastor Hood and his program and for
12  he and others, people supporting Mr. Hood for being here
13  today.  Hopefully, eventually that will be a positive.
14  Hopefully, regardless of the outcome of this case, Mr. Hood
15  will take advantage of either the Feed My Sheep Ministries or
16  some other program, which will help to continue to address
17  issues regarding temperament and weapons matters.

18          This is not a factor in terms of my custody decision,
19  but I do have to respond to defense's contention that the
20  program takes him out of harm's way.  If the Exhibit B, which
21  was presented to the Court reflects some evidence or
22  indication that Mr. Hood is a target, and I sincerely regret
23  he is a target, having in the past done his duty of actually
24  testifying against individuals, that I'm afraid that even in
25  the ministries program, that they would come and find him if

35

1  there are still ongoing threats to his safety, and that's a

2  real tragedy and a real shame.  But it's not a factor in terms

3  of whether or not Mr. Hood himself constitutes a danger to the

4  community.

5          But in this case, I have reviewed all the information

6  that was presented to me by both sides, the exhibits that were

7  presented today and the two reports from Pretrial Services,

8  and I do have to conclude in this case that under all the

9  circumstances, there is clear and convincing evidence here

10  that Mr. Hood still possesses a -- poses a danger to the

11  community.  Therefore, the request to revoke the detention

12  order is denied.

13          Okay, is there another court date that's already been

14  set in terms of a status hearing?

15          MR. LEE:  I believe we need to set that, Your Honor.

16  And just for clarification, the Court is detaining him just as

17  a danger.

18          THE COURT:  Correct.

19          MR. LEE:  Very good.  Perhaps we could set a status.

20  I know Miss Sanchez and I haven't had a chance to do any plea

21  negotiations.  We are still in the middle of some

22  investigation.  Perhaps you can set us back in magistrate

23  court, Judge Oberto.

24          THE CLERK:  Magistrate Beck's court.

25          MR. LEE:  Oh, I'm sorry.  Is that the first week or

36

1    second week?

2              THE COURT:  Let's see, his next court dates --

3              MR. LEE:  I'd actually like to go into December, just

4    the first available December date.

5              THE COURT:  That would be December 10th.

6              MR. LEE:  Okay, could that be at 1:00?

7              THE COURT:  Yes.  All right, we'll continue the

8    status conference to Monday, December 10th, at 1:00 in the

9    afternoon before Magistrate Judge Beck.  I will exclude time

10   through and including December 10th to allow time for

11   continued pretrial investigation, trial preparation in the

12   matter.  All right.

13             MS. SANCHEZ:  Thank you, Your Honor.  I would note

14   that the Government was unaware that the defendant had

15   received this note.  I will speak with Mr. Lee and address

16   security concerns with the marshals.

17             THE COURT:  Okay.

18             MR. LEE:  Thank you.

19             (Court was adjourned at 3:46 PM.)

20

21

22

23        I, Gail Lacy Thomas, Official Court Reporter, certify
     that the foregoing transcript is true and correct.

24

     Dated:  10/18/2012              /s/ Gail Lacy Thomas
25                                   GAIL LACY THOMAS, RMR-CRR

BENJAMIN B. WAGNER
United States Attorney
KIMBERLY A. SANCHEZ
Assistant U.S. Attorney
4401 Federal Building
2500 Tulare Street
Fresno, California 93721
Telephone: (559) 497-4000

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 01: 11-CR-00443 AWI-DLB |
| Plaintiff, | GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER |
| v. | |
| ALBERT HOOD, | Date: October 15, 2012 Time: 10:00 a.m. Courtroom Two Honorable Anthony W. Ishii |
| Defendant. | |

TO:  THIS HONORABLE COURT, DEFENDANT AND HIS ATTORNEY OF RECORD

The United States of America, by and through Benjamin B. Wagner, United States Attorney, and Kimberly A. Sanchez, Assistant United States Attorney, files its opposition to defendant's motion to revoke detention order.

**STATEMENT OF FACTS**

On December 22, 2011 a grand jury returned an indictment charging the defendant with being a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1).  On August 22, 2012, after a hearing, the Honorable Sheila K. Oberto issued an order detaining the defendant as a danger to the community.  The defendant has filed a motion to

1

44

1  revoke the detention order.  The government now responds.

2      1.   **<u>Offense Conduct</u>**:

3      On December 4, 2011, Fresno Police Officer Kenneth Webb was

4  on duty in the area of Grant Avenue and Fresno Street, Fresno,

5  California.[1]  He observed a vehicle commit a violation of section

6  21804(a) of the California Vehicle Code, failure to yield.

7  Officer Webb saw the vehicle stop in front of a house at 2014 E.

8  White Avenue, and initiated a stop by turning on his overhead red

9  and blue lights on his police car.  The defendant, who was the

10 driver, got out, looked back at Officer Webb, and Officer Webb

11 yelled for the defendant to get back into the car.  Instead, the

12 defendant ran.  While running, Officer Webb saw a dark object fall

13 to the ground and hit the ground as the defendant ran.  Sgt.

14 Alvarez responded to assist Officer Webb.  Sgt. Alvarez was

15 walking to the back yard of the residence where Officer Webb

16 arrested the defendant, and found a firearm on the ground in the

17 front yard.  Officer Webb observed the firearm, which he knew to

18 be the dark object he had previously seen fall to the ground from

19 the defendant as he ran.  The firearm was a loaded Ruger .44

20 caliber revolver which had previously been reported stolen.

21 Officer Webb contacted the owner of the firearm, who said that he

22 did not know the defendant nor did the defendant have permission

23 to possess the firearm.

24     Officer Webb also searched the defendant's phone which the

25 defendant had in his possession at the time of his arrest.  He

26

27     [1] The facts set forth underlying the instant offense are
28 taken from Government's Exhibit A, the report of Officer Kenneth
   Webb.

1  observed several gang related photographs referencing the Blood

2  gang.  One of the photographs was of two hands using fingers to

3  spell out "blood" with the words "CRAB KILLER," "BLOOD LOVE," and

4  "BLOOD" on the picture.  Another picture titled "Bloodgang" was of

5  a cartoon character wearing the color red.  The defendant was also

6  wearing red.  Officer Webb knew based upon his training and

7  experience that red is the primary color used to reference the

8  Blood gang.

9       Post-Miranda, the defendant told Officer Webb that he ran

10 from the police because he had a suspended drivers license.  He

11 denied possessing the firearm.

12      3.   The defendant has the following prior felony

13 convictions:

14      2000 Fresno County Superior Court conviction for California
            Vehicle Code § 10851(a) – Take Vehicle Without
15          Consent/Vehicle Theft

16      2000 Fresno County Superior Court conviction for California
            Penal Code § 273.5 – Infliction of Corporal Injury on
17          Spouse/Cohabitant; and

18      2010 Fresno County Superior Court conviction for California
            Penal Code §§ 245(a)(1) and 12021(a)(1) – Force/Assault
19          With a Deadly Weapon Not a Firearm: Great Bodily Injury
            Likely – With Prior, and Felon in Possession of a
20          Firearm

21

22 See Exhibit B (copies of certified court documents of the

23 convictions).

24                           **ARGUMENT**

25      **A.   Bail Reform Act.**

26      The detention and release of a defendant is governed by the

27 Bail Reform Act of 1984, 18 U.S.C. § 3141, et seq.  In order to

28 request that a defendant be detained, the government must meet the

                              3

1  requirements of the Section 3142(f)(1) and (2).

2       The government bears the burden of proving by clear and

3  convincing evidence that the defendant poses a danger to the

4  community, <u>United States v. Gebro</u>, 948 F.2d 1118, 1121 (9th Cir.

5  1991).  Section 3142(g) of Title 18 governs the factors which the

6  court must consider in determining issues regarding

7  release/detention.  The section states:

8       The judicial officer shall, in determining whether these
        are conditions of release that will reasonably assure
9       the appearance of the person as required and the safety
        of the community, take into account the available
10      information concerning-
        (1)  the nature and circumstances of the offense
11           charged, including whether the offense is a
             crime of violence or involves a narcotic drug;
12      (2)  the weight of the evidence against the person;
        (3)  the history and characteristics of the person,
13           including-
             (A)  the person's character, physical and
14                mental condition, family ties,
                  employment, financial resources,
15                length of residence in the
                  community, community ties, past
16                conduct, history relating to drug or
                  alcohol abuse, criminal history, and
17                record concerning appearance at
                  court proceedings; and
18           (B)  whether, at the time of the current
                  offense or arrest, the person was on
19                probation, on parole, or on other
                  release pending trial, sentencing,
20                appeal, or completion of sentence
                  for an offense under Federal, State,
21                or local law,
        (4)  the nature and seriousness of the danger to
22           any person or the community that would be
             posed by the person's release. . . .
23
        **1.   The Nature and Circumstances of the Crime and
24           Seriousness**

25      As previously noted, the defendant is charged with being a

26  felon in possession of a firearm in violation of 18 U.S.C.

27  §922(g)(1).  The maximum penalty for this offense is ten years

28  imprisonment.  The defendant ran from police and threw a gun in

                                 4

the process.  He was on probation at the time of the offense.  The
firearm was stolen.

    **2.  Weight of the Evidence.**

    Here, the weight of the evidence against this defendant is
strong.  While the government recognizes that the Ninth Circuit
has held that this factor should be given the least amount of
weight,[2] it is, nevertheless, a factor which this court cannot
ignore.

    The defendant was identified by two detectives as being in
possession of a backpack that contained the firearm.  Moreover,
the defendant admitted that he had previously handled the firearm.
The defendant has prior felony convictions.  Thus, the weight of
the evidence is extremely strong.  This factor is probative under
Section 3142(g)(2) and is a factor which favors the defendant's
detention.

    **3.  Defendant's Prior Criminal History/ History and
       Character.**

    The defendant's prior criminal history consists of the 3
felony convictions set forth above, including a 2010 for assault
with a deadly weapon for which the defendant was still on
probation at the time of the instant offense.  1 witness and the
victim of the assault reported to police that the defendant was
walking down the street at approximately 10:30 p.m. past a
residence at which they were located with 2 other males.[3]
According to the victim, the defendant responded to a racial

---

    [2] <u>United States v. Motamedi</u>, 767 F.2d 1403 (9th Cir. 1985).

    [3]  The facts from the assault conviction are taken from the
Fresno Police report, case number 10-01262, attached as Exhibit C.

1  epithet an individual at the residence made by calling for
2  assistance.  The witness said that the defendant made a call but
3  there is no indication he heard what the defendant said.  The
4  witness and victim said that an individual arrived in a car and
5  got out with a gun.  The individual began trying to fire the gun
6  at a victim, but it would not fire.  The victim and the witness
7  reported that he struck the individual, causing him to fall and
8  drop the gun.  They said that the defendant picked the gun up.
9  The victim reported that the defendant took the gun and pistol
10 whipped him and was kicking him. The witness said that he and the
11 other male turned away to grab a shovel and a baseball bat and
12 then went to help the victim.  When they got to the victim, they
13 saw the defendant and the other individual was leaving.

14      The defendant provided a post-Miranda statement to the
15 police.  He admitted the incident occurred but with very different
16 circumstances.  He did not admit to assaulting anyone or to having
17 a gun.  Police searched his residence pursuant to a search
18 warrant.  They found a loaded sawed-off shotgun.  The defendant
19 admitted it was his.  In <u>United States v. Dunn</u>, 946 F.2d 615, 621
20 (9th Cir. 1991), the Court recognized that possession of sawed-off
21 shotguns involve a substantial risk of improper physical force.
22 The Court referenced the Congressional finding that firearms that
23 must be registered (which include sawed-off shotguns) are
24 "inherently dangerous and generally lacking usefulness, except for
25 violent and criminal purposes. . . " <u>Id</u>.[4]

26
    _____
27      [4] While the Court in <u>Dunn</u> was analyzing whether a violation
    of 26 U.S.C. § 5861(d), possession of certain unregistered
28  firearms, is a crime of violence, the same reasoning applies here.

1    While the defendant argues that the circumstances of the

2  assault with a deadly weapon charge are in dispute, he entered

3  into a no contest plea[5] relying on <u>People v. West</u> to allow a

4  stipulation to the facts in the police report.  Exhibit B, Bates

5  Stamp number 40-41.  Thus, the Court can properly reference the

6  police report for the facts forming the basis of the conviction.

7  <u>See</u> <u>United States v. Almazan-Becerra</u>, 537 F.3d 1094 (9th Cir.

8  2008); <u>see</u> <u>also</u> <u>see</u> <u>Hernandez-Cruz v. Holder</u>, 651 F.3d 1094, 1097

9  fn 4 (9th Cir. 2011).

10    In addition, the defendant suffered the following misdemeanor

11  convictions:

12        1.   1982 conviction for obstruction/ resisting a public
              officer in violation of California Penal Code ("CPC")
13             section 148 for which the defendant was sentenced to 36
              months probation and 30 days jail;
14        2.   1986 conviction for fighting/ noise / offensive words in
              violation of CPC 415 for which the defendant was
15             sentenced to 24 months probation and 15 days jail;
16        3.   1986 conviction for battery in violation of CPC 242 for
              which the defendant received 24 months probation and 90
              days jail;
17        4.   1995 conviction for infliction of corporal injury on a
              spouse or cohabitant in violation of CPC 273.5 for which
18             the defendant received 24 months probation and 180 days
              jail

19

20  The defendant also suffered the following arrests for offenses for

21  which he was not convicted:

22        1.   1982 arrest for loitering where children are present in
              violation of CPC 553(g) (same arrest as the obstruction
23             conviction noted above);
24        2.   1986 arrest for disturbance of the peace and
              trespassing;
25        3.   1987 arrest for exhibiting a deadly weapon/firearm in
              violation of CPC 417;
          4.   1989 arrest for infliction of corporal injury on a
26

27  ─────────────
    [5] A "no contest" plea has the same effect as a guilty plea.
28  CPC 1016; <u>see</u> <u>Hernandez-Cruz v. Holder</u>, 651 F.3d 1094, 1097 fn 3
    (9th Cir. 2011)

7

50

spouse or cohabitant in violation of CPC 273.5;
5.  1990 arrest for trespass in violation of CPC 602(l);
6.  1991 arrest for battery with serious bodily injury in violation of CPC 243(d);
7.  1991 arrest for infliction of corporal injury on a spouse or cohabitant in violation of CPC 273.5;
8.  1992 arrest for battery in violation of CPC 242;
9.  1994 arrest for infliction of corporal injury on a spouse or cohabitant in violation of CPC 273.5 and force/ADW not firearm: GBI likely in violation of CPC 245(a)(1);
10. 1994 arrest for robbery in violation of CPC 211;
11. 1995 arrest for vehicle theft in violation of California Vehicle Code ("CVC") 10851(a);
12. 1999 arrest for vehicle theft in violation of CVC 10851(a);
13. 1999 arrest for possession/purchase of cocaine base for sale in violation of California Health and Safety Code, Section 11351.5, vehicle theft, and possession of a stolen vehicle, etc. in violation of CPC 496D(a);
14. 2006 arrest for prohibited person in possession of ammunition in violation of CPC 12316(b)(1), and felon in possession of a firearm in violation of CPC 12021(a)(1);
15. 2007 arrest for vehicle theft in violation of CVC 10851(a);
16. 2007 arrest for assault to commit rape in violation of CPC 220 and sexual penetration with force, etc. in violation of CPC 289(a)(1) (acquitted);
17. 2008 arrest for DUI, driving without a license, etc.;
18. 2009 arrest for robbery in violation of CPC 211;
19. 2010 arrest for possession of controlled substance paraphernalia in violation of California Health and Safety Code 11364

The defendant also suffered parole or probation violations on 2 occasions in 2003, once in 2004, once in 2005, once in 2011, and once in 2012.

The pretrial services report indicated that the defendant was using crack cocaine daily in December 2011 when he was arrested.

The defendant's history clearly sets forth an abundance of evidence supporting a finding by clear and convincing evidence that no conditions or combination of conditions can assure the safety of the community or any person.  The defendant has an alarming number of law enforcement contacts which include 2 felony convictions for crimes of violence, 3 misdemeanor convictions for

8

1    crimes of violence/ assaultive behavior, and 10 additional arrests
2    for crimes of violence or firearms offenses.  The defendant was on
3    probation for a felony assault charge and an illegal firearms
4    possession charge at the time he is alleged to have committed the
5    instant offense.  The defendant has at least 6 parole or probation
6    violations.  He also has a serious drug problem.  There are no
7    conditions that can reasonably assure the safety of the community.
8         While the defendant's uncle, Pastor Hood is certainly engaged
9    in a righteous endeavor, the program cannot reasonably assure that
10   the defendant will not engage in further criminal conduct.  While
11   the program is a live-in program, it is not a secured facility.
12   GPS will not provide reasonable assurance that the defendant will
13   not pose a danger to the community.  The defendant has had a
14   multitude of failed attempts to comply with conditions imposed by
15   a court previously.  He has a continual and repetitive history of
16   arrests, convictions, and supervision within the criminal justice
17   system that dates back to 1982.  He has an alarming number of
18   domestic violence arrests which include convictions which
19   evidences the defendant's lack of control even when with people
20   with whom he shares relationships which would include people with
21   whom he would relate to within the proposed program.
22
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

9

52

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

There is clear and convincing evidence that the defendant is a danger to the community and that there are no conditions or combination of conditions that can assure the safety of the community or any other person.  Therefore, the defendant should remain detained.

Respectfully submitted,

BENJAMIN B. WAGNER
United States Attorney

DATED:  October 9, 2012        By    /s/Kimberly A. Sanchez
                                      KIMBERLY A. SANCHEZ
                                      Assistant U.S. Attorney

53

**EXHIBIT A**

# DRAFT
## LAW ENFORCEMENT REPORT FORM
### FRESNO POLICE DEPARTMENT
2323 MARIPOSA MALL, FRESNO CA 93721
Phone: (559)621-7000
CA0100500

**Event: 11BS8181**                                                    **Case: 11-084918**

### INCIDENT INFORMATION

**Report #:** 1 of 1     **Report Type:** OTHER CRIME   **District:** SW **Sector:** C     **Zone:** 2456
**Definition and Class:** PC12021(A)(1) - FELON/ETC POSS FIREARM - Lvl F
**Occurred From:** 12/04/11 20:39 Sun   **Occurred To:** 12/04/11 21:08 Sun     **Received Date:** 12/04/11 20:39 Sun
**Location:** 2014 E WHITE AV FRESNO
**Cross Street:** N DIANA ST
**How Rcv::** O

### CASE FACTORS

**SOLVABILITY FACTORS**
    ADULT BOOKED, PHYSICAL EVIDENCE OBTAINED, WEAPON INVOLVED
**SPECIAL FACTORS**
    ELECTRONIC REPORT, GANG RELATED, PCD ON FILE

### APPROVALS AND ROUTING

**Close Class:** 4X3 - WEAPONS OFFENSE     **Open Class::** 1N
**Premise:** O     **CAS Code:** WEAP
**Printed:** 12/5/2011 9:43:41 AM   **Printed By:** ESCALANTE (V3911), RICH(S166)     **Printed From:** A66614MA
**Rpt #:** 1     **Type:** FIRST     **Officer:** WEBB (V3654), KENNETH #P1166   **Clerk:** WEBB (V3654), KENNETH #P1166
**Team:** VCIT  **Created:** 12/04/11 20:39   **Filed Date:** 12/04/11 21:07     **Assigned Date:** 12/04/11 21:07
**From:** P1166  **To:** GANGS **Route Date:** 12/5/2011 2:00:55 AM     **Reason:** GANG-RELATED
**From:** P1166  **To:** RR     **Route Date:** 12/5/2011 2:01:15 AM     **Reason:** REVIEW

### NAMES

**Inv:** ARRESTED # 1     **Adult/Juvenile:** A   **Type:** PERSON
**Name:** HOOD, ALBERT LEE
**Race:** B   **Sex:** M     **DOB:** ▓▓▓▓     **Age:** 47     **Height:** 511  **Weight:** 240 **Hair:** BLK   **Eyes:** BRO
**Occupation:** NONE **Employer:** NONE
**Language:** ENGLISH     **PD#:** 73273     **Birth City:** FRESNO     **Birth State:** CA
**Clothing:** RED/BLUE/WHT JACKET, WHT SHIRT, BLUE JEAN PANTS, RED BB CAP, RED SHOES
**Crime Type:** PC12021(A)(1)     **Suspect Status:** ARR

**Physical Desc:**

| Category | Type |
|---|---|
| BODY BUILD | MEDIUM |
| HAIR LENGTH | SHORT |
| COMPLEXION | DARK |
| FACIAL HAIR | UNSHAVEN |
| GENERAL APPEARANCE | CASUAL |
| WEAPON | HANDGUN |
| EMOTIONAL STATE | UPSET |
| GUN FEATURE | REVOLVER |
| GUN FEATURE | BLUE STEEL |

**AKA Name:** DIMPLES

**Scars, Marks and Tattoos:**

| Location | Feature | Description |
|---|---|---|
| UR ARM | TAT | PLAYBOY BUNNY |
| L BRS | TAT | JUANITA |
| CHEST | TAT | JUDY HOOD |
| CHEST | TAT | UPPER R CHEST "HOOD" |
| CHEST | TAT | (RIGHT) FELICIA HOOD |

**Identification:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Officer:** WEBB (V3654), KENNETH #P1166                                                    Page 1 of 7
**Supervisor:**                                                    **U.S. v. Hood, 1:11-CR-00443 AWI09/05/2012  9**

55

# DRAFT
## FRESNO POLICE DEPARTMENT
CA0100500

**Event: 11BS8181**                                                                          **Case: 11-084918**

Addres
Phone:
Addres
Phone:

***** Charge Information *****

| Section | Code | Lvl | Description | Counts | Bail | Warrant |
|---|---|---|---|---|---|---|
| 12021(A)(1) | PC | F | FELON/ETC POSS FIREARM | 1 | | |
| 12316(B)(1) | PC | F | PROHIBTD OWN/ETC AMMO/ETC | 5 | | |
| 12031(A)(1) | PC | M | CRRY LOAD F/ARM PUB PLACE | 1 | | |
| 12031(A)(2)(A) | PC | F | CARRY LOAD F/ARM:PR FEL | 1 | | |
| 12031(A)(2)(B) | PC | F | CARRY STOLEN LOADED F/ARM | 1 | | |
| 12031(A)(2)(C) | PC | F | GANG MEMB:CLF/ARM:PUB/ETC | 1 | | |
| 12031(A)(2)(F) | PC | F | CC/LOAD F/ARM:NOT REG OWN | 1 | | |
| 12025(A)(1) | PC | M | CCW IN VEHICLE | 1 | | |
| 12025(A)(2) | PC | M | CCW ON PERSON | 1 | | |
| 12025(B)(1) | PC | F | CCW IN VEH W/PR FEL CONV | 1 | | |
| 12025(B)(2) | PC | F | CARRY CONCEALD STOLEN WPN | 1 | | |
| 12025(B)(3) | PC | F | CCW:CRIM ST GANG:ACTIVE | 1 | | |
| 12025(B)(4) | PC | F | CCW:PROHIB/UNLAWFUL POSS | 1 | | |
| 496(A) | PC | F | REC KNWN STOLN PROP $400+ | 1 | | |
| 14601.1(A) | VC | M | DRIVE:LIC SUSPENDED/ETC | 1 | | |
| 21804(A) | VC | I | FAIL YIELD TRAFIC:HWY ENT | 1 | | |
| 1203.2(A) | PC | F | PROB VIOL:REAREST/REVOKE | 1 | | |
| 148(A)(1) | PC | M | OBSTRUCT/ETC PUB OFCR/ETC | 1 | | |

**Section:** 12021(A)(1)   **Judicial District:** FRESNO MUNI
**Section:** 12316(B)(1)   **Judicial District:** FRESNO MUNI
**Section:** 12031(A)(1)   **Judicial District:** FRESNO MUNI
**Section:** 12031(A)(2)(A)   **Judicial District:** FRESNO MUNI
**Section:** 12031(A)(2)(B)   **Judicial District:** FRESNO MUNI
**Section:** 12031(A)(2)(C)   **Judicial District:** FRESNO MUNI
**Section:** 12031(A)(2)(F)   **Judicial District:** FRESNO MUNI
**Section:** 12025(A)(1)   **Judicial District:** FRESNO MUNI
**Section:** 12025(A)(2)   **Judicial District:** FRESNO MUNI
**Section:** 12025(B)(1)   **Judicial District:** FRESNO MUNI
**Section:** 12025(B)(2)   **Judicial District:** FRESNO MUNI
**Section:** 12025(B)(3)   **Judicial District:** FRESNO MUNI
**Section:** 12025(B)(4)   **Judicial District:** FRESNO MUNI
**Section:** 496(A)   **Judicial District:** FRESNO MUNI
**Section:** 14601.1(A)   **Judicial District:** FRESNO MUNI
**Section:** 21804(A)   **Judicial District:** FRESNO MUNI
**Section:** 1203.2(A)   **Judicial District:** FRESNO MUNI
**Section:** 148(A)(1)   **Judicial District:** FRESNO MUNI

Officer: WEBB (V3654), KENNETH #P1166                                    Page 2 of 7
Supervisor:                                        **U.S. v. Hood, 1:11-CR-00443 AWI** 09/05/2012   10

# DRAFT
## FRESNO POLICE DEPARTMENT

**Event: 11BS8181**                    CA0100500                    **Case: 11-084918**

### NAMES

**Inv:** LEGAL OWNER # 1   **Type:** BUSINESS
**Name:** COSMOPOLITAN FINANCIAL
**Home:** PO BOX 27348, FRESNO, CA 93729

**Inv:** REGISTERED OWNER # 1   **Adult/Juvenile:** A   **Type:** PERSON
**Name:**

**Inv:** VICTIM # 1   **Type:** STATE OF CALIFORNIA
**Name:** STATE OF CALIFORNIA

### VEHICLES

**Inv:** IMPOUNDED   **Date/Time:** 12/4/2011 8:39:00 PM
**License:** 5HEX426   **State:** CA   **Lic Year:** 2012   **Lic Type:** PC   **Year:** 1998   **Make:** LINC
**Model:** TOWNCAR  **Style:** 4D   **Color:** WHI   **VIN:** 1LNFM81W5WY650089   **Vehicle Dispo:** IMP
**Officer Id:** P1166   **Tow From:** WHITE / CLARK   **Odometer:** 139245   **Value Options:** 501-4000
**Lic Plate Loc:** BOTH    **Reg Expire Date:** 5/26/2012   **Tow Company:** DENNIS TOW/226-8219
**Storage Authority:** CVC 22651(H)(1)   **Recovery Code:** A0Y   **Vin Condition:** OK
**Misc Items:** MISC TOOLS IN TRUNK
**Impound Reason:** DRIVER ARRESTED POSSESSION STOLEN LOADED GUN PC12021
**Impound Date:** 12/4/2011 9:19:00 PM   **Tow Company Rep:** ROB BRATTON   **Tow Date:** 12/4/2011 9:19:00 PM
**Wheel Lfront:** FAIR    **Wheel Rfront:** FAIR    **Wheel Lrear:** FAIR    **Wheel Rrear:** FAIR    **Wheel Spare:** NO
**Wheel Spec:** NO
 VIN checked w/ Reg Card, Drivable, Front Seat, Rear Seat, Radio, Registration, Alt/Generator , Battery, Differential, Ignition Key,
Transmission, Impound, Other, Unlic, suspended, DUI, Speed Contest, Evidence, RO, Driver Booked, Need VIN Verified - No
**DRIVER:** HOOD, ALBERT LEE
**REGISTERED OWNER:** COBURN, MICHAEL JAMES
**LEGAL OWNER:** COSMOPOLITAN FINANCIAL

### PROPERTY

**Inv:** Evidence # 1   **Date:** 12/4/2011 8:39:00 PM
**Category:** FIREARMS (NO BB-GUNS OR PELLET GUNS)**Article:** HANDGUN      **Brand:** RUGER      **Model:** BISLEY
**Color:** BLK   **Disposition:** HQ   **Officer ID:** P1166   **Quantity:** 1   **Value:** $ 500 **Serial #:** 5721025
**Dispo:** HQ   **County Code:** 10   **NCIC Code:** CA01 **Size:** .44 CAL.   **Zone:** 2456
 Send to NCIC
**Firearm Type:** PISTOL   **Firearm Category:** REVOLVER **Barrel:** 5"   **Caliber:** .44
**Importer:** STURM, RUGER & CO., INC. SOUTHPORT, CONN. U.S.A.   **Description:** WOOD GRIPS
 Crime Gun, Weapon Reported Stolen, Illegally Possessed Weapon
**POSSESSED:** HOOD, ALBERT LEE
**Total Evidence:** $500

**Officer:** WEBB (V3654), KENNETH #P1166
**Supervisor:**

Page 3 of 7

# <u>CERTIFICATE OF SERVICE</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.C.A. No. 14-10092 |
| *Plaintiff-Appellee,* | ) | U.S.D.C. No. 1:11-cr-00443 AWI |
| | ) | |
| v. | ) | |
| | ) | |
| ALBERT HOOD | ) | |
| *Defendant-Appellant,* | ) | |
| | ) | |

I hereby certify that on July 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 3, 2014                    */s/ Marc C. Ament*
                                             Marc C. Ament

**U.S.C.A. NO.  14-10092**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,


v.


ALBERT HOOD
Defendant-Appellant.


On Appeal From The United States District Court
For The Eastern District of California


Honorable Anthony W. Ishii
United States District Judge


U.S.D.C. No. 1:11-cr-00443 AWI


---

**EXCERPTS OF RECORD**

---

**VOLUME 2 OF 3**
**Bates-Stamped 62 through 342**

MARC C. AMENT
Attorney at Law
1539 E. Starpass Drive
Fresno, CA 93730-3448
(559) 978-4429
Attorney for Defendant-Appellant
ALBERT HOOD

## TABLE OF CONTENTS

|  |  | **Docket No.** | **Page(s)** |
|---|---|---|---|
| 5. | Verdict Form | 56 | 62 |
| 6. | Reporter's Transcripts of Proceedings<br>Jury Trial, Day 2<br>(filed 5/19/14)……………………….<br>(held 10/17/13)......................................... | <br><br>77<br>53 | <br><br>63<br> |
| 7. | Reporter's Transcripts of Proceedings<br>Jury Trial, Day 1<br>(filed 5/19/14)..........................................<br>(held 10/16/13)........................................... | <br><br>76<br>75 | <br><br>122<br> |
| 8. | Reporter's Transcripts of Proceedings<br>Trial Confirmation / Motions in Limine<br>(filed 5/19/14)...........................................<br>(held 10/15/13)........................................... | <br><br>75<br>51 | <br><br>346<br> |
| 9. | Reporter's Transcripts of Proceedings<br>Sentencing<br>(filed 5/19/14)...........................................<br>(held 2/18/14)............................................. | <br><br>78<br>64 | <br><br>345<br> |

FILED

OCT 1 7 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

ALBERT HOOD

                Defendant.

CASE NO.  1:11-CR-00443 AWI

VERDICT FORM

**VERDICT FORM   COUNT ONE**

     We the jury, return the following verdict with regard to Count One of the Indictment, Felon In Possession Of a Firearm.

          _____               12
              Not Guilty                   Guilty

Dated: October 17, 2013

                              Foreperson

Hood Verdict Form               1

2:30 pм  10/17/13

216

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

UNITED STATES OF AMERICA,    ) 1:11-cr-443 AWI
                             )
            Plaintiff,       ) JURY TRIAL
                             )
       vs.                   ) DAY 2
                             )
ALBERT HOOD,                 )
                             )
            Defendant.       )
_____  )

Fresno, California                   Thursday, October 17, 2013

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Vol. 2, Pages 216 to 274, inclusive

REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

217

APPEARANCES OF COUNSEL:

For the Government:                    **KIM SANCHEZ**
                                       Assistant U.S. Attorney
                                       2500 Tulare Street
                                       Suite 4401
                                       Fresno, California 93721

For the Defendant:                     **LINDEN ARLAN LINDAHL**
                                       Attorney at Law
                                       2014 Tulare Street
                                       Suite 505
                                       Fresno, California 93721

218

### INDEX

GOVERNMENT'S REBUTTAL WITNESS:

  STACIE SZATMARI                                          223
  DIRECT EXAMINATION                                       224
  BY MS. SANCHEZ
  CROSS-EXAMINATION                                        227
  BY MR. LINDAHL

DEFENDANT'S SURREBUTTAL WITNESS:

  ALBERT HOOD JR.,                                         228
  DIRECT EXAMINATION                                       229
  BY MR. LINDAHL
  CROSS-EXAMINATION                                        232
  BY MS. SANCHEZ

*****

219

```
 1   Thursday, October 17, 2013              Fresno, California
 2                                           8:36 a.m.
 3
 4            THE COURT:  On the record, outside the presence of
 5   the jury.  I don't think our mikes are working, so we need to
 6   speak up.  First of all, let me get an update on the evidence
 7   to be presented.  Government?
 8            MS. SANCHEZ:  Your Honor, the Government has one
 9   witness to call on rebuttal this morning.
10            THE COURT:  Okay.  And then the defense also, then,
11   has a surrebuttal witness?
12            MR. LINDAHL:  Yes, Your Honor.  I have one
13   surrebuttal witness.  I just looked in the hallway, and he's
14   not present yet.  So I'm hoping by the time that the
15   Government's witness is done, we'll be ready to go.
16            THE COURT:  Okay, sure.  He doesn't have to be here
17   until 9:00 anyway, so that's fine.
18            Before we get to the jury instructions and verdict
19   form, then, is there anything else we need to take up for the
20   trial itself for plaintiff's side.
21            MS. SANCHEZ:  No, Your Honor.
22            THE COURT:  Defense side?
23            MR. LINDAHL:  No, Your Honor.
24            THE COURT:  All right.  On the jury instructions,
25   just going over it quickly, on Jury Instruction Number 2,
```

220

1    we'll need to modify it a little bit because there is one

2    charge.  I need -- on the second paragraph, it will be, "The

3    charge against the defendant is" --

4            MS. SANCHEZ:  I'm sorry, Your Honor.  You did mention

5    that yesterday.

6            THE COURT:  Oh, no problem.  And then on the last

7    paragraph, since we're not doing the brief summary, I guess we

8    need to omit that.

9            MS. SANCHEZ:  Well, when we take a break, I can run

10   down and change the hard copy and bring up printed copies.

11           THE COURT:  Yeah.  And there is no urgency on that.

12   So -- did you get your staff back today?

13           MS. SANCHEZ:  What's that?

14           THE COURT:  Did you get your staff back today?

15           MS. SANCHEZ:  We did.

16           THE COURT:  Good for you.  All right.

17           And then I'm not sure if I received a clean copy of

18   the verdict form.

19           MS. SANCHEZ:  Oh, you know what, I didn't realize

20   that I was supposed to do that.  I must have missed that.  Is

21   it all right if I do that on a break?  I can run down quickly

22   and do that.

23           THE COURT:  Oh, yeah, no problem at all.  And then if

24   you see any other -- if either one of you see any other items

25   in the instructions, it just needs minor tinkering, or

221

1    whatever, you can confer amongst yourselves.

2         But other than that, anything as far as the jury

3    instructions and verdict form we need to talk about this

4    morning for plaintiff's side?

5         MS. SANCHEZ:  No, Your Honor.

6         THE COURT:  Defense side?

7         MR. LINDAHL:  No, Your Honor.

8         THE COURT:  All right, is there anything else we need

9    to talk about before 9:00?

10        MR. LINDAHL:  No, Your Honor.

11        MS. SANCHEZ:  No, Your Honor.

12        THE COURT:  So what we'll do is, we'll have the final

13   couple of witnesses, which probably wouldn't take that long.

14   I'm still going to send the jury out.  We'll have our

15   technical final instruction verdict form conference, and then

16   if there is anything else we need to address, then we'll have

17   the jury come right back in.  I'll read the jury instructions.

18   We'll go right into plaintiff's closing argument and defense

19   closing argument.  I'm not sure timing-wise how much time

20   you'll need in your closing.  Obviously once we go into about

21   an hour and a half, whoever's closing, I won't interrupt your

22   closing.  But if it -- if we need to take a break, I'll see if

23   there is a pause or something in your presentation.  But

24   otherwise, I'll try not to break up your closing argument.

25        If we need to take a short break in between

68

222

 1    arguments, we can do that also.  But I'll leave that to you

 2    folks to meet and confer on a time estimate for your closing

 3    arguments, just logistically, so on those if I need to take a

 4    break at some point.

 5          But other than that, then, I'll go ahead, and we'll

 6    be in recess until 9:00, and then 9:00, we'll have the jury

 7    come back in.

 8          MR. LINDAHL:  Thank you, Your Honor.

 9          THE COURT:  We'll stand in recess.

10          MS. SANCHEZ:  Your Honor, do you want me to make an

11    amendment to the second jury instruction on the clean copy?

12          THE COURT:  Yeah, only because it will go to the

13    jury.

14          MS. SANCHEZ:  Okay.

15          THE COURT:  Yeah.

16          MS. SANCHEZ:  I will remove the "S" from "charges,"

17    and did you want me to put the elements of the offense in

18    where the instruction ends?

19          THE COURT:  You can if you wish.  I mean, if it helps

20    clarify both sides in your closing, that's perfectly fine with

21    me.

22          MS. SANCHEZ:  Okay.

23          THE COURT:  Okay?

24          MS. SANCHEZ:  All right, and then I'll do the clean

25    copy of the jury instructions.

69

223

1          THE COURT:  Okay, good.  We'll stand in recess.

2          (Recess.)

3          THE COURT:  All right, back on the record, are we

4    ready to have the jury come back in?

5          MS. SANCHEZ:  Yes, Your Honor.

6          MR. LINDAHL:  Yes, Your Honor.

7          THE COURT:  Okay, we'll have the jury come in.

8          (The jury entered the courtroom, and the following

9    proceedings were held in their presence:)

10         THE COURT:  All right, the jury is present.  Please

11   be seated.

12         All right, good morning, members of the jury.  We're

13   going to continue with the trial, and we're at the rebuttal

14   stage, and the plaintiff, Government, may call its next

15   witness.

16         MS. SANCHEZ:  Detective Szatmari.

17         THE CLERK:  Please raise your right hand.

18                    **STACIE SZATMARI**,

19   called as a witness on behalf of the Government in rebuttal,

20   having been first duly sworn, testified as follows:

21         THE CLERK:  Thank you.  Please state your full name

22   and spell your last name for the record.

23         THE WITNESS:  It's Stacie Szatmari, S-Z-A-T-M-A-R-I.

24         THE CLERK:  And how do you spell "Stacie"?

25         THE WITNESS:  Stacie is with an I-E.

Szatmari - D

224

1                       DIRECT EXAMINATION

2    BY MS. SANCHEZ:

3    Q.  By whom are you employed?

4    A.  Fresno Police Department.

5    Q.  And how long have you worked with the Fresno Police

6    Department?

7    A.  I was hired in 2003.

8    Q.  And what's your current position?

9    A.  Detective with the Fresno Ceasefire Unit, PSN.

10   Q.  And are you familiar with the recordkeeping system of the

11   Fresno Police Department?

12   A.  Yes, I am.

13   Q.  And how does the Fresno Police Department keep records of

14   calls that come in and calls that police officers go out on?

15   A.  We have two systems.  We have the CAD system, which is

16   what our dispatch uses, and that's where they create events

17   for any types of calls for service.  And we also have a

18   Records Management System, which documents any type of written

19   incident field interviews, reports, any type of reports of

20   that nature.

21   Q.  And is there a way to search those systems if you're

22   searching for a particular report regarding a location or a

23   person making a report or various other ways to search it?

24   A.  Yes, there is.

25   Q.  And are you familiar with how to search the system to find

Szatmari - D

225

1   a certain type of report?

2   A.  Yes, that's part of my daily activities.

3   Q.  And did you conduct a search of the CAD system to

4   ascertain whether in 2011, there were any reports of shots

5   fired at 2014 East White Street in Fresno, California?

6   A.  Yes.

7   Q.  Now, specifically, directing your attention to November or

8   December of 2011, did you find any records that there were any

9   reports of shots fired at 2014 East White Street?

10  A.  No.

11  Q.  And how did you conduct that search in the CAD system?

12  A.  In the CAD system, I inputted the address of record that

13  was requested and pulled up all the calls for service linked

14  to that address.

15  Q.  And did you also search the system under names of

16  potential reporting parties?

17  A.  Yes.

18  Q.  Which names did you personally search?

19  A.  Underneath the RMS system, I searched Albert Hood and also

20  the junior that was requested.

21  Q.  Is there a different search mechanism for the CAD system

22  and the RMS system?

23  A.  Yes, CAD system is by addresses.  RMS is either address

24  and/or name.

25  Q.  Okay.  So then moving on to the RMS system -- well, let me

Szatmari - D

226

1    back up.  So the CAD system you searched by address of 2014

2    East White Street; is that correct?

3    A.  Correct.

4    Q.  Did you search the RMS system for any reports of shots

5    fired at 2014 East White Street in the City of Fresno during

6    2011?

7    A.  Yes, I did.

8    Q.  Specifically in November or December of 2011, did you find

9    any reports of shots fired at 2014 East White Street in the

10   City of Fresno?

11   A.  No, I did not.

12   Q.  And how did you conduct your search?

13   A.  I ran the address first and looked for potential RP's,

14   which is basically the person who called in the report, and

15   located nothing underneath those dates.  And then I ran both

16   the names that were given to me and pulled up all calls or

17   reports that are attached to that person's name, and there was

18   nothing reported during November or December of 2011 of shots

19   fired.

20   Q.  And what names did you run?

21   A.  I ran Albert Hood and Albert Hood Jr. and then --

22   Q.  I'm sorry.

23   A.  And then I requested another party, a Leslie Hood.

24   Q.  And did any reports come up for Leslie Hood?

25   A.  No.

73

Szatmari - X

227

1   Q.  If someone else had reported shots fired, had called the

2   police department reporting shots fired at 2014 East White

3   Street other than Albert Hood, Albert Hood Jr. or Leslie Hood,

4   would the search you conducted have elicited that information?

5          MR. LINDAHL:  Objection.  Calls for speculation on

6   the part of the witness; vague.

7          THE COURT:  Overruled, if you can answer.

8          THE WITNESS:  Basically if an incident had happened

9   at the address that was requested at 2014 East White, the

10  incident would have been changed to that address via the

11  officer and inputted in by the dispatcher that that's where

12  the incident had occurred.  So it would have showed up by

13  running the address search.

14         MS. SANCHEZ:  No further questions, Your Honor.

15         THE COURT:  Cross-examination?

16                     CROSS-EXAMINATION

17  BY MR. LINDAHL:

18  Q.  Detective Szatmari, you based your search upon what had

19  been input into the record system, both CAD's and RMS;

20  correct?

21  A.  All right.

22  Q.  If that information for some reason were not forwarded or

23  entered in the CAD's or RMS, would it have showed up on your

24  record system?

25  A.  It would not have, but it wouldn't have been documented.

74

Szatmari - X

228

1          MR. LINDAHL:  Okay, thank you.  That's all I have.

2          THE COURT:  Redirect.

3          MS. SANCHEZ:  No, Your Honor.

4          THE COURT:  Either party wish this witness remain

5     subject to recall?

6          MS. SANCHEZ:  No, Your Honor.

7          MR. LINDAHL:  No, Your Honor.

8          THE COURT:  You are excused.  Thank you.

9          THE WITNESS:  Thank you, Your Honor.

10         THE COURT:  And further evidence in rebuttal on

11    behalf of plaintiffs?

12         MS. SANCHEZ:  No, Your Honor.  The Government rests.

13         THE COURT:  All right.  And surrebuttal.

14         MR. LINDAHL:  Yes, defense calls Albert Hood Jr.

15         THE COURT:  All right.

16         MR. LINDAHL:  Your Honor, where would the Court like

17    him to be sworn?

18         THE COURT:  Oh, please come forward to the witness

19    stand, please.

20         THE CLERK:  Please raise your right hand.

21                       ALBERT HOOD JR.,

22    called as a witness on behalf of the Defendant in surrebuttal,

23    having been first duly sworn, testified as follows:

24         THE CLERK:  Thank you.  Please state and spell your

25    full name for the record.

Albert Hood Jr. - D

229

1          THE WITNESS:  Albert Lee Hood, A-L-B-E-R-T, L-E-E,

2   H-O-O-D, Junior.

3          THE COURT:  Please be seated.

4                      DIRECT EXAMINATION

5   BY MR. LINDAHL:

6   Q.  Good morning, Mr. Hood.

7   A.  Good morning.

8   Q.  First, I'd like to ask you if you know anybody that's in

9   the courtroom here?

10  A.  Yeah.

11  Q.  Who?

12  A.  My dad.

13  Q.  Okay.

14  A.  And you.

15  Q.  Anybody else?

16  A.  Family members in the back.

17  Q.  Okay.  Mr. Hood, are you aware of what this proceeding is?

18  A.  Yeah.

19  Q.  Okay.  Mr. Hood, you just took an oath to tell the truth;

20  correct?

21  A.  Yes, sir.

22  Q.  And the fact that the man on trial here is your father,

23  does that affect whether you tell the truth or not?

24  A.  No, but that is my dad.  I love him, but that wouldn't

25  affect anything.

Albert Hood Jr. - D

230

1    Q.   Okay.  Mr. Hood, you are aware that your father is on
2    trial for an arrest which occurred on the 4th of December,
3    2011.
4    A.   Yeah.
5    Q.   Okay.  Just prior to that date, did you have contact with
6    members of the Fresno Police Department?
7    A.   Yes.
8    Q.   When you had that contact with members of the Fresno
9    Police Department, where were you living?
10   A.   On 2014 East White.
11   Q.   Okay.  And when you had contact with members of the Fresno
12   Police Department, do you recall how long prior to your father
13   being arrested that contact occurred?
14   A.   Within a couple days.
15   Q.   Okay.  Now, what unusual thing happened that caused you to
16   come into contact with members of the Fresno Police
17   Department?
18   A.   We were shot at.
19   Q.   Where?
20   A.   In our backyard.
21   Q.   Okay.  The house on East White?
22   A.   Yes.
23   Q.   Okay.  And did members of the Fresno Police Department
24   contact you specifically?
25   A.   Well, they -- they made me sit down on the curb.  They

Albert Hood Jr. - D

231

1    talked to me.

2    Q.    Okay.  And how many police officers were there?

3    A.    Have to be about three cars, four cars, six, eight police.

4    Q.    Okay.  Do you recall any other vehicles being present on

5    that day?

6    A.    Just the cars in the neighborhood.

7    Q.    Okay.  Any media?

8    A.    Yeah, I think I seen a news van.

9    Q.    If you recall, from which news outlet?

10   A.    I'm not sure.

11   Q.    Okay.  All right, and when you were contacted by members

12   of the Fresno Police Department, about how long was it that

13   this contact occurred?

14   A.    What?

15   Q.    How long were you there with the police?

16   A.    Oh, they had us on the curb for about 20, 25 minutes.

17   Q.    Okay.  And are you sure it was within a few days prior to

18   your father being arrested?

19   A.    Yeah.

20   Q.    Okay.

21   A.    Because he was -- after that, he was gone.

22        MR. LINDAHL:  All right.  Thank you.  That's all I

23   have.

24        THE COURT:  Cross-examination?

25   ///

Albert Hood Jr. - X

232

1                        CROSS-EXAMINATION

2   BY MS. SANCHEZ:

3   Q.  Good morning, Mr. Hood.

4   A.  Good morning.

5   Q.  Did you provide the police with your name on that day?

6   A.  Yeah.

7   Q.  And were you making a report that there were shots fired

8   at 2014 East White Street?

9   A.  Make a report?  No, somebody called, and they were

10  questioning me on what had happened that day.

11  Q.  Did you provide them with information that there were

12  shots fired at 2014 East White Street?

13  A.  Yes, ma'am.

14          MS. SANCHEZ:  I have no further questions,

15  Your Honor.

16          THE COURT:  And redirect?

17          MR. LINDAHL:  That's all I have.  Thank you,

18  Your Honor.

19          THE COURT:  Either party wish this witness remain

20  subject to recall?

21          MR. LINDAHL:  No, Your Honor.

22          MS. SANCHEZ:  No, Your Honor.

23          THE COURT:  You are excused.  Thank you.  And further

24  surrebuttal?

25          MR. LINDAHL:  No, Your Honor.

233

1          THE COURT:  Any other evidence to be presented on

2    behalf of the Government?

3          MS. SANCHEZ:  No, Your Honor.  The Government rests.

4          THE COURT:  All right.  Any further evidence on

5    behalf of the defendant?

6          MR. LINDAHL:  No, Your Honor.

7          THE COURT:  All right, both sides rest their entire

8    case, then, is that my understanding?

9          MS. SANCHEZ:  Yes, Your Honor.

10          MR. LINDAHL:  Yes, Your Honor.

11          THE COURT:  All right, members of the jury, both

12    sides have rested their entire case.  That means that the

13    evidence you will consider in deciding this case has been

14    presented to you.  At this time, because the evidence has been

15    concluded, I'm going to be meeting with the attorneys to

16    finalize the jury instructions, the verdict form, go through

17    the exhibits, and then prepare.

18          Now, when you come back in here, what will happen is

19    as follows:  I will read you the concluding jury instructions,

20    and then we'll have closing arguments.  The plaintiff's side,

21    the Government, will give a closing argument.  Defendant will

22    give -- defense will give a closing argument, and because the

23    Government has the burden of proof, they get the last word.

24    They'll get a rebuttal argument.  There are three jury

25    instructions that I reserved to the very end, and then you'll

234

1    begin your deliberations this morning.

2         Okay, now, remember the admonition.  As soon as we're

3    ready to go, we'll have you come back in here for that

4    concluding portion of the trial.

5         All right, so you can leave.

6         (Jury left the courtroom.)

7         THE COURT:  All right, the jury has left for its

8    recess.  Before I get into the instructions and the verdict

9    form, are there any matters we need to take up on behalf of

10   the plaintiff?

11        MS. SANCHEZ:  No, Your Honor.

12        THE COURT:  Defense?

13        MR. LINDAHL:  No, Your Honor.

14        THE COURT:  Okay, on the jury instructions, I

15   apologize, I attempted to contact Miss Sanchez when I realized

16   that when I was reviewing the jury instructions, I had them

17   all stapled together, and then I realized that I was looking

18   at the preliminary jury instructions and the concluding

19   instructions, and so what I -- I am going to be doing is on

20   the jury instructions that I read to the jury, I'll start with

21   the jury instruction that's labeled Jury Instruction Number

22   15, "Duties of the jury to Find Facts and Follow Law."  And

23   that is the initial jury instruction.  And then it would

24   proceed on through and including Jury Instruction Number 34.

25        And so with respect to those instructions, and they

81

235

```
 1   do include -- and I also apologize, they do include the
 2   elements of the offense in case either or both sides wish to
 3   refer to that in your closing arguments.  They do appear at
 4   Jury Instruction Number 27.
 5           And I will say this:  Once I have read the jury
 6   instructions, if you wish to display any of the instructions
 7   on the overhead, you can certainly do that.  Obviously you're
 8   not required to do so.  I will be giving two copies of the
 9   jury instructions, numbers 15 to 34, to the jury when they
10   begin their deliberations.
11           So with that, is there anything with respect to the
12   jury instructions that we need to address, first, on behalf of
13   plaintiff's side?
14           MS. SANCHEZ:  No, Your Honor.
15           THE COURT:  Defense side?
16           MR. LINDAHL:  Your Honor, I noticed on Number 17, it
17   had the -- Instruction Number 17, that's instruction 3.4.
18           THE COURT:  Yes.
19           MR. LINDAHL:  It looks like the copy has the
20   modification, "given, refused" language down at the bottom.
21   It's not a big deal.  I just wanted to bring that to the
22   court's attention.
23           THE COURT:  Sure.  And I don't know if -- if somebody
24   in your staff can just delete that part.  Is it possible?
25           MS. SANCHEZ:  I can go delete it.  It's on my file.
```

236

1    It really wouldn't take me more than a minute.

2            THE COURT:  Okay.  If can you go ahead and do that,

3    that will be fine.

4            Okay, and then anything else, defense side, then, on

5    the instructions?

6            MR. LINDAHL:  No, Your Honor.

7            THE COURT:  All right.  Both sides agree, then, that

8    the instructions, with that deletion on Number 17, are the

9    appropriate instructions to give in this case?  Plaintiff's

10   side?

11           MS. SANCHEZ:  I'm sorry, Your Honor.

12           THE COURT:  These are the appropriate instructions?

13           MS. SANCHEZ:  Yes.  Yes, Your Honor.

14           THE COURT:  Defense?

15           MR. LINDAHL:  Yes, Your Honor.

16           THE COURT:  And then see, let's see, Miss Sanchez,

17   did you prepare a clean verdict form?

18           MS. SANCHEZ:  I did, and I gave it to your clerk.

19           THE COURT:  Okay, all right.  Okay, then, what we're

20   going to do is, we'll get that modification.

21           Now, I'm going to read all the instructions, but I am

22   going to move the order around a little bit, so if you're

23   trying to follow numerically, it's not going to work, but I

24   will assure you that I'm going to read every one of these

25   instructions, I'm going to move some around that I think might

237

1    be a little more easy for the jury to follow.

2            And in addition, I do reserve three instructions

3    after you've given your closing arguments, and those would be

4    Jury Instruction Number 29, "Duty to Deliberate," Jury

5    Instruction Number 33, "Verdict Form," and Jury Instruction

6    Number 34, "Communication With the Court."

7            Those three I'd give at the very end.  So when I read

8    the concluding instructions, I won't be reading those yet, but

9    I will at the end of closing arguments.  Okay?

10           All right.  And then what we do is, once the jury

11   begins their deliberations, before I send back the jury

12   instructions, the verdict form, and the exhibits, I invite

13   counsel to approach the clerk, and so you can see exactly what

14   we're going to be sending back to the jury.  And nothing will

15   go back to the jury until you've agreed on it.  And obviously

16   if there are any issues, we can come on the record.

17           But basically as I understand the exhibits we have

18   are the photos submitted by plaintiff and the photos submitted

19   by the defense.

20           And now the firearm, I normally do not send drugs or

21   firearms back to the jury.  Obviously if they want to look at

22   it, then we'll have them come back into open court and have

23   them view it in open court.  All right.

24           With that, then, is there anything else at this time,

25   then?

238

1      MR. LINDAHL:  No, Your Honor.

2      MS. SANCHEZ:  No, Your Honor.

3      THE COURT:  Okay, we'll go ahead and take a 15-minute

4  recess, then, and come back into court.

5      We'll be in recess.

6      (Recess.)

7      THE COURT:  All right, back on the record.  One thing

8  when I was reading -- reorganizing the jury instructions, it

9  occurred to me, I thought about this earlier, and I failed to

10  mention it.  On Jury Instruction Number 26, "Impeachment,"

11  which is normally given, obviously when a prior conviction is

12  strictly for the purposes of impeachment, in this case, it's

13  an element.  It's also an element of the offense, and so it

14  may need to be modified.

15      MS. SANCHEZ:  Your Honor, what if there was just a

16  modification except to the extent the parties have stipulated

17  that it forms the basis of one of the elements of the offense

18  with which the defendant is charged?

19      THE COURT:  All right.  Defense -- and I'm open to

20  any modifications, as long as it's clear to the jury.  I want

21  to make sure that basically that the jury doesn't consider the

22  prior conviction simply to say, well, he was convicted once

23  before, so he is, therefore, guilty, which is the purpose of

24  this instruction, but we obviously need to modify it so that

25  the jury understands that the prior -- a prior crime is an

239

1   element of the offense even though the parties have

2   stipulated.  So I don't want to unduly complicate this or make

3   it confusing to the jury.

4        Defense thoughts on how to modify this?

5        MR. LINDAHL:  Your Honor, if the Court were to add

6   language about there has been a stipulation or -- or refer

7   back to the instruction on the stipulation, where it may be

8   considered for a different reason.  The fact of a prior

9   conviction may be considered to satisfy the element of a

10  person being convicted within the meaning of the charge.

11       MS. SANCHEZ:  That's agreeable with the Government.

12       THE COURT:  Okay, I could put something like, "You

13  have heard evidence that the defendant has previously been

14  convicted of a crime.  You may consider that evidence only as

15  it may affect the defendant's believability as a witness and

16  as an element of the crime for which the defendant is now on

17  trial."  Does that work?

18       MS. SANCHEZ:  That's agreeable with the Government,

19  Your Honor.

20       MR. LINDAHL:  Yes, Your Honor.

21       THE COURT:  Okay.  All right, I'll go ahead and do

22  that.  And we won't worry about the modification.  I

23  interlineated that on mine.  We won't worry about changing --

24  modifying that instruction for the jury purpose for sending it

25  back to the jury until after closing arguments.  We'll have

240

1    some time.  Jury can start deliberating.  They don't need the

2    instructions immediately, and we can just go ahead and add

3    that in.

4         Anything else, then, that we need to take up before

5    we have the jury come in?

6         MS. SANCHEZ:  No, Your Honor.

7         MR. LINDAHL:  No, Your Honor.

8         THE COURT:  All right, we'll have the jury come in.

9    I'll read the instructions.  I am going to read all the

10   instructions except for those concluding three.  I did change

11   the order a little bit, but I am going to read all the

12   instructions to them.

13        Okay, we'll have the jury come in.

14        (Pause in the proceedings.)

15        THE COURT:  And, again, if necessary, after about an

16   hour and a half, we'll take a break, and if either one of you

17   on your closing argument portion at about an hour and a half,

18   I'll just sort of try to figure out whether or not you're

19   close to concluding or whether there is a reasonable point

20   where we can just take a break.  But I don't want to otherwise

21   interrupt your closing argument.

22        MR. LINDAHL:  Your Honor --

23        THE COURT:  Yes.

24        MR. LINDAHL:  I'm fairly certain that my closing

25   argument will not exceed the length of the actual taking of

241

1    testimony.

2          THE COURT:  Okay.  Yeah, it was fairly

3    straightforward, so I don't anticipate a lengthy closing, but,

4    again, if we do go past an hour and a half, that's fine.  If

5    necessary, we'll take a break.

6          (Jury returned to the courtroom.)

7          THE COURT:  All right, the jury is present.  Please

8    be seated.

9          All right, members of the jury, we'll go ahead now

10   and enter into the concluding portions of the trial itself.

11   I'll read the jury instructions.  Again, as I mentioned at the

12   outset, with the preliminary instructions, I do have to

13   literally have to read them verbatim.  We will be sending

14   copies back with you during your deliberations.

15         Members of the jury, now that you have heard all the

16   evidence, it is my duty to instruct you on the law that

17   applies to this case.  A copy of these instructions will be

18   available in the jury room for you to consult.

19         It is your duty to weigh and to evaluate all the

20   evidence received in the case and, in that process, to decide

21   the facts.  It is also your duty to apply the law as I give it

22   to you to the facts as you find them, whether you agree with

23   the law or not.  You must decide the case solely on the

24   evidence and the law and must not be influenced by any

25   personal likes or dislikes, opinions, prejudices, or sympathy.

242

1    You will recall that you took an oath promising to do so at

2    the beginning of the case.

3            You must follow all these instructions and not single

4    out some and ignore others; they are all important.  Please do

5    not read into these instructions or into anything I may have

6    said or done any suggestion as to what verdict you should

7    return.  That is a matter entirely up to you.

8            The indictment is not evidence.  The defendant has

9    pleaded not guilty to the charge.  The defendant is presumed

10   to be innocent unless and until the Government proves the

11   defendant guilty beyond a reasonable doubt.  In addition, the

12   defendant does not have to testify or present any evidence to

13   prove innocence.  The Government has the burden of proving

14   every element of the charge beyond a reasonable doubt.

15           Proof beyond a reasonable doubt is proof that leaves

16   you firmly convinced that the defendant is guilty.  It is not

17   required that the Government prove guilt beyond all possible

18   doubt.

19           A reasonable doubt is a doubt based upon reason and

20   common sense and is not based purely on speculation.  It may

21   arise from a careful and impartial consideration of all the

22   evidence or from a lack of evidence.

23           If after a careful and impartial consideration of all

24   the evidence, you are not convinced beyond a reasonable doubt

25   that the defendant is guilty, it is your duty to find the

243

1   defendant not guilty.  On the other hand, if after a careful

2   and impartial consideration of all the evidence, you are

3   convinced beyond a reasonable doubt that the defendant is

4   guilty, it is your duty to find the defendant guilty.

5        The evidence from which you are to decide what the

6   facts are consist of:

7        1.   The sworn testimony of any witness;

8        2.   The exhibits which have been received into

9   evidence; and

10        3.   Any facts to which the parties have agreed.

11        In reaching your verdict, you may consider only the

12   testimony and exhibits received in evidence.  The following

13   things are not evidence, and you may not consider them in

14   deciding what the facts are:

15        1.   Questions, statements, objections, and arguments

16   by the lawyers are not evidence.  The lawyers are not

17   witnesses.  Although you must consider a lawyer's questions to

18   understand the answers of a witness, the lawyer's questions

19   are not evidence.  Similarly, what the lawyers will say in

20   their closing arguments and at other times is intended to help

21   you interpret the evidence, but it is not evidence.  If the

22   facts as you remember them differ from the way the lawyers

23   state them, your memory of them controls.

24        2.   Any testimony that I have excluded, stricken, or

25   instructed you to disregard is not evidence.  In addition,

Jury Instructions

244

1    some evidence was received only for a limited purpose; when I

2    have instructed you to consider certain evidence in a limited

3    way, you must do so.

4         3.   Anything you may have seen or heard when the

5    court was not in session is not evidence.  You are to decide

6    the case solely on the evidence received at the trial.

7         Evidence may be direct or circumstantial.  Direct

8    evidence is direct proof of a fact, such as testimony by a

9    witness about what that witness personally saw or heard or

10   did.  Circumstantial evidence is indirect evidence, that is,

11   it is proof of one or more facts from which you can find

12   another fact.

13        You are to consider both direct and circumstantial

14   evidence.  Either may be used to prove any fact.  The law

15   makes no distinction between the weight to be given to either

16   direct or circumstantial evidence.  It is for you to decide

17   how much weight to give to any evidence.

18        In deciding the facts in this case, you may have to

19   decide which testimony to believe and which testimony not to

20   believe.  You may believe everything a witness says, or part

21   of it, or none of it.

22        In considering the testimony of any witness, you may

23   take into account:

24        (1) the witness' opportunity and ability to see or

25   hear or know the things testified to;

245

1          (2) the witness' memory;

2          (3) the witness' manner while testifying;

3          (4) the witness' interest in the outcome of the case,

4     if any;

5          (5) the witness' bias or prejudice, if any;

6          (6) whether other evidence contradicted the witness'

7     testimony;

8          (7) the reasonableness of the witness' testimony in

9     light of all the evidence; and

10          (8) any other factors that bear on believability.

11          The weight of the evidence as to a fact does not

12     necessarily depend on the number of witnesses who testify.

13     What is important is how believable the witnesses were and how

14     much weight you think their testimony deserves.

15          The defendant has testified.  You should treat this

16     testimony just as you would the testimony of any other

17     witness.

18          You have heard testimony that the defendant made a

19     statement.  It is for you to decide (1) whether the defendant

20     made the statement, and (2) if so, how much weight to give to

21     it.  In making those decisions, you should consider all of the

22     evidence about the statement, including the circumstances

23     under which the defendant may have made it.

24          The Government has charged that on or about

25     December 4, 2011, the defendant was a felon in possession of a

246

1    firearm.  The Government does not have to prove that the crime

2    was committed on that exact date so long as the Government

3    proves beyond a reasonable doubt that the defendant committed

4    the crime on a date near December 4, 2011.

5         You have heard evidence that the defendant had

6    previously been convicted of a crime.  You may consider that

7    evidence only as it may affect the defendant's believability

8    as a witness, and as an element of the crime for which the

9    defendant is now on trial.

10        The defendant is charged in the indictment with the

11   possession of a firearm in violation of Section 922(g)(1) of

12   Title 18 of the United States Code.  In order for the

13   defendant to be found guilty of that charge, the Government

14   must prove each of the following elements beyond a reasonable

15   doubt:

16        First, the defendant knowingly possessed a Ruger

17   Model Vaquero, 44 caliber revolver;

18        Second, the Ruger Model Vaquero, 44 caliber revolver

19   had been shipped and transported from one state to another;

20   and

21        Third, at the time the defendant possessed the Ruger

22   Model Vaquero 44 caliber revolver, the defendant had been

23   convicted of a crime punishable by imprisonment for a term

24   exceeding one year.  The defendant stipulates that as of the

25   date of the offense, the defendant had been convicted of a

247

1   crime punishable by imprisonment for a term exceeding one

2   year.

3          An act is done knowingly if the defendant is aware of

4   the act and does not act through ignorance, mistake, or

5   accident.  The Government is not required to prove that the

6   defendant knew that his acts or omissions were unlawful.  You

7   may consider evidence of the defendant's words, acts, or

8   omissions, along with all the other evidence, in deciding

9   whether the defendant acted knowingly.

10         A person has possession of something if the person

11  knows of its presence and has physical control of it, or knows

12  of its presence and has the power and intention to control it.

13         More than one person can be in possession of

14  something if each knows of its presence and has the power and

15  intention to control it.

16         Some of you have taken notes during the trial.

17  Whether or not you took notes, you should rely on your own

18  memory of what was said.  Notes are only to assist your

19  memory.  You should not be overly influenced by your notes or

20  those of your fellow jurors.

21         The punishment provided by law for this crime is for

22  the Court to decide.  You may not consider punishment in

23  deciding whether the Government has proven its case against

24  the defendant beyond a reasonable doubt.

25         Okay, I'll give you one concluding instruction, which

248

1    I've given before.  This is just a cautionary instruction.

2            Because you must base your verdict only on the

3    evidence received in the case and on these instructions, I

4    remind you that you must not be exposed to any other

5    information about the case or to the issues it involves.

6    Except for discussing the case with your fellow jurors during

7    your deliberations:

8            Do not communicate with anyone in any way and do not

9    let anyone else communicate with you in any way about the

10   merits of the case or anything to do with it.  This includes

11   discussing the case in person, in writing, by phone or

12   electronic means, via e-mail, text messaging, or any Internet

13   chat room, blog, website or other feature.  This applies to

14   communicating with your fellow members, your employer, the

15   media or press, and the people involved in the trial.  If you

16   are asked or approached in any way about your jury service or

17   anything about this case, you must respond that you have been

18   ordered not to discuss the matter and to report the contact to

19   the Court.

20           Do not read, watch, or listen to any news or media

21   accounts or commentary about the case or anything to do with

22   it.  Do not do any research, such as consulting dictionaries,

23   searching the Internet or using other reference materials; and

24   do not make any investigation or in any other way try to learn

25   about the case on your own.

Government's Closing Argument

249

1          The law requires these restrictions to ensure the
2     parties have a fair trial based on the same evidence that each
3     party has had an opportunity to address.  A juror who violates
4     these restrictions jeopardizes the fairness of these
5     proceedings, and a mistrial could result that would require
6     the entire trial process to start over.  If any juror is
7     exposed to any outside information, please notify the Court
8     immediately.
9          Okay, there are three instructions I'll give at the
10    very end of the case just before you begin your deliberations,
11    but at this time, I'm going to invite counsel to give their
12    closing arguments, and we'll start off first with the
13    plaintiff's side.  Government counsel may give a closing
14    argument.
15         MS. SANCHEZ:  Thank you, Your Honor.
16         May it please the Court, Mr. Lindahl.  Good
17    afternoon -- good morning, ladies and gentlemen.  This has
18    been a short case.  I'm going to be equally short in
19    addressing you with my closing.
20         This case is all about keeping it simple.  It is what
21    it is.  The evidence that you heard from the witness stand
22    from Officer Webb and Sergeant Alvarez proves beyond a
23    reasonable doubt that this defendant was in possession of a
24    firearm on December 4th, 2011.
25         Now, there's three elements to that offense that the

Government's Closing Argument

250

1   Court just read you, that the defendant knowingly possessed a

2   firearm, that the defendant has a prior conviction punishable

3   by more than a year imprisonment, and that the firearm

4   traveled in interstate commerce.

5           As you've also heard, the parties have stipulated to

6   two of those elements.  So what's really left is sort of like

7   a whodunit, did he possess the gun or did he not?  Do you

8   believe Officer Webb, or do you believe the defendant's

9   version.

10          What Officer Webb told you is consistent with what

11  makes sense.  And as the judge said, you are called upon just

12  to exercise your common sense, your judgment that you use in

13  making everyday decisions in making a decision whether the

14  Government's met its burden.

15          Officer Webb told you that he saw the defendant

16  pulling out of a parking lot.  He committed a traffic

17  violation.  He followed him for a short distance.  He saw the

18  defendant's car pulling in front of a residence.  He pulled up

19  behind it, activated his lights.  The defendant was getting

20  out of his vehicle.  Officer Webb said that he made eye

21  contact with the defendant and told him to get back into his

22  vehicle.  The defendant chose to run away from him.

23          Officer Webb followed him, lost sight of him for just

24  a short distance.  As they ran to the corner of the house --

25  and you saw the picture of the residence -- that as they

Government's Closing Argument

251

1    rounded the corner of the house, and Officer Webb drew an

2    arrow in that direction, he saw the defendant standing on the

3    side of the house where he saw a dark object fall from the

4    defendant and strike the ground.

5            Now, I'm not trying to scare anyone, and I'm not

6    trying to be melodramatic here, so I can assure that you this

7    gun is unloaded as verified by officers and completely safe.

8    But I think when Officer Webb told you that he's heard a gun

9    fall to the ground before, and that he recognized, or the

10   sound he heard was consistent with a gun falling to the

11   ground, even on a carpeted floor, that makes a pretty loud

12   distinctive sound, which would be even more enunciated when it

13   hits the cement.

14           Officer Webb then followed the defendant to the back

15   of the residence and arrested him at the back door.

16           What you heard from the defendant that doesn't make

17   sense is that he never knew that Officer Webb was behind him.

18   He never saw the lights on his car, and that he never knew

19   that he was a police officer until he arrested him in the

20   backyard of his house.

21           That he saw some strange person in his yard who ran

22   from him, standing what happened to be in the exact location

23   where Officer Webb saw the gun fall from the defendant and ran

24   into the house.  And he never told any officer that that's

25   what had happened that night.

Government's Closing Argument

252

1              Had an opportunity to speak with Officer Webb, and,

2    in fact, did talk to him, denied possession of a gun, told him

3    that he was running from him because he had a suspended

4    license, but never mentioned this strange individual who

5    happened to be standing in his yard where he had to be one of

6    the unluckiest people in the world to have been there at that

7    precise moment when this individual was there in the exact

8    spot where Officer Webb saw and heard the gun fall from the

9    defendant.

10             It's that simple.  It's direct and circumstantial

11   evidence.  The fun thing -- or the good thing about

12   circumstantial evidence is that it doesn't lie.  So the

13   circumstantial evidence is that Officer Webb told you he saw a

14   dark object fall from the defendant hit the ground making a

15   sound that, to him, was consistent with what he's heard when

16   he's seen a gun fall and hit the ground before.

17   Circumstantial evidence doesn't lie.

18             When he comes back to that exact location, he sees a

19   gun that Sergeant Alvarez told you that he found laying there

20   when he arrived just seconds after Officer Webb had called for

21   assistance.  And remember, that Sergeant Alvarez also said

22   that when he arrived, that Officer Webb's lights were on.

23             Now, by your common experience, most of us have seen

24   the red and blue lights of a police car at night.  Those red

25   and blue lights illuminate an area.  They don't illuminate it

Defendant's Closing Argument

253

1  such that it's a bright light like the sun or a street light,

2  but you can clearly see those red and blue lights.  It doesn't

3  make sense that somebody who is in such close proximity would

4  not have seen them at all.

5        So the Government submits that this is a simple case.

6  Just keep it simple.  Use your common sense that you use in

7  making decisions in your everyday life, and in doing that, you

8  would find that the defendant is guilty as charged.  Thank

9  you.

10       THE COURT:  And closing argument on behalf of the

11  defense.

12       MR. LINDAHL:  Thank you, Your Honor.

13       Well, ladies and gentlemen, you have agreed to take

14  this burden of being jurors to determine not whether Mr. Hood

15  has been proved guilty beyond common sense or to common sense,

16  but whether the United States has proved him guilty beyond a

17  reasonable doubt.

18       Now, at the outset of this case yesterday, as Miss

19  Sanchez has alluded to, this was not a long, drawn-out case.

20  It was a quick case.  But when the Court was talking to you

21  yesterday during jury selection about whether you believe we

22  put a man on the moon, I'm not trying to stand here and tell

23  you you have to -- you know, we didn't put a man on the moon.

24  This case is more like the Challenger disaster than putting a

25  man on the moon.  Okay?

100

Defendant's Closing Argument

254

1          When you listen to the evidence and when you take it

2     as a whole, what Officer Webb says and what Mr. Hood say make

3     perfect sense in terms of the two sides of this story.

4          Now, Officer Webb said that his vehicle was -- that

5     the overhead emergency lights were on, and that they were

6     bright and very bright.  They pick up things, they reflect off

7     things, which I asked him, such as a 44 caliber Ruger

8     revolver.

9          Officer Webb in his initial testimony never saw a

10    weapon.  He walked right by -- if his testimony is to be

11    accepted at face value, he went right by this weapon.  Unable

12    to see it.  When you look at the photographs that the United

13    States has presented, they would have you believe that Officer

14    Webb went right by this hog leg here and didn't see it.

15         If he didn't see it, I submit to you he didn't see it

16    because it was not illuminated because his lights were not on.

17    That would be the only way to explain how Officer Webb would

18    not see this firearm.  His lights were not on.

19         Now, his headlights were on, obviously.  We heard the

20    testimony of Mr. Hood who said as he was going down the

21    street, he saw the vehicle behind him, and he was concerned

22    because he saw the vehicle's headlights lift up as if the

23    vehicle were accelerating.  That makes perfect sense here.

24         Now, Albert Hood is innocent.  But it's not my burden

25    to prove to you that Albert Hood is innocent.  When the great

Defendant's Closing Argument

255

1   weight of the United States Government is brought to bear, and

2   you are here to weigh the issue of his future, it is not the

3   burden of a Mickey Mouse defense lawyer to prove that he's

4   innocent.  It's the United States' burden to prove beyond a

5   reasonable doubt that he is guilty.

6       And what does that mean?  I mean, we throw this

7   phrase around, we throw a lot of phrases around.  You know,

8   during jury selection, I asked, you know, can you give a guy a

9   fair trial?

10       Well, years ago, it was portrayed in the movie *True*

11   *Grit,* Judge Parker, who controlled the Oklahoma territory,

12   once told the defendant that, "Yes, you'll get a fair trial

13   followed by a first-rate hanging."

14       So what really is a fair trial?  A fair trial is what

15   each of you, the 12 of you individually, I hope, will give

16   Mr. Hood.  And it is an individual decision for all 12 of you.

17   This is not a collective.  This is not a majority rules.  This

18   means each one of you has an individual decision to make.  If

19   you get back there, and six of you think one thing, and six of

20   you think another, he's entitled to your individual decisions.

21   This is not majority rules.  This is your individual call

22   based on the evidence here.

23       And what the evidence shows is that perhaps Mr. Hood

24   had a firearm, and perhaps Mr. Hood did not have a firearm.

25   Proof beyond a reasonable doubt means you have to know in your

Defendant's Closing Argument

256

1  heart of hearts, without any question, that Mr. Hood is
2  guilty.  And that's not the case here.
3      How could Officer Webb not see the firearm?  Because
4  it's dark, it's unlit.  He's not using his flashlight until he
5  gets back to the area in the back of the house, which is
6  illuminated by street lights from Belmont.  Yet then turn
7  around and say, "Oh, my vehicle was lit up.  Those bright blue
8  and white overhead emergency lights were activated, and
9  they're very clear, they're very bright."  But that doesn't
10  dovetail with him not being able to see this firearm that he
11  says -- he assumes that Mr. Hood threw when he was watching
12  him walk down -- or run down the west side of the house.
13      Mr. Hood ran.  Is that evidence of guilt?  It could
14  be evidence of guilt, but you have also heard evidence of
15  Mr. Hood's state of mind.  That Mr. Hood was a shooting
16  victim, and that his house was the subject of a shooting just
17  prior to that.  And I have presented photographic evidence of
18  that shooting.  And I have presented testimony when that
19  shooting occurred.
20      Now, you've heard rebuttal evidence by the People
21  saying, "Well, we don't have a CAD's or an RMS report on
22  that."  Why is that?  Why is there no CAD's or RMS report?  I
23  don't know.  I do not know.  But the evidence of the bullet
24  holes is there.  And the evidence of Mr. Hood being a shooting
25  victim and the subject of gang retaliation is undisputed.

Defendant's Closing Argument

257

1          So when it comes to weighing his credibility and his
2   believability, given, Mr. Hood is on trial here.  He is not
3   dressed in a dapper uniform of Fresno's Finest.  And does he
4   have an interest in this case?  Absolutely.  His freedom is at
5   stake.
6          Does the officer have a stake in this?  Well, I
7   submit to you that in an instance where a firearm is found,
8   they need to make this case work.  And they need to make this
9   case work by traveling the shortest distance.
10         Mr. Hood did not stop when the officer was behind
11  him.  This is undisputed.  Mr. Hood has been convicted before.
12  This is undisputed.
13         This Ruger 44 caliber pistol was not made in the
14  State of California.  I'm pretty sure it was made in
15  Bridgeport, Connecticut.  Therefore, we are here because it
16  traveled to California before being sold through the channels
17  of interstate commerce.  That's undisputed.
18         What is the sole subject of dispute?  And what I
19  invited you to focus on at the beginning of this case is
20  whether or not the United States has proved beyond a
21  reasonable doubt that Albert Hood possessed that firearm on
22  the 4th of December 2011.
23         Now, you heard Mr. Hood's testimony, and Mr. Hood
24  told you that when he got out of the vehicle, he saw someone
25  on the side of his house.  He did not identify that person.

Defendant's Closing Argument

258

1   And I hope my client will forgive me.  I'm speculating here.

2   Mr. Hood did not identify that person.  He probably didn't see

3   them.  I think we can make an inference from the evidence,

4   though, as to who that person was.

5        You will recall both Officer Webb and Sergeant

6   Alvarez told you that they spoke to someone inside the house.

7   Mr. Hood said that someone went inside the house.  Both

8   Officer Webb and Albert Hood say that Albert Hood was pounding

9   on the back door trying to get in the back door of the house.

10  Mr. Hood tells you that someone went in the house just before

11  him.  And that someone is the same person who he does not

12  identify on the west side of the house.

13       Later on, the officers do not document who they talk

14  to in the house.  Officer Webb says, "I know I talked to

15  somebody."  Officer Alvarez -- Sergeant Alvarez also says,

16  "Yeah, we talked to somebody inside the house.  I thought it

17  was Mr. Hood's son."  Mr. Hood's testimony was no.  His cousin

18  Brian, who was also an occupant of that house, went in that

19  house.

20       I submit to you that a reasonable reading of the

21  evidence is that Mr. Hood left the convenience store where he

22  had paid his cell phone bill.  That Officer Webb saw him

23  commit a traffic violation there at 10:30 at night on

24  December 4, 2011.

25       That the officer accelerated his vehicle.  Mr. Hood

Defendant's Closing Argument

259

1   looked in the rearview mirror, saw the headlights raise up per

2   his testimony, and his first thought was, 'Oh, no, what's

3   going to happen now?'

4          Mr. Hood pulled up to his residence.  He got out of

5   the vehicle and fled.  If you believe Officer Webb's testimony

6   that it was dark in the front, then you must also believe that

7   his overhead emergency lights were not activated.  His

8   headlights, by any reasonable reading of the evidence, would

9   be on, but they would be facing forward, not into the front

10  yard of the house at 2014 East White.  But his headlights --

11  or his overhead lights weren't on.

12         Mr. Hood would not know who this is, and Mr. Hood,

13  acting reasonably, in fear for his safety ran.

14         Now, if Brian Hood was standing outside, and he saw

15  the police vehicle pull up, or he saw a vehicle pull up, it's

16  not unreasonable to think that he possessed that weapon.

17         Now, you didn't hear direct testimony to that.

18  Mr. Hood testified truthfully that he couldn't tell who it

19  was, but it was somebody.  And there was somebody found in the

20  house.  So if this is a reasonable inference that you can draw

21  from the evidence in this case -- I'm not saying the only

22  inference.  Obviously the United States does not proceed with

23  a case unless they're fairly confident that they have a decent

24  case.  But that's not the only inference that can be drawn in

25  this case if there are two reasonable inferences.

Defendant's Closing Argument

260

1          We're not telling you that there's a man on the moon
2   here.  I'm saying there are two reasonable inferences.  And
3   one of them is that Albert Hood fled, and that Brian Hood, who
4   was also an occupant in that house, and the evidence shows
5   what's in that house dropped that weapon for whatever reason.

6          Did we have Brian Hood testify?  Well, first of all,
7   Albert Hood doesn't know who it was, or won't identify who it
8   was.  But there was someone in that house by any reading of
9   the evidence in this case.

10          If Officer Webb knew that there was a firearm, that
11   he heard a clink that he recognized as the metallic thud of
12   metal on concrete, you heard Officer Webb's testimony that he
13   was in communication with Sergeant Alvarez.  But he never told
14   Sergeant Alvarez, "I heard a gun."  Sergeant Alvarez came upon
15   it.  Sergeant Alvarez's testimony was that I almost tripped on
16   it, or I almost kicked it.  I'm not certain which it was, but
17   it was one of those two statements.  Why is that?  Because
18   Officer Webb at the time he was following this person did not
19   see him throw something away and was not aware of the firearm.

20          Officer Webb is also not aware of the person on the
21   west side of the building.  Why?  Because he's focused on the
22   guy who got out of the car and ran.

23          Given the state of the evidence in this case, that
24   there are two reasonable inferences that can be drawn in the
25   evidence in this case, you must find Albert Hood not guilty.

Government's Rebuttal Argument

261

1    You're not being asked to find Albert Hood innocent.

2    Obviously he's not.  He is my friend, but he is not an

3    innocent.  But he is not guilty, and I ask you to find as

4    such.

5              Thank you.

6              THE COURT:  And rebuttal on behalf of the Government.

7              MS. SANCHEZ:  Thank you, Your Honor.

8              I do want to clear up two points.  One, the standard

9    for beyond a reasonable doubt was read to you by the Court.

10   And the standard for beyond a reasonable doubt does not

11   require that you find without question the defendant possessed

12   the firearm.  The instruction specifically says it's not

13   beyond all doubt.  It's beyond a reasonable doubt.  And there

14   is not two reasonable inferences to be made in this case.

15   There is one, and that's based on the testimony of Officer

16   Webb and Sergeant Alvarez.

17             The defense would have you believe that Officer Webb

18   has to mold his testimony to make this case work.  That's not

19   true.  Officer Webb goes to his job every single day.  The

20   defense has presented no interest that this officer would have

21   in making up facts to make them fit a scenario, to make any

22   person guilty of anything.  Officer Webb came in and told you

23   facts that both -- you might think would benefit and detract

24   from his -- from his case, his cause, if you want to call it

25   that, the Government's case.

Government's Rebuttal Argument

262

1          Officer Webb didn't say he saw a gun fall from the

2    defendant.  He told you what he observed.  He was running.

3    There was illumination, but he explained to you that it wasn't

4    plain as day illumination.  He saw a dark object fall from the

5    defendant.  He didn't make assumptions.  He heard it hit the

6    ground.  He told you he's heard guns hit the ground before,

7    and it was a sound consistent with that.

8          And Sergeant Alvarez told you that he arrived moments

9    later.  To believe the defendant's version, which is not to

10   believe Officer Webb, you have to believe the defendant.  And

11   that would discount both Officer Webb and Sergeant Alvarez.

12         Sergeant Alvarez told that you when he arrived at the

13   residence, that the blue and red lights on Officer Webb's car

14   were illuminated.  That's consistent with Officer Webb's

15   testimony that he illuminated his blue and red lights.  He ran

16   from the car on the heels of the defendant who ran into the

17   backyard of the residence.

18         When Officer Webb saw the object fall from the

19   defendant, he was on the heels of the defendant.  He was in

20   close proximity of the defendant.  He told you that.  There

21   was no one else there who dropped a gun.  He didn't mistake

22   one person for two people.  That would be what you would have

23   to believe if you were to believe the defendant's versions of

24   the facts.

25         Officer Webb saw and heard an object fall to the

Government's Rebuttal Argument

263

1   ground, which he then learned just moments later was a gun,

2   and then knew that was consistent with the observations that

3   he had made.  He didn't come in and tell you, "I saw a gun on

4   the defendant.  I saw the defendant holding a gun."  He told

5   you what his observations were, so you could make that

6   conclusion because that's your job.  His job is to give you

7   the facts as he perceived them, not make assumptions, and let

8   you make inferences and reasonable inferences.  And that's

9   what he did.

10         So, again, the standard in this case is not without

11  question.  It's beyond a reasonable doubt.

12         And the defense attorney also alluded to the fact

13  that you are here to decide his client's future.  That, too,

14  is not true.  As the judge told you, your job is solely to

15  focus on the facts and make a determination as to whether the

16  facts have proven the defendant guilty beyond a reasonable

17  doubt, not to consider anything that's going to happen after

18  this point.

19         So it's the Government's position that the evidence

20  that you heard from Officer Webb and Sergeant Alvarez fits.

21  What the defendant told you is like making a square peg fit

22  into a round hole.  There are too many things that have to

23  align that just don't.  That would have to be unlucky

24  occurrences, happenstances.  And common sense should tell you

25  that that's not the case.  That's not what happened here.

264

1          The officers' version of events is what makes sense,

2    and that's the version that you should accept.  Thank you.

3          THE COURT:  All right, members of the jury, I'll go

4    ahead and read you the concluding instructions.

5          When you begin your deliberations, elect one member

6    of the jury as your foreperson who will preside on the

7    deliberations and speak for you here in court.  You will then

8    discuss the case with your fellow jurors to reach agreement if

9    you can do so.  Your verdict, whether guilty or not guilty,

10   must be unanimous.

11         Each of you must decide the case for yourself, but

12   you should do so only after you have considered all of the

13   evidence, discussed it fully with the other jurors and

14   listened to the views of your fellow jurors.

15         Do not be afraid to change your opinion if the

16   discussion persuades you that you should.  But do not come to

17   a decision simply because other jurors think it is right.

18         It is important that you attempt to reach a unanimous

19   verdict, but, of course, only if each of you can do so after

20   having made your own conscientious decision.  Do not change an

21   honest belief about the weight and effect of the evidence

22   simply to reach a verdict.

23         A verdict form has been prepared for you.  After you

24   have reached unanimous agreement on a verdict, your foreperson

25   should complete the verdict form according to your

265

1    deliberations, sign and date it and advise the Court that you
2    are ready to return to the courtroom.
3         The verdict form is relatively straightforward.  It's
4    a single page and just indicates on here the finding of the
5    jury, whether "not guilty" or "guilty," and then the date and
6    the signature line for the presiding juror.
7         If it becomes necessary during your deliberations to
8    communicate with me, you may send a note through my staff,
9    signed by one or more of you.  No member of the jury should
10   ever attempt to communicate with me except by a signed
11   writing, and I will respond to the jury concerning the case
12   only in writing or here in open court.
13        If you send out a question, I will consult with the
14   lawyers before answering it, which may take some time.  You
15   may continue with your deliberations while waiting for the
16   answer to any question.  Remember that you are not to tell
17   anyone, including me, how the jury stands numerically or
18   otherwise on any questions submitted to you, including the
19   question of the guilt of the defendant until after you have
20   reached a unanimous verdict or you have been discharged.
21        Okay, in a moment, you'll begin your deliberations.
22   We will send back to you a couple copies of the jury
23   instructions, the verdict form itself, and then the exhibits
24   that have been received into evidence, which are basically the
25   photographs.

266

1          Now, one exhibit is the firearm, but it is the policy

2    of the Court not to send out firearms, drugs, or contraband

3    back to the jury just for safety concerns.  As Government

4    counsel pointed out to you, before a weapon comes into the

5    courtroom, it is rendered disabled basically, so there is no

6    danger of the weapon, but just for safety purposes, we don't

7    send it back.  But if any juror wishes to view, handle the

8    exhibit, that's fine.  What happens is, you just come back in

9    the courtroom, and we'll have law enforcement officer

10   supervise the showing of the firearm to you, if necessary.

11         All right, I'm going to ask now the clerk of the

12   Court to administer an oath to the Court staff.

13         (The court staff, Ray Horng, and Al Mason, Court

14   Security Officer, were duly sworn to take charge of the jury.)

15         THE CLERK:  Thank you.

16         THE COURT:  All right.  Members of the jury, and,

17   Juror 0023, if you just remain in the courtroom.

18         All right.  Okay, so with that, then, our staff will

19   escort the jury to begin your deliberations.  It will be a few

20   minutes before we get the other materials to you, but you can

21   go ahead and start your deliberations before the instructions,

22   verdict form, and exhibits are sent back to you.

23         (Jury excused from the courtroom at 10:30 AM for jury

24   deliberations.)

25         THE COURT:  All right, the record will reflect that

267

1    the jury has left to begin their deliberations.  Our alternate

2    juror, Juror 0023, will be escorted to the other jury room to

3    wait to see whether or not she is needed to substitute in.

4            Otherwise, let me ask, is there anything we need to

5    address now?  Of course, we need just the modification of that

6    one instruction.  But anything for the Government at this

7    time?

8            MS. SANCHEZ:  No, Your Honor.

9            THE COURT:  Defense?

10           MR. LINDAHL:  No, Your Honor.

11           THE COURT:  If you folks just stand by, and, again,

12   check with staff here to make sure that the documents that you

13   believe are in evidence can go back to the jury there.  The

14   verdict form, and then once we get that one modification of

15   the jury instruction, and that will go back.  We might just go

16   ahead and send back the exhibits and the verdict form before

17   we send back the instructions just so the jury will have those

18   before.

19           But otherwise, if there is nothing else, just stand

20   by.  If I need to come back on the bench for any reason, I

21   will.  Otherwise, as soon as we hear from the jury, questions

22   or verdict, we'll reconvene.

23           All right, so we'll be in recess.

24           (Recess.)

25           (The following proceedings were held outside the

268

1   presence of the jury at 11:32 AM:)

2            THE COURT:  All right, back on the record outside the

3   presence of the jury.  It's my understanding the jury has

4   arrived at a verdict.  Is there anything by the parties before

5   I have the jury come in for plaintiff's side?

6            MS. SANCHEZ:  No, Your Honor.  Thank you.

7            THE COURT:  Defense side?

8            MR. LINDAHL:  Your Honor, does the Court normally

9   poll jurors upon counsel's request?

10           THE COURT:  Yes.

11           MR. LINDAHL:  Okay.

12           THE COURT:  I normally poll with or without.

13           MR. LINDAHL:  Thank you.

14           THE COURT:  Basically the procedure will be the jury

15  will come in, I'll receive the verdict, I'll read the verdict

16  into the record.  I'll poll the jurors.  I'll ask if counsel

17  has anything further of the jury.  If you do, let me know.  If

18  you don't, then I will discharge the jury and let them go.

19           And then I usually go -- well, I will go back and

20  chat with the jury.  I don't talk about the case.  I tell them

21  there are always post-trial proceedings in civil and criminal

22  cases.  I just basically thank them and give them a

23  certificate.

24           I will tell them if they want to talk to the

25  attorneys, they can do so.  If so, that will be downstairs in

269

1    the lobby area.  Obviously, if you don't need to talk to them,

2    that's fine.  If you do and they don't wish to talk to you,

3    then just let them go.

4            All right, anything else?

5            MR. LINDAHL:  No, Your Honor.

6            MS. SANCHEZ:  No, Your Honor.

7            THE COURT:  All right, let's have the jury come in.

8            (Pause in the proceedings.)

9            (The jury returned to the courtroom at 11:34 AM and

10    the following proceedings were had:)

11            THE COURT:  All right, the jury will reflect that --

12    I'm sorry, the record will reflect that the jury is personally

13    present in court.  Go ahead and have a seat.

14            All right, let me ask, who is the presiding juror?

15    All right.  Juror 0009, has the jury arrived at a unanimous

16    verdict in this case?

17            JUROR 0009:  We have, Your Honor.

18            THE COURT:  All right, if you can hand the verdict

19    form to court personnel, who will then hand it to me.

20            Members of the jury, I'm going to go ahead and read

21    the verdict into the record.  I'll ask the presiding juror if

22    the verdict as read by the Court reflects your unanimous

23    verdict in all respects.  If she answers "yes," then I will

24    poll the jury.  Basically I'll ask if the verdict as

25    published, that is, read by the Court reflects your individual

270

1    verdict in all respects.  If so, just answer "yes."

2         If not, if you have any questions, answer "no," which

3    is not a problem at all.  You just continue with your

4    deliberations.

5         Very well.  All right, I have received the verdict

6    form, and it reads as follows:

7         "Verdict Form Count One.  We, the jury, return the

8    following verdict with respect to Count One in the indictment,

9    Felon in Possession Of a Firearm."  And in there, it indicates

10   "guilty" and the number would be 12.  And it is dated and

11   signed.

12        So in this case, the jury has reached a unanimous

13   verdict of guilty in this case.  Is that a true and accurate

14   reflection of the verdict in this case, Juror 0009?

15        JUROR 0009:  Yes, Your Honor.

16        THE COURT:  Very well.

17        All right, I'm going to ask each of you, then, if the

18   verdict as read by the Court reflects your individual verdict

19   in all respects.  If so, answer "yes."  If not, say "no."

20        All right, does the verdict as read by the Court

21   reflect your individual verdict in all respects, Juror 0020?

22        JUROR 0020:  Yes.

23        THE COURT:  All right, Juror 0002?

24        JUROR 0002:  Yes.

25        THE COURT:  Juror 0016?

271

```
1              JUROR 0016:  Yes.
2              THE COURT:  All right, Juror 0004?
3              JUROR 0004:  Yes.
4              THE COURT:  All right, Juror 0017?
5              JUROR 0017:  Yes.
6              THE COURT:  All right, Juror 0006?
7              JUROR 0006:  Yes.
8              THE COURT:  All right, Juror 0015?
9              JUROR 0015:  Yes.
10             THE COURT:  All right, Juror 0022?
11             JUROR 0022:  Yes.
12             THE COURT:  All right, Juror 0009?
13             JUROR 0009:  Yes.
14             THE COURT:  All right, Juror 0010.
15             JUROR 0010:  Yes.
16             THE COURT:  All right, Juror 0011?
17             JUROR 0011:  Yes.
18             THE COURT:  And, Juror 0026?
19             JUROR 0026:  Yes.
20             THE COURT:  Very well.  All right, I'm going to ask
21    the clerk to go ahead -- there are two copies.  Just enter one
22    for the record, then.
23             All right, the jury has arrived at a verdict in this
24    case, which has been read by the Court and placed into the
25    record.  Is there anything further by the parties as to the
```

272

1    jury itself before I discharge the jury?  First, on behalf of

2    plaintiff?

3            MS. SANCHEZ:  No, Your Honor.  Thank you.

4            THE COURT:  On behalf of the defendant?

5            MR. LINDAHL:  No, Your Honor.

6            THE COURT:  Very well.  All right, members of the

7    jury, I'm going to go ahead and discharge you in a moment.

8    That concludes your service as jurors in this case.  What will

9    happen is that you'll go back to the jury room, and I'll go

10   back to meet with you very briefly just to thank you and to

11   give you certificates.

12           You're released from the admonition, as far as

13   communication with anyone on the outside.  You're free to

14   speak now.  If you wish to speak with the lawyers, you may,

15   but you're not required to.  That would be downstairs in the

16   lobby area.  If you just want to leave and go on your way,

17   they'll understand that.

18           But with that, then, there being no further

19   proceedings involving the jury, then, I will discharge the

20   jury with our thanks.  Thank you very much.

21           (The jury was excused.)

22           THE COURT:  All right, the jury has left.  Please be

23   seated.

24           If there are any post-trial matters, we can take

25   those up.  All I want to do today is to set a date for

119

273

1  consideration of the Presentence Report and Sentencing.  So in

2  this case, I will advise that a written Presentence Report

3  will be prepared by the probation office.

4       And in this case, Mr. Hood, you will be asked to give

5  information for the report.  You are entitled to have your

6  attorney present at any contact that you have with the

7  probation office.  You and your attorney will be permitted to

8  read the report and file any objections to the report before

9  your sentencing hearing.

10       At your sentencing hearing, both you and your

11  attorney will have the opportunity to speak on your behalf.

12       Okay, we'll set consideration of the report and

13  sentencing, and that will be for Monday, December the 23rd,

14  and that would be at 10:00 in the morning here in this court.

15       Okay, before we adjourn this proceeding, then,

16  anything further on behalf of plaintiff's side?

17       MS. SANCHEZ:  No, Your Honor.  Thank you.

18       THE COURT:  Anything further on behalf of defense

19  side, then?

20       MR. LINDAHL:  Not today, Your Honor.

21       THE COURT:  All right, the Court will stand in

22  recess, then.  Thank you.

23       (Court was adjourned at 11:39 AM.)

24

25

274

1

2          I, Gail Lacy Thomas, Official Court Reporter, certify
that the foregoing transcript is true and correct.

3

4    Dated:  05/19/2014              /s/ Gail Lacy Thomas
                                     GAIL LACY THOMAS, RMR-CRR

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

UNITED STATES OF AMERICA,    ) 1:11-cr-443 AWI
                             )
          Plaintiff,         ) JURY TRIAL
                             )
     vs.                     ) DAY 1
                             )
ALBERT HOOD,                 )
                             )
          Defendant.         )
———————————————————————————  )

Fresno, California                Wednesday, October 16, 2013

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Vol. 1, Pages 1 to 215, inclusive

REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

2

APPEARANCES OF COUNSEL:

For the Government:                    **KIM SANCHEZ**
                                      Assistant U.S. Attorney
                                      2500 Tulare Street
                                      Suite 4401
                                      Fresno, California 93721

For the Defendant:                    **LINDEN ARLAN LINDAHL**
                                      Attorney at Law
                                      2014 Tulare Street
                                      Suite 505
                                      Fresno, California 93721

3

<u>INDEX</u>

**GOVERNMENT'S WITNESSES:**

**KENNETH WEBB**                                    131
DIRECT EXAMINATION                                 132
BY MS. SANCHEZ
CROSS-EXAMINATION                                  145
BY MR. LINDAHL
REDIRECT EXAMINATION                               155
BY MS. SANCHEZ
RECROSS-EXAMINATION                                160
BY MR. LINDAHL
**JOE ALVAREZ**                                    161
DIRECT EXAMINATION                                 162
BY MS. SANCHEZ
CROSS-EXAMINATION                                  167
BY MR. LINDAHL
**KENNETH WEBB**                                   202
DIRECT EXAMINATION                                 202
BY MS. SANCHEZ
CROSS-EXAMINATION                                  206
BY MR. LINDAHL
REDIRECT EXAMINATION                               207
BY MS. SANCHEZ
RECROSS-EXAMINATION                                207
BY MR. LINDAHL
**JOE ALVAREZ**                                    208
DIRECT EXAMINATION                                 208
BY MS. SANCHEZ

**DEFENDANT'S WITNESSES:**

**ALBERT HOOD**                                    182
DIRECT EXAMINATION                                 183
BY MR. LINDAHL
CROSS-EXAMINATION                                  194
BY MS. SANCHEZ

*****

4

## EXHIBITS

| GOVERNMENT'S | RECEIVED |
|---|---|
| 1-A, 1-H | 137 |
| 2 | 145 |
| 1-H.1 | 167 |

| DEFENDANT'S | |
|---|---|
| A to H | 186 |

*****

5

1   Wednesday, October 16, 2013                    Fresno, California
2                                                  8:35 a.m.

3

4            THE CLERK:  Calling action CR-11-443, United States
5   versus Albert Hood for jury trial.
6            THE COURT:  Okay, good morning.  If I could have your
7   appearances for the record.
8            MR. LINDAHL:  Linden Lindahl appearing with and for
9   Mr. Hood, who is present.
10           MS. SANCHEZ:  Kim Sanchez, representing the United
11   States.
12           THE COURT:  Okay, basically we're convening outside
13   the presence of the jury panel.  Before we have the jury panel
14   come in, I did want to cover a few things.
15           So, first of all, are there any matters we need to
16   take up now before we begin the jury selection process, first
17   on behalf of plaintiff's side, anything?
18           MS. SANCHEZ:  I can't think of any, Your Honor.
19           THE COURT:  All right.  Defense, anything?
20           MR. LINDAHL:  Your Honor, I would just inquire, the
21   Court's selection method, do you use what's referred to as a
22   six-pack method?
23           THE COURT:  Yes.
24           MR. LINDAHL:  Okay.
25           THE COURT:  And I'll cover that in just a moment.  So

6

1    anything else for now, though?

2          MR. LINDAHL:  No, Your Honor.

3          THE COURT:  All right, let me just explain to you

4    very briefly what my process.  When the jury panel comes in,

5    I'll go ahead and make the initial introductions -- let's

6    see -- okay, and basically what I do, I introduce everyone at

7    counsel table.  So plaintiff's side, Miss Sanchez, I'll go

8    ahead and introduce you, and then you have one officer with

9    you there?

10          MS. SANCHEZ:  That's correct, Your Honor, and the ATF

11    agent is present as well.

12          THE COURT:  Okay.

13          MS. SANCHEZ:  The ATF's agent's name doesn't appear

14    on the paperwork.  Her name is Special Agent Sharon Reynolds,

15    and I don't plan to call her as a witness.

16          THE COURT:  Will she be at counsel table when the

17    jury panel comes in?

18          MS. SANCHEZ:  She'll be sitting behind me.  Officer

19    Webb will be sitting with me.

20          THE COURT:  Okay.  Okay, so then I'll go ahead and

21    introduce you and Officer Webb, and then I'll turn to you

22    Mr. Lindahl, introduce you and Mr. Hood.  I'll introduce a

23    couple of my staff people, and then on the -- on the witness

24    list, I do have the Government's witness list, Officer Webb,

25    Officer Alvarez, and Timothy Warren Stromer.

7

 1          Defense side, are there any individuals you wish me

 2    to disclose to the jury panel to see if they know anybody

 3    involved in the case?

 4          MR. LINDAHL:  Well, only Mr. Hood.

 5          THE COURT:  All right.  Okay, and obviously he'll be

 6    introduced as a party.

 7          Okay.  So I'll go ahead and make those introductions.

 8    And, again, I don't indicate whether they are plaintiffs

 9    witnesses or defense witnesses, nor that necessarily they

10    would be testifying, but the purpose of my introducing the

11    witness list to the jury panel is to see if they know anybody

12    involved in the case.

13          Okay, now, what I normally do, I do give a very brief

14    summary to the jury panel for two purposes.  One, so they

15    understand what the case is about; and two, so they understand

16    why we might be asking certain questions on voir dire.

17          I received from the parties a joint statement of

18    facts.  Now, I don't know if that was intended to be something

19    that I would read to the jury panel at the outset, or if

20    that's just something that's part of the evidence that would

21    be presented at some point in time during the trial.

22          MS. SANCHEZ:  If the Court wanted to give a brief

23    overview of the offense, that was a statement of the facts

24    that the parties had agreed on for introductory purposes, if

25    that was the Court's desire.

8

1          THE COURT:  All right.  I probably won't go into this

2    in detail.  What I'll probably do is simply just tell the jury

3    that -- I think I'll just advise the jury that -- Mr. Hood, in

4    this case, this is a criminal law case.  Mr. Hood is charged

5    with being a felon in possession of a firearm, that he has

6    entered a plea of not guilty to that charge, and the jury is

7    not to consider the fact that I mentioned that as evidence in

8    the case, but only to let them know what kind of case this is

9    and why we'll be asking certain questions on voir dire.

10         Okay, now, the jury selection process -- so once we

11   get that taken care of, then we'll call 18 people in the jury

12   box.  It is the modified six pack, or the Arizona selection

13   process.  So in the top upper row, we'll seat six.  The lower

14   row in the box, which will be the middle row, we'll seat six.

15         In the front area where those six chairs are, we'll

16   seat the other six.  So we'll conduct the voir dire on those

17   18 people.  I'll be asking a number of questions of them.  If

18   at some point in time, any of the prospective jurors are

19   excused for cause, then we'll just fill that seat instead of

20   just trying to move forward.

21         For example, if I excuse for cause prospective juror

22   number one, I'm not going to move everybody forward and fill

23   seat number 18.  I'm just going to plug in and put someone in

24   seat number 1.  The main reason for that is, it gets very

25   confusing, and I think if you folks had to continually try to

9

1    move your charts or readjust your charts, I think it would be
2    pretty confusing.  So that's what I would do.

3            In terms of cause matters, I'm generally reluctant to
4    allow fairly lenient or liberal cause issues.  Most people
5    obviously would rather be at work or other places.  It's just
6    my experience historically that if I allow someone to leave
7    because they say it's a hardship, I'm going to lose work, half
8    of the people are going to raise their hand, and we're going
9    to lose them.  So I usually spend a lot of time on someone who
10   wants to get off jury service simply so that everyone else on
11   the jury panel understands that it's not going to be easy.
12   They just can't say, "I can't serve."

13           There are a few matters that I do just go ahead and
14   excuse for cause without consulting with counsel.  And they
15   include the following:  Individuals who have a medical
16   situation, doctor's appointment, surgery, or whatever, coming
17   up that cannot be or shouldn't be set over or continued;
18   prepaid vacations where it's nonrefundable.  Every once in
19   awhile, for whatever reason, I'll have a mother or father come
20   in, and they bring their children with them, or whatever, that
21   sort of a thing.  This is a fairly short trial, so I don't
22   expect to see too many people on hardship bases.

23           And then normally what I do is, generally I don't
24   encourage sidebars, but during jury selection, I don't have a
25   problem with going sidebar simply because -- to send out 40 or

130

10

1   50 people to do a reported proceeding, chews up probably 15 or

2   20 minutes by the time we get everybody back in.  So generally

3   during the selection process we might go sidebar a couple of

4   times.  I may call counsel.  It would just be counsel.  It

5   will be off the record.  We'll just go in the hallway.  It is

6   not substantive.  Anything that we say off the record, you're

7   entitled to, and I encourage you to put on the record once we

8   have a break.  The only thing that I call sidebar with counsel

9   only is simply to ask you a question generally about a

10  prospective juror or jurors that have not yet been excused for

11  cause just to get your take.  And if I do call you at sidebar,

12  I'll just ask you what do you think of prospective juror

13  number three, five, and seven who may have given arguably some

14  good reason, but I am reluctant just to automatically excuse

15  someone without consulting with counsel except for those few

16  instances that I've already indicated.

17          And basically it's just a situation, if you both

18  stipulate and agree, then when we come back on the record,

19  I'll just excuse those people.  If either one of you is not

20  willing to stipulate, which is perfectly fine, then we'll just

21  continue on with that process.

22          At the same token, if either one of you -- counsel

23  says, you know, I'm not sure, I have a question about your

24  process or your procedure, or whatever, you can always ask for

25  a sidebar during jury selection process.  We'll just go

11

1    outside in the hallway, and you can let me know what it is.
2    And obviously if there is a significant issue, we will send
3    the jury panel out, and we'll put it on the record
4    immediately.
5         But basically, then, what we'll do is, I'll be asking
6    a number of questions of prospective jurors.  After I'm done,
7    if you wish to have me ask some follow-up questions, just go
8    ahead and jot it down on a piece of paper and hand it up to
9    me.  And if I think it's appropriate, I'll go ahead and ask
10   those questions in that manner.
11        Once we're done with that, then I'll turn over to
12   counsel, I'll give each side 15 minutes to do individualized
13   voir dire.  That doesn't give you a whole lot of time, 15
14   minutes trying to question 18 prospective jurors.  Hopefully
15   based upon any written questions you've submitted beforehand,
16   the questions that I ask, any of your follow-up questions,
17   that I will have covered most of what you want to cover, and
18   so with that 15 minutes that you have, you can hone in on
19   specific prospective juror or jurors or specific areas that
20   you would like to really focus in on.
21        I'm pretty strict on 15 minutes.  When your 15
22   minutes is up, I'll just ask you to please sit down.
23        Once we're done with that, resolved any cause issues,
24   we'll conduct the peremptory challenge stage.  That will be
25   oral on the record.  Plaintiff's side, Government gets six,

12

1    defense gets 10.  In order to balance it out, and I'll keep

2    track of this, basically what I do is, it will be plaintiff's

3    peremptory, defense peremptory.  Plaintiff's peremptory, and

4    then two defense peremptories.  And then back to plaintiff's

5    peremptory, two defense peremptories, et cetera, et cetera.

6          Now, you can obviously pass one of your peremptories

7    tactically if you wish, and that will still preserve all of

8    whatever your remaining peremptories are.  But if you pass,

9    and the other side passes behind you, it's over.  So if you

10   pass tactically, or whatever, and you still have peremptories

11   left, and then the other side passes behind you, that ends it.

12   So don't stand up and say, "Oh, Judge, I made a mistake.  I

13   would like to exercise a peremptory."  It's over.  It's too

14   late.  So be careful when you pass, whether you still have

15   remaining peremptories.

16          We'll pick one alternate juror, so once we get the 12

17   jurors selected, sworn in, we'll go ahead and pick one

18   alternate juror.  Each side will get one peremptory challenge

19   as to an alternate juror.

20          Now, basically, what we're going to do is, once we've

21   completed all of the voir dire of the 18, and we completed the

22   cause matters and we're in the peremptory challenges, there

23   will be 18 people still there because we will have covered all

24   18.  There will be 18 -- when you exercise your peremptories,

25   focus in on the 12 in the box.  Don't worry about the six in

13

1    the front row.  Your jury is going to be the 12 in the box.

2    That's where you exercise your peremptories.

3          If you exercise a peremptory, then the person in seat

4    number 13 will take that person's place.  So basically you

5    know who your jury is going to be.  It's the 12 in the box,

6    and you know who the next six are going to be because those

7    are the next six.  So you'll basically know when you exercise

8    your peremptory, who's going to fill that seat.

9          Now, assuming that you've exercised -- both sides

10   between you have exercised six peremptories, then there would

11   be nobody left in the front row.  There will just be the 12 in

12   the box.

13         The very next peremptory, then, will take someone out

14   of the box, so that there is only 11 people left.  At that

15   point in time, we're going to go ahead and fill that seat with

16   people from the audience area and then fill the other six

17   seats.  So we'll now have seven new prospective jurors.  Our

18   voir dire on them will be focused in on those seven.  The

19   other 11 in the box have already passed cause matters,

20   et cetera.

21         So we'll focus in on those folks.  We'll be asking

22   questions of those new people.  I will give you a couple

23   minutes, two minutes a piece after I'm done with the new seven

24   to go ahead and ask individualized peremptories.  So don't

25   think you have to save any of your 15 minutes for subsequent

14

1    prospective jurors who come in to fill the box.

2            Once we're done with those new seven, we've taken

3    care of the cause issues, and we'll continue on with the

4    peremptory challenge, wherever we left off, and we'll continue

5    on.  You focus on the 12 in the box, including the new juror,

6    prospective juror, and, of course, you know who the next six

7    are going to be as you exercise your peremptories.

8            Any questions on the jury selection process, either

9    side?

10           MR. LINDAHL:  No, Your Honor.

11           MS. SANCHEZ:  No, Your Honor.

12           THE COURT:  Okay.  Now, I do need to advise the jury

13   panel of their time commitment.  Yesterday I think there was

14   an indication that you believed in good faith that we would be

15   able to complete it in two days.  I could indicate to the jury

16   that it could spill over to a third day, but probably based

17   on -- unless you tell me otherwise this morning, it looks

18   like -- assuming we get the jury selected in a reasonable

19   period of time, that based upon the number of witnesses, and

20   the indication of counsel, that we would probably finish up in

21   two days.  Is that still a reasonable estimate?

22           MS. SANCHEZ:  The Government believes that's a

23   reasonable estimate, Your Honor.

24           THE COURT:  Defense?

25           MR. LINDAHL:  Yes, Your Honor.

15

1          THE COURT:  Okay.  I'll tell them two days.  But I'll

2     say it might spill over to the third day, but more than likely

3     it's going to be just two days.  Hopefully that will take care

4     of any cause issues for hardship that the jury panel might

5     express.

6          Okay.  So that's basically the preliminary, so once

7     we reconvene and the jury panel comes in, that's what we're

8     going to be doing.

9          Any questions or other issues for plaintiff's side at

10    this time?

11         MS. SANCHEZ:  No, Your Honor.  Thank you.

12         THE COURT:  Defense at this time?  Defense, anything

13    at this time?

14         MR. LINDAHL:  No, Your Honor.

15         THE COURT:  Let's go ahead and take a break until --

16    well hold on just a second.

17         Okay, they're still doing the orientation with the

18    jury panel.  So let's take a 15-minute -- why don't you come

19    back here at 9:05.  We'll see how they're doing.  As soon as

20    the panel is ready to go, we'll have them come on up, and

21    we'll start the jury selection process.

22         So we'll recess until 9:05.

23         (Recess.)

24         THE COURT:  All right, back on the record, it's my

25    understanding the jury panel is ready to come on in.  Before I

16

1   have them enter the courtroom, is there anything else we need

2   to take up before the jury panel comes in.  Plaintiff's side?

3           MS. SANCHEZ:  I would just note for the Court, I

4   mentioned to the defense counsel that I had advised the

5   officer not to mention that the defendant was on probation at

6   the time that they suspected that night of any gang

7   affiliation, or that they had served a search warrant at that

8   residence previously.  I told the officer that if the defense

9   attorney asked him a question and elicit those responses, of

10  course, he should answer.  But if it's vague, I may ask for a

11  brief break and a sidebar, so the witness knows what to do

12  without violating those instructions.  And I obviously advised

13  him of that because such evidence would be inadmissible unless

14  the defense found a way to make it relevant.

15          THE COURT:  Okay.  All right.  Defense?

16          MR. LINDAHL:  Your Honor, I just have a question

17  regarding courtroom demeanor.  And do I need to stay at the

18  podium because I tend to walk around like I'm doing now.

19          THE COURT:  Right.

20          MR. LINDAHL:  Is that acceptable to the Court?

21          THE COURT:  Yeah, neither side is tethered to the --

22  I mean, to the podium itself, but there are two restrictions.

23  One, of course, is you need to make sure you're close to a

24  microphone so everyone can hear what you're saying.  And,

25  frankly, I've seen attorneys who stray away from the podium,

17

1   who turn their back to the court reporter or even to the jury,

2   and they just cannot hear, and that's just really more of an

3   advisory to counsel.

4           The other thing is, and I notice when you're walking,

5   remember there are going to be people --

6           MR. LINDAHL:  During voir dire, I recognize they're

7   going to be sitting here.

8           THE COURT:  But other than that, yeah, once we get

9   the jury picked, and they've got that -- my rule of thumb is

10  if you can reach out and touch that railing, you're too close.

11          MR. LINDAHL:  All right, Your Honor.

12          THE COURT:  And I notice jurors do get uncomfortable

13  when lawyers get too close to them.

14          MR. LINDAHL:  I don't blame them.

15          THE COURT:  Just a word of caution.

16          MR. LINDAHL:  Thank you, Your Honor.

17          THE COURT:  Anything else, then?

18          MS. SANCHEZ:  No, Your Honor.

19          THE COURT:  I see our illustrious jury clerk here

20  ready to go.  So if there is nothing else, we'll have the jury

21  panel come in and start the jury selection process.

22          (The prospective jurors entered the courtroom.)

23          THE COURT:  All right, the record will reflect that

24  the jury panel is present.  Members of the jury panel, good

25  morning.  We're going to start trial in just a bit.

18

1            There are a couple of things before we get started.

2    First of all, I do want to make a few introductions so you'll

3    see basically some of the players here.  I'll start off with

4    myself.  My name is Tony Ishii.  I'll be the judge who is

5    presiding over this particular trial.  Every trial, whether

6    it's a civil law case or civil law case -- civil or criminal,

7    the parties are designated.  The party that brings the lawsuit

8    is designated as the plaintiff or plaintiffs, and the party

9    against whom the lawsuit is brought is designated as the

10    defendant or the defendants.  That has no other legal

11    significance with respect to how the jury views the evidence

12    and makes its decision.

13            But I would like to introduce the parties to you.

14    This is a criminal law case, and so the plaintiff is the

15    Government entity -- in this case, we designate as the United

16    States.  And the attorney for the Government, the United

17    States is Assistant United States Attorney Kimberly Sanchez,

18    who is seated at the counsel table.  With her is Officer

19    Kenneth Webb, who will be also participating in the trial.

20            The defendant in this case, Mr. Albert Hood, is

21    represented by his lawyer, Mr. Linden Lindahl, who is seated

22    also at counsel table.

23            I want to mention a couple of other names to you who

24    may become involved in the trial as witnesses.  In addition,

25    of course, to Mr. Hood and Mr. Webb, other witnesses might be

19

1   a Mr. Joey Alvarez and a Mr. Timothy Warren Stromer.  Now, I
2   don't expect you to remember all of our names, but basically
3   what we need to know, if you're called up to the jury box, is
4   whether you know anybody involved with the trial that I've
5   mentioned by name.  And if so, we just need to be aware of
6   that, and we'll follow up on that issue.
7           Okay, one thing I do want to mention in terms of my
8   staff, my court reporter Gail Thomas here.  I do want to
9   mention a couple things about her role so that you'll
10  understand why we do certain things.  First of all, she is
11  required to take down everything that's said in the courtroom,
12  and that generates two basic rules:  First, only one person at
13  a time can speak.  And the other thing is, everyone needs to
14  keep their voices up so that she can hear, but more
15  importantly, so everyone in the courtroom can hear.
16          That's generally not an issue because we have
17  microphones throughout.  It only becomes an issue in a limited
18  matter.  During the jury selection process, we have a handheld
19  microphone, and we're going to ask you to use that when you
20  speak so everyone in the courtroom can hear.
21          Okay, now -- okay, very briefly, as I mentioned at
22  the outset, this is a criminal law matter.  In this case,
23  Mr. Hood is charged with an offense.  It's commonly referred
24  to as felon in possession of a firearm.  Now, to that charge,
25  Mr. Hood has entered a plea of not guilty, and so really

20

1   this -- the charge itself has no significance.  It will be up
2   to the jury to make a determination as to whether or not he is
3   guilty or not guilty of that particular charge.
4           And the only reason I mention that to you is, number
5   one, so you'll understand what this case is about very briefly
6   from the title, and also so you'll understand why we're going
7   to be asking certain questions of you during the jury
8   selection process.
9           Okay, at this time, basically I'm going to ask that
10  we call 18 of you to be seated in the jury box.  There are
11  assigned seats, so when your name is called, and you come
12  forward, I'll just indicate to you where you need to sit.
13          THE CLERK:  Juror 0001.
14          THE COURT:  Juror 0001, if you can just come through
15  the gate there, and if you just come -- you'll need to go to
16  your right and then all the way forward here to the front of
17  the jury box.  Okay, and I'm going to ask you to go all the
18  way to the back row and then walk all the way back to the
19  audience area to that first seat there, and that will be
20  designated as seat number 1.
21          THE CLERK:  Juror 0002.
22          THE COURT:  Okay, and, Juror 0002, if you can just
23  come forward and have a seat next to Juror 0001, and that will
24  be seat number two.
25          THE CLERK:  Juror 0003.

21

1          Juror 0004.

2          Juror 0005.

3          Juror 0006.

4          Juror 0007.

5          THE COURT:  Juror 0007, I'm going to have you start a

6     new row, if you can just go all the way back to the front

7     there, and that will be seat number 7.

8          THE CLERK:  Juror 0008.

9          Juror 0009.

10         THE COURT:  Juror 0008, if you have a seat there next

11    to Juror 0007 there, in what will be the middle row, and

12    that's seat number 8.  And Juror 0009 will be seat number 9.

13         THE CLERK:  Juror 0010.

14         Juror 0011.

15         Juror 0012.

16         Juror 0013.

17         THE COURT:  All right, Juror 0013, I'm going to have

18    you start the new row right in the front area there.  That

19    first seat closest to you will be seat number 13.

20         THE CLERK:  Juror 0014.

21         Juror 0015.

22         Juror 0016.

23         Juror 0017.

24         Juror 0018.

25         THE COURT:  All right, now, for those panel members

22

1    who are still in the audience area, you're still very much a

2    part of the jury selection process.  We will be focusing our

3    attention on the 18 of your fellow prospective jurors in the

4    jury box.

5         What I'm going to ask you to do in the audience area

6    is pay attention to the questions we are asking.  And as

7    you're seated out in the audience area, think of what answer

8    you would give if you were seated in the jury box as your

9    fellow prospective jurors are.  And listen then carefully to

10    the answers that are given by the other prospective jurors.

11    That way, if you're called to replace any of the 18, rather

12    than my having to repeat all of the questions all over again,

13    I can just ask you if you heard and understood all the

14    questions that were asked, if you formed an answer in your own

15    mind, and if your answers were any different, or if you wanted

16    to elaborate on anything that your fellow prospective jurors

17    have already responded to.

18         Okay, now, so for those of you in the jury box, we're

19    going to be focusing our attention on you, asking you a number

20    of questions.  I will tell you at the outset, the questions

21    that we are going to be asking are not designed to embarrass

22    you, they're not designed to put you on the spot.  They're not

23    designed to argue with you about your beliefs.  They're simply

24    designed to get you thinking in your own mind whether or not

25    in this particular case you can be fair and impartial to both

143

23

1    sides.

2            All right, now, being fair and impartial is sort of a

3    technical word of art.  We all recognize that in your own

4    lives, you're all basically fair and impartial.  However, we

5    all recognize that you come in here with your own life's

6    experiences which might affect how you view a particular type

7    of case.

8            For example, if this were a civil law case, and the

9    lawsuit involved a traffic collision, and you or a family

10   member had been involved in a traffic collision fairly

11   recently, maybe went to the hospital, et cetera, talked to

12   insurance people, lawyers, that might have an impact on how

13   you view a case if this were a case that involved a traffic

14   collision.  Again, that's just a very basic example of how we

15   recognize that own life's experiences might affect how you

16   view a particular case.

17           Now, at the same time, again, following up on my

18   traffic collision hypothetical, you may have been involved in

19   a traffic collision recently, but that doesn't mean that that

20   disqualifies you from serving on a jury that involves a

21   traffic collision as long as you can separate the two

22   incidences out.  Okay?

23           All right, so with that, then, I'll try to indicate

24   to you as I go along and ask questions, different categories

25   and why I'm going to be asking the questions.  If I ask you a

24

1   question and you're not sure what I'm asking, just ask me to

2   repeat or rephrase it.  If I ask you a question you don't want

3   to answer in open court for whatever reason, let me know.  At

4   our next break when we excuse your fellow jury panel members,

5   then you can mention or give your answer at that time just

6   with the parties and the Court present.

7          Okay, what I'm going to ask you to do -- now, there

8   is a microphone there, Juror 0010, right in front of you.  If

9   you can just pass it all the back to the corner to Juror 0001,

10  because I'm going to ask you the basic question, a little bit

11  of background information on each of you.  And so what I'm

12  going to do is, for the first three of you, I'm going to ask

13  the question specifically.  Okay, by the time I get to the

14  fourth, Juror 0004, and the rest of you, I'll just ask you to

15  give me the background information, and it will be as follows:

16         First of all, I'll want to know where you live.  I

17  don't want your home address.  I just want the community.  So

18  you live in Fresno or Bakersfield or two miles outside of

19  Modesto, whatever, let me know.  The reason that we ask the

20  residence question is sometimes cases are location-specific.

21  For example, in my traffic collision scenario, if that traffic

22  collision had occurred in an intersection in your home

23  community, you pass by that intersection on a daily basis, we

24  need to be aware of that.

25         The next question is employment status, whether or

25

1    not you're employed outside the home.  If so, what is it you

2    do.  If you're self-employed, just what -- very briefly what

3    your business is.  Usually job title or description is

4    sufficient here.  The reason I'm going to be asking the

5    employment question, and it will follow up on some of the

6    other questions I'll be asking you in terms of background is

7    that sometimes people are involved in employment situations

8    that might have some bearing on the case.

9          Again, going back to my traffic collision scenario,

10   if the issue was what happened in the emergency room, and that

11   you happen to be in the medical profession, maybe even work in

12   a hospital, whatever, we just need to know that and be aware

13   of your knowledge or understanding of medical process or

14   medical procedures.

15         If you're retired, what your last job was.  If you're

16   between jobs, what your last job was, et cetera.

17         The next question I'm going to ask is your marital

18   status.  And the reason I'm asking that question is if you are

19   married, whether or not your spouse is employed outside the

20   home.  And, again, that's the employment issue.  You may not

21   be in the medical field, but your spouse may be, and we just

22   need to be aware of that.

23         The next question is children, if you have any

24   children.  We're basically concerned or interested in adult

25   children who are working outside the home.  Again, that's the

26

1    employment question.  So if you have school-aged children, all

2    you have to do is say, "I have two children, a boy eight and a

3    girl five."  That's all I need to know on that.  And, again, I

4    don't need to know anything more about your own children

5    except if they're employed outside the home, what it is that

6    they do.

7            The next question is whether or not there are any

8    other adults living in your household, significant others,

9    mothers, mother-in-laws, roommates, et cetera.  And, again,

10   the only reason I ask that question is, again, the employment

11   situation.  If they're employed outside the home, what it is

12   that they do.

13           And then finally your educational background, just

14   the highest level of formal education or training that you've

15   had.

16           So with the first three of you, I'm going to go

17   through each of these questions individually, and, again, by

18   the time we get to the fourth person, I'll just ask you to

19   give us the background information.

20           Okay, so, Juror 0001, I'm going to start off with you

21   first.  Where do you live?

22           JUROR 0001:  I live in Ridgecrest, California.

23           THE COURT:  And do you work outside the home?

24           JUROR 0001:  Yes, I do.

25           THE COURT:  What do you do?

147

27

```
 1              JUROR 0001:  I am a business financial manager for
 2     unmanned systems.
 3              THE COURT:  All right.  And marital status?
 4              JUROR 0001:  I am married.
 5              THE COURT:  Okay.  Does your husband work outside the
 6     home?
 7              JUROR 0001:  Yes, Your Honor.  He works outside the
 8     home.
 9              THE COURT:  Okay.  And what does he do?
10              JUROR 0001:  He is deputy director for F-18s.
11              THE COURT:  Okay, that's in the military --
12              JUROR 0001:  Yes, sir, I think it's known more as
13     China Lake.
14              THE COURT:  Is he in the military in a civilian
15     capacity?
16              JUROR 0001:  Retired -- we're retired.
17              THE COURT:  Okay.  All right, great.
18              And children?
19              JUROR 0001:  We have three minors at home.  Two older
20     ones are in college.  Full-time students.
21              THE COURT:  All right.  Now, the college-aged
22     students, children, do they have any announced major or
23     emphasis at this point?
24              JUROR 0001:  Yes, Your Honor.  One is a chemical
25     engineer, and the other one is culinary for bakery.
```

28

```
 1              THE COURT:  All right.  And your educational
 2    background.
 3              JUROR 0001:  Associate's degree, working on a
 4    bachelor's.
 5              THE COURT:  Okay.  And what major or emphasis for the
 6    bachelor's?
 7              JUROR 0001:  Technical management.  That should be
 8    finished next year in the summer.
 9              THE COURT:  Great.  Thank you very much.
10              JUROR 0001:  Thank you.
11              THE COURT:  All right, and, Juror 0002.  All right,
12    first, where do you live?
13              JUROR 0002:  I live in Soulsbyville, and that's in
14    Tuolumne County.
15              THE COURT:  All right.  And do you work outside the
16    home?
17              JUROR 0002:  Yes, I do.
18              THE COURT:  What do you do?
19              JUROR 0002:  I am a district sales manager for the
20    local newspaper.
21              THE COURT:  All right.  And your marital status?
22              JUROR 0002:  I am married.
23              THE COURT:  Does your husband work outside the home?
24              JUROR 0002:  No, he's retired.
25              THE COURT:  What was he doing before he retired?
```

29

1          JUROR 0002:  He worked in a chemical plant.

2          THE COURT:  And what was his job title or

3     classification?

4          JUROR 0002:  Well, he was a manager -- I mean,

5     supervisor.  And then he became a safety director at that

6     plant.

7          THE COURT:  Okay.  How long has he been retired?

8          JUROR 0002:  2008.

9          THE COURT:  Okay, great.  Thank you.

10         And children?

11         JUROR 0002:  We have four sons that are all adults.

12         THE COURT:  And do they work outside the home?

13         JUROR 0002:  They do.

14         THE COURT:  What do they do?

15         JUROR 0002:  Our oldest works in the same chemical

16    plant as his dad did.  Our second son is a bike shop owner.

17    Our third son is a mechanic.  And our fourth son is a police

18    officer.

19         THE COURT:  All right.  And what department or agency

20    does he work for?

21         JUROR 0002:  Hayward.

22         THE COURT:  Hayward?  Okay, great.  Okay.

23         Any other adults living in your household?

24         JUROR 0002:  No.

25         THE COURT:  Okay, and your educational background?

30

1          JUROR 0002:  High school.

2          THE COURT:  Great.  Thank you.  Pass the microphone

3    down to Juror 0003.

4          All right, Juror 0003, first, where do you live?

5          JUROR 0003:  Hanford.

6          THE COURT:  Do you work outside the home?

7          JUROR 0003:  Yes, I'm an RN, working as a school

8    nurse for Tulare County Office of Education, mostly based in

9    Pixley, California.

10          THE COURT:  And your marital status.

11          JUROR 0003:  Married.

12          THE COURT:  Does your husband work outside the home?

13          JUROR 0003:  Yes, he's a supervising mechanic at a

14    cotton gin.

15          THE COURT:  Any children?

16          JUROR 0003:  Two.  27 years old, both of them.

17          THE COURT:  Do they work outside the home?

18          JUROR 0003:  Yes, one is a CHP officer based in LA.

19    And the other one is -- I guess he's a research technician in

20    a lab in Santa Maria.

21          THE COURT:  Any other adults living in your

22    household?

23          JUROR 0003:  No.

24          THE COURT:  And your educational background?

25          JUROR 0003:  I have a bachelor's plus several grad

31

1    school credits to get the school nurse credential.

2              THE COURT:  Okay, great.  Thank you very much.

3              All right, and, Juror 0004, if you can give us some

4    background information on yourself.

5              JUROR 0004:  Okay, I live in Kingsburg.  I'm a

6    pediatric occupational therapist.  I work in early

7    intervention.  I'm married.  My husband is a teacher.  And I

8    have a seven-year-old son.

9              THE COURT:  What area does your husband teach?

10             JUROR 0004:  Well, he teaches just outside of

11   Kingsburg, eighth graders.

12             THE COURT:  Okay, eighth grade.  Good.  Okay.

13             All right, and your educational background is --

14             JUROR 0004:  Bachelor's in psychology, master's in

15   occupational therapy.

16             THE COURT:  Okay, good.  Thank you.

17             Pass the microphone down.  And Juror 0005.

18             JUROR 0005:  Hi.  I'm from Kingsburg.  I am a

19   part-time customer service representative in an insurance

20   agency.  My husband is a supervisor at a local ag chemical

21   plant.  I have two adult children, both work outside the home.

22   One works as a secretary at the school district, and the other

23   is a supervisor at a tomato cannery.

24             THE COURT:  And then your educational background?

25             JUROR 0005:  Oh, I'm sorry.  An AA degree.

32

1          THE COURT:  Did you have a major emphasis?

2          JUROR 0005:  Customer merchandising.

3          THE COURT:  Thank you.

4          And, Juror 0006.

5          JUROR 0006:  I'm a retired schoolteacher.  I'm a

6   Viet Nam veteran.  My wife is also retired.  She was employed

7   at CSUF.  I have one adult daughter.  She's a social worker

8   here for County of Fresno.

9          THE COURT:  And then your educational background?

10          JUROR 0006:  I got a bachelor's, plus I'm a retired

11   schoolteacher.

12          THE COURT:  Okay, great.  All right.  Okay, and then

13   what grade level or subject matter --

14          JUROR 0006:  High school.

15          THE COURT:  And the courses that you taught were

16   basically what area?

17          JUROR 0006:  Industrial arts and Spanish.

18          THE COURT:  Okay, great.  Your wife, when she worked

19   at the university, what was her title or classification?

20          JUROR 0006:  She was an evaluator there in the

21   admissions office.

22          THE COURT:  Okay, great.  Thank you very much.

23          All right, if we just pass the microphone.  We'll go

24   all the way down to Juror 0007 there at the far end.

25          JUROR 0007:  Good morning.  I live in Stratford,

33

1 California.  I'm self-employed, and then I'm the general

2 manager for the family's business.  I'm married.  My wife is a

3 stay home mom.  She was a dental hygienist.  I have two

4 children, eight and nine.  And then my educational background,

5 I have a bachelor of science in ag system management and a

6 minor in business.

7           THE COURT:  Okay.  And then the family business,

8 then, is in agriculture?

9           JUROR 0007:  Yes, it's a large farming operation.

10           THE COURT:  Thank you very much.

11           And, Juror 0008.

12           JUROR 0008:  Live in Clovis.  Work at the Clovis

13 hospital.  Single, live by myself.  And high school

14 graduation.

15           THE COURT:  All right.  And then at the hospital,

16 what do you do there?

17           JUROR 0008:  It's called surgical procedural

18 assistant.

19           THE COURT:  Oh, okay.

20           JUROR 0008:  Like this side of being a nurse.

21           THE COURT:  Okay, great.  Thank you very much.

22           And, Juror 0009.

23           JUROR 0009:  I'm from Visalia, California.  I'm

24 married.  I am a cruise expert.  I am a manager of the dot.com

25 division.  I also do bookkeeping for a doctor in Visalia.  My

154

34

1    husband is a superintendent with a general contractor in

2    Porterville.  I have an 18-year-old daughter.  She goes to

3    COS.  She did an internship at the DA's office over the

4    summer.  She also works part time at the Golf Pro Shop at the

5    Visalia Country Club.  I'm a high school graduate.

6              THE COURT:  Great.  Thank you very much.

7              All right.  And, Juror 0010.

8              JUROR 0010:  I'm from Modesto.  I am married.  We

9    have three kids, six, four, and 19 months.  I work as a

10   financial advisor in Modesto, and I have a bachelor's degree

11   in social science.

12             THE COURT:  Great.  Does your wife work outside the

13   home?

14             JUROR 0010:  No, she doesn't.

15             THE COURT:  Thank you.  All right, Juror 0011.

16             JUROR 0011:  I'm from Reedley.  I'm married.  My

17   husband is disabled.  I have one son, one adult son works

18   outside the home.  He works for P.G.&E.  He's a single dad, so

19   I assist with his little boy because they live near us.  I am

20   self-employed.  I'm a bookkeeper at my truck shop; an AA

21   degree in business.

22             THE COURT:  All right.  Before his disability, was

23   your husband working outside the home?

24             JUROR 0011:  He was a mechanic.

25             THE COURT:  Thank you.  Juror 0012.

35

1          JUROR 0012:  I am the hazardous materials coordinator

2    for Naval Hospital, Lemoore.  My wife is a teacher in Kings

3    County, teaching sixth, seventh, and eighth grade, science and

4    reading.  I have three children, the oldest is a stay-at-home

5    mom.  The second one is a bus driver in Washington State, and

6    my son is an assistant manager at a movie theater and at a

7    game stop.  I've got some college working toward a degree for

8    emergency management.

9          THE COURT:  Okay.  Good, great.  Thank you.

10          Okay, if you can just pass the mike down all the way

11    down to Juror 0013.

12          JUROR 0013:  Okay, I'm a paralegal at a Workers' Comp

13    and social security firm.  I am divorced.  I have a

14    five-year-old daughter, and I have a bachelor's degree in

15    criminology and restorative justice.

16          THE COURT:  Okay, great.  All right.  And, Juror

17    0014.

18          JUROR 0014:  I live in Bakersfield.  I work for Kern

19    County Department of Human Services.  I'm a physical sports

20    specialist.  My husband is retired.  He used to work at

21    Ralph's Grocery Store.  No children.  Education, I have some

22    college.  And I forgot the other question.

23          THE COURT:  Let me back up.  Did you have a major or

24    emphasis in college?

25          JUROR 0014:  Caseload management.

36

```
 1            THE COURT:  All right.  Okay, I think that takes care
 2   of it.  Thank you.
 3            JUROR 0014:  Oh, mother-in-law.
 4            THE COURT:  Oh, living in the household.  Okay.  Does
 5   she work outside the home?
 6            JUROR 0014:  She's 90 years old.
 7            THE COURT:  All right.  Thank you.
 8            JUROR 0015:  Hi, I live in Fresno, I just recently
 9   got a job as a bookkeeper with a CPA.  I am married, but
10   separated.  My husband is a financial planner.  I have three
11   grown children.  My oldest son who actually lives with me
12   right now is unemployed.  My middle son is in Idaho.  Works
13   for the forestry in the summertime.  My daughter lives here in
14   Fresno, and she works as a policy administrator in my
15   husband's office.  I have an AA degree in business
16   administration.
17            THE COURT:  Great, thank you.  And, Juror 0016.
18            JUROR 0016:  I live in Orange Cove.  I'm an
19   after-school program teacher, and I also -- I'm the
20   cross-country coach at that school.  I live with my mom.  And
21   my younger sister, she's a student and in general education.
22   What else?
23            THE COURT:  Okay.  Does your mom work outside the
24   home?
25            JUROR 0016:  She works outside the home.  She works
```

37

1    at a fruit-packing house.

2         THE COURT:  All right, and your sister, does she have

3    an emphasis or major?

4         JUROR 0016:  Criminology.

5         THE COURT:  All right, good.  Thank you.

6         All right, Juror 0017.

7         JUROR 0017:  Okay, I live in Dos Palos.  I am

8    married, but currently separated.  And I have two adult

9    children.  One is a funeral arranger, and the other works for

10   the California Department of Corrections.  And high school.

11        THE COURT:  And the son that works for the Department

12   of Corrections, what is his job title?

13        JUROR 0017:  It's my daughter.

14        THE COURT:  Or daughter.

15        JUROR 0017:  I have two daughters.  I'm not real

16   sure.  She started out as an officer, and now she is -- I'm

17   not sure of her title.  Some kind of rehab counselor,

18   something like this.  I'm not sure of her title.

19        THE COURT:  Okay.  Fine.  And, Juror 0018.

20        JUROR 0018:  Yes, I'm married.  I work for the County

21   of Madera as a certified shorthand reporter.  My husband just

22   started a job two weeks ago working for the DA's office.

23   Before that, he worked for family support.  I live in

24   northwest Fresno, and we have one son that's seven.

25        THE COURT:  All right.  Okay.  And then what is his

38

1    title with the District Attorney's Office?

2           JUROR 0018:  He is an account clerk.  He works in the

3    business office.

4           THE COURT:  Okay, perfect.  Great.  Thank you.

5           All right, and there may be some follow-up questions.

6    I know this is a very brief background here.  I'll be asking a

7    number of questions which might touch more on some of the

8    answers that you've already provided to the parties.

9           But let me get to the area that I'm sure you're all

10   interested in, and that is how long is this trial going to

11   last.  I spoke to the attorneys.  Now, unlike a movie or a TV

12   program where there is a set ending time, the dynamics of a

13   trial is such that you really don't know, depending how long a

14   witness testifies, et cetera, et cetera.  But in this case,

15   the parties are reasonably certain that they can get this to

16   the jury by tomorrow.  There are not a lot of witnesses here.

17   It's relatively straightforward.  So in terms of any time

18   frame involvement is basically for you today, tomorrow,

19   arguably could spill over to Friday, not likely.

20          Our jury clerk might have indicated to you we have

21   very few provisions for excusing people.  Hopefully, because

22   of the fairly short duration of this trial, you'll be able to

23   serve.  But we do try to accommodate folks.  Normally if it's

24   a longer trial, if you have a doctor's appointment, you have

25   to be someplace earlier in the day or late in the day, we can

159

39

1   always start a little later or end a little earlier.  We
2   probably shouldn't try to do that in this trial, because in
3   order to finish it up in two days, we need to full two days.
4           So with that understanding, though, if we have any
5   scheduling issues that we need to be aware of for any of you,
6   please let me know.
7           So let me go ahead and start off in the back row.
8   Are there any scheduling issues for today or tomorrow that we
9   need to be aware of?  Anybody in the back row there?
10          Yes, I'm sorry, Juror 0004.
11          JUROR 0004:  I'm not concerned about tomorrow.  I'm
12  worried about Friday because of my child to school.
13          THE COURT:  Yeah.  According to what the attorneys
14  have indicated, and it seems reasonable we'll be done.  The
15  only reason I mentioned Friday is obviously it can spill over
16  to that day.  But they believe that they can actually get this
17  to the jury by tomorrow, and then it's up to the jury how
18  long.  But we'll keep that in mind.
19          Anybody else in the back row?
20          (No response.)
21          THE COURT:  All right, how about what I'm going to
22  call the middle row there in the jury box.  Anybody?
23          (No response.)
24          THE COURT:  All right, how about the front row, any
25  issues there?

40

1          (No response.)

2          THE COURT:  Okay, great.

3          All right, let me just go through some of the basic

4    principles here.  With respect to a criminal law case, I'm

5    going to -- there are three guiding principles that govern how

6    a jury approaches and views a criminal law matter.  And,

7    again, I'm not going to go into any great detail on the legal

8    aspects, but you have heard of most of these principles

9    before, and I'm just going to try to put it in the context of

10   this case and your service as a juror.

11          The basics that govern a criminal law case are as

12   follows:  First, a person charged with a criminal offense is

13   cloaked with what we call the presumption of innocence.  That

14   is, as Mr. Hood is seated here in the Court, he is presumed by

15   law to be innocent of any charges.  The fact that he's here in

16   court, the fact that I read to you the charge itself is no

17   evidence of his guilt in this case.  Does anyone have any

18   questions or concerns about that particular principle of law,

19   that a person charged with a criminal law offense is presumed

20   by law to be innocent?  Anyone have any concerns about that?

21          Okay.  The thing that -- the practical thing that you

22   need to be aware of and think about yourself is, bottom line,

23   as we're going through a jury selection process, is as you're

24   seated there, are you indeed, in fact, affording Mr. Hood that

25   presumption of innocence?  Because if you're not, then he

41

1    starts off at a disadvantage, which the law does not allow.

2            So you need to keep that in mind as we go through the

3    questioning process.  If at any point in time you believe that

4    Mr. Hood does not enjoy that presumption of innocence, you

5    need to let us know.

6            Okay, now, the next thing is on every dispute that's

7    involved in a court, whether it's a civil law case or a

8    criminal law case, somebody has the burden of proof.  You're

9    accustomed to that in your own lives and your occupation,

10   family matters, disputes, et cetera.  Does someone really have

11   to prove something to you before you take action.  Whether

12   it's a dispute amongst your children, coworkers, neighbors,

13   et cetera, you want someone to provide information to you so

14   you can decide how to act in a particular situation.

15           That also applies in a court setting.  There is a

16   burden of proof.  Someone has to prove something to you before

17   you can render a verdict.

18           In a criminal law case, the burden of proof is on the

19   plaintiff, and normally in civil, criminal law cases, the

20   burden is always on the party who brings the lawsuit, which is

21   the plaintiff.  In this case, it's the Government, the United

22   States Government.  And the unique thing about a criminal law

23   case is that the burden of proof rests solely on the

24   Government.  The Government wielding its power to charge

25   someone with a criminal offense is then charged with a duty

42

```
 1   solely to prove the individual's guilt.  And that's what we
 2   call the burden of proof.
 3          The corollary rule to that, which is different or
 4   unique to your own life setting is that because the burden of
 5   proof is solely on the plaintiff, the Government, the
 6   defendant in a criminal law case, in this case, Mr. Hood has
 7   no burden at all.  He doesn't have to testify.  He doesn't
 8   have to put on any evidence.  At the end of the Government's
 9   case, he can consult with his lawyer and say, "I don't think
10   they have proven their case," and they don't have to put on
11   any evidence at all.
12          So if you're selected as a juror and you hear the
13   evidence by the Government, and you're not convinced that the
14   Government has met its burden of proof, but then someone says,
15   "Well, yeah, you know, the Government hasn't really met his
16   burden of proof because the defendant didn't testify, didn't
17   put on any evidence," et cetera.  You can't consider that as
18   adding to the Government's case.  Is everyone okay with that?
19   So that's the basic rule in criminal cases whether you're here
20   in federal court or in state court.
21          Now, that doesn't mean that the defense side isn't
22   going to be actively involved, give an opening statement,
23   cross-examine witnesses, et cetera.  Okay, so if the
24   Government has the burden of proof, what is the standard of
25   proof?  The standard of proof in a criminal case is what we
```

43

1   call beyond a reasonable doubt.  Okay, now, I can't quantify
2   that to you in terms of a visual.  If this were a civil case,
3   then we're talking about a preponderance of the evidence.  I
4   can show you an imaginary scale, and if the plaintiff tips
5   that scale, that meets that burden of proof.  There is no such
6   scale as per se in a criminal law case.
7        There is a jury instruction on what beyond a
8   reasonable doubt is, and I will give you that instruction
9   during the course of the trial.  But basically it is that
10  situation, the state of the case when you've heard all of the
11  evidence, that you're convinced, satisfied, that the
12  Government has proven its case beyond a reasonable doubt.
13       The only other thing I can tell you about reasonable
14  doubt is the Government is not required to prove a case beyond
15  all possible doubt because everything in life is subject to
16  some doubt.  Your role, as jurors as you hear all the evidence
17  and you discuss it with your fellow jurors, you have to decide
18  is there some doubt in your mind, a reasonable doubt in your
19  mind that the Government has not proven its case.  And then
20  you need to discuss that and determine whether or not that
21  doubt that you might have in your mind is reasonable or not.
22  If it is reasonable, then the Government has not proven its
23  case beyond a reasonable doubt.
24       I'm going to give you an example.  Sometimes I'm a
25  little reluctant to give it because I'm not sure of what the

44

1   mind-set of some of the jurors are, but I'll give it anyway to
2   you.
3           Let's say the issue in this case were whether or not
4   we actually landed someone on the moon.  Okay, and the
5   Government brings in witnesses, the plaintiff brings in
6   witnesses, scientists, engineers, experts, they bring in rock
7   samples that they say came from the moon, et cetera.  And so
8   from that evidence, you have to decide whether or not someone
9   actually landed on the moon.
10          On the other side, someone might say, well, wait a
11  minute, you know, we've seen some really incredibly good
12  movies that seem to show that someone actually landed on the
13  moon.  And with the technology nowadays, how do we really know
14  that someone actually landed on the moon?  We go to movies,
15  and we see people on the moon, or wherever, and it looks very
16  real to us.  And how do we really know that this rock is a
17  moon rock?  It could have been from anywhere.
18          So that might create some doubt in your mind as to
19  whether or not we actually landed on the moon.  And then you
20  discuss that, and you decide, okay, I have a doubt because of
21  the technology today, because we're really not sure,
22  et cetera.  And you have to decide is that reasonable, is
23  there a reasonable doubt that we landed on the moon?  If you
24  have a reasonable doubt, if you believe based on the evidence
25  or the lack of evidence, that there is a reasonable doubt in

45

1    your mind, then the plaintiff has not proven their case.

2         If, on the other hand, you think about it and say,

3    well, you know, I have thought about it, we looked at it, the

4    evidence, the witnesses, you know, there is some doubt in my

5    mind, but it's not reasonable, then the plaintiff's side has

6    proven its case.  Is everyone okay with that?  All right.

7         Now, so basically those are the principles, the

8    presumption of innocence, burden of proof, and the standard of

9    reasonable, which is beyond a reasonable doubt.

10        Now, combined with those principles, then, your role

11   as jurors, you decide what the facts are in this case.  You

12   are the sole deciders of what the facts are, and you're going

13   to determine what the facts are based upon a couple of things.

14   One, of course, is the witnesses who appear on the witness

15   stand to testify, and the other is exhibits, documents that

16   are received into evidence that you can consider.

17        Now, with respect to the witnesses, the one thing

18   you're going to discover is that you're going to be

19   determining credibility or believability of every witness who

20   appears on the witness stand.  You decide yourself

21   collectively and individually whether or not to believe

22   everything a witness says, only a part of what a witness says,

23   or none of what a witness says.  That's totally your call.

24        And we do have some basic rules or guidelines that I

25   will read to you as a jury instruction.  But basically we are

46

1   relying on the individual and collective common sense of all

2   of the individual jurors to make that determination as to what

3   you're going to believe about a particular witness.

4          Is there anyone who has any qualms or concerns about

5   deciding credibility or believability of witnesses?  Anybody?

6          (No affirmative response.)

7          THE COURT:  With respect to the ground rules again,

8   I'll read to you some basic jury instructions which are fairly

9   common sense.  There are a couple of things that I want to

10  mention to you as far as determining credibility or

11  believability that you can or you should or should not

12  consider.

13         One is you don't consider whether or not it's the

14  plaintiff's side or the defense side that calls a witness.  In

15  other words, whether they're designated as a plaintiff's

16  witness or a defendant's witness.  Whoever calls a witness is

17  really irrelevant in your determination as to whether or not

18  to ascribe any credibility or believability to that witness.

19         The other thing is job title or classification.

20  Okay.  An individual's job title or classification in and of

21  itself does not determine credibility or believability.  Let

22  me give you an example.

23         Let's a go back to my traffic collision scenario.

24  And let's say that you're a jury, and you're to determine in

25  this intersection who had the red light and who had the green

47

1    light in this traffic collision at this intersection.  Two

2    witnesses appear to testify.  One says, "I was standing on the

3    corner of the intersection, and car A had the green light."

4         Another witness appears on the stand and testifies,

5    "I was standing on the intersection" -- I mean, "I was

6    standing at the corner of that intersection and car B had the

7    green light."  And then I turn it over to you and say, okay,

8    you have to decide who had the green light.  You say "I can't

9    decide."  One witness said that car A had the green light, and

10   the other witness said car B had the green light.

11        And you might say, you know, it's hard to decide, we

12   really don't know based on what limited information you

13   provided to us.  If I were to give you one other piece of

14   information, and that is that one of the witnesses -- and I'm

15   just going to pick on one profession.  It could be lawyers or

16   judges.  But let's say I tell you one other fact is one of the

17   witnesses was a doctor.  Now, you might be involved in a

18   medical area.

19        Oh, I'm sorry.  It would be the front row there,

20   Juror 0018, right there in the front.  No, Juror 0018, I'm

21   sorry.  The first one.  Sorry, my fault.

22        So at any rate, if the only other piece of

23   information I gave you is one of the witnesses was a doctor.

24   You happen to like your doctor.  You're in the medical field.

25   You like that profession.  To my knowledge, there is no

168

48

1    information that says a doctor has better eyesight or
2    condition or can identify who has the red light or green light
3    as anybody else.  Okay, is everyone okay with that?  Again,
4    I'm picking on doctors because that's a profession that most
5    people like.  It could be lawyers, judges, whatever.

6              Okay, but let's say, then, so basically everyone
7    understands, then, that job title or classification has very
8    little or anything at all to do with credibility.  Is everyone
9    okay with that?

10             Okay.  Now, let's say, however, the issue was what
11   happened in the emergency room and then someone were to appear
12   to testify, and he or she says, "I'm a physician."  Gives you
13   their background, training, and experience.  Says that, "I
14   examined one of the persons involved in the traffic collision,
15   and that person suffered a broken leg."  Okay?

16             All right.  Again, the title itself, because he or
17   she came and said "I'm a doctor," again, doesn't deal with
18   credibility.  But the testimony itself as far as the ultimate
19   conclusion that someone suffered a broken leg, you can
20   believe.  But that has to do with what we call the quality of
21   the testimony.  That is what the doctor had to say as opposed
22   to his mere title.  Is everyone okay with that?

23             There is a difference between mere job title and what
24   they have to say.  And you're interested in what they have to
25   say.  Is every one okay with that?

49

1          Generally people are.  That is not a problem.  That's

2    not an issue with 99 percent of the professions that we deal

3    with.  There is one profession that is somewhat unique, and

4    that is law enforcement.  The same ground rules apply for law

5    enforcement officers.  The fact that someone appears to

6    testify on the witness stand and identifies themself as a

7    police officer, highway patrol officer, sheriff, et cetera,

8    doesn't give that person more or less credibility than anybody

9    else, no more than the doctor, et cetera.  Okay.  And that's,

10   again, I'm talking mere job title.  Okay?

11         Now, everyone understands it?  Is everyone okay with

12   that, because we will have law enforcement officers

13   testifying, but you can't automatically believe or disbelieve

14   them merely because of their title.  You're looking at the

15   quality of their testimony, what they have to say.  Is

16   everyone okay with that?

17         Now, I'm going to do some follow-up questions in this

18   area to somewhat touch upon this, but it's a little more

19   general, and I'm going to basically ask -- and some of you

20   already indicated that you do have relatives in law

21   enforcement, which is perfectly fine.  My only question would

22   be for those of you who do have friends or relatives in law

23   enforcement, whether or not that would, in fact, impact your

24   service as a juror.  Okay, and by that, there are some basic

25   areas that you need to be aware of.

50

 1          First of all, because you may be related to or
 2    acquainted -- you may not be related to a law enforcement
 3    officer, but it may be your neighbor or your best friend or
 4    someone you attend church with, or whatever, is in law
 5    enforcement.  Maybe you've even talked to them about their
 6    cases.  But the question is, whether or not because you're
 7    either related to or acquainted with people in law
 8    enforcement, whether or not that would affect your service as
 9    a juror, and I'll give you some examples of how that could.
10          First of all, if someone were to appear to testify
11    and identifies themself as being in law enforcement, would you
12    automatically tend to believe that person because you know or
13    are related to people in law enforcement?
14          Secondly, would you give more credit or weight to the
15    side that calls law enforcement or more law enforcement
16    officers simply because they called more law enforcement
17    officers.
18          And third, as you're deliberating as a juror, and in
19    this case, for example, you're not convinced beyond a
20    reasonable doubt that the Government has proven its case, but
21    then you know that you're going to see your son, daughter,
22    relative, neighbor, et cetera, who is in law enforcement this
23    weekend maybe for a picnic, or whatever, and you'd be
24    embarrassed to tell them that you voted not guilty on a
25    criminal case, would that impact how you decide the case.

51

1          So with that background, let me ask you this:  Those
2   of you who are related to or acquainted with any law
3   enforcement officer, would that affect your service as a
4   juror, that is, to decide the case fairly and impartially
5   based upon the evidence.  Does anyone have any concern about
6   that?
7          Okay, let me ask you the other side, the sort of flip
8   side of that.  Sometimes people have had bad experiences
9   relating to law enforcement.  It could be anything.  It could
10  be a traffic ticket that you received, and you thought the
11  officer was discourteous, that you didn't deserve the ticket.
12  It could be that you had a friend or relative or someone who
13  was actually stopped by someone that you didn't think was
14  right or fair, et cetera.  So it is possible, then, that based
15  upon your own life's experience, you might have had or a
16  family member or close friend might have had a bad experience
17  relating to law enforcement that might affect your service as
18  a juror.
19         So, for example, if a person were to appear to
20  testify, he or she says, "I'm in law enforcement," would you
21  automatically discount or disregard that witness' testimony
22  because of a prior bad experience that you might be aware of
23  relating to law enforcement.
24         Secondly, if one side or the other were to call law
25  enforcement or more law enforcement officers, would you tend

52

1   to be against that side because they happen to call law

2   enforcement officers?

3          And third, if you're selected as a juror, and you're

4   deliberating on the case and you're satisfied that the

5   Government has proven its case beyond a reasonable doubt, but

6   you still recall this incident where you feel that a friend or

7   relative or even yourself had a bad experience relating to law

8   enforcement, and you're thinking, well, you know, yeah, the

9   Government has proven its case beyond a reasonable doubt, but,

10  you know, I've known that there has been bad experiences, and

11  so I'm going to vote not guilty.

12         So those are sort of the flip sides based upon any

13  prior experiences, et cetera, relating to law enforcement.

14         Is there anyone, either on the plus side or the minus

15  side, that because of any relationship you have with law

16  enforcement, any bad -- any bad experiences relating to law

17  enforcement officers that would affect your service as a juror

18  here today?  Anybody have any experience?

19         (No response.)

20         THE COURT:  Okay, I'm going to basically get into a

21  few of the areas that you mentioned that relate to this

22  particular charge.  One of them is obviously from the charge

23  itself.  There are a number of different elements, as you've

24  indicated, and the parties aren't going to dispute or disagree

25  that Mr. Hood had a prior conviction and is designated as a

173

53

1   felon.

2          That in and of itself does not resolve the case.

3   That's just one of the many elements involved in this

4   particular case.  And you can't automatically say, well, gee,

5   well, Mr. Hood has been convicted of something before.  I

6   can't believe him or his side.  You can't do that.  You have

7   to look at all of the different elements of the case, and

8   basically, in this case, it is the charge itself is a felon in

9   possession of a firearm.  Okay, so obviously you see a number

10  of elements.  One, is he a felon?  Number two, was there a

11  firearm involved?  And number three, was he in possession of

12  it?

13         Okay, so those are different aspects, and the

14  Government has to prove each of those aspects beyond a

15  reasonable doubt, and they just can't prove one.  They can't

16  say, okay, I've proven he's a felon on a prior and convicted

17  of a -- he has a prior conviction.  Therefore, I win.  No,

18  there are different elements.

19         So does anyone who is thinking now, well, okay, as

20  long as I know that Mr. Hood has a prior conviction, I'm going

21  to vote him guilty no matter what?  Is there anyone who feels

22  that way?

23         Okay, the other thing relates to firearm, and

24  obviously everyone has different views of firearms.  We're not

25  here to discuss, debate, or argue whether or not people should

54

```
1    or should not be entitled to possess firearms.  That's not
2    what this case is about.  But some people have very strong
3    feelings about firearms that, you know, no matter what the
4    situation, everyone should be entitled to have a firearm.  Or
5    people might say, you know, firearms are dangerous.  No one
6    should have possession of firearms.  Of course, there are
7    thoughts in between.  But the fact that a firearm may be
8    testified to in this case, would that cause anyone to just
9    shut down and say, you know, I can't decide this case, or I
10   feel so strongly about firearms that I'm going to
11   automatically vote guilty or not guilty because of my belief
12   about firearms?  Anyone have any concerns about that?
13           (No response.)
14           THE COURT:  Okay, let me just tell you the law is
15   very clear as to what the elements of this particular offense
16   are.  And if you have a disagreement with that, this is not
17   the arena to do that by voting guilty or not guilty.  You go
18   to your legislators and you ask them to change the laws.  The
19   law is, and the law you have to follow is the law that I give
20   you in this particular case.
21           Okay, the next area that I'm going to ask you about
22   is really what exposure, if any, you've had to the legal
23   system.  The three areas that I'm going to cover with you,
24   number one, whether or not you've ever served as a juror
25   before.
```

175

55

1          Number two, whether or not you have ever been a party

2    to, a witness to any lawsuit.

3          And the third is any exposure you might have had to

4    the legal system that you have not already mentioned.

5          So let me start off in the back row and ask if any of

6    you have ever served as a juror before in the back row?

7    Anyone in the back row?

8          A number of you folks, so let me have the microphone

9    go back up there.  I think Juror 0002 was the first one.

10         Now, before I ask Juror 0002 some questions, let me

11   just mention, there are two basic kinds of cases you might

12   have served as a juror on.  One is a criminal law case where

13   you've asked to find someone guilty or not guilty.  The other

14   is a civil law case.  Usually plaintiff or plaintiffs are

15   asking for money damages.  And so basically I'm going to ask

16   you, first of all, how many times you served as a juror.  If

17   so, whether it's criminal, civil, some of each.  I'll ask you

18   to just very briefly tell me what you can recall as far as a

19   title, what kind of a case it was, and whether or not a

20   verdict was reached.

21         So let me go ahead and start off first, Juror 0002,

22   how many times have you served as a juror?

23         JUROR 0002:  Once.

24         THE COURT:  Was it a criminal law case or civil law

25   case?

56

1          JUROR 0002:  Criminal.

2          THE COURT:  Do you remember what kind of case it was?

3          JUROR 0002:  DUI.

4          THE COURT:  How long ago was it?

5          JUROR 0002:  Probably no longer than two years ago.

6          THE COURT:  Okay.  Was a verdict reached in that

7   case?

8          JUROR 0002:  Yes, it was.

9          THE COURT:  Was there anything about that case,

10  anything the judge did, the lawyers did, the parties did, the

11  jury deliberation that bothered you, upset you, or concerned

12  you to the extent that it would spill over and affect your

13  service as a juror here today?

14          JUROR 0002:  No.

15          THE COURT:  And then whatever you might remember

16  about that case, the facts or the law, whatever, you have to

17  totally disregard for the purpose of this case.  Are you okay

18  with that?

19          JUROR 0002:  Yes.

20          THE COURT:  Okay, great.  Thank you.

21          And we'll just pass the mike down, and if you have

22  not served as a juror, just pass it down to the next person.

23          Juror 0003, how many times have you served as a

24  juror?

25          JUROR 0003:  I'm kind of old.  I think three.

57

1          THE COURT:  Were they criminal, civil, some of each?

2          JUROR 0003:  I think they were all criminal.

3          THE COURT:  Okay.  Do you remember what kind of case?

4          JUROR 0003:  One of them was child abuse.  I remember

5     that one.  And I can't quite remember the other two.  It's

6     been a long time ago.

7          THE COURT:  Which is perfectly fine because my next

8     question would be whatever you might remember about any of

9     those cases, you have to totally disregard --

10          JUROR 0003:  Don't worry.  I disregarded it.  I can't

11     remember.

12          THE COURT:  And were verdicts reached in those cases?

13          JUROR 0003:  Yes.

14          THE COURT:  In all of them?  Okay, thank you very

15     much.

16          Juror 0004?

17          JUROR 0004:  No.

18          THE COURT:  No?  Okay.

19          Juror 0005?

20          JUROR 0005:  Two jury trials, both criminal.

21          THE COURT:  Okay.  Do you remember what kind of cases

22     they were?

23          JUROR 0005:  The first was three defendants, and it

24     had to do with drugs.

25          THE COURT:  And then the other --

58

1          JUROR 0005:  The other was a criminal boating
2    accident.
3          THE COURT:  All right.  Were verdicts reached in
4    those cases?
5          JUROR 0005:  Yes, on the first one.  And, no, it was
6    hung on the second.
7          THE COURT:  Anything about either one of those
8    experiences that would affect your service as a juror here
9    today?
10          JUROR 0005:  No.
11          THE COURT:  And you have to totally disregard
12    whatever you might remember about those cases for the purpose
13    of this case.
14          JUROR 0005:  Yes.
15          THE COURT:  Okay, thank you.  All right.
16          JUROR 0006:  I served once, but I just don't
17    remember --
18          THE COURT:  Okay, and that's fine.
19          JUROR 0006:  I think what happened is they settled
20    before we decided on a verdict.
21          THE COURT:  Oh, okay.  Good, great.  Okay, and
22    obviously that takes care of the couple of things.  First of
23    all, you have to disregard what you might remember about those
24    cases, and, of course, the other thing is as far as that
25    case -- I'm sorry, let me back up a little.  Do you remember

59

1    what kind of a case it was?

2                JUROR 0006:  No.

3                THE COURT:  Okay, and that's perfectly fine.  Okay,

4    good.  Thank you very much.

5                All right, we'll pass it down to the next row down.

6    And, again, starting with Juror 0007, if you served as a juror

7    before.  Let me know.  Okay.

8                JUROR 0009:  Yes, twice.  Both criminal, stalking and

9    high speed chase.  The first one they settled.  The second

10   one, we reached a verdict.  And nothing about either one of

11   them that I will remember.

12               THE COURT:  Okay, thank you, Juror 0009.  All right.

13               JUROR 0012:  I have been on two jury trials.  One was

14   possession of a narcotic.  The other was a communicating a

15   threat from a prisoner.  We reached a verdict in both.

16               THE COURT:  Anything about any of either those

17   experiences that concern you?

18               JUROR 0012:  No.

19               THE COURT:  Thank you.

20               All right, we'll pass it all the way back down to the

21   front row first to Juror 0013, and we'll just pass the mike

22   down.

23               JUROR 0013:  I haven't.

24               THE COURT:  Okay.

25               JUROR 0014:  I've been on two.  Both criminal.  First

60

1    one was theft.  The second one was a felon in possession of a
2    firearm.
3             THE COURT:  Were verdicts reached in those cases?
4             JUROR 0014:  Yes.
5             THE COURT:  And then how long ago were those cases?
6             JUROR 0014:  The theft one was about 12 years ago,
7    and the other one, I think, was about eight or nine years ago.
8             THE COURT:  Okay.  Now, you understand it's
9    especially important because you served on a similar type
10   case, you have to totally disregard what you remember about
11   those cases.  Are you okay with that?
12            JUROR 0014:  Yeah.
13            THE COURT:  Okay, thank you.
14            JUROR 0017:  I served on one jury.
15            THE COURT:  Okay.  Criminal or civil?
16            JUROR 0017:  Criminal.
17            THE COURT:  Was a verdict reached?
18            JUROR 0017:  Yes.
19            THE COURT:  Do you remember what kind of case it was?
20            JUROR 0017:  It was like drug possession or
21   something.
22            THE COURT:  Anything about that case that would
23   affect your service as a juror here?
24            JUROR 0017:  No.
25            THE COURT:  You have to disregard what you remember

61

1    about that case.  Okay, thank you.

2          Okay.  Good.  The next set of questions really relate

3    to whether or not you've been a party to, a witness to, any

4    legal proceedings before.  And let me just go ahead and pass

5    the mike back all the way to the top row there again.

6          Again, this could be whether you were a party, or

7    maybe you were called as a witness.  Sometimes in your

8    employment capacity, you're called in as a witness, or

9    whatever.  It could be a small claims case, it could be a

10   traffic ticket that you went in to contest.  If you have ever

11   been a party to, a witness to any legal proceeding, let me

12   know.  Otherwise, you can just pass the mike down.  We'll

13   start with Juror 0001 first.

14         JUROR 0001:  Yes, Your Honor.  Previously before the

15   employment that I have now, I was a Homeowners' Association

16   manager.  And from time to time, we would have disputes with

17   fines, things like that.  And it was really mostly collection.

18         THE COURT:  Um-hmn.

19         JUROR 0001:  Things like that, but nothing big.

20         THE COURT:  Anything about any of those experiences

21   that would affect your service as a juror here today?

22         JUROR 0001:  No, Your Honor.

23         THE COURT:  Okay, thank you.  And if you haven't,

24   just pass the mike down so we'll know.

25         JUROR 0004:  I was summoned for a deposition for

62

1    work.

2          THE COURT:  And did they actually take your

3    deposition?

4          JUROR 0004:  They took it, yes, but that was it.

5          THE COURT:  Okay, so you never actually came into the

6    courtroom itself?

7          JUROR 0004:  No.

8          THE COURT:  But was there anything about that

9    experience that would affect your service as a juror here

10   today?

11         JUROR 0004:  I don't think so.  It was not a

12   comfortable experience, but I don't think so.

13         THE COURT:  Okay.  And in other words, anything about

14   the facts of that case that might spill over and affect your

15   service?

16         JUROR 0004:  No.

17         THE COURT:  All right.  Was the experience itself

18   uncomfortable, having to testify, et cetera?

19         JUROR 0004:  It was.

20         THE COURT:  All right.  Let me ask you this:  Was

21   there anything -- were there lawyers representing various

22   parties there?

23         JUROR 0004:  There were.  It was a malpractice.

24         THE COURT:  Okay.  Was there anything that the

25   lawyers did during the deposition because sometimes the side

63

 1  that calls you is real friendly, and the other side is not as

 2  friendly.

 3          JUROR 0004:  Exactly.

 4          THE COURT:  All right.  And that happens.  That's

 5  sometimes the way it works out.

 6          But that does bring me into another topic and that

 7  is -- a related topic, and that is the lawyers in this case

 8  are going to do their best to present the evidence to you.

 9  They may call their own witnesses, they may what we call

10  cross-examine the other side's witnesses.  Usually

11  cross-examination is not -- I don't want to say it's not

12  polite, but it is sometimes more direct.  Not quite hostile

13  that it could be.  The bottom line is as you proceed to this

14  case, you may like or dislike what a particular lawyer does,

15  either their conduct, et cetera.  I've had jurors comment on

16  how the parties, the lawyers dress, et cetera.  But this is

17  not a popularity contest between the lawyers.  So if you like

18  or dislike a particular lawyer, what he or she does, that's

19  not relevant.  You still have to decide the case based upon

20  the facts.  And are you okay with that?

21          JUROR 0004:  Yes.

22          THE COURT:  And that applies to everyone.  Thank you.

23          We'll go back down then to the middle row to Juror

24  0007.

25          JUROR 0011:  I was party to a case years ago.  It

184

64

1    settled before we went anywhere.

2           THE COURT:  Okay.  All right.  Did you have to

3    testify, a deposition?

4           JUROR 0011:  No.

5           THE COURT:  Anything about -- go ahead.

6           JUROR 0011:  I don't think so.

7           THE COURT:  Anything about that experience that would

8    spill over and affect your service as a juror here?

9           JUROR 0011:  No.

10           THE COURT:  Thank you.

11           Okay, we'll pass the mike all the way down to Juror

12    0013.

13           JUROR 0013:  I was a party just for a motor vehicle

14    accident.

15           THE COURT:  Okay, all right.  Did you actually go

16    into court, then?

17           JUROR 0013:  Only a deposition.

18           THE COURT:  Okay.  Anything about that experience

19    that would affect your service as a juror here today?

20           JUROR 0013:  No.

21           THE COURT:  Great.  Thank you.

22           JUROR 0014:  As part of my position at Kern County

23    Human Services, I do collections for overpayments for welfare

24    recipients, and I regularly go to small claims to secure the

25    debts.

65

1          THE COURT:  Anything about any of those experiences
2     that would affect your service as a juror here?
3          JUROR 0014:  No.
4          THE COURT:  Okay, good.  Thank you.
5          Now, let me ask, and I'll just ask in general.  Any
6     other exposure to the legal system that has not been raised or
7     mentioned by any of you?
8          Okay, yes.  First of all, Juror 0018, the mike is
9     near you, so let me start you off first.
10         JUROR 0018:  I work in court every day.
11         THE COURT:  As a court reporter?
12         JUROR 0018:  Yes.
13         THE COURT:  Okay.  So you can sympathize with
14    Miss Thomas here.
15         So let me ask you, and you've heard all kinds of
16    cases, criminal civil, et cetera.  Okay, now, do you
17    understand that whatever you might have heard in your
18    capacity, you have to totally disregard for the purposes of
19    this case here?  You're okay with that?
20         JUROR 0018:  Yes.
21         THE COURT:  Thank you very much.
22         And then we had someone in the back row, I think,
23    Juror 0003?
24         JUROR 0003:  I was thinking about it as this last one
25    was going around.  I was called on the part of one of my

186

66

1  former students to testify.  I don't know if that matters.

2         THE COURT:  Sure.  Would you actually come into the

3  courtroom?

4         JUROR 0003:  Yeah, it was a juvenile court in Tulare

5  County.

6         THE COURT:  Anything about that experience that would

7  affect your service here as a juror?

8         JUROR 0003:  No.

9         THE COURT:  Okay, great.  Thank you.

10        Okay, we have someone here.  All right, Juror 0009.

11        JUROR 0009:  Well, my daughter was on mock trial for

12  three years, so I spent a lot of time in the courtroom, but

13  not official.

14        THE COURT:  Okay.  Now, would that experience because

15  I know with mock trial, they really --

16        JUROR 0009:  It was real.  We went to State.

17        THE COURT:  Perfect.  But anything about those

18  experiences that would affect your service as a juror?

19        JUROR 0009:  No, just made me much more informed

20  about the process.

21        THE COURT:  Great.  Thank you very much.

22        Anybody else?  Okay.  All right.

23        Okay, now I think we see a lot of movies, television

24  programs related to law enforcement investigation,

25  investigative techniques, et cetera, you know.  It always

187

67

1   seems that there's some detective or some forensic expert that

2   finds stuff.  And it always seems so fascinating.  And it's

3   interesting.  You see fingerprints, we see DNA, we see all

4   these other technical tools that are available.  Sometimes you

5   see them in trials, and sometimes you don't.  But in terms of

6   what you -- and a lot of that is accurate.  I mean, factually

7   accurate.  Some of it is not.  But is everyone okay with the

8   fact that whatever you might have seen in the movies,

9   television, regarding criminal law investigations, court

10  cases, that you can totally disregard for the purposes of this

11  case?  Anyone say, well, you know, I saw this episode on such

12  and such, and this is what they did, and they didn't do it

13  here, so, you know, the Government didn't do this, or the

14  defendant didn't do that.  You can't relate that way.  Is

15  everyone okay with that?

16          (Jury nods in the affirmative.)

17          THE COURT:  Okay, now, I've asked a number of what I

18  call closed-end questions, sort of focusing in on areas that I

19  wanted to cover with you.  But there may be some things that

20  you felt you should mention, but I didn't ask the right

21  question, or I was starting to get in that area, and I moved

22  to a different area.  So let me ask you, and I'll start off

23  with the back row first.

24          Is there anything that you have not been able to

25  mention regarding your prospective jury service that you just

188

68

1  not have had a chance to mention because I didn't ask the

2  right question?  Anybody in the back row, anything that you

3  feel that the parties should be aware of in terms of your own

4  background and experience that you have not had a chance to

5  mention?

6          Okay, top back row there.  All right, Juror 0001.

7          JUROR 0001:  I just wanted to mention I'm a veteran

8  also.  I was a Marine Corps aircraft hydraulics mechanic, but

9  also Army and I was a combat medic.

10         THE COURT:  Okay, great.  Good.  And let me ask you,

11 would that affect or influence your service as a juror here?

12         JUROR 0001:  No, not at all.

13         THE COURT:  And I'm not sure that anyone is going to

14 identify themself as having been a veteran.  But if they do,

15 again, it's like titles, et cetera, that you can't give them

16 more or less weight because of that.  Are you okay with that?

17         JUROR 0001:  Yes, Your Honor.

18         THE COURT:  Thank you for disclosing that.

19         Anybody else in the back row?

20         How about the middle row, anything that you have not

21 had a chance to mention or raise?

22         How about the front row?  Anybody in the front row?

23         Okay, yes, we'll go to Juror 0018.

24         JUROR 0018:  I do recognize one of the parties here,

25 Mr. Lindahl.  I've worked with him in a professional capacity.

69

1          THE COURT:  Okay.  Good.  Great.  And let me ask you,

2     would that affect your service as a juror?

3          JUROR 0018:  Not at all.

4          THE COURT:  Let's say that we've heard all the

5     evidence, and you're satisfied the Government has proven its

6     case beyond a reasonable doubt, but you've got Mr. Lindahl

7     lined up for another trial, would that affect or influence

8     your service as a juror?

9          JUROR 0018:  No.

10         THE COURT:  I'm sure he would feel the same way.

11         Yes, okay, we have another one.  Okay, Juror 0009.

12         JUROR 0009:  I don't know I need a microphone, but I

13    believe you were on a rotary cruise with me six or seven years

14    ago.

15         THE COURT:  That's correct.  Yeah.  You won't hold

16    that --

17         JUROR 0009:  No.

18         THE COURT:  And I didn't do anything -- good.  Thank

19    you.

20         All right, anybody else?  Anything else?

21         Okay, all right, are there any follow-up questions by

22    either side?  Do you have any written follow-up questions?

23         MS. SANCHEZ:  I don't have any written follow-up

24    questions.

25         MR. LINDAHL:  No written questions.

70

1          THE COURT:  All right, what I'm going to do, I'm
2     going to turn it over to the attorneys to ask some follow-up
3     questions.  Again, the same ground rules apply.  If they ask
4     you a question that you're not sure what they're asking, ask
5     them to repeat or rephrase it.  If they ask you a question,
6     and you don't want to answer it in open court, let them know,
7     and we'll move on to a different area and take it up at the
8     first break.
9          Let me start off and allow the plaintiff's side to
10    conduct the questioning.
11         MS. SANCHEZ:  Thank you, Your Honor.
12         Good morning.  This case is going to be brief.  I'll
13    be equally brief right now.  One question that I don't know
14    was covered.  Does anyone here have any moral, philosophical,
15    or religious beliefs that would make it difficult for you to
16    sit and make a decision of guilty or not guilty of another
17    person?
18         (No response.)
19         MS. SANCHEZ:  And the judge is going to give you
20    instructions and has given you some instructions on your duty
21    as a juror.  And one of the instructions is not to allow
22    prejudices to influence your decision one way or the other.
23    And that's a difficult thing for anyone to do is admit you
24    have a prejudice.
25         For example, two of my kids, understand, one is

71

1   afraid of clowns, and one is afraid of elevators, and I'm not

2   quite sure of the source of that.  I can present one with 10

3   certificates of safety, and he would not believe that that

4   elevator was safe.

5          I could show my other son that all clowns are

6   friendly that he would encounter, and he would never feel

7   comfortable encountering those clowns.  That's a prejudice

8   that each of them has developed, and they would make a

9   decision about a clown or an elevator, not based on any

10  evidence that was presented to them.

11         So is there anyone who feels after soul searching in

12  that light, that they have any prejudice that would affect

13  your decision either for the Government or for the defendant?

14         (No response.)

15         MS. SANCHEZ:  Is there anyone here who does not

16  believe that the Government is entitled to a fair trial the

17  same way that the defendant is entitled to a fair trial?

18         (No response.)

19         MS. SANCHEZ:  Thank you for your time.

20         THE COURT:  And defense.

21         MR. LINDAHL:  Thank you, Your Honor.

22         Eighteen of you, quick showing of hands, who'd rather

23  be somewhere else?  Come on, tell me the truth.

24         Who'd rather be here?  Raise your hand.  One hand.

25         All right, is it Juror 0002.

72

1          JUROR 0002:  Yes.

2          MR. LINDAHL:  Why is that?

3          JUROR 0002:  I just find the Court system

4     interesting.

5          MR. LINDAHL:  Okay.  Would you -- do you think you

6     could -- if you came to a decision after you heard the

7     evidence in this case, and you were back there with 11 other

8     people who couldn't get out of jury duty, and would you be

9     able to discuss the case with the others?

10          JUROR 0002:  On how I felt about --

11          MR. LINDAHL:  On the evidence as you heard it.

12          JUROR 0002:  Correct.  Yes.

13          MR. LINDAHL:  If your mind -- and after discussing it

14     with them, if your mind was made up, suppose there is one of

15     you and 11 others, kind of outnumbered there, if you felt that

16     in your heart, do you think you'd be able to stick with your

17     decision if others felt differently?

18          JUROR 0002:  After looking at the evidence and

19     hearing everything, if I really felt, you know, in my heart,

20     yes, I could.

21          MR. LINDAHL:  All right.  Thank you, ma'am.  Juror

22     0018, as you've stated, you and I have known each other for a

23     long time, haven't we?

24          JUROR 0018:  Yes.

25          MR. LINDAHL:  You have heard dozens, if not hundreds,

73

1  of my cases; correct?

2          JUROR 0018:  Yes.

3          MR. LINDAHL:  Some pretty serious cases in some

4  instances, murder?

5          JUROR 0018:  Yes.

6          MR. LINDAHL:  You were previously the court reporter

7  for the late John DeGroot, weren't you?

8          JUROR 0018:  Eighteen years.

9          MR. LINDAHL:  Yes.  God rest his soul.

10         Now, if you were seated as a juror in this case, with

11 what you know of me and my personality, would you hold that

12 against my client?

13         JUROR 0018:  No.

14         MR. LINDAHL:  Okay, fair enough.

15         Okay, quick showing of hands, again, who believes we

16 put a man on the moon?  Who doesn't believe we put a man on

17 the moon?

18         Okay, who's not sure -- thank you.

19         Miss -- is it, Juror 0013?

20         JUROR 0013:  Juror 0013.

21         MR. LINDAHL:  You mentioned that you're employed as a

22 paralegal?

23         JUROR 0013:  Yes.

24         MR. LINDAHL:  And do you ever deal with criminal law

25 in your capacity?

74

1              JUROR 0013:  No.

2              MR. LINDAHL:  Do you deal with evidence?

3              JUROR 0013:  Yes.

4              MR. LINDAHL:  Do you deal with depositions?

5              JUROR 0013:  No.

6              MR. LINDAHL:  Okay.  So this is pretty much

7    unfamiliar territory for you, at least in a legal realm?

8              JUROR 0013:  My degree is in criminology, so I know

9    something about it.

10              MR. LINDAHL:  Yeah.

11              JUROR 0013:  But I don't have any experience with it.

12              MR. LINDAHL:  Okay.  Miss -- I believe it's -- Juror

13    0004?

14              JUROR 0004:  Yes.

15              MR. LINDAHL:  You mentioned during the Court's

16    questioning, that you had to suffer through a deposition.  And

17    the impression that I got of that was that it was not a

18    pleasant experience.  Would that be accurate?

19              JUROR 0004:  Yes.

20              MR. LINDAHL:  Now, you recognize that in a courtroom

21    setting, the difference between a trial and a deposition is

22    that we have a referee, we have a judge here.  Anything at

23    all -- I know the judge covered it, but anything at all about

24    that experience that's going to make you go, if you have to

25    listen to, say, potentially vigorous cross-examination of a

75

1   witness?

2           JUROR 0004:  I don't believe so.

3           MR. LINDAHL:  All right, fair enough.

4           As you have heard, this is a short case.  I mean,

5   it's two days tops.  It's basically "he said, he said."

6   Juror 0007?

7           JUROR 0007:  Yes, sir.

8           MR. LINDAHL:  Did he do it?  Is he guilty?

9           JUROR 0007:  I don't know.

10          MR. LINDAHL:  If you -- if you were asked, if you

11  were sworn in right now, and the Government stood up and said,

12  "Government rest," and you had to go deliberate, what would

13  your verdict be?

14          JUROR 0007:  No evidence.  He's free.

15          MR. LINDAHL:  Okay.

16          THE REPORTER:  Can you keep your voice up a little

17  bit louder.  Thank you.

18          JUROR 0007:  Okay.  He would be free to go.

19          MR. LINDAHL:  Finally, Juror 0017, you have two grown

20  children.  One is employed as a Department of Corrections

21  employee in some capacity?

22          JUROR 0017:  Um-hmn, yes.

23          MR. LINDAHL:  And this child has previously worked --

24  sounds like a prison guard at some point?

25          JUROR 0017:  Yes, she's working with the California

76

1    Department of Corrections.

2            MR. LINDAHL:  All right.  Now, dealing -- are you

3    close with this child?

4            JUROR 0017:  My daughter, yes.

5            MR. LINDAHL:  Sorry if I asked a "duh" question.

6            JUROR 0017:  Sorry.

7            MR. LINDAHL:  Being an employee at the Department of

8    Corrections, your child deals with felons all the time.  You

9    recognize that not all felons are prison mates?

10           (Juror nods.)

11           MR. LINDAHL:  It's your daughter, right?

12           JUROR 0017:  Um-hmn.

13           MR. LINDAHL:  Does she share a lot of stories of what

14   goes on?

15           JUROR 0017:  No.

16           MR. LINDAHL:  Okay.  All right.  Final showing of

17   hands, who would like me to shut up and sit down?

18           Seeing no hands, I'll do so anyway.  Thank you,

19   Your Honor.

20           THE COURT:  Let me just ask counsel if you can just

21   approach sidebar.

22           (The attorneys had a bench conference, which was not

23   reported.)

24           THE COURT:  All right, any cause matters, first on

25   behalf of plaintiff?

197

77

1          MS. SANCHEZ:  No, Your Honor.

2          THE COURT:  Defense?

3          MR. LINDAHL:  No, Your Honor.

4          THE COURT:  All right, prospective members of the

5     jury, the jury selection process does take a little bit of

6     time.  Both sides have no cause issues, that is, there is no

7     reason why the 18 of you could not serve as jurors in this

8     case.  For those of you who are aware, why is there 18 of you,

9     there are only 12 of you that will ultimately serve on the

10    jury.

11         We're going to take a recess.  We're going to move

12    into the peremptory challenge phase, in which case both sides

13    have the opportunity and the right to ask to thank and excuse

14    you.  And they'll be focusing on the 12 of you in the box.

15    And if any of you are excused in the box, then the 18 of you

16    starting with Juror 0013 will replace them.

17         Now, those of you in the audience area, if the

18    parties exercise enough peremptory challenges such that we run

19    out of the people in the bottom row, and we're down to the 11

20    in the top row, then you folks will come on board.  So we're

21    still very much engaged in the jury selection process.

22         We're going to take our morning recess in a moment,

23    but let me advise all of you, please, do not talk about -- you

24    don't know anything about the case, but don't talk anything

25    about the case.  There may be people involved.  The lawyers

198

78

1   are aware, and I'll just remind them.  They should not talk
2   about the case, their witnesses, or anything else because you
3   never know.  I mean, you'll be out in the hallway, you may be
4   in the rest rooms, you may use the elevator, et cetera, so
5   they must be careful not to talk about the case.  If you hear
6   and overhear anybody talking about the case, please report it
7   to me.  Usually it's accidental or inadvertent, but we'll try
8   to make sure that no one talks about the case while you're
9   outside.
10          Okay, so let's go ahead take a 15-minute recess, and
11  we'll resume in 15 minutes and continue with the jury
12  selection process.
13          (Prospective jurors left the courtroom.)
14          THE COURT:  All right, the record will reflect the
15  jury panel has left for its recess.  We're going to take a
16  recess in just a second.  I just want to indicate the sidebar
17  was simply to ask counsel if there were any cause issues.
18  Both counsel indicated, no, so I placed that on the record.
19          We'll go ahead and take our recess for 15 minutes.
20  And I don't know --
21          MR. LINDAHL:  10:45, Your Honor?
22          THE COURT:  Yeah.  That's fine.  If counsel wants to
23  use -- the rest rooms may be crowded.  If you want to use the
24  ones back there in the jury room.
25          MR. LINDAHL:  Okay, thank you.

79

1           (Recess.)

2           THE COURT:  All right, back on the record.  As I

3     mentioned just before the recess, we're going to begin the

4     peremptory challenge stage.

5           Now, again, the parties are entitled to exercise a

6     peremptory.  That is, they ask those of you, the 12 of you in

7     the box to thank and excuse any one of you.

8           Now, they're not allowed to -- required or allowed to

9     state the reason, but you can be sure that whatever it was, if

10    you're excused, it isn't because of you said something, quote,

11    wrong, or anything like that because if there were some basis,

12    something you might have said that would cause the attorneys,

13    either side, to excuse you, they would have exercised what we

14    call a challenge for cause.  That is, based on what that

15    person said, I don't think they can be fair and impartial.

16    That did not happen.  The parties both agreed that there is no

17    reason why any of the 18 of you, frankly, could not serve as a

18    juror in this case.

19          But on the peremptory challenge stage, it is more

20    subjective.  They're basically looking at you more

21    individually and as a group.  They're looking at so many

22    different factors in terms of balance, geographical area, age,

23    gender, et cetera.  So all I can tell you, obviously, if you

24    are excused, there is no -- nothing that you said, at least in

25    terms of a cause matter, that would have caused them to thank

80

1   and excuse you.

2           So having said that, if you are excused, you're free

3   to leave.  You would need to call the 800 number after 5:00 PM

4   on Friday to see if there is another assignment.  Otherwise,

5   if you're excused, you can just go ahead and leave.

6           If you need to check with a jury clerk as far as

7   getting a note as proof or evidence that you were here today,

8   you can certainly do that.  They'll go ahead and give that to

9   you down where you assembled at the jury assembly room.  But

10  otherwise, if you are excused, you are excused with our

11  thanks.  This part goes fairly quickly, so we'll go ahead and

12  start.

13          And, first of all, we'll start with the plaintiff.

14  The plaintiff may exercise its first peremptory challenge.

15          MS. SANCHEZ:  Your Honor, do you want me to mark it

16  on the list?

17          THE COURT:  Oh, just go ahead and announce it.

18  That's fine.

19          MS. SANCHEZ:  The plaintiff exercise its first

20  peremptory challenge on Number 7.

21          THE COURT:  All right, Juror 0007.  All right, Juror

22  0007, you are excused with our thanks.  Thank you very much.

23          JUROR 0007:  Thank you.

24          THE COURT:  All right, and, Juror 0013, we'll go

25  ahead and have you take that seat.  That will be seat Number

81

1  7.

2          It is the defense peremptory.

3          MR. LINDAHL:  Thank you, Your Honor.  The defense

4  would ask the Court to thank and excuse Juror Number 1, Juror

5  0001.

6          THE COURT:  All right, Juror 0001, you are excused.

7  Thank you very much.

8          Okay, and, Juror 0014, if you can take that seat,

9  please.

10          MS. SANCHEZ:  The plaintiff's second peremptory --

11          THE COURT:  Oh, I'm sorry.  Hold on for a second.  It

12  would be -- let's see -- yeah, it is the plaintiff's next

13  peremptory.  Yes.

14          MS. SANCHEZ:  The second peremptory is Number 7,

15  Juror 0013.

16          THE COURT:  All right, Juror 0013, you are excused

17  with our thanks.  Thank you very much.

18          Okay, Juror 0015, if you can take that seat, please.

19          Okay, and it's defense peremptory.

20          MR. LINDAHL:  Yes, Your Honor.  Defense would ask the

21  Court to thank and excuse Juror Number 3, Juror 0003.

22          THE COURT:  Juror 0003, you are excused with our

23  thanks.  Thank you.

24          Yes, Juror 0016, you'll take that seat.

25          Okay, and it's still defense next peremptory.

82

1    Defense peremptory.

2            MR. LINDAHL:  Yes, Your Honor, the defense would ask

3    the Court to thank and excuse Juror Number 5, Juror 0005.

4            THE COURT:  All right, Juror 0005, you are excused

5    with our thanks.  Thank you very much.

6            Okay, then, Juror 0017, if you can take that seat,

7    please.  That's seat Number 5.

8            Okay, it's the plaintiff's peremptory.

9            MS. SANCHEZ:  The plaintiff would exercise its next

10   peremptory on Juror Number 8, Juror 0008.

11           THE COURT:  Okay, Juror 0008, you are excused with

12   our thanks.  Thank you very much.

13           Okay, and, Juror 0018, if you would take that seat.

14           Okay, and it's the defense peremptory.

15           MR. LINDAHL:  Yes, Your Honor.  Defense would ask the

16   Court -- if I could have just a moment, Your Honor.  I'm

17   sorry.

18           THE COURT:  Sure.

19           MR. LINDAHL:  Defense would ask the Court to thank

20   and excuse Juror Number 12, Juror 0012.

21           THE COURT:  Okay, Juror 0012, you are excused with

22   our thanks.  Thank you very much.

23           Okay, we'll go ahead and fill the seats that are now

24   vacant.  We're going to start off with filling seat Number 12.

25           THE CLERK:  Juror 0019.

203

83

1           THE COURT:  Okay, we'll fill the top row -- I mean

2    the bottom row.  I'm sorry.

3           THE CLERK:  Juror 0020.

4           THE COURT:  Juror 0020, please take the first seat

5    there in the front row.

6           THE CLERK:  Juror 0021.

7           Juror 0022.

8           Juror 0023.

9           Juror 0024.

10          Juror 0025.

11          THE COURT:  Okay.  We're going to focus our attention

12   on the seven of you who have just joined us.  We're going to

13   go through the questioning process again.

14          Now, I'm going to shorten this up simply because I'm

15   going to assume that you have heard and understood all the

16   questions that have been asked.  If you didn't, let me know,

17   and if you were not able to hear the answers, please let me

18   know.  Anyone was not able to hear either the questions that I

19   asked or the answers that were given?  Anyone was not able to

20   hear that?  Okay.

21          I'm not going to cover every question with you, then,

22   but, again, the fact that I don't ask you a specific question

23   that you heard me ask the other prospective jurors doesn't

24   mean I don't now consider it to be important.  It's just that

25   I'm hoping that you were able to understand through the whole

84

1    selection process really what I'm looking for.

2           The bottom line again for the new seven is whether or

3    not in this particular case, you can be fair and impartial to

4    both sides, and if you're not able to for whatever reason, we

5    will need to know that.

6           So there are a couple things that I am going to cover

7    with you individually simply because they are unique to you.

8    And then the others, I'll be a little bit more general.  I'm

9    going to ask you background information.  Again, because it's

10   been a little while, with Juror 0019, I'll go ahead and ask

11   each of you the questions individually, and, Juror 0020, by

12   the time I get to you and the other six, just go ahead and

13   give me the background information.

14          The information is as follows:  First, Juror 0019,

15   where do you live?

16          JUROR 0019:  Near Oakhurst.

17          THE COURT:  Do you work outside the home?

18          JUROR 0019:  Yes.

19          THE COURT:  What do you do?

20          JUROR 0019:  I'm a registered nurse in the PICU.

21          THE COURT:  And that is -- is it a private hospital?

22          JUROR 0019:  It's children's.  It's in the pediatric

23   intensive care.

24          THE COURT:  Okay, great.

25          Okay, your marital status.

85

1          JUROR 0019:  Divorced.

2          THE COURT:  And any children?

3          JUROR 0019:  Two grown sons.

4          THE COURT:  Do they work outside the home?

5          JUROR 0019:  One does.  He's a full-time police

6    officer down in the City of Orange.  And the other doesn't

7    live in the home.  He's a college student, full time.

8          THE COURT:  All right.  And you heard me ask the

9    other prospective jurors a similar question, the fact that

10   your son is a police officer, have you discussed cases with

11   him or situations?

12         JUROR 0019:  No.

13         THE COURT:  Would the fact that he's a police officer

14   affect your service as a juror, how you view witnesses,

15   parties, how you decide the case?

16         JUROR 0019:  No.

17         THE COURT:  Okay.  If the Government were not able to

18   prove its case beyond a reasonable doubt, and you felt that

19   you were -- you should vote not guilty, do you think in the

20   deliberation, do you think, 'Oh, gee, what will my son say if

21   he found out I voted not guilty?'

22         JUROR 0019:  I wouldn't tell him.

23         THE COURT:  Okay, good.  But even if you did, even if

24   it came up, would it affect your decision?  Would you say,

25   well, the Government hasn't proven its case beyond a

86

1   reasonable doubt, but I'm concerned, or I've got to do this,

2   I've got to vote guilty.  Do you think you would do that?

3           JUROR 0019:  If I needed to, yes.

4           THE COURT:  In terms of -- that's a bad question.

5           If the Government did not prove its case beyond a

6   reasonable doubt, would you be able to vote not guilty?

7           JUROR 0019:  Yes.

8           THE COURT:  Even though your son is in law

9   enforcement.

10          JUROR 0019:  Yes.

11          THE COURT:  Okay, thank you.  That was a bad

12  question.

13          Any other adults living in your household?

14          JUROR 0019:  No.

15          THE COURT:  And your educational background?

16          JUROR 0019:  I got my nursing qualification in

17  England, so it's considered the same as a degree over there.

18          THE COURT:  Great.  Okay, perfect.  Thank you.

19          All right, we'll pass the microphone all the way down

20  to Juror 0020, then, and ask you to give us some background

21  information on yourself.

22          JUROR 0020:  Yes.  I live in Salida.  Retired.  I was

23  a supervisor for a defense -- defense distribution DEPO.

24  Married.  My wife is a nurse practitioner, and we have no

25  children.

87

1          THE COURT:  And your educational background?

2          JUROR 0020:  Some college.

3          THE COURT:  Did you have an emphasis or major?

4          JUROR 0020:  Computer programming.

5          THE COURT:  In your job capacity, was that military

6    or civilian?

7          JUROR 0020:  It was a government DEPO, but I was a

8    civilian.  Yes.

9          THE COURT:  All right, thank you.

10         All right, and Juror 0021?

11         JUROR 0021:  I live in Fresno.  I'm a seamstress in a

12   boat upholstery factory.  My husband is self-employed.  He

13   owns his own print shop.  I have one son that doesn't live at

14   home.  He's grown.  He's unemployed.  High school diploma.

15         THE COURT:  Great.  Thank you.

16         Juror 0022.

17         JUROR 0022:  I live in Ridgecrest, California.  I am

18   a car audio systems installer for the family business.  I am

19   single, no children, and I have my degree in biology.

20         THE COURT:  Good.  Thank you.  I'm sorry, and in the

21   household, are there adults that are --

22         JUROR 0022:  Yes, I live with both of my parents.

23         THE COURT:  Do they work outside the home?

24         JUROR 0022:  Yes.  My mom works on the Naval base out

25   there, and my dad is retired, and he is the shop -- the

208

88

1   business owner.

2            THE COURT:  What did he retire from?

3            JUROR 0022:  He retired -- he was 20 years in the

4   Navy, as well as he retired from civil service.

5            THE COURT:  Great.  Thank you.

6            Juror 0023.

7            JUROR 0023:  I am from Modesto.  I am a registered

8   nurse.  I am not technically married, but my significant other

9   is a mechanic.  Builds drive lines, works on race cars.  No

10  children.  And I have a bachelors in nursing.

11           THE COURT:  Great.  Thank you.

12           And Juror 0024.

13           JUROR 0024:  I live in Fresno.  I work at a tattoo

14  shop.  I'm a piercer.  I'm single.  No children.  And high

15  school.

16           THE COURT:  All right.  And do you live with others

17  in the house?

18           JUROR 0024:  My parents.

19           THE COURT:  Okay.  Do they work outside the home?

20           JUROR 0024:  Yes, my mom is a farmer, and my dad does

21  welding.

22           THE COURT:  Thank you.  And, Juror 0025.

23           JUROR 0025:  I'm a retired pastor.  I live in

24  Bakersfield, California.  I'm married.  My wife works in the

25  church.  I have two children out of the home.  My daughter

89

1   works for the church.  My son works for Chevron.

2           THE COURT:  And then your educational background?

3           JUROR 0025:  High school graduate.

4           THE COURT:  Great.  Perfect.  Thank you.

5           All right, now let me ask, and let me start off, is

6   there anything scheduling-wise, as I indicated, and the

7   lawyers have reconfirmed, it's probably not more than a

8   two-day trial, but scheduling-wise, is there anything we need

9   to address for seven of you.  Yes, Juror 0019.

10          JUROR 0019:  I'm excused from the 23rd to the 28th if

11  it does go over.  That's next Wednesday.

12          THE COURT:  Oh, yes.  You're good to go.  All right.

13          Okay, you know, I went over the basic principles that

14  guide a criminal law case, the presumption of innocence, the

15  burden of proof on the Government.  Defense does not have to

16  present any evidence at all.  Defendant does not have to

17  testify.  The standard of proof is beyond a reasonable doubt.

18  Is there anyone who has any disagreements or would not be able

19  to follow those principles in this case, the seven of you?

20  Anybody?  Okay.

21          In terms of your role as jurors, deciding what the

22  facts are, you have to decide credibility and believability of

23  all witnesses.  Is there anyone who feels uncomfortable about

24  that and not able to do that?  Okay.

25          And, again, as far as what you -- the criteria of

90

1   standard you used for credibility or believability, I'll give

2   you some jury instructions at the end.  They're pretty basic,

3   but otherwise, we're relying on your own common sense or

4   experience to make those credibility determinations, which you

5   probably do every day in your own life when you meet people

6   for the first time.

7           Is there anyone here -- I'm sorry, let me ask you

8   this:  I went through a number of scenarios as far as things

9   that shouldn't be considered, whether they're designated as

10  plaintiff's witnesses or defendant's witnesses, et cetera.

11  And also the job title in and of itself is not a basis for

12  deciding credibility.  Is anyone uncomfortable when we went

13  through that process?  Anyone have any concerns?

14          (No response.)

15          THE COURT:  Okay, now, I did state that there is a

16  concern that sometimes people raise with the profession of law

17  enforcement, and that you treat law enforcement witnesses just

18  like you would any other witness at least in terms of their

19  title.  The fact that someone comes in and says I'm a

20  Sheriff's officer, or whatever, doesn't mean you automatically

21  give that person more weight or less weight because of the

22  title.  Now, what they have to say may make a difference just

23  like any other witness.

24          Is there anyone who feels uncomfortable about that

25  prospect or would not be able to do that?

91

1          Okay, now some of you have mentioned some

2     relationship either with the law enforcement or legal

3     community.  For those of you who might be either related to,

4     acquainted with anyone in law enforcement, would that affect

5     your service as a juror here today in terms of deciding the

6     case?  Anybody?

7          (No response.)

8          THE COURT:  All right, I also mentioned the other

9     side of that.  Sometimes people have bad experiences with law

10    enforcement.  It could be anything from a traffic ticket that

11    you got and that you felt that the officer was rude or

12    impolite to you.  You didn't think you deserved the ticket.

13    It could be that you, a family member, a close friend was

14    actually arrested or maybe prosecuted in court, and you might

15    have thought somewhere along the line, that there's something

16    about that was unfair.

17         Is there anything in your own life's experiences,

18    relating to the law enforcement, anything negative or

19    something that bothered you that would concern yourself in

20    terms of service as a juror in this case, being fair and

21    impartial to both sides?

22         (No response.)

23         THE COURT:  Is there anything about the nature of

24    this case, what we're talking about here in terms of what I

25    call the elements, the different things that need -- the jury

92

1  needs to consider.  They relate to felon, which means as
2  different counsel pointed out, it doesn't mean that a person
3  convicted of a felony doesn't mean they actually went to
4  prison.  What we're looking at really more is was there a
5  prior conviction.  Was there a firearm involved?  Sometimes
6  people get concerned about firearms because of their own
7  personal philosophies, et cetera, and the possession aspect,
8  whether or not an individual was or was not in possession of a
9  firearm.
10         Does the aspect of this kind of a case -- and you
11  don't know anything about the facts, of course, but I just
12  basically told you what the offense is -- charge is.  Is there
13  anything about the kind of case this is, as you were sitting
14  in the audience area, listening to responses et cetera, that
15  caused you some concern about this particular case.
16  Juror 0019.
17         JUROR 0019:  I have strong personal views because of
18  my upbringing on the rights to bear arms.
19         THE COURT:  Okay.  Would that be that you have a firm
20  belief that people should or should not have the right to bear
21  arms?
22         JUROR 0019:  I don't think they should.
23         THE COURT:  Okay, and that's fine.  All right.  And
24  that's understandable.  We've had, like I said, there are
25  polar extremes.  There are people in the middle, and that's

93

1   perfectly good.

2          Now, in this case, the law -- you have to make the

3   assumption that the law does provide that people can possess

4   firearms, but there are certain categories of individuals who

5   are not allowed to carry firearms.  So in this case, what you

6   have to decide is would you be able to consider all the

7   elements or -- as long as -- let's say, for example, the

8   Government produces a gun, says here is a gun.  I've got this

9   gun, the guy is guilty.  And disregard the requirement of

10  proving that he has a prior conviction, i.e., a felony, and

11  that he possessed it.  Do you think you'd say, "No, that's

12  good enough for me.  That gun, I just don't even want to see

13  it.  I don't think he should -- anybody should have it.  I'm

14  going to vote him guilty just because they brought in a

15  firearm."  Do you think you would find yourself in that

16  position?

17         JUROR 0019:  I honestly can't say.

18         THE COURT:  Well, and I realize in putting you on the

19  spot, there have been no -- no one on this jury knows what the

20  facts are going to be presented other than the fact that I

21  told you what the charge is.  But imagine yourself on this

22  jury.  You have been sworn in, you're on the jury.

23  Government's first witness comes in, has a box, gets up on the

24  witness stand, opens the box.  It's a gun.  Are you going to

25  say, "My, Oh God, I'm going to find this guy guilty"?

94

1          JUROR 0019:  I hope not.  I honestly can't say, and
2     it does depend on the circumstances of the case.
3          THE COURT:  Oh, sure.  I mean, the facts, you have to
4     consider all the facts.  But what I'm saying is, with respect
5     to a firearm, that the fact that someone produces -- I mean,
6     I'm just trying to get you in the mind-set, okay, you're a
7     juror, the person is on the witness stand.  They produce a
8     gun.  And I'll embellish it.  It's a big gun.
9          JUROR 0019:  It makes me really uncomfortable because
10    I'm so against them.
11         THE COURT:  Would you find Mr. Hood guilty just
12    because they were able to produce a firearm?  In other words,
13    there are other elements.  You still have to find whether or
14    not he's in possession of the thing.  Do you think that you
15    would say, "I'm not concerned about that.  It's here.  He's
16    here.  He's guilty."
17         JUROR 0019:  No, I'd listen to the facts.
18         THE COURT:  And that's important.  Because it may
19    well be that you will find, yes, indeed, that's a firearm, but
20    you know, the Government has not proven beyond a reasonable
21    doubt that Mr. Hood possessed that firearm.  And if you're
22    sitting there, thinking, 'I don't think they've proven that he
23    had possession of that.'  You have to find him not guilty, you
24    understand, even though they wave the gun around, whatever.
25    That's your obligation.

215

95

1            JUROR 0019:  Okay.

2            THE COURT:  If the Government proves the elements,

3    it's your obligation to find him guilty.  There is no question

4    about that.  But the Government also has the burden of proof

5    beyond a reasonable doubt as to every aspect of the case.  Are

6    you okay with that?

7            JUROR 0019:  Yeah.

8            THE COURT:  Anybody else, the kind of case -- oh,

9    yes, Juror 0025.

10           JUROR 0025:  I believe very strongly of the right to

11   bear arms, but I don't believe that would have any bearing on

12   this case.

13           THE COURT:  All right.  Perfect.  And, again, the

14   same dialogue, I'm not going to repeat it, but, Juror 0019, if

15   the Government doesn't prove all of its elements, you have to

16   find him not guilty, you understand?  But if they do prove all

17   the elements, then, okay.  Okay, anybody else?

18           Have any of the seven of you ever served as a juror

19   before?  A number of you.

20           Juror 0019, let me start with you.  How many times

21   have you served as a juror?

22           JUROR 0019:  Once.

23           THE COURT:  Criminal or civil?

24           JUROR 0019:  Criminal.

25           THE COURT:  Do you remember what kind of a case it

96

1  was?

2          JUROR 0019:  It was burglary.

3          THE COURT:  Okay.  Was a verdict reached?

4          JUROR 0019:  Yes.

5          THE COURT:  Anything about that experience that would

6  affect your service as a juror here today?

7          JUROR 0019:  No.

8          THE COURT:  Can you disregard everything you might

9  remember about that case for the purpose of this case?

10         JUROR 0019:  Yes.

11         THE COURT:  Okay, great.  If you pass the mike down,

12 there are a couple people down below that have also served as

13 jurors before.

14         JUROR:  I served once.  It was a criminal case on

15 drug possession, and we came to a verdict.

16         THE COURT:  Okay, anything about that experience that

17 would affect your service as a juror?

18         JUROR:  No, sir.

19         THE COURT:  Okay, and you can disregard whatever you

20 might remember about that case?

21         JUROR:  Yes.

22         THE COURT:  Okay.

23         JUROR 0023:  I served on a DUI.  We did reach a

24 verdict.  And, no, it would not impact my judgment.

25         THE COURT:  Great.  Thanks, Juror 0023.

97

1          Okay, great.  All right, and of the seven of you,

2    then, have you ever been a witness to or a party to any legal

3    proceedings, anybody?

4          Okay, we have Juror 0023.

5          JUROR 0023:  I was a witness on a theft case.

6          THE COURT:  Okay.  Did it actually come into the

7    courtroom?

8          JUROR 0023:  Yes.

9          THE COURT:  Anything about that experience that would

10   affect your service as a juror here today?

11         JUROR 0023:  No.

12         THE COURT:  Couple folks.  Juror 0025.

13         JUROR 0025:  I was involved with a case when -- that

14   we had filed charges against a shoplifter and testified in

15   court.

16         THE COURT:  Okay.  Anything about that experience

17   that would affect your service?

18         JUROR 0025:  No.

19         THE COURT:  Thank you.  And then, Juror 0019?

20         JUROR 0019:  My son was involved in the juvenile

21   system.

22         THE COURT:  Um-hmn.

23         JUROR 0019:  And that did leave a nasty taste in my

24   mouth because I think there's inequalities in sentencing.

25         THE COURT:  Okay.  And would that affect your service

98

1    as a juror here today?

2            JUROR 0019:  No.

3            THE COURT:  And I have spoken with jurors afterwards

4    about types of cases.  Now, the jury has to understand and,

5    Juror 0019, you need to understand, sentencing, if the jury

6    arrives at a verdict, sentencing is not an issue that the jury

7    deals with.  In other words, you can't find someone guilty

8    because you assume the Court's going to be lenient, and you

9    can't find him not guilty because you're afraid of what the

10   Court might do.  That's a totally separate proceeding.  You're

11   okay with that, then?

12           (Juror 0019 nods.)

13           THE COURT:  All right, anything else there?

14           Okay, and then let me ask, then, any other

15   involvement or relationship regarding the legal system by

16   anyone?  Yes, Juror 0019.

17           JUROR 0019:  We had a civil suit filed against us,

18   too, with regards to my son, and that settled.

19           THE COURT:  All right.  And during the -- before it

20   settled, were you called to testify or anything like that,

21   depositions?

22           JUROR 0019:  Yes.

23           THE COURT:  Anything about that whole experience

24   including the taking of your deposition that would affect your

25   service as a juror here?

99

1          JUROR 0019:  No.

2          THE COURT:  Yes.  Okay, Juror 0025.

3          JUROR 0025:  I was involved in -- someone filed a

4  lawsuit against us.  It was a fellow business partner.  So we

5  had depositions, went to court, and the case was dismissed.

6          THE COURT:  Anything about that experience that would

7  affect your service?

8          JUROR 0025:  No, Your Honor.

9          THE COURT:  Anybody else of the seven?

10         Okay.  And, again, I didn't ask all of the specific

11 questions.  I think that between myself, the attorneys, we

12 covered the areas that we think you should -- you folks should

13 think about in terms of whether or not at this point in time,

14 you can be fair and impartial to both sides.  But, again, as I

15 did with the other folks, there may have been some areas that

16 I did not cover that you wish to mention.  Again, the fact

17 that I didn't repeat verbatim every question I asked of the

18 other folks, it doesn't mean they're less important.  It's

19 just that I know that sitting in the audience area, you heard

20 and understood all the questions and the answers that were

21 given.

22         So is there anything else that you believe or feel

23 that the parties should be made aware of regarding your

24 potential service as a juror?  Any of the seven of you,

25 anything you have not had a chance to mention or disclose?

100

1          (No response.)

2          THE COURT:  All right, let me go ahead and, again,

3    turn it over to the attorneys to allow them the opportunity

4    the ask some questions of the seven of you, let me start with

5    the plaintiff's side.

6          MS. SANCHEZ:  Thank you, Your Honor.

7          Good morning.  I just have two quick questions.  The

8    first one is, is there anyone who has any philosophical,

9    moral, or religious beliefs that would make it difficult for

10   to you sit in judgment and make a decision on guilt or not

11   guilt in this case?

12         (No response.)

13         MS. SANCHEZ:  Does anybody have any prejudices that

14   you think would negatively affect either the Government or the

15   defendant in making a decision in this case?  Thank you.

16         THE COURT:  Okay, and defense.

17         MR. LINDAHL:  Juror 0019, thank you for being

18   forthcoming.  You mentioned because of your background, you

19   have a strong opposition in theory with guns.

20         JUROR 0019:  Um-hmn.

21         MR. LINDAHL:  Because in England, they don't allow

22   guns; correct?

23         JUROR 0019:  That's correct.

24         MR. LINDAHL:  If you were -- ma'am, this probably

25   isn't a case, then, for you, is it?

101

1          JUROR 0019:  Not really, no.

2          MR. LINDAHL:  You're not comfortable, are you?

3          JUROR 0019:  No.

4          MR. LINDAHL:  Okay, all right.

5          Juror 0020, you were a private contractor with the

6    Department of Defense?

7          JUROR 0020:  No, I was a government employee.

8    Federal.

9          MR. LINDAHL:  Any particular branch of the service?

10          JUROR 0020:  I was in the Army, but I was working as

11    a civilian.

12          MR. LINDAHL:  Okay, all right.  Well, I was asking,

13    was it Army, was it Marines?

14          JUROR 0020:  All branches of the Government.

15          MR. LINDAHL:  Okay.  So your honest thought, as we're

16    sitting here today, we know that Mr. Hood is a felon.  What do

17    you think, is he guilty?

18          JUROR 0020:  I haven't heard any evidence yet.

19          MR. LINDAHL:  What do you think?

20          JUROR 0020:  He's innocent until proven guilty.

21          MR. LINDAHL:  Thank you, sir.

22          Now, you heard the Court mention that there are

23    elements to crimes, and I'm just going the briefly touch,

24    reiterate what the judge said.  In order to find someone

25    guilty of being a felon in possession of a firearm, first,

102

1   they have to be a felon.  That's not going to be an issue in

2   this case.

3          There has to be a firearm.  That's not going to be an

4   issue in this case.  The question is, then, if there is a

5   dispute over possession, whether -- and that is an element

6   which must be satisfied and must be proved beyond a reasonable

7   doubt in order to find someone guilty, what I'm asking you is,

8   can you stick to the burden of proof beyond a reasonable doubt

9   on all three of those elements?

10          JUROR 0020:  Yes.

11          MR. LINDAHL:  Okay.  And you're not going the go back

12   there and go, "Two out of three is not bad.  Close enough."

13   Right?  And I apologize for putting you on the spot.

14          Any one of the other six of you, anybody think two

15   out of three is good enough?  That satisfies the proof of

16   the -- the burden of proof beyond a reasonable doubt?

17          Ma'am, what do you think?

18          JUROR 0021:  I don't really know how to answer that.

19   Would you repeat the question.

20          MR. LINDAHL:  My question is, well, is two out of

21   three good enough?

22          JUROR 0021:  No, I would need the know everything.  I

23   would want to hear -- I can't pass judgment on something I

24   don't know enough about.

25          MR. LINDAHL:  And if you heard evidence, and the

103

```
1    Court were to instruct you that there are three elements which
2    are required, being a felon, there is being a firearm there,
3    and the person possessing a firearm.  If you had proof beyond
4    a reasonable doubt that two of those three applied, in your
5    mind, is that good enough --
6              JUROR 0021:  There is still a third element.
7              MR. LINDAHL:  That was my question to you.  All
8    right, thank you.
9              Other than Juror 0019, because I just spoke with you,
10   the six of you here in the front who really doesn't want the
11   sit on this trial, tell me now.  Seeing no hands, that's all I
12   have, Your Honor.
13             THE COURT:  There was a hand, but --
14             MR. LINDAHL:  I'm sorry, was there a hand?
15             JUROR 0021:  Yeah, mine.
16             MR. LINDAHL:  Okay, thank you, ma'am.
17             THE COURT:  Okay, all right.  Do you want a sidebar
18   on the cause?
19             MR. LINDAHL:  Please, Your Honor.
20             (Discussion at the bench, which was not reported.)
21             THE COURT:  All right, I have consulted with the
22   attorneys, Juror 0019, based upon your concerns on this
23   particular issue.  I'll excuse from you this particular case.
24   You can check back with the jury clerk if you need a note.
25   Otherwise, call that 800 number after 5:00 PM, Friday.  Thank
```

104

1    you very much.

2            We'll go ahead and fill that seat.

3            THE CLERK:  Juror 0026.

4            THE COURT:  All right, Juror 0026, were you able the

5    hear and understand everything that was asked so far?

6            JUROR 0026:  Yes.

7            THE COURT:  Were you able to form an answer in your

8    own mind?

9            JUROR 0026:  Yes.

10           THE COURT:  Okay, good.

11           All right, I'm going to bring you up to speed with

12   everyone else.  First, can you give us some background

13   information on yourself.

14           JUROR 0026:  Yeah, I'm from Modesto.  I am a

15   territory sales rep for a rental company.  I'm married.  I

16   have a 16-year-old daughter, high school.

17           THE COURT:  And does your wife work outside the home?

18           JUROR 0026:  Yeah.  She runs an office for a

19   chiropractor.

20           THE COURT:  Okay, great.

21           Have you ever served as a juror before?

22           JUROR 0026:  No.

23           THE COURT:  Ever been a party to -- party to, a

24   witness to any lawsuit?

25           JUROR 0026:  No.

105

1          THE COURT:  Any other relationship with the legal
2     system or the Court system?
3          JUROR 0026:  None.
4          THE COURT:  Any scheduling matters that we need the
5     address?
6          JUROR 0026:  No, not for this.
7          THE COURT:  Okay, great.  Good.
8          All right, any concerns about the basic principles,
9     presumption of innocence, burden of proof, standard of proof?
10         JUROR 0026:  None.
11         THE COURT:  All right.  And in terms of your fact
12    finding, credibility, believability, anything about anything
13    we discussed there including job titles, et cetera, that cause
14    you some concern about being able to fairly and impartially
15    determine credibility or believability of any witness?
16         JUROR 0026:  None at all.
17         THE COURT:  Anything either because you know people
18    or are related to people in law enforcement or perhaps bad
19    experience relating to law enforcement that would cause you
20    some concern about being a juror where we have law enforcement
21    officers present as witnesses?
22         JUROR 0026:  None.
23         THE COURT:  Anything else about -- and, again, I'm
24    not going to go through all the questioning, but that doesn't
25    mean that they're not important.  They are important.  But is

106

1    there anything during any of the questions that I or the
2    attorneys asked, any of the answers that were given that would
3    cause you in your own mind as you're sitting in the audience
4    to think about, well, I would have answered that differently,
5    I really need to say something more about any of that?
6            JUROR 0026:  None.
7            THE COURT:  Is there any reason why you couldn't
8    serve as a fair and impartial juror in this particular case?
9            JUROR 0026:  No.
10           THE COURT:  Let me ask counsel to ask if there are
11   any questions.  First, on behalf of Government?
12           MS. SANCHEZ:  Government has no further questions.
13           THE COURT:  Defense?
14           MR. LINDAHL:  Juror 0026, you already heard, and you
15   will hear in testimony, that Mr. Hood is a felon.  Does that
16   make him a liar?
17           JUROR 0026:  No.
18           MR. LINDAHL:  You have heard, and will hear and see,
19   that Officer Webb is a member of Fresno's finest.  Does that
20   make him a saint?
21           JUROR 0026:  No.
22           MR. LINDAHL:  Does that mean he's automatically to be
23   believed by virtue of the uniform he wears?
24           JUROR 0026:  No.
25           MR. LINDAHL:  Police officers make mistakes?

107

1          JUROR 0026:  Yes.

2          MR. LINDAHL:  Okay, thank you, sir.  That's all I

3    have.

4          THE COURT:  Okay, all right.  Any cause matters you

5    would like to go sidebar on the newest person?

6          MR. LINDAHL:  No.

7          MS. SANCHEZ:  No, Your Honor.

8          THE COURT:  Okay.  All right, if there are no other

9    cause issues, we would continue on now that we have the new

10   seven with the peremptory challenges.  Is that acceptable with

11   plaintiff's side to do that?

12         MS. SANCHEZ:  Yes, Your Honor.

13         THE COURT:  And defense side, then, pass for cause

14   and continue on with peremptory challenges?  Peremptory

15   challenges?  Moving back into peremptory challenges?

16         MR. LINDAHL:  Okay, thank you, Your Honor.

17         THE COURT:  Okay, good.  We'll go ahead and continue

18   with the jury selection process.  Again, the seven new folks

19   have been qualified.  There is no reason why the new seven of

20   you cannot serve as jurors, but, again, we're now going to

21   move back into the peremptory challenge stage.  Again,

22   focusing on the 12 of you in the jury box, and the parties are

23   entitled to continue on with the peremptory challenges.  And

24   where we left off, then, the defense may exercise its next

25   peremptory.

108

1          MR. LINDAHL:  Thank you, Your Honor.  The defense
2    would ask the Court to thank and excuse Juror Number 1, Juror
3    0014.
4          THE COURT:  Juror 0014, you are excused with our
5    thanks.  Thank you.
6          And, Juror 0020, if you can please take that seat.
7    That's seat number 1.
8          Okay, then, moving back to the plaintiff's side, it's
9    the plaintiff's next peremptory.
10         MS. SANCHEZ:  The plaintiff would ask that the Court
11   excuse and thank Juror Number 8.
12         THE COURT:  Juror 0018, you are excused with our
13   thanks.  Thank you very much.
14         MR. LINDAHL:  Your Honor, in the interest of
15   expediency, Juror 0021 probably doesn't have to get
16   comfortable.
17         THE COURT:  Oh, okay.  All right, so it would be the
18   next defense peremptory, Juror 0021, you are excused with our
19   thanks.  Thank you very much.
20         Okay, so then it would be -- yes, Juror 0022, if you
21   would take Seat Number 8.
22         Okay, and it's still the defense next peremptory.
23         MR. LINDAHL:  Defense peremptory, Your Honor?
24         THE COURT:  Yes.
25         MR. LINDAHL:  Accept this jury as impaneled.

109

1              THE COURT:  Defense passes, and plaintiff's next
2    peremptory?
3              MS. SANCHEZ:  We accept the jury as impaneled,
4    Your Honor.
5              THE COURT:  All right, members of the jury panel,
6    both sides have passed consecutively.  That means that there
7    is no reason why the 12 of you in the box cannot serve as
8    jurors in this case.
9              Okay, so before I have you stand up and be sworn, is
10   there any reason why the 12 of you cannot serve as a juror in
11   this particular case?
12             All right, seeing no hands, if the 12 of you please
13   stand, the clerk will administer an oath.
14             THE CLERK:  Please raise your right hand.
15             (Jury sworn.)
16             THE COURT:  Please be seated.  Okay, and we are going
17   to select an alternate juror, so we have Juror 0023 up.  And
18   so first peremptory on behalf of the plaintiff.
19             MS. SANCHEZ:  The plaintiff passes, Your Honor.
20             THE COURT:  All right.  And defense.
21             MR. LINDAHL:  We pass as well, Your Honor.
22             THE COURT:  Very well.  All right, Juror 0023, then
23   you would be an alternate juror.  If something were to happen
24   for any of the 12, you would replace them as a juror in this
25   case.  So is there any reason why you couldn't serve as an

110

1    alternate, and if called upon, to serve as a juror in this
2    case.

3             JUROR 0023:  No reason.

4             THE COURT:  If you would, please, stand up, raise
5    your right hand, the clerk will administer an oath.

6             (Alternate juror was sworn.)

7             THE COURT:  Okay, you can go ahead and have a seat.
8    In fact, if you can just take a seat up there in the top row
9    there at the end, there is a space available for you.

10            Okay, Counsel, what I would intend to do is excuse
11   the two remaining jurors and the other prospective jurors in
12   the audience area with our thanks.  Anything further for the
13   remaining prospective jurors before I excuse them?

14            MS. SANCHEZ:  No, Your Honor.  Thank you.

15            MR. LINDAHL:  No, Your Honor.

16            THE COURT:  Both of you, thank you very much for
17   appearing, and both of you in the audience there, as you can
18   see, we really almost ran out of jurors.  So we appreciate
19   your coming in.  You are excused with our thanks.  If you need
20   to check with the jury administrator, you can do that.
21   Otherwise, call that 800 number after 5 :00 on Friday.

22            Thank you very much for coming in.

23            (Remaining prospective jury panel excused from the
24   courtroom.)

25            THE COURT:  All right, let me just have counsel

231

111

1   approach the sidebar.

2          (A bench conference was held, which was not

3   reported.)

4          THE COURT:  All right, members of the jury, we're

5   going to go ahead.  It's 11:30.  Once we pick a jury, then I

6   do consult with parties in all cases.  We go over preliminary

7   jury instructions, any issues we need to address, et cetera.

8   So I'm going to excuse you folks in a moment.  We'll resume at

9   1:00 this afternoon, and that will give you a jump on the

10  other lunch time folks, but if you can be back in the jury

11  room a little bit before 1:00.

12         Now, my staff will take you back to the jury room to

13  get your jury badges.  If you have any questions about --

14  procedurally about the jury service, we can either try to

15  answer those or get the jury clerk up here at 1:00 to answer

16  any questions you might have.  They'll be passing out note

17  pads, et cetera.

18         And so I just need to advise you, you obviously don't

19  know anything about the case, but I do have to advise you,

20  please do not form or express an opinion about the case.  Do

21  not discuss the case with anyone.  And, again, as I mentioned

22  during the break, the lawyers are well aware now of who you

23  are, and you'll have the badges, and so they'll be very

24  careful about talking about the case in the hallway, the

25  elevators, the rest rooms, the lobby, et cetera.

112

1          But every once in awhile, you know, especially with

2     the elevators, it's crowded, you're in the back of the

3     elevator, the lawyer, or one of the witnesses in the front,

4     they're chatting about the case.  Hopefully they will not do

5     that.  Both sides will caution their witnesses not to talk

6     about the case or anybody else who might be interested or

7     involved in the case.  But if you overhear anything, try to

8     step away from them.  But if you're not able to do that, we

9     have our security folks.  They're in the blue blazers.

10    They're downstairs.  So if anyone tries to bother you, which

11    we've rarely have ever had that issue.  Let them know.

12    Certainly if anyone tries to contact you about the case,

13    please let me know in open court when we come back here at

14    1:00.

15          Now, I will say this:  The lawyers now know who you

16    are, but they're going to ignore you basically.  In other

17    words, you might see them in a hallway.  You might say hello

18    just to be courteous.  They might as a matter of courtesy

19    acknowledge you and say hello.  That's all they can do,

20    because you have to understand, that for you, it's just

21    innocuous.  You might be asking where is a good place for

22    lunch, or whatever, but someone else might see that, and say,

23    "Oh, look at that lawyer.  That party is trying to influence

24    the juror," and then it's a big mess.  So the lawyers

25    uniformly just believe the best thing to do is just try not to

233

113

1 talk to jurors, maybe say hello, but that's about it.  Okay?

2          So with that, then, we'll take our morning recess or

3 noon recess, and we'll resume at 1:00 this afternoon.  My

4 staff will take you back to the jury room.  Have a good lunch.

5 Thank you.

6          (Jury excused.)

7          THE COURT:  All right, the jury has left for its noon

8 recess.  Again, basically the unreported sidebars were just to

9 inquire about any cause issues so that I would need to know

10 whether or not to send the jury panel out.

11          The last sidebar was simply to let counsel know that

12 because it's 11:30, that I would -- rather than try to start

13 the case up, I would let the jury go early and then resume

14 instead of at 1:30, resume at 1:00, which counsel was

15 agreeable to.

16          One thing I did want to cover with you folks, and

17 obviously if there is anything else on the record, we can

18 cover it.  But on the proposed jury instructions, I would

19 propose to give the standard Ninth Circuit preliminary jury

20 instructions.  The Government has provided me with those, and

21 the one that usually requires some modification is instruction

22 number 2, "The Charge-Presumption of Innocence" which outlines

23 basically the elements of the offense, et cetera.

24          But let me ask from defense counsel's standpoint, as

25 far as the preliminary jury instructions, any questions,

234

114

1   concerns, issues, regarding those, my giving those?

2           MR. LINDAHL:  I'm sorry, Your Honor, what is the

3   actual number of the instruction the Court's referring to?

4           THE COURT:  Oh, okay.  On the packet that we received

5   from the Government, the first proposed instruction is

6   entitled, "Duty of Jury."  And then the second proposed

7   instruction is, "The Charge-Presumption of Innocence."  And

8   that's the one that's sort of a fill in the blank as far as

9   advising what the -- what the charge is.  And there's also

10  included in there a stipulation.  So I just want to make sure

11  that you've had a chance to review those, and if you have any

12  concerns or thoughts, then I certainly will address those.

13          MR. LINDAHL:  Your Honor, I have had the opportunity

14  to review those, and I do not have any issue with them as

15  presented to the Court.

16          THE COURT:  Okay.  All right, so when the jury comes

17  in, basically I'll go ahead and read the jury instructions,

18  which is essentially what is chapter 1 of the Ninth Circuit

19  model instructions, and then also, I give 2.2, which is "Bench

20  Conferences and Recess."  And then whenever the jury takes a

21  break, I'll give 2.1, which is a cautionary instruction, first

22  recess.

23          All right, so that's what I would do as soon as we

24  get in.  And then we'll start the case.  Plaintiff, government

25  may give its opening statement, and then right after that,

235

115

1   defense may give an opening statement or reserve it, whichever

2   you prefer, and you might want to discuss that -- I don't know

3   if you want to reserve your opening or give it, whatever.

4          MR. LINDAHL:  Can I defer that until 1:00,

5   Your Honor?

6          THE COURT:  Sure.  The only reason I'm asking, so

7   she'll know to have her witness ready to go.  She probably

8   will anyway, but that's the only reason.  You can certainly

9   wait until -- actually you can wait until after her opening

10   just to state whether or not you're going to give one right

11   after that or reserve it.  So that's fine.

12          Okay, is there anything else that we should address

13   or take up before 1:00, plaintiff's side anything that you can

14   think of?

15          MS. SANCHEZ:  No, Your Honor.  I believe when we come

16   back from the lunch break, we should have stipulations to

17   present to the Court as well.

18          THE COURT:  And in terms of stipulation, whether you

19   want me to read it into the record to the jury or you folks

20   want to do it, I'll leave that totally up to you.  That's

21   perfectly fine.

22          Okay, anything else for plaintiff 's side?

23          MS. SANCHEZ:  No, Your Honor.  Thank you.

24          THE COURT:  Defense side, anything we need to address

25   or take up?

116

1          MR. LINDAHL:  No, Your Honor.

2          THE COURT:  We'll take our noon recess.  We'll resume

3     at 1:00 this afternoon.

4          MR. LINDAHL:  Thank you, Your Honor.

5          (Noon recess.)

6                        **AFTERNOON SESSION**

7          THE COURT:  Back on the record outside the presence

8     of the jury.  Just a couple of things.  I noted on the

9     proposed preliminary jury instructions, which I will be

10    giving, on the second instruction, "Charge, Presumption of

11    Innocence" in the third line, it indicates "felon in

12    possession of ammunition."  I assume that's in possession of a

13    firearm; is that correct?

14         MS. SANCHEZ:  That's correct, Your Honor.

15         THE COURT:  Okay, and then going down one, two --

16    third paragraph, second to the last line.  Instead of "these

17    charges," since it's only one count, I'm just going to

18    indicate "this charge."

19         And then on the next page, that full paragraph,

20    the weapon is indicated to be a Smith & Wesson, and in the

21    concluding instructions, it's Ruger.  So I just want to make

22    sure that we got the right --

23         MS. SANCHEZ:  It is a Ruger 44 caliber Model Vaquero

24    revolver.

25         THE COURT:  Okay.  What I'll do on this, and I'm just

117

```
 1   going to strike.  And I don't give this -- physically give
 2   this instruction to the jury to take back with them.  I give
 3   them the concluding instructions.  So I'm just going to go
 4   ahead and interlineate.
 5           Okay, so on that, that's -- the fifth line down on
 6   the second page, that last full paragraph is going to read,
 7   "has stipulated that the Ruger Model Vaquero, 44 caliber
 8   revolver."
 9           MS. SANCHEZ:  Thank you.
10           THE COURT:  Okay, finally with respect to the
11   preliminary instructions, I'm also going to give jury
12   instruction 2.2, which is designated as proposed jury
13   instruction number 13, "Bench Conferences and Recesses."  I'll
14   go ahead and give that with the preliminary jury instructions.
15   I'm going to give it right towards the end just before
16   proposed jury instruction number 11, which is outline of the
17   trial.  So it will be "Bench Conferences and Recesses."  I'll
18   give the preliminary instruction, followed by "Outline of the
19   Trial," and that will be it for the preliminary jury
20   instructions.
21           Okay, and then I received from counsel a document
22   entitled, "Stipulation."  And then with that, how would the
23   parties like that to be addressed to the jury?
24           MR. LINDAHL:  Sorry, Counsel.
25           MS. SANCHEZ:  We've agreed that the Court could read
```

238

118

1   the stipulation.  I also have a signed copy that I'll file

2   after court today.

3          THE COURT:  Okay.  What I will do, then, is you folks

4   can just let me know.  At this point, you can just refer the

5   Court, read the stipulation, which I will read, then, the

6   stipulation.  Also the jury instruction that relates to

7   stipulation, which is proposed jury instruction number 14.

8   It's Ninth Circuit jury instruction 2.4, "Stipulation of

9   Facts."  And then I'll go ahead and read that instruction, and

10  I'll go ahead and read the stipulation.  You just need to flag

11  it when I should read it, and I'll go ahead and do that.

12          All right, so before we have the jury come in, then,

13  is there anything further on behalf of plaintiff's side?

14          MS. SANCHEZ:  No, Your Honor.

15          THE COURT:  All right, defense side, anything?

16          MR. LINDAHL:  No, Your Honor.

17          THE COURT:  Okay.  All right, we'll have the jury

18  come in.

19          MS. SANCHEZ:  Your Honor, I would just note for the

20  record that the Government's witness, Sergeant Alvarez, is

21  present, but he is outside of the courtroom.

22          THE COURT:  And that will be the Government's first

23  witness, then?

24          MS. SANCHEZ:  Second witness, Your Honor.

25          (The jury entered the courtroom, and the following

1   proceedings were held in their presence:)

2        THE COURT:  All right, the jury is present.  Please

3   be seated.  And when I refer to the jury being present, I'm

4   also referring to Juror 0023, the alternate juror.

5        All right, members of the jury, we're going to go

6   ahead and begin the case itself now.  I'm going to start off

7   by reading you preliminary jury instructions.  And I just want

8   to let you know that when I read the preliminary jury

9   instructions and also the concluding instructions, I literally

10  have to read them to you because if I misstate a word or

11  phrase, it can throw the whole instruction off.

12       I'm going to try to vary the pitch, tone, cadence,

13  et cetera, of my voice so it doesn't come across by a flat

14  monotone, but by doing that, I'm not intending to emphasize or

15  deemphasize any particular word or phrase.  They're all

16  important.

17       One or two times I'll step away from the jury

18  instructions to give you some information, but when I do that,

19  I'll let I know.

20       You are now the jury in this case, and I want to take

21  a few minutes to tell you something about your duties as

22  jurors and to give you some preliminary instructions.  At the

23  end of the trial, I will give you more detailed written

24  instructions that will control your deliberations.

25       When you deliberate, it will be your duty to weigh

120

1   and evaluate all the evidence received in the case, and in
2   that process, to decide the facts.  To the facts as you find
3   them, you will apply the law as I give it to you, whether you
4   agree with the law or not.

5        You must decide the case solely on the evidence and
6   the law before you and must not be influenced by any personal
7   likes or dislikes, opinions, prejudices, or sympathy.  Please
8   do not take anything I may say or do during the trial as
9   indicating what I think of the evidence or what your verdict
10  should be.  That is entirely up to you.

11       This is a criminal case brought by the United States
12  Government.  The Government charges the defendant with being a
13  felon in possession of a firearm.  The charge against the
14  defendant is contained in the indictment.  The indictment
15  simply describes the charge the Government brings against the
16  defendant.  The indictment is not evidence and does not prove
17  anything.

18       The defendant has pleaded not guilty to the charge
19  and is presumed innocent unless and until the Government
20  proves the defendant guilty beyond a reasonable doubt.  In
21  addition, the defendant has a right to remain silent and never
22  has to prove innocence or to present any evidence.

23       In order to help you follow the evidence, I will now
24  give you a brief summary of the elements of the crime, which
25  the government must prove to make its case.

241

121

1        The defendant is charged in Count 1 of the indictment

2    being a felon in possession of a firearm, in violation of

3    Section 922(g)(1) of Title 18 of the United States Code.  In

4    order for a defendant to be found guilty of this charge, the

5    Government must prove each of the following elements beyond a

6    reasonable doubt:

7        First, the defendant knowingly possessed a firearm.

8        Second, the firearm had been shipped or transported

9    from one state to another or from a foreign nation to the

10   United States.  And

11       Third, at the time the defendant possessed the

12   firearm, the defendant had been convicted of a crime,

13   punishable by imprisonment for a term exceeding one year.

14       The defendant has stipulated that before the time

15   charged in the indictment, he had been convicted of crimes

16   punishable by imprisonment for a term exceeding one year, and

17   you should, therefore, treat this fact as having been proved.

18       The defendant has stipulated that the Ruger Model

19   Vaquero, 44 caliber revolver, that is the subject of the

20   charge in this case meets the definition of a firearm under 18

21   United States Code Section 921, and it was manufactured

22   outside of California and, therefore, traveled in and affected

23   interstate commerce.  And you should therefore treat these

24   facts as having been proved.

25       The evidence you are to consider in deciding what the

Preliminary Jury Instructions

122

1    facts are consists of:

2              (1) the sworn testimony of any witness;

3              (2) the exhibits which are received into evidence;

4    and

5              (3) any facts to which the parties agree.

6         The following things are not evidence, and you must

7    not consider them as evidence in deciding the facts of this

8    case:

9              1.  statements and arguments of the attorneys;

10             2.  questions and objections of the attorneys;

11             3.  testimony that I instruct you to disregard; and

12             4.  anything you may see or hear when the Court is

13   not in session even if what you see or hear is done or said by

14   one of the parties or by one of the witnesses.

15        Evidence may be direct or circumstantial.  Direct

16   evidence is direct proof of a fact, such as testimony by a

17   witness about what that witness personally saw or heard or

18   did.  Circumstantial evidence is indirect evidence, that is,

19   it is proof of one or more facts from which one can find

20   another fact.  You are to consider both direct and

21   circumstantial evidence.  Either can be used to prove any

22   fact.  The law makes no distinction between the weight to be

23   given to either direct or circumstantial evidence.  It is for

24   you to decide how much weight to give to any evidence.

25        Okay, I'm going to step away from the jury

243

123

1    instructions just for a moment because there is a

2    recommendation by our judicial jury instruction committee that

3    we should give the juries an example of direct and

4    circumstantial evidence because it sounds like a very specific

5    thing that relates to courts, but you use direct and

6    circumstantial evidence every day in your own lives.  You just

7    don't think about it in those technical terms.

8         If an issue in the case is whether or not it rained

9    last night, if someone were to appear to testify and swear --

10   get sworn under oath and testify that last night, they went

11   outside of their home and raindrops were falling down on them.

12   From that evidence, from that witness' testimony, if you

13   believe that witness, you can conclude from his or her direct

14   testimony, that is, what they saw, felt, heard, or did, that

15   it rained last night.

16        If, on the other hand, a witness were to appear to

17   testify under oath and indicate or testify that last evening,

18   they heard on the news that rain was predicted.  They went

19   outside, it wasn't raining.  They looked outside, they saw

20   dark clouds, but that's it.  They went to bed.

21        The next morning, they woke up, looked outside the

22   bedroom window, and the ground was wet.

23        Now, from each of those facts, you can conclude that

24   it rained last night.  But you're not required to because

25   there could be a number of reasons why the ground was wet.

124

1    The sprinklers might have gone on, et cetera.  But, again,

2    that's something -- just a brief little example of how we use

3    direct and circumstantial evidence in our own lives, so there

4    is nothing mystical or magical about it in the court system.

5         Okay, back to the instructions.

6         There are rules of evidence that control what can be

7    received in evidence.  When a lawyer asks a question or offers

8    an exhibit in evidence, and a lawyer on the other side thinks

9    that it is not permitted by the rules of evidence, that lawyer

10   may object.  If I overrule the objection, the question may be

11   answered or the exhibit received.  If I sustain the objection,

12   the question cannot be answered, or the exhibit cannot be

13   received.

14        Whenever I sustain an objection to a question, you

15   must ignore the question and must not guess what the answer

16   would have been.

17        Sometimes I may order that evidence be stricken from

18   the record and that you disregard or ignore the evidence.

19   That means that when you are deciding the case, you must not

20   consider the evidence that I told you to disregard.

21        In deciding the facts in this case, you may have to

22   decide which testimony to believe and which testimony not to

23   believe.  You may believe everything a witness says, or part

24   of it, or none of it.

25        In considering the testimony of any witness, you may

245

125

1   take into account:

2           (1) the witness' opportunity and ability to see or

3   hear or know the things testified to;

4           (2) the witness' memory.

5           (3) the witness' manner while testifying;

6           (4) the witness' interest in the outcome of the case,

7   if any;

8           (5) the witness' bias or prejudice, if any;

9           (6) whether other evidence contradicted the witness'

10  testimony;

11          (7) the reasonableness of the witness' testimony in

12  light of all the evidence; and

13          (8) any other factors that bear on believability.

14          The weight of the evidence as to a fact does not

15  necessarily depend on the number of witnesses who testify

16  about it.

17          I will now say a few words about your conduct as

18  jurors.

19          First, keep an open mind throughout the trial and do

20  not decide what the verdict should be until you and your

21  fellow jurors have completed your deliberations at the end of

22  the case.

23          Second, because you must decide this case based only

24  on the evidence received in the case and on my instructions as

25  to the law that applies, you must not be exposed to any other

126

1    information about the case or to the issues it involves during

2    the course of your jury duty.  Thus, until the end of the case

3    or unless I tell you otherwise:

4            Do not communicate with anyone in any way and do not

5    let anyone else communicate with you in any way about the

6    merits of the case or anything to do with it.  This includes

7    discussing the case in person, in writing, by phone or

8    electronic means, via e-mail, text messaging, or any Internet

9    chat room, blog, website, or other feature.  This applies to

10   communicating with your fellow jurors until I give you the

11   case for deliberation, and it applies to communicating with

12   everyone else including your family members, your employer,

13   the media or press, and the people involved in the trial,

14   although you may notify your family and your employer that you

15   have been seated as a juror in the case.  But if you are asked

16   or approached in any way about your jury service or anything

17   about this case, you must respond that you've been ordered not

18   to discuss the matter and to report the contact to the Court.

19           Because you will receive all the evidence and legal

20   instructions you properly may consider to return a verdict, do

21   not read, watch, or listen to any news or media accounts or

22   commentary about the case or anything to do with it.  Do not

23   do any research, such as consulting dictionaries, searching

24   the Internet or using other reference materials; and do not

25   make any investigation in or in any way -- I'm sorry -- in or

127

1    in any other way try to learn about the case on your own.

2         The law requires these restrictions to ensure the

3    parties have a fair trial based on the same evidence that each

4    party has had an opportunity to address.  A juror who violates

5    these restrictions jeopardizes the fairness of these

6    proceedings.  If any juror is exposed to any outside

7    information, please notify the Court immediately.

8         At the end of the trial, you will have to make your

9    decision based on what you recall of the evidence.  You will

10   not have a written transcript of the trial.  I urge you to pay

11   close attention to the testimony as it is given.

12        If you wish, you may take notes to help you remember

13   the evidence.  If you do take notes, please keep them to

14   yourself until you and your fellow jurors go to the jury room

15   to decide the case.  Do not let note-taking distract you from

16   being attentive.  When you leave the court for recesses, your

17   notes should be left in the jury room.  No one will read your

18   notes.

19        Whether or not you take notes, you should rely on

20   your own memory of the evidence.  Notes are only to assist

21   your memory.  You should not be overly influenced by your

22   notes or those of your fellow jurors.

23        From time to time during the trial, it may become

24   necessary for me to take up legal matters with the attorneys

25   privately, either by having a conference at the bench, or,

Government's Opening Statement

128

 1   when necessary, by calling a recess.  We will do what we can

 2   to keep the number and length of these conferences to a

 3   minimum.  I may not always grant an attorney's request for a

 4   conference.

 5           The next phase of the trial will now begin.  First,

 6   each side may make an opening statement.  An opening statement

 7   is not evidence.  It is simply an outline to help you

 8   understand what that party expects the witness will show.  I'm

 9   sorry, expects the evidence will show.  A party is not

10   required to make an opening statement.

11           The Government will then present evidence, and

12   counsel for the defendant may cross-examine.  Then, if the

13   defendant chooses to offer evidence, counsel for the

14   Government may cross-examine.

15           After the evidence has been presented, I will

16   instruct you on the law that applies to the case, and the

17   attorneys will make closing arguments.  After that, you will

18   go to the jury room to deliberate on your verdict.

19           All right, and at this time, I'll invite the

20   attorney, if they wish, choose to do so, to make an opening

21   statement.  First, on behalf of plaintiff, the Government.

22           MS. SANCHEZ:  Yes, Your Honor, thank you.

23           May it please the Court, Mr. Lindahl, good afternoon,

24   ladies and gentlemen of the jury.

25           The evidence that you will hear today from the

Government's Opening Statement

129

1   witness stand is going to prove each element of the offense

2   with which the defendant is charged.  That is, that he was a

3   felon in possession of a firearm on December 4th, 2011.

4         You'll hear from Officer Webb of the Fresno Police

5   Department who will tell you that he was on duty that evening,

6   and that he observed a car pull out of a parking lot cutting

7   off two other cars.  He followed the car from a short

8   distance.  It pulled in front of a house at 2014 East White

9   Street in the City of Fresno.  The officer had illuminated his

10  red and blue lights.  The driver got out of the car, who the

11  officer later identified as the defendant, Mr. Hood.  And the

12  officer instructed him to get back into the car.

13        Officer Webb will tell you that the defendant then

14  ran into the front yard of 2014 East White Street and ran

15  towards the backyard.  Officer Webb gave chase.  As he was

16  chasing the defendant, he saw a dark object fall from the

17  defendant's person, and he heard a noise as it hit the ground.

18        Officer Webb will tell you that he also had called

19  for assistance from other officers, and as Officer Webb was

20  looking for the defendant in the backyard and apprehending

21  him, Sergeant Alvarez arrived.

22        Sergeant Alvarez will tell you that when he walked to

23  the residence in the yard of 2014 East White to assist Officer

24  Webb, that he found a gun located on the ground.  It was a 44

25  caliber Ruger Model Vaquero revolver.

Defendant's Opening Statement

130

1        That after Officer Webb apprehended the defendant,

2   Officer Webb will tell you that he went back to the location

3   where Sergeant Alvarez had found the gun.  He looked at the

4   gun, and it was in the location where he had seen the object

5   fall from the defendant and heard it hit the ground, and that

6   there were no other items in the area that would have matched

7   that description.

8        You heard from the judge that the parties have

9   reached several stipulations in this case that bear on the

10  other elements of the offense, that being that the defendant

11  is a felon, at the time was prohibited from possessing a

12  firearm, and that the firearm traveled in interstate commerce.

13       At the end of the evidence, I'll come back before

14  you, and I'll ask that you find the defendant guilty as

15  charged.

16       Thank you.

17       THE COURT:  All right, at this time, does the defense

18  wish to make an opening statement or reserve it?

19       MR. LINDAHL:  Briefly I'll make an opening,

20  Your Honor.

21       THE COURT:  All right.

22       MR. LINDAHL:  Ladies and gentlemen, you're going to

23  hear that on the 4th of December of 2011, that Albert Hood was

24  driving to his home at 2014 White Street when he observed a

25  vehicle behind him.  This was about 10:30 at night on

Defendant's Opening Statement

131

1  December 9th, dark night.  And he saw a vehicle behind him,

2  and he saw the vehicle accelerate.  And you will hear his

3  testimony that when he saw the vehicle accelerate, he saw the

4  headlamps lift up as if the vehicle was moving extremely

5  quickly.  You'll hear his testimony that there were no

6  overhead emergency lights activated, and you'll hear

7  Mr. Hood's testimony that he did not know the vehicle was

8  behind him.

9          He will testify as to his state of mind at that

10  point, and you will hear that his home, 2014 East White, had

11  been shot up two days before.  And when Mr. Hood saw these

12  headlights lift up and move quickly toward him, he did not

13  know who or what to expect, but that he expected the worst.

14          Mr. Hood will testify as he told the officer that

15  day, that he did not have a gun.  That's what I expect the

16  evidence to show.

17          Thank you.

18          THE COURT:  All right, at this time, the plaintiff

19  Government may begin its case in chief calling its first

20  witness.

21          MS. SANCHEZ:  The Government calls Officer Kenneth

22  Webb.

23                    **KENNETH WEBB,**

24  called as a witness on behalf of the Government, having been

25  first duly sworn, testified as follows:

Webb - D

132

1          THE CLERK:  Please take the seat up on the witness

2    stand.  State your full name and spell your last name for the

3    record.

4          THE WITNESS:  My name is Kenneth Webb, W-E-B-B.

5                     DIRECT EXAMINATION

6    BY MS. SANCHEZ:

7    Q.   By whom are you employed?

8    A.   Fresno Police Department.

9    Q.   And how long have you been so employed?

10   A.   Over 10 years.

11   Q.   Were you on duty on December 4th, 2011?

12   A.   Yes.

13   Q.   And what was your assignment at that time?

14   A.   I was in uniform in a marked police vehicle.

15   Q.   And were you assigned to a particular unit or area of the

16   city?

17   A.   I was assigned to the Violent Crime Impact Team.

18   Q.   And at approximately 8:30 in the evening, did you observe

19   a vehicle commit a traffic violation?

20   A.   Yes, I did.

21          MR. LINDAHL:  Objection.  Leading.

22          THE COURT:  Sustained.

23          MR. LINDAHL:  Right now, withdrawn.

24          THE COURT:  All right.

25   BY MS. SANCHEZ:

Webb - D

133

1    Q.  Can you tell the members of the jury what you observed.

2    A.  I was in the area of Fresno and Grant.  I looked up Fresno

3    Street from Grant Street, and I observed a white vehicle cut

4    off two other vehicles that were proceeding southbound on

5    Fresno.

6    Q.  And when you say cut off two other vehicles, what do you

7    mean by that?

8    A.  The white vehicle that cut off the other two vehicles was

9    leaving a parking lot and pulling out onto Fresno Street.  The

10   white vehicle -- the driver of the vehicle didn't appear to

11   notice the other two cars, and the other two cars stopped

12   suddenly to avoid a collision.

13   Q.  What happened after that?

14   A.  After I observed the violation, I then drove after the car

15   and caught up to it as it reached 2014 East White.

16   Q.  And then what happened?

17   A.  As I'm driving up behind the vehicle, I turned on the

18   overhead red and blue lights of my police vehicle.  I then

19   start to get out of my car and walk towards the vehicle.  The

20   driver of the vehicle gets out and then runs away.

21   Q.  And what did you do?

22   A.  I ordered the driver to get back into the car.  He turned

23   and looked at me and failed to comply with my instructions and

24   ran towards the front yard of 2014 East White.

25   Q.  What happened next?

Webb - D

134

1   A.  As he ran through the front yard, I ran after him.  And as

2   he proceeded around the west corner of the house there, I

3   observed an object fall to the ground.  I continued to run

4   after him, trying to see where he was going, what he was

5   doing, and while trying to maintain safety, tactically, what I

6   do is I basically --

7              MR. LINDAHL:  Objection, Your Honor.  Narrative.

8              THE COURT:  Sustained.

9   BY MS. SANCHEZ:

10  Q.  What happened as you were following after him?

11  A.  As I'm trying to see where he's running to and keep visual

12  of him, he runs towards the backyard.  I lose sight of him as

13  he makes a left turn around the back corner of the building.

14  I then proceed towards the backyard, and I hear the sound of

15  someone hitting on a back door and yelling.  And then I go

16  around to that noise, and I see that it's the same subject,

17  Mr. Hood here, banging on the back door.

18  Q.  Was there anybody else around?

19  A.  No, there wasn't.

20  Q.  Had you called for backup at that point?

21  A.  Yes.  In the process of initiating the stop, the

22  activation of my overhead lights, I broadcast over the radio

23  my location, as well as the fact that there was a subject

24  running from me.

25  Q.  And what happened after that?

135

1   A.   After I had taken Mr. Hood into custody, I stood him up

2   and Sergeant Alvarez advised me over the radio that he had

3   arrived on scene and on the -- towards the front yard area, he

4   had located a firearm.

5            MR. LINDAHL:   Objection.   Calls for speculation on

6   the part of this witness; hearsay.

7            THE COURT:   Hearsay sustained.

8   BY MS. SANCHEZ:

9   Q.   What did you do after you took the defendant into custody?

10  A.   I stood him up from the ground, after I gave him

11  instructions to prone, and I put him in handcuffs.   I escorted

12  him back towards my police vehicle in the same path of flight

13  that he had taken from me.   And in doing so, I observed in the

14  location where I saw the object fall to the ground was a

15  firearm.

16  Q.   And where was Sergeant Alvarez?

17  A.   Sergeant Alvarez was standing next to the firearm.

18  Q.   Approximately how long after you had arrived at the

19  residence, were you aware that Sergeant Alvarez had arrived?

20  A.   I would say it was approximately about one minute, maybe

21  two at the most.

22  Q.   And approximately how long did it take from the time that

23  you arrived at the residence to the time that you apprehended

24  the defendant?

25  A.   Again, it was all -- it was quick, at least a minute.   And

256

Webb - D

136

1   it wasn't a far, far run.

2   Q.  And what did you do after you observed the firearm on the

3   ground?

4   A.  After I observed the firearm on the ground, I escorted

5   Mr. Hood to my police vehicle and placed him in the back seat.

6   I then went back and retrieved the firearm from the ground.

7   Q.  And what, if anything, did you notice about the firearm?

8   A.  I noticed that it was clean.  The surrounding area, the

9   ground covering was dirt and dust.  There was no indication

10  that the gun had been on the ground for any long period of

11  time.  It was obviously --

12          MR. LINDAHL:  Objection.  Foundation.

13          THE COURT:  Overruled.  Go ahead.

14          THE WITNESS:  It was obvious that it had recently

15  come to be there.  I also found that it was loaded.

16  BY MS. SANCHEZ:

17  Q.  And what else did you observe in the area immediately

18  surrounding where the firearm was found?

19  A.  There was nothing else there.  It was just a firearm.

20  There was like -- as I said, ground covering, like dirt,

21  leaves, things of that nature.

22  Q.  Were there other items in that area of the yard?

23  A.  No.

24  Q.  I just handed you two photographs that have been marked as

25  Government's Exhibits 1-A and 1-H.  Do you recognize those?

Webb - D

137

1   A.   Yes.

2   Q.   And what are those photographs of?

3   A.   1-A is a photograph of the front of 2014 East White.  And

4   1-H is the western front portion of the house where the

5   firearm was located.

6            MS. SANCHEZ:  Move for admission of Government's

7   Exhibits 1-A and 1-H.

8            MR. LINDAHL:  I have no objection to A of the

9   Government, Your Honor.

10           THE COURT:  Yes.

11           MR. LINDAHL:  I have no objection to 1-H either.

12           THE COURT:  All right, they are both admitted into

13   evidence.

14           (Government's Exhibits 1-A, 1-H, received in

15   evidence.)

16           MS. SANCHEZ:  I do have a logistical question for the

17   Court, Your Honor.  I was going to just have the witness make

18   marks on the exhibits I handed him and then put it on the

19   overhead for the jury to see afterwards with the marks to

20   avoid the delay that I know occurs in trying to print after

21   the screen being touched to make other lines.  Is that

22   acceptable to the Court to do it that way?

23           THE COURT:  All right, defense, any objection?

24   Apparently the request is that the witness mark on the items

25   that have been admitted into evidence.

Webb - D

138

1          MR. LINDAHL:  I have no objection, Your Honor.

2          THE COURT:  All right.

3    BY MS. SANCHEZ:

4    Q.  So looking at Government's Exhibit 1-A, which is on the

5    overhead and is on the screen in front of the witness -- I'm

6    not sure -- can the jurors see that?  I'm not sure if their

7    screens are up.

8          THE COURT:  Are the screens up?  And you can actually

9    pull the screens up and out away from the wall there.  If any

10   of the screens are not on, let me know, and my staff can go

11   ahead and make sure they're on.

12         MS. SANCHEZ:  Maybe I should have been more

13   articulate.  I'm going to have the witness mark on his copy as

14   well as on the screen, so the jurors can see where he's

15   marking, but use that exhibit that he writes on for admission

16   into evidence.  That was my precise request.

17         THE COURT:  All right, any objection to that

18   procedure, then?

19         MR. LINDAHL:  I don't quite get the question.

20         MS. SANCHEZ:  It's a technological question, and I

21   apologize for the confusion.  I think that defense counsel and

22   I had talked beforehand that you can mark on the screen, but

23   there usually is a delay in printing out the other exhibit, so

24   I was just trying to avoid that delay, which I'm using up now

25   by explaining trying to avoid the delay.

139

1          THE COURT:  So as I understand it, he'll mark on the

2     screen so the jury can see on the screen.  But, of course, the

3     screen itself, once you -- it's just on the screen.  But

4     rather -- to preserve it, he will also mark on his copy?

5          MS. SANCHEZ:  Exactly.

6          THE COURT:  Would you be admitting his copy?

7          MS. SANCHEZ:  I'll be admitting his copy.

8          MR. LINDAHL:  I don't think I have a objection -- so

9     this is like John Madden circling the screen?

10          MS. SANCHEZ:  Correct.

11          MR. LINDAHL:  Okay, I have no objection.

12          THE COURT:  But he's also going to be physically

13     marking on the photo he has in front of him, so there will be

14     a permanent record of what he's showing on the screen.

15          MS. SANCHEZ:  Correct.

16          MR. LINDAHL:  I have no objection.  That seems

17     relatively clean.

18          THE COURT:  All right, go ahead.

19     BY MS. SANCHEZ:

20     Q.  Can you start by placing an X both on the screen using

21     your finger and on the picture with the marker I had handed

22     you where the defendant's car was parked.

23     A.  The picture on the screen, if you can move it up some so

24     you can see the curb line there.  A little more.  Further up.

25     Will it go further?  Okay.  That's where the defendant's car

140

1   was parked approximately.

2          MR. LINDAHL:  Your Honor, for the record, marking

3   with an X an area of the curb in the lower left side of 1-A.

4          THE COURT:  Yes.

5          MS. SANCHEZ:  The officer is actually going to mark

6   it on the photograph, so there is a record -- a written record

7   of what he's showing on the screen.

8   BY MS. SANCHEZ:

9   Q.  And then where was your car?

10  A.  My car would actually be off of that photo further to the

11  east behind it.

12  Q.  So behind where the defendant's car was?

13  A.  Yes.

14  Q.  Approximately how far behind the defendant's car was your

15  car parked?

16  A.  At most, eight feet.

17  Q.  And can you draw a line showing the path of the travel

18  that you followed the defendant from his car into the

19  backyard?

20  A.  Well, coming off -- again, the photo on the screen seems

21  to be more zoomed in than the copy that I have here.  But

22  basically the defendant ran this direction.  And then I came

23  behind him.

24  Q.  And if you could mark that on the photograph you have as

25  well.

141

1          And just noting for the record the differences, I

2    think, have to do with the zoom of the picture on the screen.

3    They are the same photograph.  It's the same exhibit.

4          And where you draw the line with the arrow on it, is

5    that pointing towards the back of the residence?

6    A.   Yes.

7    Q.   Showing you what's been marked as Government's Exhibit

8    1-H.

9          THE CLERK:  You can zoom it out.

10         MS. SANCHEZ:  Thank you.

11   BY MS. SANCHEZ:

12   Q.   Showing you what's been marked as Government's Exhibit

13   1-H, is that a continuation of where you had drawn the arrow

14   on 1-A?

15   A.   Yes.

16   Q.   And can you draw an X in the approximate location of where

17   the gun was.

18         And, again, please, draw that on Exhibit 1-H as well.

19   And then can you draw a line with an arrow on it showing the

20   path of travel where you followed the defendant and ended up

21   apprehending him.

22         (Witness complied.)

23   Q.   I hand you what's been marked as Government's Exhibit 2.

24   Do you recognize that item?

25   A.   Yes.

Webb - D

142

1   Q.  And what is that?

2   A.  This is the firearm I found on the ground.  Excuse me,

3   Sergeant Alvarez found on the ground.

4   Q.  Is that the same firearm you then saw Sergeant Alvarez

5   standing next to?

6   A.  Yes.

7   Q.  And did you collect the firearm?

8   A.  Yes, I did.

9   Q.  Okay, did you speak with the defendant after you went back

10  and saw the firearm?

11  A.  Yes.

12  Q.  And where did you speak with him?

13  A.  He was seated in the back of my police car.

14  Q.  Did you advise him of his Miranda rights?

15  A.  Yes, I did.

16  Q.  And after you advised him of his Miranda rights, what did

17  he do?

18  A.  He told me that he understood his rights.

19  Q.  And did he agree to speak with you?

20  A.  Yes.

21  Q.  And what did he tell you about -- did you ask him whether

22  he saw you following him?

23  A.  Yes.

24  Q.  And what did he tell you?

25  A.  He told me that he did not see me behind him.

Webb - D

143

1    Q.  Did you ask him about cutting off the two cars?

2    A.  I did.

3    Q.  And what did he tell you?

4    A.  He told me he did not notice the two cars until after he

5    had already entered the roadway.

6    Q.  Did you ask him about his path of travel from the parking

7    lot to the residence?

8    A.  Yes.

9    Q.  And what did he tell you?

10   A.  He again said he didn't see me behind him.

11   Q.  And did he tell you anything about the -- the location

12   where he initially was coming from, the parking lot?

13   A.  He said that he had went there to pay a cell phone bill.

14   Q.  And did he tell you anything else about that?

15   A.  He said he doesn't like to go there.  He's been harassed,

16   assaulted by -- he referred to them as youngsters in that

17   area.  And essentially he just goes there when he has to.

18   Q.  And what did he tell you about the gun?

19   A.  He said that the gun, it was not in his possession, and

20   that he didn't know anything about it.

21   Q.  Can you describe the noise that you heard when you saw the

22   dark object falling from him?

23   A.  It was like a heavy metallic clink.  It's kind of a

24   distinctive sound.

25   Q.  When you say distinctive, what do you mean by that?

Webb - D

144

1   A.  Well, it's not like -- like wood falling.  It's not like
2   the drop of feet running or anything like that.  It stands
3   out.
4   Q.  Have you heard the sound of a gun hitting cement before?
5   A.  Yes.
6        MR. LINDAHL:  Objection.  Assumes facts not in
7   evidence.  He didn't say that.
8        THE COURT:  All right, sustained.  Go ahead and
9   clarify.
10  BY MS. SANCHEZ:
11  Q.  Have you ever seen a gun hit the ground before?
12  A.  Yes.
13  Q.  Have you heard what it sounds like when it strikes the
14  ground?
15  A.  Yes.
16  Q.  And did you form an opinion as to what the sound that you
17  heard sounded like?  Or let me rephrase.
18        Was that consistent with the sound you've heard
19  previously when you heard a gun striking the ground?
20  A.  Yes.
21        MS. SANCHEZ:  The Government moves for admission of
22  Government's Exhibit Number 2.
23        THE COURT:  Defense?
24        MR. LINDAHL:  Oh, the weapon?  No objection,
25  Your Honor.

Webb - X

145

1          THE COURT:  All right, it is admitted.

2          (Government's Exhibit 2, received in evidence.)

3          MS. SANCHEZ:  I have no further questions,

4    Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. LINDAHL:

7    Q.  Officer Webb, you were working the Violent Crime Impact

8    Team on the 4th of December 2011?

9    A.  Yes.

10   Q.  And part of your duties with the Violent Crime Impact Team

11   is to impact violent crime, right?

12   A.  I'm sorry?

13   Q.  To address violent crimes within your jurisdiction in the

14   City of Fresno.

15   A.  That's correct.

16   Q.  So as part of your duties with the Violent Crime Impact

17   Team, you were made aware on that date, were you not, that the

18   house at 2014 East White had been the subject of a drive-by

19   shooting two days earlier?

20   A.  No, I was not familiar with that.

21   Q.  So you were doing traffic patrol while you were there on

22   Violent Crime Impact Team; is that right?

23   A.  That is a part of my duties as a part of that unit.

24   Q.  Okay.  At what point, if any, did you learn that

25   Mr. Hood's shared home had been the sight of a drive-by

266

Webb - X

146

1  shooting two days earlier?

2  A.  I don't recall that until recently.

3  Q.  Okay.  Now, recently -- speaking of recently, the photos

4  that you just testified to, those were taken recently like day

5  before yesterday?

6  A.  Yes.

7  Q.  Okay.  Those photos weren't taken in the middle of the

8  night, were they?

9  A.  No, they weren't.

10  Q.  They were taken in broad daylight?

11  A.  Yes, they were.

12  Q.  Okay.  And they were taken in broad daylight in October of

13  2013?

14  A.  That's correct.

15  Q.  Not December of 2011.

16  A.  No, there were no photos taken that night.

17  Q.  Okay.  Did you take fingerprints off that weapon?

18  A.  No, I didn't.

19  Q.  Did you attempt to?

20  A.  No, I didn't.

21  Q.  Okay.  Did you instruct Sergeant Alvarez to do so?

22  A.  No, I did not.

23  Q.  Okay.  The photos that we were just shown, that's People's

24  1-A, Alpha, and 1-H, Hotel.  Do you have those in front of

25  you?

Webb - X

147

1   A.   Yes.

2   Q.   Okay.  Does the scene in 1-H, Hotel, is that same scene

3   shown on the smaller scale in 1-A, Alpha?

4   A.   I don't understand the question.

5   Q.   The spot that's in H, can you see that in A?

6   A.   Yeah.  Yeah, I believe you can, just barely.

7   Q.   Okay.  And now you're going to have to forgive me because

8   I am truly technologically challenged, so I'm going to try to

9   do this.  Bear with me.

10       Where was it that you saw this weapon that you say

11  Sergeant Alvarez recovered?  Where did you see it?  Or did you

12  see it?

13  A.   I discovered it was a firearm when I was walking him back

14  from the backyard.

15  Q.   Okay.  And that's when there was another officer there

16  standing, showing you where it was?

17  A.   Yes.

18  Q.   Okay.  And that other officer was whom?

19  A.   Sergeant Alvarez.

20  Q.   Okay.  And where was it that Sergeant Alvarez showed it to

21  you?  Where was it located?

22  A.   Exactly --

23  Q.   Actually, you know what, that's a terrible question.  I'll

24  withdraw that question.

25  A.   Okay.

268

148

1    Q.   And I'll try and put the pictures up on the overhead.

2              All right, showing you again, Government's Exhibit

3    1-H, Hotel.  Is that where you saw the firearm located?

4    A.   That's the approximate location, yes.

5    Q.   Okay.  Now, when you say "approximate," did you mark on

6    the exhibit that you have where you found the firearm?

7    A.   Yes, I marked approximately where the firearm was located

8    on the concrete.

9    Q.   Located by you?

10   A.   No, by Sergeant Alvarez.

11   Q.   Okay.

12   A.   That was the location I observed something fall while he

13   was running.

14   Q.   Okay.  Now, when you were going to detain this person, did

15   you go through the gate after the person along the side of the

16   house?

17   A.   Yes, I did.

18   Q.   Okay.  So then would you have had to run right past this

19   firearm?

20   A.   I ran right by it, obviously.

21   Q.   Did you see it when you ran by it?

22   A.   No.  It was dark, as you said earlier, and the front yard

23   was not illuminated.  It's not like daylight setting.  From my

24   recollection of the scene at the time, the primary source of

25   light besides maybe a house or apartment complex in the area

Webb - X

149

1   was -- the backyard was illuminated from another street light

2   off of -- I believe that would be Belmont from my

3   recollection.

4   Q.   Okay.

5   A.   The next street to the south.

6   Q.   So the nearest illumination from what you recall was the

7   next block over on Belmont, the main street south of White?

8   A.   Right.  That's per my recollection.  So in other words,

9   anyone running southbound would basically be a silhouette,

10  maybe back lit.

11  Q.   Well, in your report, you indicated that you had a

12  flashlight, did you not?

13  A.   I don't recall.

14  Q.   Well, did you have a flashlight?

15  A.   Well, I carry a flashlight, yes.  My firearm was also

16  equipped with one.

17  Q.   Okay.  And were you using that flashlight, if you recall,

18  as you were going after this individual that was going along

19  the side of the house at 2014 East White?

20  A.   As I ran towards the backyard, I'm sure I would have

21  activated the flashlight.

22  Q.   But even after the flashlight was activated, you did not

23  notice a 44 caliber revolver laying there in the middle of the

24  sidewalk?

25  A.   By the time I would have gotten towards the backyard, that

Webb - X

150

1   was when I turned on the flashlight.  Towards the front there

2   and even in that portion, there is not -- at that time, there

3   weren't any places where someone would hide, or I wouldn't be

4   able to see them.  However, toward the backyard, where there

5   were cars and debris, and it was poorly lit, there would have

6   been places for someone to hide and not be seen.

7   Q.  So -- I pushed the button, and it did something I didn't

8   want it to do.

9           Thank you.

10          So the portion of the house which you've just

11  described is an area where someone would not be able to hide.

12  That's the house that's portrayed in People's Exhibit 1-A,

13  Alpha?

14  A.  Yes.

15  Q.  So then your testimony, then, is that in the dark unlit

16  area, you didn't turn on your flashlight, but you turned it on

17  when you got to the backyard, which was illuminated by the

18  street light from Belmont?

19  A.  Barely illuminated, yes.

20  Q.  So then, Officer, what you're saying is that you didn't

21  need illumination there in the dark because you knew nobody

22  could hide there?

23  A.  As he's running away from me, again, he was silhouetted by

24  the light coming from the south, so I could see that he

25  continued running towards the backyard.  Once I had lost sight

Webb - X

151

1    of him, I can no longer see him, and I'm walking into a

2    further dimly lit area, yes, I would need a flashlight back

3    there to look into dark places, underneath the cars, things of

4    that nature.

5    Q.   Now, you testified that you saw him drop something?

6    A.   Yes.

7    Q.   And you ran right past that something that you saw him

8    drop?

9    A.   Yes, I did.

10   Q.   And you didn't look at it?

11   A.   No.  Once it left his possession, it was no longer a

12   threat to me.  I'm not concerned with things that fall at that

13   moment.  I'm trying to apprehend someone, so the person

14   themselves would be the threat.  It's not so much what they

15   drop at the time, because obviously, once it's out of their

16   hands, they can no longer manipulate or affect it.

17   Q.   Okay.  Now, going back to a later time, when you took

18   these photos, it was Monday of this week; correct?

19   A.   Yeah, I believe so.

20   Q.   All right.  And when you took these photos, did you take

21   note of what appeared to be bullet holes in the front of that

22   house?

23   A.   I did not look for any bullet holes in front of the house.

24   Q.   Okay.  Were you made aware -- strike that.  That's calling

25   for hearsay.  Sorry.

152

1      How far did you follow Mr. Hood prior to making --

2  prior to him stopping the vehicle?

3  A.  It was less than a mile.

4  Q.  Okay.  And at any point when you were following him, did

5  you accelerate your vehicle to catch up to him?

6  A.  Yes, I did.

7  Q.  Okay.  And when you accelerated your vehicle, you had not,

8  in fact, activated your overhead emergency lights; correct?

9  A.  No, not initially.  I hadn't caught up to him.

10  Q.  Was the -- was the firearm found in the dirt or on the

11  concrete?

12  A.  It was on the concrete.

13  Q.  And when you found it on the concrete, it appeared to be

14  in a clean condition?

15  A.  Yes.

16  Q.  Not dirty?

17  A.  Not dirty.

18  Q.  Okay.  I asked you about fingerprints.  Did you do or

19  order done any other kind of testing -- I know this is

20  probably over the top, but did you ask for DNA on it?

21  A.  No, I did not.

22  Q.  Okay.  After you put Mr. Hood in the vehicle or even

23  before -- sometime during this series of events, you spoke

24  with an occupant inside the house, correct, or attempted to

25  speak with an occupant inside the house?

Webb - X

153

1   A.  He was banging on the back door.  And after I placed him

2   in handcuffs, someone actually opened the back door.

3   Q.  Okay, and that individual you recall is one Brian hood?

4   A.  I don't recall what his name was.  I believe Mr. Hood said

5   it was his son, some relative.

6   Q.  Okay.  Mr. Hood, under Miranda answered your questions;

7   correct?

8   A.  Correct.

9   Q.  And Mr. Hood told you he did not have a firearm; correct?

10  A.  That's correct.

11          MR. LINDAHL:  If I can have just a moment,

12  Your Honor, I think that may be all I have right now.

13          (Pause in the proceedings.)

14          MR. LINDAHL:  Your Honor, this might be a good time

15  for the Court to read the stipulation, if that hadn't already

16  been done.

17          THE COURT:  All right.

18          MR. LINDAHL:  That you.

19          THE COURT:  All right, members of the jury, I'm going

20  to go ahead and read you a stipulation, and I'll give you an

21  instruction on that.

22          "The parties have agreed to certain facts that

23  have -- that will be stated to you.  You should, therefore,

24  treat these facts as having been proved.  And the stipulation

25  is as follows:

274

Webb - X

154

1          "Benjamin B. Wagner, United States Attorney, and

2     Kimberly A. Sanchez, Assistant U.S. Attorney, and defendant

3     Albert Hood, through his attorney, Linden Lindahl, entered

4     into a stipulation that the defendant Albert Hood has at least

5     one prior felony conviction punishable by more than a year

6     imprisonment.

7          "The parties further stipulate that the defendant's

8     prior felony conviction prohibits defendant from possessing a

9     firearm under Title 18, United States Code, Section 922(g)(1).

10          "The parties further stipulate that the Ruger Model

11     Vaquero caliber 44 revolver that is the subject of the charges

12     in this case is a firearm as defined in Title 18, United

13     States Code Section 921(a)(3).

14          "The parties further stipulate that this firearm was

15     manufactured by Ruger in Southport, Connecticut and,

16     therefore, traveled in and affected interstate commerce."

17     BY MR. LINDAHL:

18     Q.   When you were interviewing Mr. Hood, did he -- do you

19     recall him asking you, inviting you to fingerprint the weapon?

20     A.   I don't recall.  He might have.

21     Q.   Okay.  When you took Mr. Hood into custody, was he wearing

22     gloves?

23     A.   No, I don't remember him wearing gloves at all.

24     Q.   Okay.  And finally with regard to Exhibits 1-A, Alpha, and

25     1-H, Hotel, these photographs are the same location you went

Webb - RD

155

1    to on the night of the 4th of December 2011, right?

2    A.   Yes.

3    Q.   But the conditions in terms of lighting are much different

4    in 1-H, Hotel, and 1-A, Alpha, than they were on that night;

5    correct?

6    A.   Correct.

7         MR. LINDAHL:  That's all I have.  I ask the witness

8    be subject to -- oh, I'm sorry.

9         THE COURT:  Redirect.  He will remain subject to

10   recall, but redirect.

11                    REDIRECT EXAMINATION

12   BY MS. SANCHEZ:

13   Q.   Why didn't you submit the firearm for fingerprinting or

14   DNA analysis?

15   A.   I've recovered numerous firearms throughout my career, and

16   my process in requesting that testing is in situations where

17   there's no definitive possessor.  In this case, I was positive

18   and confirmed that Mr. Hood had possessed the firearm, so,

19   therefore, I did not see any need to process it for

20   fingerprints.

21   Q.   How long was it from the time that you heard the item drop

22   and saw it fall from Mr. Hood until you apprehended him,

23   approximately?

24   A.   Approximately, again, about one minute, maybe two at the

25   most.

Webb - RD

156

1   Q.   Okay.  So after you saw the object fall, and you heard it
2   hit the ground, was there a delay in your apprehending him?
3   A.   Well, yes, because after it fell, again, I'm trying to
4   maintain visual of him, so he's running towards the backyard.
5   I'm trying to see where he's going to go, what he's going to
6   do.  Once I reached towards that back corner, I slowed down
7   immediately.  Again, there is so much debris and so many
8   places to hide.  I'm trying to ascertain whether or not he
9   continued running, whether or not he's hiding in wait, or if
10  he even went inside through the back door, as has been known
11  to have happened before.
12             MR. LINDAHL:  Object to that last portion as
13  nonresponsive.
14             THE COURT:  Sustained.  Disregard that last answer in
15  terms of -- it would be "as known to have happened before."
16  Disregard that part.  Go ahead.
17             THE WITNESS:  Okay.  It was only after I heard the
18  noise and someone yelling at the back door that I immediately
19  went directly to the noise and observed Mr. Hood.
20  BY MS. SANCHEZ:
21  Q.   And what is the approximate distance from where the
22  firearm was found to where you had apprehended Mr. Hood?
23  A.   Taking into account the turn around the corner, 75 feet,
24  maybe a hundred at the most.  Not very far.
25  Q.   And I'm going to show you Exhibit 1-A.  Do you see a red

Webb - RD

157

1  sign on 1-A?

2  A.  Yes.

3  Q.  And to the left of that red sign, is that where the gate

4  entry is to the pathway where you found the gun?

5  A.  Yes, it is.

6  Q.  And the location where you found the gun, was that near

7  where that gate access was between the front and the side

8  yard?

9  A.  Yes.

10        MR. LINDAHL:  Object to the form of the question as

11  leading.

12        THE COURT:  Sustained.

13  BY MS. SANCHEZ:

14  Q.  Can you just describe that location and how you would

15  describe the location where the gun was found in relation to

16  the gate entry that you saw.

17  A.  The gun was found on the ground.  I would say just inside

18  the gate there.

19        MR. LINDAHL:  Objection.  Lack of personal knowledge,

20  calls for speculation on the part of the witness.

21        THE COURT:  Overruled.

22  BY MS. SANCHEZ:

23  Q.  Where did you see the gun?

24  A.  On the ground just inside the gate there.

25  Q.  Okay.  And when you say just inside the gate, more towards

158

1  the front yard or more towards the back of the house?

2  A.  More towards the front.

3  Q.  Okay, on which side of the fence was it on?

4  A.  It would be on the inside of the fence if you're coming

5  from the front yard, or the direction will be at the south

6  side of the fence.

7  Q.  And for clarification, there are two fences at this

8  residence; is that correct?

9  A.  Yes, there's a front yard fence, as you can see there, and

10 then where that red sign is, you can also make out the

11 chain-link fence there.

12 Q.  And so when you say it's on the inside of the fence, are

13 you referring to the chain-link fence or referring to the

14 front yard fence?

15 A.  The chain-link fence.

16 Q.  Okay.  Can you describe the lighting in the front of the

17 house when you arrived there?

18 A.  There was no front yard lighting.  It would be the

19 illumination from like my police lights, headlights, and any

20 surrounding lights.  But there is no direct -- like a porch

21 light or anything like that.

22 Q.  Were there street lights in the area?

23 A.  Yes, there's street lights.

24         MR. LINDAHL:  Objection.  Vague.

25         THE COURT:  Overruled.

Webb - RD

159

1   BY MS. SANCHEZ:

2   Q.  And did any of those street lights illuminate on to the

3   property at 2814 East White Street?

4   A.  I don't even recall if those street lights were working at

5   the time.

6   Q.  What was the lighting condition where you saw the dark

7   object fall from the defendant?

8   A.  It was dark.

9   Q.  And how could you see a dark object fall?

10  A.  Because the silhouette and the illumination coming from

11  the south in the direction that Mr. Hood was running.

12  Q.  How soon after you saw the dark object fall from him did

13  you hear the sound of metal hitting the cement?

14  A.  It would be almost immediate.

15  Q.  Okay.  Was there anyone else in the area after you

16  apprehended the defendant?

17  A.  No.  I didn't see or hear of anyone until Sergeant Alvarez

18  advised me that he had arrived for the video.

19  Q.  And prior to Sergeant Alvarez arrive, did you hear any

20  noises coming from the front of the residence?

21  A.  No, there was no one in front of the residence, and from

22  my recollection, there was no one next to the residence.

23          MS. SANCHEZ:  I have no further questions,

24  Your Honor.

25  ///

280

Webb - RX

160

1                        RECROSS-EXAMINATION

2    BY MR. LINDAHL:

3    Q.   But there was someone in the residence.

4    A.   Yes.

5    Q.   Officer, do you recall on that night at that location

6    where you've identified the firearm as being, do you recall a

7    plastic bin, crate, containing old shoes?

8    A.   No, I do not.

9    Q.   Did you recall a large -- when I say "large," I'm talking

10   about three-and-a-half to four-feet long boxful of recycling

11   cans, aluminum cans?

12   A.   I do recall a lot of debris, especially in the backyard,

13   as well as cars that looked like they haven't been running in

14   sometime.

15   Q.   No, I'm referring specifically to the location where

16   you've identified Sergeant Alvarez pointing out this firearm

17   to you.

18   A.   I don't recall exactly what was there.  I don't recall

19   anything about a bin containing recyclables, or anything like

20   that, no.

21   Q.   So your testimony was, then, that it was -- I think

22   previously you testified there was nothing around there,

23   right?

24   A.   Correct.  There was nothing around the firearm itself.

25   Q.   Your testimony is that you heard this metallic clink that

Webb - RX

161

1   you're familiar with as you saw this silhouetted figure going

2   down the side of the house.  Right?

3   **A.**   Yes.

4   **Q.**   You heard it before you walked right up to it.  Right?

5   **A.**   As I ran by.

6   **Q.**   And you didn't look down at it?

7   **A.**   No.  Again, I'm trying to see what Mr. Hood was doing as

8   he was running away from me.

9           MR. LINDAHL:  Okay, thank you.  I don't have any

10  further questions.

11          THE COURT:  Redirect?

12          MS. SANCHEZ:  No, Your Honor.

13          THE COURT:  All right, you can go ahead and step

14  down.  You're still subject to recall.  Either side may still

15  call you back to testify, but you can go ahead and return to

16  counsel table.

17          MS. SANCHEZ:  Sergeant Alvarez.

18          THE CLERK:  Please raise your right hand.

19                       **JOE ALVAREZ,**

20  called as a witness on behalf of the Government, having been

21  first duly sworn, testified as follows:

22          THE CLERK:  Please have a seat on the witness stand.

23  State your full name and spell your last name for the record.

24          THE WITNESS:  Sergeant Joe Alvarez, A-L-V-A-R-E-Z.

25  ///

Alvarez - D

162

1                           DIRECT EXAMINATION

2    BY MS. SANCHEZ:

3    Q.  By whom are you employed?

4    A.  City of Fresno.

5    Q.  How long have you been employed by the City of Fresno?

6    A.  Be 15 years this January.

7    Q.  And were you on duty on December 4th, 2011?

8    A.  I was.

9    Q.  Did you respond for a call -- to a call for assistance

10   broadcast by Officer Webb?

11   A.  I did.

12   Q.  And approximately what time?

13   A.  I think it was around 8:40 PM.

14   Q.  And what did you do when you received that call?

15   A.  I responded to the area of White and Clark to the address.

16   Q.  And was that 2014 East White Street?

17   A.  Yes, it was.

18   Q.  Approximately how long after you heard the call broadcast

19   did you arrive at that residence?

20   A.  Probably seconds.  I'd say around 20 to 30 seconds.

21   Q.  Did you happen to be in that area?

22   A.  I was.

23   Q.  What area was the unit you were assigned to at the time

24   responsible for?

25   A.  I'm sorry.

Alvarez - D

163

1   Q.  Was that location within the area that your unit at the

2   time was responsible for coverage?

3   A.  Yes, it was in the Southwest Policing District.

4   Q.  And what happened when you arrived?

5   A.  Upon arrival, I pulled my patrol vehicle westbound on

6   White.  I saw a patrol car and another vehicle with its door

7   open.  I exited the vehicle and began running towards the

8   residence, 2014, and began broadcasting to Officer Webb where

9   he was.  He had already stated that he was taking the subject

10  in custody, and I was actually yelling to him as I moved to

11  the west side of the house.  He said he was okay.

12          As I moved to the west side, I saw a firearm sitting

13  on the ground.  I kept my eye on it.  He was communicating

14  with me, and I had stopped and slowed down at that point, and

15  because he said he was taking him into custody, I kept my eye

16  on the weapon and broadcast over the radio what I had found to

17  him so he would know just in case the person wasn't actually

18  in handcuffs yet.  And just moved a little bit to the south

19  until he came around the corner.

20  Q.  You moved yourself a little bit to the south or the

21  firearm a little bit to the south?

22  A.  I moved myself.

23  Q.  And what did you do with the firearm?

24  A.  I left it in place.

25  Q.  And what happened after that?

284

Alvarez - D

164

1   A.   Officer Webb escorted his in-custody from where he was at

2   in the backyard of the residence at 2014.  He walked him

3   around the west side of the residence to the front to his

4   patrol car where he placed him in the back of the patrol car.

5   Q.   And do you see the person that Officer Webb had in custody

6   in court today?

7   A.   Yes, I do.

8   Q.   Can you please identify him for the Court?

9   A.   Mr. Hood, sitting next to counsel.

10          MS. SANCHEZ:   Indicating for the record that the

11  witness pointed to the defendant as well.

12  BY MS. SANCHEZ:

13  Q.   What happened after that?

14  A.   I had stood by the weapon until Officer Webb had put

15  Mr. Hood in the back of the car.  Officer Webb came up to me,

16  at which point I showed him where the weapon was, and he took

17  custody of the firearm.

18  Q.   What did you notice about the area around the firearm?

19  What was in that area?

20  A.   As far as the actual firearm, nothing.  It was alone.

21  Q.   Show you what's been marked as Government's Exhibit 1-H.

22  Can you see on that photograph where -- do you recognize what

23  appears in that photograph?

24  A.   Yes.

25  Q.   And what is that?

Alvarez - D

165

1   A.  That's the walkway on the west side of 2014 West White.

2   Q.  And do you see the location where you found the firearm on

3   that night?

4   A.  Yes, I do.

5   Q.  And I'm going to mark -- this is 1-H.1.  Can I please draw

6   an X on that photograph in the location where you found the

7   firearm.

8       (Witness complied.)

9   Q.  In the area around the location where you have the X on

10  the photograph, was there any other debris or any types of

11  items sitting around that area?

12  A.  Looking at the photo, not on this pathway.  But throughout

13  the curtilage of the residence, both -- I guess it's going to

14  be on the east and west, there was trash and garbage.  There

15  was items built up.  This is a fairly cleaner picture, then,

16  of that night.

17  Q.  And when you say not immediately on the walkway, are you

18  referring to -- what distance around the firearm can you

19  estimate would have been clear?

20  A.  The entire walkway was clear.

21  Q.  Was there dust or other debris on the sidewalk?

22  A.  The entire area was covered in dust.  You can see from

23  both sides of this picture, there is -- it's dirt surrounding

24  the path.  The path actually is much cleaner here than that

25  night.  The whole -- well, the cement area and what you can't

286

Alvarez - D

166

1   see around the front was a lot more dirty.

2   Q.   And did you notice anything about the firearm?  Was there

3   any dust on the firearm, on the top of the firearm?

4   A.   No.

5   Q.   Did you see anyone when you arrived at 2014 East White

6   Street?

7   A.   No.

8   Q.   When is the first time that you saw anybody after you

9   arrived there?

10  A.   When Officer Webb and Mr. Hood came around from the back

11  of the residence, which would have been to myself.

12  Q.   And approximately how long after you arrived did that

13  occur?

14  A.   Ten seconds, roughly.

15  Q.   Okay.  After that, did you see anybody else?

16  A.   Additional officers arrived, and some people came out.

17  This residential neighborhood is known for having people walk

18  to and from.  I didn't know who they were, but people did

19  start to come out and look at our patrol vehicles because our

20  lights were on.

21  Q.   And was that within the fenced-in area of 2014 or outside

22  of that area?

23  A.   It was outside.

24  Q.   After you arrived, before you saw Officer Webb coming

25  around the corner with Mr. Hood, did you see anybody -- hear

Alvarez - X

167

1   anybody else in the area?

2   A.   No one.

3   Q.   What was the lighting like where you found the gun?

4   A.   It was dark.

5   Q.   Okay.  And how close did you have to get to the gun to

6   discover it was a gun?

7   A.   I almost kicked it.

8   Q.   Okay.  If you could look at Government's Exhibit Number 2

9   in front of you, the firearm that's there, do you recognize

10  that item?

11  A.   Yes.

12  Q.   And where do you recognize that from?

13  A.   This is the exact make and model.  I believe it's the same

14  gun as what I found that night.

15         MS. SANCHEZ:  I have no further questions.

16         THE COURT:  Cross-examination.

17         MS. SANCHEZ:  I would move for admission of

18  Government's Exhibit 1-H.1.

19         MR. LINDAHL:  No objection.

20         THE COURT:  All right, it is admitted.

21         (Government's Exhibit 1-H.1, received in evidence.)

22                 CROSS-EXAMINATION

23  BY MR. LINDAHL:

24  Q.   When you arrived on that scene that night, that was your

25  normal beat, that area, Southwest or Southeast?

288

Alvarez - X

168

1    A.   Southwest, sir.

2    Q.   Southwest?

3    A.   Yes, sir.

4    Q.   The location was on East White just north of Belmont?

5    A.   Yes, sir.

6    Q.   Were you aware when you arrived at that location about the

7    occupants of that home being the victims of a drive-by

8    shooting two days prior?

9    A.   No, sir.

10   Q.   You have subsequently learned that; correct?

11   A.   No.  I have heard -- to answer your question, I heard that

12   that might be a defense that Mr. Hood was stating.

13            MR. LINDAHL:  Objection.  Nonresponsive.

14            THE WITNESS:  I don't --

15            THE COURT:  Sustained.

16            THE WITNESS:  No.

17   BY MR. LINDAHL:

18   Q.   You never bothered to check the police department's

19   reports?

20   A.   No.

21   Q.   When you were at the location there at 2014 East White,

22   did you attempt to contact an individual located inside the

23   house?

24   A.   We did knock on the door, yes, sir.

25   Q.   And you got a response from someone inside; correct?

289

Alvarez - X

169

1   **A.**  I did not.  I believe the officers that were assigned to

2   it did.

3   **Q.**  Okay.  And from what you recall, that individual refused

4   to come out; correct?

5   **A.**  Sir, I'm trying to remember.  I believe that's true.

6           MR. LINDAHL:  That you.  That's all I have.

7           THE COURT:  And redirect?

8           MS. SANCHEZ:  No, Your Honor.

9           THE COURT:  Either side wish this witness remain

10  subject to recall?

11          MS. SANCHEZ:  Yes, Your Honor.

12          MR. LINDAHL:  Out of an abundance of caution, I make

13  that request.

14          THE COURT:  Either side may still call you back to

15  testify as a witness.  They'll let you know the date and time

16  if necessary.  Thank you.

17          THE WITNESS:  Yes, Your Honor.

18          MS. SANCHEZ:  Government rest, Your Honor.

19          THE COURT:  Very well.  Members of the jury, the

20  plaintiff's side, the Government has rested its case, which

21  every time in civil or criminal law cases, when one party rest

22  their case, I always take a break just so they can check the

23  exhibits.  If there are any legal issues that we need to

24  resolve, et cetera, we'll go ahead and take care of that.

25          And so it's close to our time for an afternoon recess

170

1    anyway.  So for your purposes, we'll take our afternoon recess

2    for 15 minutes.  Maybe a little bit longer because I'm going

3    to remain in session with the attorneys.  But you'll just need

4    to stand by.

5            Let me go ahead and do the following, though.  Okay,

6    I read this instruction to you previously.  I want to read it

7    again, but in the future, when I excuse you for a break or

8    whatever, I'll ask you to remember the admonition.  This is

9    the instruction that is the admonition:

10           Because you must base your verdict only on the

11   evidence received in the case and on these instructions, I

12   remind you that you must not be exposed to any other

13   information about the case or to the issues it involves.

14   Except for discussing the case with your fellow jurors during

15   deliberations, do not communicate with anyone in any way and

16   do not let anyone else communicate with you in any way about

17   the merits of the case or anything to do with it.  This

18   includes assessing the case in person, in writing, by phone or

19   electronic means, via e-mail, text messaging, or any Internet

20   chat room, blog, website, or other feature.  This applies to

21   communicating with your family members, your employer, the

22   media or press, and the people involved in the trial.

23           If you are asked or approached in any way about your

24   jury service or anything about this case, you must respond

25   that you've been ordered not to discuss the matter and to

291

171

1    report the contact to the Court.

2           Do not read, watch, or listen to any news or media

3    accounts or commentary about the case or anything to do with

4    it and do not do any research such as consulting dictionaries,

5    searching the Internet, or using other reference materials,

6    and do not make any investigation or in any other way try to

7    learn about the case on your own.

8           The law requires these restrictions to ensure the

9    parties have a fair trial based on the same evidence that each

10   party has had an opportunity to address.  A juror who violates

11   these restrictions jeopardizes the fairness of these

12   proceedings.  If any juror is exposed to any outside

13   information, please notify the Court immediately.

14          All right, members of the jury, go ahead and take an

15   afternoon recess.  We'll resume in approximately 15 minutes,

16   probably, again, a little bit longer.  We'll keep you in

17   touch.  Our break shouldn't take that long, and then when we

18   come back, we'll continue on with the trial itself.  All

19   right?

20          (Jury excused.)

21          THE COURT:  All right, the jury has left for its

22   recess.  Go ahead and have a seat.  We'll take a break after I

23   just cover a few things.

24          My indication is that the items in evidence so far

25   are photos, Plaintiff's 1-A, 1-H, and 1-H.1.  And then

172

1   Exhibit 2, which is the firearm; is that correct?

2           MS. SANCHEZ:  That's correct, Your Honor.

3           MR. LINDAHL:  I agree, Your Honor.

4           THE COURT:  Very well.  Okay.  Are there any matters

5   that we need to take up at this point in time before we resume

6   the trial, first, on behalf of plaintiff's side?

7           MS. SANCHEZ:  No, Your Honor.

8           THE COURT:  All right, defense?

9           MR. LINDAHL:  Your Honor, I have some photos I'm

10  going to discuss with the People.  I don't know if the Court

11  needs to get involved.

12          THE COURT:  That's fine.  But other than that,

13  anything else on the record that we need to take up for

14  defense side at this time?

15          MR. LINDAHL:  No, Your Honor.

16          THE COURT:  Okay, we'll take our afternoon recess, 15

17  minutes, but obviously if you need a little bit more time,

18  that's perfectly fine.  I'll touch bases with you folks in 15

19  minutes.

20          All right, we'll be in recess.

21          (Recess.)

22          THE COURT:  All right, back on the record, we do have

23  Mr. Hood on the witness stand ready to go on defense case in

24  chief; is that correct?

25          MR. LINDAHL:  That's correct, Your Honor, and we

173

 1  worked out -- we've discussed -- and I marked my items of

 2  evidence.  I did put the case number on them.  However, I have

 3  horrible handwriting, so my apologies to the Court and the

 4  clerk.

 5          THE COURT:  Okay.  And after Mr. Hood testifies, is

 6  there going to be further evidence on the defense case in

 7  chief?

 8          MR. LINDAHL:  I will rest after Mr. Hood testifies.

 9  I believe the People have rebuttal, and I have surrebuttal.

10  We each have one witness.

11          THE COURT:  The only reason I'm asking, logistically,

12  if you -- so that we can position Mr. Hood correctly.  So once

13  you're done, you rest your case, I'll send the jury out.  No

14  matter how long the testimony takes, with the understanding

15  that if you rest your case in chief, we just normally do that,

16  and Mr. Hood can retake his seat.  And then we'll have the

17  jury come in, and we'll do rebuttal and surrebuttal.

18          MR. LINDAHL:  Okay.

19          THE COURT:  Anything else before we have --

20          MS. SANCHEZ:  I'm sorry.  I didn't mean to interrupt

21  the Court.

22          THE COURT:  No, go ahead.

23          MS. SANCHEZ:  I'm just trying to process.  I know

24  that Mr. Lindahl intends to ask the defendant about his

25  testimony in a case where he testified against Bulldog Gang

174

1  members and the retaliation he suffered since then.  I guess I

2  was under the impression that that was the evidence we were

3  agreeing not to admit in support of a necessity defense.

4      THE COURT:  All right.

5      MR. LINDAHL:  I'm not offering it for necessity,

6  Your Honor.

7      MS. SANCHEZ:  Right.

8      MR. LINDAHL:  I'm offering it for Mr. Hood's state of

9  mind to explain his conduct why he would -- why he would get

10 out of his vehicle and run to the side of the house.  So it's

11 being offered for his state of mind.

12     THE COURT:  If it's for that limited purpose, then,

13 why he ran.

14     MS. SANCHEZ:  Can I have an offer of proof of how far

15 we're going to get into the history of what you're saying

16 caused him to run?

17     MR. LINDAHL:  The shooting a couple days before, the

18 shooting of the house, and the shooting of him when he

19 interjected his body between his son and Mr. Lopez and -- what

20 was the other guy's name?

21     THE WITNESS:  Herman, Herman something.  I don't

22 remember his last name.

23     MR. LINDAHL:  Which had occurred in 2005, because

24 he's been the subject of this ever since he testified.

25     MS. SANCHEZ:  I understand the proffer is to offer it

175

1    to say he ran from the police because he didn't think they

2    were the police.  He thought that they were people after him.

3    That doesn't get to the ultimate issue, and I'm -- I guess I

4    haven't considered it for the purpose prior to this point in

5    time because I was operating under the impression that that

6    evidence, because we discussed the evidence underlying it,

7    wasn't going to be admitted.  Just seems to be like a mini

8    trial in and of itself that's outside of this trial.  And I

9    don't -- we haven't really placed his running in issue at this

10   point.  It's part of the facts of the case.  We haven't made

11   any argument at this point that why he ran one way or the

12   other.

13       MR. LINDAHL:  Well, we need to have the evidence

14   before we can argue on it.

15       THE COURT:  Okay.

16       MR. LINDAHL:  And, Your Honor, it is offered in good

17   faith.  The Government was aware of these prior -- this prior

18   conduct.

19       MS. SANCHEZ:  I'm not alleging that we weren't aware

20   of the prior conduct.  The Government definitely was aware of

21   it.  And that was the whole source of the debate as to whether

22   a necessity defense could be raised.

23       MR. LINDAHL:  Well, frankly --

24       MS. SANCHEZ:  The issue had to do with the evidence

25   supporting the necessity defense as well as the necessity

176

1  defense itself.

2          MR. LINDAHL:  Frankly, Your Honor, just so the

3  Court's aware, I neglected one thing when I was preparing the

4  necessity defense, which was to sit down and talk with my

5  client about what had actually occurred.  And after speaking

6  with my client, I realize that there is no necessity defense

7  because Mr. Hood still denies having a gun, just as he did to

8  Officer Webb.

9          THE COURT:  All right.  Okay, let me just say this:

10  I can understand the relevance of the state of mind as to why

11  he would run, because obviously, the jury could infer that

12  running is part of the whole culpable thing of, yeah, why did

13  he run?  Well, he had a gun.  He wasn't supposed to have a

14  gun.  So that's okay.  I guess the problem I have is the

15  Government is now raising is how much is he going to get into

16  the history, so that if the Government wishes to attempt to

17  refute that, that is, let's say Mr. Hood says, "Well, I was

18  shot at in 2005," there may be some evidence that he wasn't,

19  or maybe it was a mutual fight or something that would attack

20  his credibility, or that his house was shot up two days

21  before, that maybe there was never a police report and no

22  evidence of any bullet holes or fragments in the house.

23          I mean, so -- now -- and I can understand, I can

24  understand the relevance.  I guess my concern is, it seemed

25  that from what the parties had understood, you know, we had

177

1   the motion in limine, and it involved prior conduct for prior

2   actions that would be the basis for a necessity defense.  That

3   was not opposed, and so I granted that motion.  So I'm not

4   sure to what extent that is a surprise, now that the

5   Government would be allowed, then, to explore factually and

6   call witnesses to rebut or refute Mr. Hood's proposed

7   testimony or proffer as to prior incidences and the

8   circumstances surrounding those incidences.

9       I am a little concerned that -- I think he's entitled

10  to testify as to why he ran.  And so that, I don't have a

11  problem with that.  I guess the big problem is whether or not

12  that now will expand the trial out to require or allow the

13  Government to bring in rebuttal witnesses as to those aspects

14  that would go to his credibility since he's now -- he's

15  introducing state of mind, which would mean the jury would

16  have to believe his testimony about the prior incidences in

17  order to --

18      MR. LINDAHL:  Explain his conduct.

19      THE COURT:  Yeah, exactly.  Actually to believe that

20  that's why he ran.  So I'm not sure if the Government, in

21  thinking about the necessity defense, had thought about

22  whether it would be required to call witnesses to rebut any

23  allegations or statements.

24      MR. LINDAHL:  As an offer of proof, Your Honor.  I

25  wouldn't be going beyond anything that hadn't already been

298

178

1    provided to the Government.  And the offer of proof is that in
2    2005, Mr. Hood was shot three times by an individual who was
3    arrested and tried along with another gentleman.  Those two
4    were found guilty of attempted murder for the benefit of a
5    street gang of the Fresno -- I believe it was the Lewis Street
6    Bulldogs, and that Mr. Hood has been subject to shootings,
7    threats, and ultimately the shooting at this same address just
8    prior to being detained by Officer Webb.
9         Now, the sequence of events, it stretches back to
10   2005.  Mr. Hood was shot in 2005.
11        THE COURT:  Um-hmn.
12        MR. LINDAHL:  But the shooting at his home happened
13   just days before.
14        MS. SANCHEZ:  I don't -- the Government is aware that
15   the defendant and his son were both victims of shootings -- a
16   shooting in 2005, and that the defendant testified against the
17   perpetrators of the shooting, and that those perpetrators were
18   convicted.  The Government is aware of that.
19        The Government is also aware that there have been
20   some instances between then and now, some of which resulted
21   in -- at least one of which resulted in the defendant being
22   convicted, that there has been at least discussion of those
23   instances being -- occurring because of the defendant's role
24   in the 2005 case.  Whether or not that plays out at least in
25   the one that comes to mind, I'm not so sure.

179

1          So I guess -- the bottom line is I agree with the

2     Court.  I believe the defendant has a right, and it's relevant

3     to say why he was running.  My question is, more of a 60 -- a

4     balancing question of, you know, cumulative evidence, undue

5     delay, that sort of analysis in terms of how much comes in.

6          MR. LINDAHL:  I talk fast.

7          THE COURT:  Well, okay.  I don't have a -- let's say,

8     for example, let's say we limit it to Mr. Hood testifying that

9     he -- and apparently there is no dispute that he was shot in

10    2005.  And since then, he has suffered retaliation.  And I

11    don't know if because he testified against these folks, that

12    he was shot in 2005, that he testified against them at a

13    trial, and that's all, and that he's been subject to

14    retaliation ever since, including the fact that within the

15    prior couple of days, his house was shot at, and that's why he

16    ran.  And that shouldn't take more than a couple of minutes.

17    No detail about the trial, no detail about who the gunmen

18    were, or who's been shooting at him ever since.

19          MR. LINDAHL:  Okay.

20          THE COURT:  Or who shot at him a couple days before.

21    Simply that because of these circumstances, that's when the

22    car pulled up.  Didn't know that they were police.  I assume

23    he's going to testify as an opening statement, there were no

24    lights, no siren, no nothing, just somebody pulled up.  He

25    thought it was, again, an attack, he ran.  And that's why he

180

1    ran.  I think that's okay.

2            The Government agrees that the shooting in 2005 took

3    place and that he testified.  I don't think the Government is

4    disagreeing that he's been subject to reprisal, retaliation,

5    or whatever, since then.  I guess the main thing is the

6    shooting a couple days prior to, I don't know if the

7    Government is going to attempt to call the witness to say, you

8    know, it was never reported, or the police went out there --

9            THE WITNESS:  Yeah, they went out there.

10           MR. LINDAHL:  Don't say anything, Mr. Hood.

11           THE COURT:  Didn't see any bullet holes or fragments,

12   or Mr. Hood didn't point out anything.  And I don't know.  I

13   don't know if the Government has those witnesses.  But that's

14   really the only thing I can see where the Government might

15   need to call a witness, and I know this is sort of an

16   off-the-top-of-the-head call.

17           We can certainly -- it's already 3:00.  We can

18   certainly finish everything we can, with the understanding

19   that the Government could between now and tomorrow morning, to

20   see whether or not they need any rebuttal witnesses, and

21   whether they can locate anyone, or whether they -- when they

22   choose to do that.

23           We might end a little early today, but that's okay

24   because we still have to talk about final jury instructions

25   and the verdict form in any event.  So we can occupy most of

181

1    the day between Mr. Hood's testimony and then maybe some
2    rebuttal or surrebuttal.  I understand the Government reserves
3    the right to basically rebuttal until tomorrow morning to see
4    if.  And then maybe, Miss Sanchez, you can e-mail us tonight
5    and say, "Yeah, I'm going to do it," or, "No, I'm not going to
6    do it" -- if you're able to do it tonight.  If not, we can
7    figure it out tomorrow morning at 8:30.
8            MS. SANCHEZ:  I will be able to on the point that I
9    believe I would present a rebuttal witness.  That witness is
10   on the way to court right now, but the defense has provided me
11   with some additional information that I think I need to
12   research to confirm that our lack of records of a shooting is
13   accurate.  So I surmise that we might even be able to do it
14   today if I can -- if she gets here in time.  But at the
15   latest, tomorrow morning probably.
16           MR. LINDAHL:  And I'm fully aware of that.  The way
17   it looks, Your Honor, the Government has one rebuttal witness.
18   I have one surrebuttal witness.  I don't think either one is
19   going to be lengthy in terms of -- we're on track.
20           THE COURT:  Okay, that's fine.
21           All right, why don't we do this, then:  I'll call the
22   jury in.  We'll have Mr. Hood testify.  If you rest your case
23   in chief, then I'll send the jury out because that's
24   procedurally what I do in any event, and then we'll have the
25   jury come back in, and we can do the rebuttal by Government,

182

1  surrebuttal by defense.  And then I'll go ahead and recess the
2  jury tomorrow morning.  If the Government wishes to reopen
3  rebuttal, I'll allow that on the limited issue of the prior
4  incidences that go to Mr. Hood's state of mind.
5          MS. SANCHEZ:  That's fine with the Government,
6  Your Honor.  Thank you.
7          THE COURT:  All right, anything else before we have
8  the jury come back in?
9          MR. LINDAHL:  No, Your Honor.
10         MS. SANCHEZ:  No, Your Honor.
11         THE COURT:  All right, let's have the jury come back
12  in.
13         (The jury returned to the courtroom.)
14         THE COURT:  All right, the jury has returned.  Please
15  be seated.
16         Thank you for your patience.  We dealt with a number
17  of issues that I believe we have resolved.  So we're going to
18  continue on now with the defense case in chief.  The defense
19  may call its first witness.
20         MR. LINDAHL:  Thank you, Your Honor.  The defense
21  calls Albert Hood.
22         THE COURT:  Mr. Hood, please raise your right hand.
23                    **ALBERT HOOD**,
24  called as a witness by and on his own behalf, having been
25  first duly sworn, testified as follows:

303

Hood - D

183

```
1        THE CLERK:  State your full name, spell your last
2    name for the record.
3        THE WITNESS:  My first name is Albert Hood, H-O-O-D.
4                        DIRECT EXAMINATION
5    BY MR. LINDAHL:
6    Q.  Mr. Hood, you are the defendant in this case; correct?
7    A.  Yes, sir.
8    Q.  And, Mr. Hood, I would like to direct your attention back
9    to the 4th of December, the year 2011.  But before I do, I
10   want to approach you with some photographs.  I'm going to ask
11   you to look at these one at a time as I identify the exhibit
12   number, and I'd like you to tell me if you recognize what it
13   is and describe what it is.
14   A.  Yes.
15       MR. LINDAHL:  May I approach, Your Honor?
16       THE COURT:  Yes.
17   BY MR. LINDAHL:
18   Q.  Mr. Hood, showing you what has been marked Defendant's
19   Exhibit A.  Look at that, sir.  Is that anything that you
20   recognize?
21   A.  Yes, this is the back of my house.
22   Q.  Okay.  And showing you what's previously been marked as
23   Defense Exhibit B.  Could you take a look at that?
24   A.  Yes.
25   Q.  What is that?
```

Hood - D

184

1   A.   That's my back door.

2   Q.   Okay.  Is the back door in Exhibit B also portrayed in

3   Exhibit A?

4   A.   You can see it, yes.

5   Q.   Okay.  Showing you what has been marked as Defense Exhibit

6   C.  Do you recognize that?

7   A.   Yes, sir.

8   Q.   What is that?

9   A.   That's a room of the house that I built.

10  Q.   And is there anything that you recognize unusual in that

11  photograph?

12  A.   Yes, there is.

13  Q.   What is that?

14  A.   That's a bullet hole.

15  Q.   Okay.  And for purpose of it being marked, is there a

16  number on what looks like a sticky pad?

17  A.   Yes, that's a number 1.

18  Q.   Okay.  And showing you Defense Exhibit D.  Do you

19  recognize that?

20  A.   Yes, I do.

21  Q.   What is that?

22  A.   That's my back door.

23  Q.   And is there anything unusual that you notice in Defense

24  Exhibit D?

25  A.   Yes.  There's a number 2, and above it is another bullet

305

185

1    hole.

2    Q.  Okay.  Showing you what's previously been marked as

3    Defense Exhibit E as in "Echo."  What is that?

4    A.  That's another picture of my house, the back door.

5    Q.  And is there anything -- identifying marker on there?

6    A.  Yes.

7    Q.  What is it?

8    A.  The number 3 with another bullet hole.

9    Q.  And showing you what's been marked as Defense Exhibit F as

10   in "Foxtrot."  If you know, what is that?

11   A.  That's the bottom of my door.

12   Q.  And is there any identifying marker on there?

13   A.  Yes, there is in number 4 with another bullet hole on the

14   side of it.

15   Q.  And showing you Defense Exhibit G, "Golf."  Do you

16   recognize that?

17   A.  Yes, that's my back window.

18   Q.  Okay.  And is there any identifying marker on there?

19   A.  Yes, that's in number 5 with a bullet hole in the window.

20   Q.  And finally showing you Exhibit H, "Hotel."  Do you

21   recognize that?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's a screen.

25   Q.  Okay.  A screen to what?

Hood - D

186

1    A.  It looks like to the window.

2    Q.  Okay.  And do you recognize that?

3    A.  Yes.  In number 6 with a bullet hole and the bullet hole

4    in the refrigerator.

5    Q.  Okay.  Having shown you these objects, Mr. Hood, these

6    portray your house, do they not?

7    A.  Yes, sir.

8    Q.  Okay.  And you identified some bullet holes.

9            Permission to publish, Your Honor?

10           THE COURT:  Are you moving them into evidence?

11           MR. LINDAHL:  I am.

12           THE COURT:  All right, Government response?

13           MS. SANCHEZ:  No objection, Your Honor.

14           THE COURT:  All right, each of the photos, Defense A

15   through H are admitted into evidence, and you may publish

16   them.

17           MR. LINDAHL:  Okay.

18           (Defendant's Exhibit A to H, received in evidence.)

19   BY MR. LINDAHL:

20   Q.  And showing for the jury Defense A, "Alpha."  Mr. Hood,

21   you identified -- can you see that photograph from where you

22   are?

23   A.  Yeah.

24   Q.  Okay.  And you identified that as your house?

25   A.  Yes, sir.

Hood - D

187

1    Q.  Okay.  Showing you Exhibit B.  That's your house as well?

2    A.  Yes, it is.

3    Q.  And is there anything on the window, which you recognize?

4    A.  Yes, there is.

5    Q.  What is that?

6    A.  The number 4 or 5, with a bullet hole.

7    Q.  Okay.  Anything down at the lower portion of the door

8    which you recognize?

9    A.  Yes.  Number 4, with a bullet hole.

10   Q.  Okay.  And the number 5 with a bullet hole, showing you

11   Defense Exhibit G, "Golf," is that the same bullet hole?

12   A.  Yes, it is.

13   Q.  Okay.  And showing you Exhibit F, "Foxtrot," with a number

14   4.  Is that the bullet hole you referred to at the lower

15   portion of the door?

16   A.  Yes, it is.

17   Q.  Showing you Defense Exhibit E, "Echo," is that the bullet

18   hole that you described that we're seeing on the picture here?

19   A.  Yes, it is.

20   Q.  Okay.  Showing you Exhibit D, "Delta," is that the bullet

21   hole you described?

22   A.  Yes, it is.

23   Q.  And showing you Exhibit C, "Charlie," with the -- as we

24   can see the number 1.  Is that the bullet hole you identified?

25   A.  Yes, it is.

Hood - D

188

1   Q.  And showing you Exhibit H, "Hotel," with a number 6.  Is
2   that the bullet hole you identified?
3   A.  Yes, it is.
4   Q.  Mr. Hood, when did those bullet holes find their way into
5   your residence?
6   A.  Approximately two, three days before I was arrested.
7   Q.  Okay.  Now, on that date, were you living at that
8   residence alone, or was there someone living there with you?
9   A.  Yes, my son and my cousin.
10  Q.  And your cousin's name is what?
11  A.  Brian Hood.
12  Q.  Okay.  Now, let me ask you, on the date that you were
13  arrested by Officer Webb, the 4th of December --
14  A.  Yes.
15  Q.  Were you aware of any one of the other residents, the
16  other occupants of the home being there?
17  A.  Yes.
18  Q.  At the time that Officer Webb detained you?
19  A.  Yes.
20  Q.  Who, if you know, was in that house?
21  A.  Brian.
22  Q.  Okay.  Was your son there?
23  A.  No.
24  Q.  Okay.  Mr. Hood, on the 4th of December of 2011, were you
25  driving a vehicle?

Hood - D

189

1    A.   Yes, I was.

2    Q.   Were you alone or with somebody?

3    A.   I was alone.

4    Q.   Okay.  And at some point, did you notice something unusual

5    as you were driving your vehicle?

6    A.   Yes, I did.

7    Q.   Please describe that for the jury, sir.

8    A.   I was going home from paying a cell phone bill, and Fresno

9    Street and White Street, and it's about two blocks from Clark

10   Street.  Clark is the last block to my house.  And when I

11   stopped at the stop sign, I looked back in my rearview mirror,

12   and I seen a car headlights go up like as if he was speeding

13   to come and get me or whatever.

14   Q.   So you saw a car headlight in the rearview mirror?

15   A.   Yes, I did.

16   Q.   And you formed the impression that this car was

17   accelerating because the headlights raised?

18   A.   Yes, sir.

19   Q.   Did you see any overhead emergency lights activated?

20   A.   No, I didn't.

21   Q.   Did you know who the occupant or occupants were of the

22   vehicle behind you?

23   A.   No, I didn't.

24   Q.   Okay.  This is a "duh" question, but I have to ask it.

25   Was it dark?

Hood - D

190

1    A.   Yes, it was.

2    Q.   What time of night was it, if you recall?

3    A.   It might have been 8:00, 9:00, or 10:00, somewhere around

4    there.

5    Q.   Okay.  Mr. Hood, did you have a firearm in your

6    possession?

7    A.   No, I didn't.

8    Q.   Did you tell the officer?

9    A.   Yes, I did.  I told him I didn't have a gun.

10   Q.   Okay.  Is that true?

11   A.   Yes, it's true.

12   Q.   Mr. Hood, you're a convicted felon, right?

13   A.   Yes, I am.

14   Q.   Okay.  Are you supposed to have a gun?

15   A.   No, I'm not.

16   Q.   Okay.  Now, on that date, when you saw this car, with the

17   headlights lift up, what was your state of mind?  What did you

18   think?

19   A.   I thought somebody was trying to attack me, coming to get

20   me.

21   Q.   And what in particular do you base your state of mind on?

22   A.   That I had just -- my house had just recently been shot

23   at.

24   Q.   Anything else?

25   A.   Just coming fast.

Hood - D

191

1   Q.   Okay.  Now, Mr. Hood, have you been -- have you been the
2   subject of an attack before?
3   A.   Yes, I have.
4   Q.   I'm referring specifically to -- in 2005?
5   A.   I was shot in a hate crime.
6   Q.   Okay.  In that case, were the people prosecuted?
7   A.   Yes, they were.
8   Q.   And did you testify?
9   A.   Yes, I did.
10  Q.   And what, if you recall, were they convicted of?
11  A.   Attempted murder on me and my son.
12  Q.   Any special findings?
13  A.   I don't understand what you said.
14  Q.   Was it for anyone's benefit?  Was that crime found to be
15  for the benefit of some organization?
16  A.   Yeah.  It's a gang.  Bulldogs.
17  Q.   What gang?
18  A.   Bulldog gangs.
19  Q.   Okay.  At the time you pulled up to your house, did you
20  have a concern for your safety?
21  A.   Yes, I did.
22  Q.   Did you know Officer Webb was a police officer?
23  A.   No, I didn't.
24  Q.   When did you realize that Officer Webb was a police
25  officer?

312

Hood - D

192

1    A.   When I was trying to get the key in my back door to go

2    into the house, and he said, "Get down on the ground, police

3    officer."

4    Q.   And did you comply when he told him that?

5    A.   I asked him what did he want.  He said get down on the

6    ground.  I said, "All right, can I go over here," because the

7    spot where he was trying to make me get down was wet.  So then

8    I got down on the ground.  And he came over and arrested me.

9    Q.   Mr. Hood, did you discard a firearm as you ran through the

10   west gate of your home?

11   A.   No, I didn't.

12   Q.   Mr. Hood, did you see any other person as you traveled

13   along the west side of your home?

14   A.   When I pulled up.

15   Q.   Who did you see, if you know?

16   A.   I really don't know who it was.

17   Q.   Where was this person?

18   A.   On the side of the house.

19   Q.   The same side of the house with a weapon?

20   A.   That I ran on, yes.

21   Q.   Okay.  As you went down the side of the house, were you

22   able to observe this person at all?

23   A.   No, but I know that they ran in the house.

24   Q.   Okay.  What did you do?

25   A.   Trying to get in behind them, shit.  I mean, shoot.

313

Hood - D

193

1    Q.  Thank you, Mr. Hood.

2            You don't know for certain who it was that entered

3    the house?

4    A.  No, I don't.

5    Q.  Okay.  All right.  Officer Webb read you your Miranda

6    rights; correct?  "You have the right to remain silent,

7    anything you say can and will be used against you."

8    A.  Yeah, when we got down to the police department.

9    Q.  Okay.  And you agreed to speak with him after he read you

10   your rights; correct?

11   A.  Yes, I did.

12   Q.  And what, if anything, did you tell him about having a

13   firearm?

14   A.  I told him I didn't have a gun, and that he should

15   fingerprint the gun.

16   Q.  Okay.  Are you aware of whether the gun was fingerprinted?

17   A.  No.  He said he didn't have to because he saw me throw it.

18   And then he said -- then he said --

19   Q.  Well, hold on.  I'm just asking you what you said, not

20   what he said.

21   A.  Okay.

22   Q.  Okay?

23   A.  I'm sorry.

24           MR. LINDAHL:  All right.  I think -- that's all I

25   have.  All right.  Now, the Government's going to ask you some

314

Hood - X

194

1    questions.

2           THE COURT:  Cross-examination.

3                       CROSS-EXAMINATION

4    BY MS. SANCHEZ:

5    Q.  Good afternoon, Mr. Hood.

6    A.  Hello.  How you doing?

7    Q.  You said that when you got to your house, you saw someone

8    with a weapon?

9    A.  No, I didn't say I saw anybody with a weapon.

10   Q.  I'm sorry, I misheard you, then.

11   A.  Yeah, you did.

12   Q.  When you just testified, did you mention that you saw

13   someone go inside of your house?

14   A.  Yes.

15   Q.  And what did you say about that person?

16   A.  I just said they was on the side of the house.

17   Q.  Okay.  When did you notice that person?

18   A.  When I pulled up and got out the car.

19   Q.  Could you see who it was?

20   A.  No, I couldn't.

21   Q.  Could you see any characteristics about that person at

22   all?

23   A.  Yes, I could.

24   Q.  What could you see?

25   A.  The type of clothes they were wearing.

Hood - X

195

 1    Q.  Could you tell whether it was a male or female?

 2    A.  Yes, it was a man.

 3    Q.  And how did they get into the house?

 4    A.  They ran in.

 5    Q.  But what entry did they --

 6    A.  The back door.

 7    Q.  Okay.  And do you usually leave the back door open?

 8    A.  Yes, we usually do.

 9    Q.  Where were you when you first noticed this person?

10    A.  Getting out of the car on the curb.

11    Q.  And where exactly was the person when you got out of the

12    car?

13    A.  On the side of the house, like they were coming out to the

14    curb, but turned around and ran.

15    Q.  Okay.  Did you make eye contact with them?

16    A.  No, it was too far back.

17    Q.  After you said you saw them coming out toward the car, did

18    they turn around and run into the back of the house?

19    A.  Yes, ma'am.

20    Q.  And where was -- was the officer's car behind your car at

21    that point in time?

22    A.  No.

23    Q.  At what point did you start walking toward your house?

24    A.  As soon as I got out the car.

25    Q.  Were you walking or running?

Hood - X

196

1   A.   I was running.

2   Q.   And before you turned the corner, you saw the officer pull

3   up; is that correct?

4   A.   No.  I saw the car pull up.  I didn't -- I never knew it

5   was a police officer.

6   Q.   So you didn't notice any red and blue lights?

7   A.   Not at all.

8   Q.   And you saw a person behind you as you're walking or

9   running down the sidewalk?

10  A.   No, I didn't.

11  Q.   And you didn't hear anyone making any announcements?

12  A.   Not until he got in the backyard.  I was too far ahead of

13  him for him to be up on me to give me any instructions.

14  Q.   So are you saying that you were running away from the

15  person who turned out to be the officer because you thought he

16  was someone else?

17  A.   Exactly.

18       MR. LINDAHL:  Object to the form of the question as

19  vague and compound.

20       THE COURT:  Overruled.  If you can answer.  I think

21  you did.  That's okay.

22  BY MS. SANCHEZ:

23  Q.   I'm sorry, did you say yes?

24  A.   Yes, I did.

25  Q.   Okay.  You told the officer, when you spoke with him, that

Hood - X

197

1    you were running because you had a suspended license; is that

2    correct?

3    A.  No, that's not correct.

4    Q.  You never mentioned that to the officer?

5    A.  I never mentioned it, no, nothing about a suspended

6    license.

7    Q.  And you said that you didn't like -- generally, you didn't

8    like going into the area where the convenience store was where

9    you paid your cell phone bill because there were youngsters

10   there that harassed you; is that correct?

11   A.  I told him that at the police station, yes.

12   Q.  You have a prior conviction from 2011 for a felony

13   offense; is that correct?

14   A.  Yes, I do.

15   Q.  And you also have a prior conviction from 2000 for auto

16   theft; is that correct?

17   A.  Yes.

18   Q.  Did anyone come out of the house after you knocked on the

19   back door?

20   A.  After he had me detained and handcuffed, they opened the

21   door.

22   Q.  And who opened the door?

23   A.  Brian.

24   Q.  Did Brian say anything when he opened the door?

25   A.  No.  Officer Webb said something to him.

Hood - X

198

1  Q.  Okay, but you didn't hear Brian say anything?

2  A.  He just said no.

3  Q.  Was Brian at your house with your permission?

4  A.  Yes, he was.

5          MS. SANCHEZ:  I have no further questions,

6  Your Honor.

7          THE COURT:  And redirect?

8          MR. LINDAHL:  No, Your Honor.

9          THE COURT:  Okay, and then further evidence on behalf

10  of the defense?

11          MR. LINDAHL:  Defense rest, Your Honor.

12          THE COURT:  Defense has now rested its case -- his

13  case in chief.

14          The next stage will be both sides are entitled -- the

15  plaintiff's side is always entitled to present rebuttal

16  evidence rebutting the defense case in chief.  And if the

17  Government does that, the defense is entitled to present

18  what's called surrebuttal, that is, present evidence rebutting

19  the rebuttal.  That process doesn't take a great deal of time,

20  but because the defense side has rested as indicated when the

21  Government's side rested, we always take a break because we

22  need to sort out the exhibits, the evidence, and any legal

23  issues.

24          Although it's been fairly brief, we are going to take

25  a recess.  You'll be in recess.  Remember the admonition.

199

1   We're going to remain in session to deal with matters before
2   we do the transition into the rebuttal portion of the trial.
3   So the jury will be in recess.
4            (The jury was excused.)
5            THE COURT:  All right, the jury has left for their
6   recess.  Go ahead and have a seat.
7            THE WITNESS:  Over there?
8            THE COURT:  Yeah, you can go back to the counsel
9   table.
10           All right, on the defense side, received into
11  evidence are Defense A through H, photographs.  I believe
12  that's the sum total of the exhibits?
13           MR. LINDAHL:  Yes, and I am giving those to the
14  courtroom deputy now, Your Honor.
15           THE COURT:  Okay, great.  Okay.
16           Let me ask for defense side, are there any legal
17  issues or other matters we need to take up at this time?
18           MR. LINDAHL:  None that I'm aware of, Your Honor.
19           THE COURT:  All right.  Plaintiff's side, anything?
20           MS. SANCHEZ:  No, Your Honor, and the plaintiff will
21  be prepared to put on its rebuttal witness, and then the
22  remaining rebuttal witness is doing the search right now that
23  I had mentioned to the Court.
24           MR. LINDAHL:  Your Honor, could the Court have my
25  witness ordered back for tomorrow?  He's out in the hallway.

200

1          THE COURT:  Now, is he going to come in to testify
2   today, though?
3          MR. LINDAHL:  No, not today, would be only after -- I
4   understand Officer Szatmari of the Fresno Police Department
5   will be testifying.  He's my surrebuttal witness.
6          THE COURT:  Oh, okay.
7          MR. LINDAHL:  In case for employment purpose, or
8   whatever, I want -- I have the subpoena in my briefcase.
9          THE COURT:  Oh, okay, no problem.  But as I
10  understand it, then, when the jury comes back in, does the
11  Government have any rebuttal witnesses at this time?
12         MS. SANCHEZ:  Yes.  The Government will be calling
13  Officer Webb as a rebuttal witness and then reserving Officer
14  Szatmari.  I may have the answer of whether I want to call her
15  or not before Officer Webb is done, but if not, I would ask
16  that we be able to call her tomorrow.
17         THE COURT:  And is that the surrebuttal witness if
18  that witness testifies?
19         MR. LINDAHL:  That's correct.  He's not relevant
20  unless their rebuttal witness.  May I have him come in,
21  Your Honor?
22         THE COURT:  Yes, please.
23         MR. LINDAHL:  Thank you.
24         Your Honor, and present is the potential witness,
25  Albert Hood, Jr.  I just ask the Court order him back for

201

1    tomorrow's AM proceeding.

2            THE COURT:  Yes.  Mr. Hood, in this case, you may be

3    called to testify, but it wouldn't be until tomorrow morning.

4    So I am going to order you to return here tomorrow morning at

5    8:30.

6            MR. HOOD:  Okay.

7            MR. LINDAHL:  Thank you, Your Honor.

8            THE COURT:  All right, thank you.

9            Okay, so as I understand it, then, when the jury

10   comes back in, the Government will present one rebuttal

11   witness.  Then we'll recess the jury for the evening.  We'll

12   remain in session going through the jury instructions and the

13   verdict form.  Obviously we'll have a final jury instruction/

14   verdict form conference at the end of all the evidence, but,

15   hopefully, we can probably work it out so that we're probably

16   down to maybe a couple instructions at the most.  That way,

17   our final instruction conference hopefully won't be that

18   lengthy, and we can go right into closing arguments tomorrow

19   morning after the rebuttal and surrebuttal.

20           All right, okay.

21           (Pause in the proceedings.)

22           THE COURT:  Okay, is the Government prepared on at

23   least the initial part of rebuttal?

24           MS. SANCHEZ:  Yes, Your Honor.

25           THE COURT:  All right, we'll have the jury come back

322

Webb - D

202

1  in.

2         (Jury returned to the courtroom.)

3         THE COURT:  All right, the jury is present.  Please

4  be seated.  Members of the jury, we'll go ahead and continue

5  with the presentation of evidence, and plaintiff may present

6  rebuttal evidence.

7         MS. SANCHEZ:  Officer Webb.

8                            **KENNETH WEBB**,

9  called as a witness on behalf of the Government in rebuttal,

10 having been previously duly sworn, testified further as

11 follows:

12        THE COURT:  All right, so please be seated.  I'll

13 remind you you're still under oath, but if you could, again,

14 state your name for the record.

15        THE WITNESS:  My name is Kenneth Webb.

16        THE COURT:  Thank you.

17                      DIRECT EXAMINATION

18 BY MS. SANCHEZ:

19 Q.  On the night of December 4th, 2011, did the defendant tell

20 you why he ran from police?  Did he report a reason?

21 A.  Yes, he did.

22 Q.  And what did he tell you?

23 A.  When we were still at the house after I had taken him in

24 custody, he was sitting in the back seat of my car, and at

25 that time, after reading him Miranda, he told me that he ran

Webb - D

203

1    because his license was suspended.  He then reiterated that

2    statement during the booking process after I had taken him

3    downtown.

4    Q.   Did the defendant mention to you seeing anybody else on

5    the property that night?

6    A.   No.  There was no mention of anyone being outside, or that

7    he was trying to get into the door after someone else had ran,

8    or that there was anyone else that he had seen that night.

9    Q.   So did he tell you whether he chased anybody down the

10   sidewalk?

11   A.   No, he made no comment about it.

12   Q.   Did he mention his house being shot at?

13   A.   No.  He did not mention about his house being shot at,

14   just only that he had been shot at before.

15   Q.   Okay.  Where was the defendant when you pulled up to his

16   house?

17   A.   As I pulled up, he was in the car, and then as I'm getting

18   out, he's getting out of the car.

19   Q.   And at what point did you put your red and blue overhead

20   lights on?

21   A.   I was still in motion at the time I turned the lights on.

22   Q.   So when you saw him getting out of the car, were your

23   overhead red and blue lights on?

24   A.   Yes.

25   Q.   When you saw him getting out of the car, what

Webb - D

204

1   announcements did you make to him?

2   A.  Well, as I was driving up behind him and I see him stop,

3   again, I'm still in motion, I turn the lights on, and the

4   reason being is because I wanted him to know that I was there,

5   because if he was to get out of the car, I wanted him to know,

6   hey, the police are coming up behind you.  Stay in your

7   vehicle.  That's customary.

8           He got out of the car, I got out of the car.  I told

9   him to get back inside the car, and he didn't.

10  Q.  Did you announce that you are a police officer?

11  A.  I didn't yell out that I was a police officer, but I was

12  dressed the same way I am today, and I was in a marked police

13  vehicle with the lights activated.

14  Q.  And how are you dressed today?

15  A.  With marked uniform patches.

16  Q.  That say "Fresno Police" on them?

17  A.  Yes.

18  Q.  And there are multiple patches on your uniform in white?

19  A.  Yes.

20  Q.  And after you directed him to get back in the car, what

21  did he do?

22  A.  He turned and looked at me, and then he ran towards the

23  back.

24  Q.  And as he ran away, did you continue making announcements

25  to him?

Webb - D

205

1    A.   I told him to stop, and I just ran after him.

2    Q.   Okay.  Did he stop?

3    A.   No.

4    Q.   And were the red and blue lights on your car still on?

5    A.   Yes.

6    Q.   Could you see the red and blue lights when you went around

7    the corner?

8    A.   You could see the red and blue lights reflecting off the

9    walls before I come around the corner.

10   Q.   But did it reach around the side of the house if you --

11   once you go to the side down that path you ran, the sidewalk

12   you ran on the side of the house, could you see the red and

13   blues reflecting?

14   A.   Yes, you would see the reflection.

15   Q.   Okay.  And as you got to the backyard, could you see the

16   red and blues?

17   A.   If you were to look from the backyard towards the west,

18   yeah, you should be able to see them.  Those lights are very

19   bright, and as I say, they reflect off of everything,

20   especially considering how dark it was.

21   Q.   What was the defendant doing when you approached him at

22   the back of the house?

23        MR. LINDAHL:  Your Honor, I want to make an objection

24   at this point to being cumulative.  It's asked and answered.

25        THE COURT:  All right, sustained, unless it goes

Webb - X

206

1   directly to rebuttal.

    BY MS. SANCHEZ:

3   Q.  When the defendant told you that he ran because he had a

4   suspended license, did he also tell you that he had no reason

5   to possess a gun?

6   A.  Yeah --

7           MR. LINDAHL:  Object to the form of the question as

8   leading.

9           THE COURT:  Sustained.

10  BY MS. SANCHEZ:

11  Q.  What else did he tell you about -- or did he tell you

12  anything about having a reason or not to possess a gun?

13  A.  He didn't specifically state a reason to possess a gun.

14  He just stated that the area where he paid his cell phone

15  bill, he had problems with people assaulting him or attacking

16  him, indicating that it would not be a safe place for him to

17  be.

18  Q.  Was there anything else anywhere near the location where

19  you saw the firearm that could have made the sounds you heard?

20  A.  No.

21          MS. SANCHEZ:  No other questions.

22                      CROSS-EXAMINATION

23  BY MR. LINDAHL:

24  Q.  So your red and blue lights were activated very brightly?

25  A.  Yes.

Webb - RD

207

1   Q.  But you couldn't see anything in the dark was your

2   testimony earlier, wasn't it?

3   A.  That's correct.

4           MR. LINDAHL:  Okay.  I don't have any other

5   questions.

6           THE COURT:  And redirect.

7                   REDIRECT EXAMINATION

8   BY MS. SANCHEZ:

9   Q.  Can you explain what you mean by that, your red and blue

10  rights were bright, but you had trouble seeing in the dark.

11  A.  The red and blue lights aren't stationary.  They're

12  constantly waving back and forth, so they're not focusing on

13  one specific area.  As you go into dimmed areas or darker

14  areas, the lights themselves are bright, so they're going to

15  reflect off of other surfaces.  And because they are red and

16  blue, they're easily observed.

17          MS. SANCHEZ:  No further questions, Your Honor.

18                  RECROSS-EXAMINATION

19  BY MR. LINDAHL:

20  Q.  Those red and blue lights would probably reflect off the

21  shiny surface like a 44 caliber Ruger, wouldn't they?

22  A.  That is a possibility.

23          MR. LINDAHL:  Thank you.  That's all I have.

24          THE COURT:  Anything further?

25          MS. SANCHEZ:  No, Your Honor.

Alvarez - D

208

1          THE COURT:  Okay, either side may still call you back

2     to testify, but you're still under oath.  But you can go ahead

3     and return to your seat.

4          THE WITNESS:  Thank you.

5          THE COURT:  And further rebuttal evidence at this

6     time?

7          MS. SANCHEZ:  Sergeant Alvarez.

8          THE COURT:  Sergeant, please retake the witness

9     stand.  As you're coming forward, I'll remind you you're still

10    under oath.

11         THE WITNESS:  Yes, Your Honor.

12                         **JOE ALVAREZ**,

13    called as a witness on behalf of the Government in rebuttal,

14    having been previously duly sworn, testified further as

15    follows:

16         THE COURT:  For the record, restate your name.

17         THE WITNESS:  Sergeant Joe Alvarez, A-L-V-A-R-E-Z.

18                    DIRECT EXAMINATION

19    BY MS. SANCHEZ:

20    Q.  Sergeant Alvarez, back to December 4, 2011, when you saw

21    Officer Webb walking down the sidewalk with the defendant, did

22    you hear the defendant saying anything?

23    A.  I don't recall.

24    Q.  You don't recall or you didn't hear him saying anything?

25    A.  He was talking to Officer Webb, but I don't recall what

Alvarez - D

209

1    was being said.

2    Q.  Okay.  And did you ever have a chance to speak with the

3    defendant?

4    A.  I might have said something to him in back of the patrol

5    car.  As far as like he's outside, when he was yelling to get

6    Officer Webb's attention just like, "Hey, give it a minute."

7    But I didn't, like, interact or have an interview with him,

8    no.

9    Q.  And did you -- did he tell you that there was an

10   unauthorized person present at the residence that he chased

11   into his residence before Officer Webb apprehended him?

12   A.  No.

13        MR. LINDAHL:  Objection.  Assumes facts not in

14   evidence.

15        THE COURT:  Overruled.

16        THE WITNESS:  No.

17        MS. SANCHEZ:  I have no further questions.

18        THE COURT:  And cross-examination?

19        MR. LINDAHL:  No questions, Your Honor.

20        THE COURT:  Okay, and either side wish this witness

21   remain for recall?

22        MR. LINDAHL:  No, Your Honor.

23        MS. SANCHEZ:  No, Your Honor.

24        THE COURT:  You are excused.  Thank you.

25        THE WITNESS:  Thank you, Your Honor.

210

1          THE COURT:  Okay, and then further rebuttal at this

2    time?

3          MS. SANCHEZ:  No, Your Honor, not at this time.

4    Thank you.

5          THE COURT:  All right.  All right, members of the

6    jury, we're going to go ahead and recess now.  There are a

7    couple of other potential witnesses, very brief, because this

8    is rebuttal and surrebuttal.  They would be available tomorrow

9    morning.  It shouldn't take that much longer, and that would

10   complete the testimony and evidence in this case.

11         So -- but, again, remember, you haven't heard all the

12   evidence, and you obviously haven't heard the jury

13   instructions.  So, again, remember the admonition.  And we'll

14   see you tomorrow morning at 9:00.

15         (The jury was excused.)

16         THE COURT:  All right, the jury has left for the day.

17   Please be seated.

18         A couple of things -- well, let me ask first, are

19   there any matters that we need to address, defense side,

20   anything that we need to address specifically today for

21   defense side?

22         MR. LINDAHL:  I don't believe so, no, Your Honor.

23         THE COURT:  Government's side?

24         MS. SANCHEZ:  No, Your Honor.

25         THE COURT:  Okay, this is what I'm going to ask you

211

1    folks to do, is that we do have the proposed jury instructions

2    submitted by the Government.  And what I'd like to do is try

3    to get it resolved as much as possible this evening because

4    what I would like -- and I'm not sure if your office has the

5    ability to just do clean copies.  The clean copies would be

6    those that don't have the heading "Proposed Jury

7    Instructions."  They don't have the footers down below as to

8    the source of the instructions, basically the title of the

9    instruction and the text.

10             MS. SANCHEZ:  Yes, Your Honor, I can do that.

11             THE COURT:  Okay, good.

12             And basically what I'd like to do, I'd like to

13   resolve as much as possible tonight, so that those can be

14   prepared and we'll have them tomorrow because what I would

15   like to do is, again, resolve as much as possible so we can

16   have relatively clean copies tomorrow.  I do give two copies

17   to the jury, and I want to make sure that what I give to them

18   is exactly what I read and what you have available to you.  So

19   there is no question about what's being instructed upon.

20             Now, there are some that maybe you're not going to be

21   able to determine until tomorrow.  There are some here that

22   you would find are just not necessary, given the status of the

23   case.  For example, the defendant's decision to testify or

24   not testify, et cetera.

25             So what I will ask you to do is, I'll take a brief

212

1    recess, meet and confer, and if you can agree on the bulk of

2    the instructions, then I'll ask you to put that on the record,

3    and then I'll ask the Government over the evening to have your

4    staff -- if you have any staff left, because of the furloughs.

5    If that can be prepared, clean copies, and so we'll have them

6    available tomorrow morning.

7         And then also with the verdict form, a clean copy of

8    the verdict form that does not have the titles, and, again,

9    that would be meeting and conferring to make sure the verdict

10   form -- a clean copy of the verdict form, would be available

11   to the jury itself.  So we can go ahead and do that.

12        So I'll be in recess.  As soon as you folks are ready

13   to go on the record, let me know.  I'll come back in.  You can

14   state on the record the jury instructions that you've agreed

15   upon, the instructions that you agree could be deleted, and if

16   there are any that you need to wait until tomorrow to decide,

17   finally or that you disagree on, either the instruction or

18   portions of the instruction, you can let me know, and that way

19   over the evening, I can find my staff and think about any

20   potential issues there.

21        So I'll stand in recess.  As soon as you folks are

22   ready to have me come back in, I'll have you come back in, and

23   we'll go over the jury instructions and the verdict form.  All

24   right, so I'll stand in recess for now.

25        MS. SANCHEZ:  Thank you, Your Honor.  I think we can

213

1   probably do this in about five minutes because we have
2   discussed the bulk of them already.
3              THE COURT:  And I assumed that would be true.  Just
4   let me know whenever you're ready.
5              (Recess.)
6              THE COURT:  All right, back on the record.  On the
7   jury instructions, if I can just get an update from counsel.
8              MR. LINDAHL:  We've agreed on the instructions,
9   and --
10             MS. SANCHEZ:  We agreed that 17 and 23 on the list of
11  instructions, which is the Ninth Circuit 3.3, "Defendant's
12  Decision Not to Testify," and Ninth Circuit 3.10, "Activities
13  Not Charged" don't need to be provided to the jury.
14             And then I had filed supplemental jury instructions.
15  This was missing, "reasonable doubt," and the definition of
16  possession.  So those will be included.
17             THE COURT:  All right.  And defense agree to that,
18  then?
19             MR. LINDAHL:  Yes, Your Honor.
20             THE COURT:  And there is no issue regarding the
21  verdict form?
22             MR. LINDAHL:  No, I reviewed the verdict form.  It's
23  a single form with either guilty or not guilty.  It's a single
24  count.  It's fine.
25             THE COURT:  All right.  So, Miss Sanchez, if you and

214

 1   your staff this evening can go ahead and prepare the clean

 2   copy.

 3          Now, what we'll do tomorrow morning, we'll reconvene

 4   at 8:30.  And then if we can go ahead and go over the jury

 5   instructions and the verdict form, and if it's okay, then I'll

 6   just confirm on the record that the, quote, clean copy

 7   prepared by the Government is the set of jury instructions

 8   that both parties agreed upon.  The verdict form, the same.

 9   And then that will take care of that.

10          And then if there are any other issues tomorrow

11   morning, we can take that up at 8:30.  I can get an update

12   from you folks on the remainder of the rebuttal/surrebuttal

13   witnesses, and then we'll start the concluding portion, which

14   is my reading the jury instructions and then the closing

15   arguments.

16          So for this evening, then, anything further,

17   plaintiff's side?

18          MS. SANCHEZ:  Your Honor, do you want me to file the

19   jury instructions, and is there any particular order you would

20   like them in?

21          THE COURT:  No, actually the way that they're set up,

22   through the model instructions order is fine.

23          MS. SANCHEZ:  Okay.

24          THE COURT:  If I need to move a couple of them

25   around, I'll certainly let you know beforehand.  As long as we

215

1    have the full set of instructions, then -- to the extent

2    possible, I'm going to try to follow the sequence that you

3    already have them in.

4              MS. SANCHEZ:  Okay.

5              THE COURT:  Anything else, then?

6              MR. LINDAHL:  I just had a question.  When the jury

7    is deliberating, I was planning on going back over to the

8    county courthouse.  That I can be back within 10 minutes.  Is

9    that -- is that acceptable to the Court?

10             THE COURT:  You know, that may be okay.  The concerns

11   that I have generally is if the jury pops back with a question

12   or a verdict, I just want to make sure everyone is back in

13   time.  I know the courthouse itself --

14             MR. LINDAHL:  I'll just stay here, then, Your Honor.

15   That's fine.

16             THE COURT:  Yeah, if you'd do that.  Then both of

17   you -- well, obviously the Government has their office here,

18   but if you want to bring some work, or whatever, there is also

19   the attorney lounges, as you're aware, on the second floor.

20   Or you can stay in the courtroom and work also.

21             MR. LINDAHL:  All right, Your Honor.

22             THE COURT:  All right, if there is nothing further,

23   we'll recess, and we'll reconvene tomorrow morning at 8:30.

24             (Court was adjourned at 3:56 PM.)

25

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) 1:11-cr-443 AWI |
| | ) |
| Plaintiff, | ) TRIAL CONFIRMATION |
| | ) |
| vs. | ) MOTIONS IN LIMINE |
| | ) |
| ALBERT HOOD, | ) |
| | ) |
| Defendant. | ) |
| ————————————————— | ) |

Fresno, California                    Tuesday, October 15, 2013

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

2

APPEARANCES OF COUNSEL:

For the Government:                **KIM SANCHEZ**
                                   Assistant U.S. Attorney
                                   2500 Tulare Street
                                   Suite 4401
                                   Fresno, California 93721

For the Defendant:                 **LINDEN ARLAN LINDAHL**
                                   **Attorney at Law**
                                   **2014 Tulare Street**
                                   **Suite 505**
                                   **Fresno, California 93721**

3

| | |
|---|---|
| 1 | Tuesday, October 15, 2013 |
| 2 | 1:36 p.m. |

Tuesday, October 15, 2013                     Fresno, California

1:36 p.m.

THE CLERK:  Calling item 18 on calendar, CR-11-443, United States versus Albert Hood for trial confirmation and motions in limine.

MR. LINDAHL:  Linden Lindahl on behalf of Mr. Hood, who is personally present.  He's in custody.

MS. SANCHEZ:  Kim Sanchez representing the United States.

THE COURT:  Okay, we had set this over in -- the case over for any late motions that need to be filed.  Apparently there were none.  However, we remained on calendar in case there are any issues that we need to address before tomorrow morning.  So I'll turn it to counsel, if there is anything we need to take up this afternoon.

MS. SANCHEZ:  Your Honor, it's my understanding from speaking to Mr. Lindahl, that he will not be filing an opposition to my motion in limine to exclude any justification or necessity defense, and that he will not be attempting to introduce evidence in that regard.  That being the case, then, I believe that I just ask the Court to rule on that motion since there is no opposition, if I haven't misstated what Mr. Lindahl had represented to me.

THE COURT:  Yes.

4

1          MR. LINDAHL:  What she said, Your Honor.

2          THE COURT:  Is correct?

3          MR. LINDAHL:  Yes.

4          THE COURT:  Very well.  All right, in light of that,

5   then, the motion in limine to exclude the justification

6   defense and any references to any such matters is granted, and

7   counsel make sure that that motion is complied with.

8          All right, anything else that we can take up this

9   afternoon that would assist us for tomorrow morning?

10         MS. SANCHEZ:  I don't believe so.

11         MR. LINDAHL:  Logistical matters, but not for the

12  Court.  I think we're ready, Your Honor.

13         THE COURT:  Okay.  All right, then convene at 8:30

14  if there are any matters.  Basically what I'll do tomorrow

15  morning is go over some of the logistics in terms of what

16  we're going to do as far as jury selection, introduction of

17  parties, some court personnel; reading a statement of the

18  case, which is not evidence, but will assist in the jury

19  selection process.

20         I'll go ahead and conduct the bulk of the jury

21  voir dire, but I will allow each side 15 minutes to do an

22  individualized questioning after I'm done.  And other than

23  that, we can probably cover some of the logistics tomorrow

24  morning.

25         Let me get an update on the status.  In terms of the

5

1   time duration, parties' best estimate as to the time estimate

2   here?

3        MS. SANCHEZ:  Your Honor, I anticipate I'll finish my

4   case tomorrow.  I would guess early to late afternoon,

5   depending on how long jury selection takes.  I anticipate

6   calling two witnesses.

7        THE COURT:  All right.

8        MR. LINDAHL:  I anticipate one witness, Your Honor.

9        THE COURT:  All right.  Okay, now, obviously tomorrow

10  morning, we'll get an update.  But the thing that I need to

11  know the time estimate for, I need to let the jury panel know

12  what their time commitment is, and I'll touch bases with you

13  folks tomorrow.  But since we're starting on a Wednesday, you

14  can tell me whether we'd be comfortable in advising the jury

15  that their term of service would not be later than Friday.

16  That would be a total of three days, and if we are completed

17  in two days, of course, that's obviously -- would be fine, but

18  I'm more concerned about the outside parameters of some

19  prospective jurors having commitments Friday or beyond.

20        Okay, so the only thing is that I do have a

21  commitment tomorrow evening in Bakersfield.  I was going to do

22  an abbreviated schedule.  But we'll see how that works out.

23  If everything is completed, and it goes to the jury, I might

24  go ahead and delay my departure.  So we'll see how that goes.

25  But we'll probably know by the end of the first day, but just

6

1   to give you folks a fair warning, that I might break a little

2   bit early on Thursday unless we're to the point where it's to

3   the jury.

4          All right, is there anything else that we need to

5   take up today, then, for tomorrow morning?

6          MR. LINDAHL:  No, Your Honor.

7          MS. SANCHEZ:  No, Your Honor.  I will file --

8   Mr. Lindahl and I had collaborated on the joint statement of

9   the parties.  I'll file that this afternoon for you.

10         THE COURT:  All right.  So we'll see both sides

11  tomorrow morning at 8:30.

12         MS. SANCHEZ:  Thank you, Your Honor.

13         THE COURT:  All right.

14

15

16

17

18         I, Gail Lacy Thomas, Official Court Reporter, certify
    that the foregoing transcript is true and correct.

19

    Dated:  05/15/2014              /s/ Gail Lacy Thomas
20                                  GAIL LACY THOMAS, RMR-CRR

21

22

23

24

25

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:11-cr-443 AWI |
| | ) | |
| Plaintiff, | ) | SENTENCING |
| | ) | |
| vs. | ) | |
| | ) | |
| ALBERT HOOD, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

Fresno, California                    Tuesday, February 18, 2014



REPORTER'S TRANSCRIPT OF PROCEEDINGS









REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR No. 3278

2

APPEARANCES OF COUNSEL:

For the Government:                    **KIM SANCHEZ**
                                       Assistant U.S. Attorney
                                       2500 Tulare Street
                                       Suite 4401
                                       Fresno, California 93721

For the Defendant:                     **LINDEN ARLAN LINDAHL**
                                       **Attorney at Law**
                                       **2014 Tulare Street**
                                       **Suite 505**
                                       **Fresno, California 93721**

3

1   Tuesday, February 18, 2014           Fresno, California

2                                    10:48 a.m.

3

4        THE CLERK:  Court calls item number 5, 11-CR-443,

5   United States versus Albert Hood.

6        MR. LINDAHL:  Linden Lindahl appearing with and for

7   Mr. Hood.

8        MS. SANCHEZ:  Kim Sanchez representing the United

9   States.

10        THE COURT:  All right, this is the date and time set

11   for consideration of the presentence report and sentencing,

12   and, Mr. Hood, have you had a chance to read over the

13   presentence report?

14        THE DEFENDANT:  No.

15        MR. LINDAHL:  He has not, Your Honor.  I have not

16   reviewed it with him.

17        THE COURT:  Okay.

18        MR. LINDAHL:  He is aware of the -- the potential

19   sentence in this case and most of the factors.

20        THE COURT:  All right.  And so, Mr. Hood, would you

21   like more time to discuss your sentencing with your attorney,

22   then?

23        THE DEFENDANT:  No.

24        THE COURT:  Okay.  All right, counsel and Mr. Hood,

25   then, are you prepared to proceed with sentencing, then?

4

1          MR. LINDAHL:  We are, Your Honor.

2          THE COURT:  Very well.  All right.  And on behalf of

3   Mr. Hood, are there any additions or corrections to the report

4   or comments regarding the sentencing?

5          MR. LINDAHL:  Your Honor, I've carefully gone over

6   the report.  I don't know specifically additions or

7   corrections.  However, there are a few comments that I'd like

8   to make.

9          THE COURT:  All right.

10          MR. LINDAHL:  First of all, would be on the face page

11   of the report, Your Honor, it indicates date of arrest,

12   August 15th, 2012.  I would -- in terms of calculating time

13   credits, Your Honor, I would submit to the Court that the de

14   facto date of arrest in this case was the date of offense,

15   December the 4th, 2011.  It's my belief that the reason it

16   indicates August 15th, that was the date that the federal case

17   came about.  But he was arrested on this identical set of

18   facts on December the 4th, 2011 as the Court would note in --

19   I believe it's item -- I think it's item 46.

20          Mr. Hood was arrested and charged in state court for

21   the identical offense.  That offense was the only reason he

22   was arrested.  So I would submit to the Court that the actual

23   date of arrest was December 4, 2011.

24          Your Honor, in terms of factors in mitigation in this

25   case, I would submit to the Court that -- Your Honor heard the

5

1    testimony in this case.  The jury made its decision in this

2    case.

3              THE COURT:  Yes.

4              MR. LINDAHL:  So at this point, there is no disputing

5    that Mr. Hood was, in fact, in possession of a firearm in

6    violation of 18 USC 922(g)(1).  However, Your Honor, the

7    report indicates that Mr. Hood failed to avail himself of some

8    other means of avoiding contact with the street gang, which

9    had caused him so much trouble, including an attempt to take

10   his life back in 2005.

11             Your Honor, he did move to the State of Arizona in an

12   effort to avoid these -- to avoid this exact situation.  The

13   reason he was in Fresno was because his probation officer in

14   Fresno County demanded that he return to Fresno, the one place

15   on the face of the earth where his life was -- if not

16   constantly in danger, where he suffered a high degree of

17   probability that he would be shot.

18             As the Court is aware from reading the report, he, in

19   fact, bears the scars from five bullet wounds that he received

20   in an attempt to -- a successful attempt to save his son's

21   life from being shot by those same gang members that he was

22   trying to get away from.

23             So while the report indicates that Mr. Hood should

24   receive the statutory 10-year maximum in this case, I would

25   submit to the Court that there are some factors in mitigation,

6

1   and that is the largest one.

2         Mr. Hood -- we have four generations of his family in

3   court today, from his mother down to his grandson.  And I

4   believe that in this instance, once again, accepting the fact

5   that Mr. Hood was found guilty of possession, that while it

6   was not on all fours a necessity defense, and it certainly

7   wasn't self-defense, nor was that presented to the jury when

8   they made their decision.

9         I would ask the Court, in looking at the totality of

10   the circumstances, to impose a lesser sentence than the 120

11   months.  I am asking the Court to impose 60 months or 72

12   months.

13         THE COURT:  All right.  And, Mr. Hood, is there

14   anything you wish to say about the report or your sentencing

15   before I impose sentencing in your case?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Yes.

18         THE DEFENDANT:  I take all responsibility for having

19   the gun.  But, Your Honor, my life was in danger.  My house

20   had got shot, and the police officer didn't have no lights on

21   except for the headlights, and I didn't know who he was.

22         I didn't have the gun in the street.  I stashed the

23   gun in the bushes.  His sergeant pulled the gun out.  I mean,

24   because he was going to jump the fence and saw the gun.  I

25   mean -- and all I was doing was trying to protect my life.

7

1    That's it.  Nothing more.

2         Like he said, I left the State of California and went

3    to Arizona to avoid this situation right here, where I'm

4    spending a year, two years in jail fighting a case behind

5    these stupid people.  I'm a 50-year-old grandfather, not a

6    50-year-old gang member.  So that's all I would like to say.

7         THE COURT:  On behalf of the Government?

8         MS. SANCHEZ:  Your Honor, the Government requests the

9    Court follow the presentence report recommendation.  The Court

10   heard the testimony at trial.  The defense basically was the

11   defendant did not have a gun.  So I understand that there is

12   an argument that the defense is making for a necessity, but I

13   don't think that was made out by the facts at trial or the

14   facts set forth in the presentence report.

15        I think it's very unfortunate, I think it's horrible

16   that the defendant was shot previously, that his son was

17   shot -- was shot at.  I respect that the defendant testified,

18   and as a result, is subject to a touchy situation with Bulldog

19   gang members.  But the Court can see the defendant's lengthy

20   criminal history on top of that, and this defendant should not

21   be in possession of a gun.

22        The defendant did not have to go to those places

23   where he would be subject to that threat, or he could remove

24   the threat in other means or choose not to.  But one way that

25   he couldn't remove the threat was by carrying a gun himself,

8

1    and that was the choice that he made.

2            It's an unfortunate situation all around.  I wish

3    that the defendant wasn't subject to that situation, but it is

4    what it is, and he cannot carry a gun.  If he walks out of

5    this courtroom 10 years from now, five years from now, he

6    can't carry a gun even if he stays in Fresno.  And it

7    shouldn't be an excuse.  He has prior convictions for firearms

8    offenses and for crimes of violence, and I think the probation

9    report is spot on, with 120 months.

10           If you look through his extensive criminal history,

11   there are very few times in his history where he hasn't had a

12   charge, or been under supervision, or been in custody of some

13   sort for a variety of criminal violations.  So I think the

14   report is well founded, and that the Court should impose the

15   120 months recommended by the report.

16           THE COURT:  Anything further on behalf of the

17   defense, then?

18           MR. LINDAHL:  Your Honor, I would submit that when it

19   came to removing himself from places where he might -- these

20   confrontations might occur, the place or places where the

21   confrontation might occur would be within the City of Fresno.

22   He tried to get as far away -- and, in fact, did for some

23   period of time, get as far away from here as he could in the

24   State of Arizona.  And it was only because of the specific

25   direct order of his probation officer to return to Fresno,

9

1    that he did.  He pled to leave, he begged to leave.  He was

2    not allowed to leave the one place where his life was

3    constantly in danger.

4            That's all I have to say, Your Honor.

5            THE COURT:  All right, is he requesting an

6    institution in Arizona?

7            MR. LINDAHL:  He is.

8            THE COURT:  And how about the substance abuse

9    treatment program?

10           MR. LINDAHL:  He is.

11           THE COURT:  All right, any legal cause why sentence

12   should not be imposed, then?

13           MR. LINDAHL:  No legal cause, Your Honor.

14           MS. SANCHEZ:  No, Your Honor.

15           THE COURT:  All right, very well.  All right, in this

16   case, then, I'll adopt the bulk of the probation report.  In

17   terms of the Advisory Sentencing Guidelines, I do find that

18   the total offense level is 26.  Criminal history category is

19   VI.  The guideline range is 120 to 150 months, but because

20   this offense carries a maximum of 120 months, obviously

21   anything above that would not be applicable.

22           So I have taken into consideration, looking at the --

23   basically the offense itself and the statutory provisions,

24   which are zero to 10 years, the question for the Court is

25   where within those parameters should Mr. Hood be sentenced.

10

1          As the probation office has pointed out, regrettably,

2     Mr. Hood has been in and out of custody.  The criminal history

3     is very lengthy, as the probation office points out, beginning

4     at the age of 17, with a first conviction at age 18.  The

5     Court does note as pointed out by the probation office that

6     there have been very few times in your life when you have not

7     been under some kind of a sentence for probation -- either a

8     sentence itself or probation or parole.

9          There are prior convictions for crimes of violence,

10    so I recognize that in terms of sentencing considerations,

11    that public safety is a factor.

12         Also a factor in this case is prevention.  Hopefully,

13    the sentence imposed would impress upon Mr. Hood and also

14    others that if you're not allowed to possess a firearm, you

15    simply cannot under -- virtually under any circumstance, which

16    in this case, I understand there are mitigating circumstances,

17    which I'll get into in a moment.

18         In terms of mitigating factors, as the probation

19    office points out, there is clear family support, support

20    within the community.  Mr. Hood is working towards earning his

21    GED.  He does wish to participate in educational programs

22    while confined.

23         The other factors, and, of course, we have covered

24    these, not only as the trial, but on the previous motion to

25    suppress, and which we actually had live testimony.  So I

11

1  recognize in this case the circumstances that led up to

2  Mr. Hood's arrest.

3          The background information is compelling with respect

4  to the fact that Mr. Hood did at one time stand up and testify

5  in court, which put himself and his family in danger.  It is

6  regrettable, but there is no really -- recourse, certainly no

7  recourse in terms of carrying a firearm, which is difficult.

8          But I do find at least under the circumstances, the

9  extreme danger to Mr. Hood and his son, that although it's not

10  a necessity defense and certainly would not be considered by

11  the Court to be necessity, there are mitigating factors, and

12  the Court recognizes that Mr. Hood otherwise would not have

13  been in the State of California, but for fulfilling his

14  requirements under probation.

15          So those are mitigating factors.  I do find that in

16  consideration, I will give Mr. Hood some credit for that, and

17  I find in this case, that a reasonable sentence is 96 months,

18  and I'll sentence accordingly.

19          All right, therefore, pursuant to the Sentencing

20  Reform Act of 1984, it is the judgment of the Court that you

21  are hereby committed to the custody of the Bureau of Prisons

22  to be imprisoned for a term of 96 months.  You shall pay a

23  special assessment of $100, payment to begin immediately.  I

24  find that you do not have the ability to pay a fine.

25  Imposition of a fine is waived.

12

1          Upon release from imprisonment, you shall be placed

2    on supervised release for a term of 36 months.  Within 72

3    hours of your release from the custody of the Bureau of

4    Prisons, you shall report in person to the probation office in

5    the district to which you are released.

6          While on supervised release, you shall not commit

7    another federal, state, or local crime, you shall not possess

8    a firearm, ammunition, a destructive device or any other

9    dangerous weapon.  You shall not illegally possess controlled

10   substances.

11         You shall cooperate in the collection of DNA as

12   directed by the probation officer.  You shall comply with the

13   standard conditions, which have been recommended by the United

14   States Sentencing Commission and adopted by this Court.  You

15   shall refrain from any unlawful use of a controlled substance.

16   You shall submit to one drug test within 15 days of your

17   release from imprisonment, at least two periodic drug tests

18   thereafter, not to exceed four drug tests per month.

19         You shall also comply with the following special

20   conditions:

21         1.  You shall submit to the search of your person,

22   property, home, and vehicle by a United States Probation

23   Officer or any other authorized person under the immediate and

24   personal supervision of the probation officer, based upon

25   reasonable suspicion without a search warrant.  Failure to

13

1    submit to a search may be grounds for revocation.  You shall

2    warn any other residents that the premises may be subject to

3    searches pursuant to this condition.

4         2.  As directed by the probation officer, you shall

5    participate in an outpatient correctional treatment program to

6    obtain assistance for drug or alcohol abuse.

7         3.  As directed by the probation officer, you shall

8    participate in a program of testing to determine if you have

9    reverted to the use of drugs or alcohol.

10         4.  As directed by the probation officer, you shall

11    participate in a copayment plan for the treatment or testing

12    and shall make payment directly to the vendor under contract

13    with the United States Probation Office of up to $25 per

14    month.

15         I will recommend that you be incarcerated at an

16    institution in Arizona, but only insofar as this

17    recommendation accords with security classification and space

18    availability.  I will also recommend that you participate in a

19    500-hour Bureau of Prisons Substance Abuse Treatment Program.

20         All right, Mr. Hood, do you understand the sentence

21    imposed by the Court in this case?

22         THE DEFENDANT:  Yes.  May I ask a question?

23         THE COURT:  Yes.

24         MR. LINDAHL:  Your Honor, if I could -- there was one

25    thing.  With regard to the date of arrest, had the Court made

14

1   a finding whether it was August 15, 2012 or December 4, 2011?

2           MS. SANCHEZ:  Your Honor, the defendant was arrested

3   on the federal warrant on August 15th.  I agree that he was

4   arrested on this offense for state charges on December 4th,

5   2011.  The Bureau of Prisons is going to calculate what the

6   time credit is.  I have not researched, nor am I prepared to

7   make any representations on whether that time credit went to

8   anything else.  I know that the defendant had other

9   supervision, I think, from a prior case, and I see him shaking

10  his head, so that could be wrong.  But I'm not prepared to

11  address that right now.

12          So I don't think that making a finding that the

13  federal arrest date is December 4th, 2011 is warranted.  I

14  agree that he was arrested for the facts underlying this case

15  on state charges on December 4th of 2011, and that the federal

16  arrest warrant was served on August 15th, 2012, though.

17          THE COURT:  Well, the Bureau of Prisons will

18  calculate time credits that are appropriate as to Mr. Hood.

19          All right --

20          MR. LINDAHL:  Your Honor, finally I would ask, I know

21  that Mr. Hood would like to appeal that.  He is indigent.  I

22  would ask at this point to be relieved so that other counsel

23  can be appointed for his appeal.

24          THE COURT:  All right.  Okay, well, let me do the

25  following:  You are advised that you do have the right to

15

1    appeal.  If you desire to appeal, you must file your Notice of

2    Appeal in writing with the Court within 14 days of today's

3    date.  If you cannot afford an attorney for your appeal, the

4    Court will appoint one for you.

5            I'll go ahead, Mr. Lindahl, I'll relieve you as the

6    attorney of record for the trial itself.  I'll refer Mr. Hood

7    to the Federal Defender's Office for consideration.  You'll

8    have to fill out some paperwork, and if he qualifies, then he

9    will be entitled to appointed counsel for the purposes of

10   appeal.

11           MR. LEE:  And, Your Honor, Mr. Hood was previously --

12   excuse me.

13           Mr. Hood was previously a Federal Defender client.

14   There should be a financial in the file.  I don't believe his

15   financial situation has changed.  He's been in custody this

16   whole time, so if you can reappoint our office, we will take

17   it from here for appellate purposes.

18           THE COURT:  And that will be the order.  Thank you

19   very much, Mr. Lee, for bringing that to the Court's

20   attention.

21           MR. LINDAHL:  Thank you, Your Honor.

22

23           I, Gail Lacy Thomas, Official Court Reporter, certify
     that the foregoing transcript is true and correct.

24

25   Dated:  05/15/2014            /s/ Gail Lacy Thomas
                                   GAIL LACY THOMAS, RMR-CRR

## CERTIFICATE OF SERVICE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | U.S.C.A. No. 14-10092 |
| *Plaintiff-Appellee,* | ) | U.S.D.C. No. 1:11-cr-00443 AWI |
| | ) | |
| v. | ) | |
| | ) | |
| ALBERT HOOD | ) | |
| *Defendant-Appellant,* | ) | |
| | ) | |

I hereby certify that on July 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 3, 2014                    */s/ Marc C. Ament*
                                        Marc C. Ament

**U.S.C.A. NO.  14-10092**


IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,
Plaintiff-Appellee,


v.


ALBERT HOOD
Defendant-Appellant.


On Appeal From The United States District Court
For The Eastern District of California


Honorable Anthony W. Ishii
United States District Judge


U.S.D.C. No. 1:11-cr-00443 AWI


---

**EXCERPTS OF RECORD**

---

**VOLUME 3 OF 3**
**Bates-Stamped 343 through 354**

MARC C. AMENT
Attorney at Law
1539 E. Starpass Drive
Fresno, CA 93730-3448
(559) 978-4429
Attorney for Defendant-Appellant
ALBERT HOOD

# TABLE OF CONTENTS

|  |  | **Docket No.** | **Page(s)** |
|---|---|---|---|
| 10. | Indictment...................................................... | 3 | 343 |
|  | DOCKET: Eastern District of California<br>        Case Number 1:11-cr-00443 AWI | --- | 346 |

APPEAL,CLOSED

# U.S. District Court
## Eastern District of California – Live System (Fresno)
## CRIMINAL DOCKET FOR CASE #: 1:11–cr–00443–AWI–1

Case title: USA v. Hood
Magistrate judge case number: 1:11–mj–00263–DLB

Date Filed: 12/22/2011
Date Terminated: 02/18/2014

Assigned to: District Judge
Anthony W. Ishii

Appeals court case number:
14–10092 Ninth Circuit

**Defendant (1)**

| | | |
|---|---|---|
| **Albert Hood**<br>*TERMINATED: 02/18/2014* | represented by | **Linden Arlan Lindahl**<br>2014 Tulare Street<br>Suite 505<br>Fresno, CA 93721<br>559–266–2560<br>Email: lindahl@ciummolaw.com<br>*TERMINATED: 02/18/2014*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained* |

**Marc C Ament**
Marc C. Ament, Attorney At Law
1539 East Starpass Drive
Fresno, CA 93730
559–978–4429
Email: ament–attorney@usa.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles J. Lee**
Federal Defender's Office
2300 Tulare Street
Suite 330
Fresno, CA 93721
559–487–5561
Fax: 559–487–5950
Email: charles_lee@fd.org
*TERMINATED: 01/31/2013*

**Francine Zepeda**
Federal Defender (FRS)
2300 Tulare Street
Suite 330
Fresno, CA 93721
(559) 487–5561
Fax: (559) 487–5950
Email: francine_zepeda@fd.org
*TERMINATED: 01/31/2013*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:922(g)(1) – Felon in Possession<br>of a Firearm | Custody 96 months; S/A $100; S/R 36 months; Fine<br>is waived; Appeal Rights were given |

346

(1)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| 18 USC 922(g)(1) – Felon in Possession of a Firearm | |

**Plaintiff**

USA                                         represented by   **Fresno Forfeiture Unit**
United States Attorney's Office
2500 Tulare Street
Suite 4401
Fresno, CA 93721
559–497–4000
Email: usacae.ecffrsfor@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Kimberly A. Sanchez**
United States Attorney
2500 Tulare Street
Suite 4401
Fresno, CA 93721
559–497–4038
Email: kimberly.sanchez@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/05/2011 | 1 | CRIMINAL COMPLAINT as to Albert Hood (1). (Gonzalez, R) [1:11–mj–00263–DLB] (Entered: 12/06/2011) |
| 12/22/2011 | 3 | INDICTMENT as to Albert Hood (1) count(s) 1. (Attachments: # 1 Info Sheet and True Bill) (Martin–Gill, S) (Entered: 12/22/2011) |
| 08/15/2012 | 5 | MINUTES (Text Only) for proceedings held before Magistrate Judge Jennifer L. Thurston: ARRAIGNMENT as to Albert Hood (1) Count 1 held on 8/15/2012. Defendant was advised of charges, rights; waived formal reading, NOT GUILTY PLEA ENTERED; discovery requested &reciprocal – So Ordered. Detention Hearing set for 8/21/2012 at 01:30 PM in Courtroom 7 (SKO) before Magistrate Judge Sheila K. Oberto, Status Conference set for 8/27/2012 at 01:00 PM in Courtroom 9 (DLB) before Magistrate Judge Dennis L. Beck. Government Counsel Y. Mohammad present. Defense Counsel F Zepeda present. Custody Status: Custody – Fully Shackled. Court Reporter/CD Number: ECRO – Otilia Figueroa. (Kusamura, W) (Entered: 08/16/2012) |
| 08/17/2012 | 7 | NOTICE of ATTORNEY APPEARANCE: Francine Zepeda appearing for Albert Hood. Attorney Zepeda, Francine added. (Zepeda, Francine) (Entered: 08/17/2012) |
| 08/17/2012 | 8 | NOTICE of ATTORNEY APPEARANCE: Charles J. Lee appearing for Albert Hood. Attorney Lee, Charles J. added. (Lee, Charles) (Entered: 08/17/2012) |

| 08/21/2012 | 9 | MINUTES (Text Only) for proceedings held 8/21/2012, before Magistrate Judge Sheila K. Oberto: DETENTION HEARING as to Albert Hood NOT held. Defense counsel requests a 1–day continuance to allow for a witness to be available. No objection by the government. **Detention Hearing continued to 8/22/2012, at 01:30 PM in Courtroom 7 (SKO) before Magistrate Judge Sheila K. Oberto.** Government Counsel K. Sanchez present. Defense Counsel C. Lee present. Custody Status: Custody – FULLY SHACKLED. Court Reporter/CD Number: ECRO / O. Figueroa. (Timken, A) (Entered: 08/21/2012) |
|---|---|---|
| 08/22/2012 | 10 | MINUTES (Text Only) for proceedings held before Magistrate Judge Sheila K. Oberto: DETENTION HEARING as to Albert Hood held on 8/22/2012. The matter was argued and submitted. Pastor Bruce Hood, (uncle), spoke on behalf of defendant. Defendant ordered DETAINED. Per the request of defense counsel and with no objection by the government, the Status Conference currently set for 8/27/2012 is **CONTINUED to 9/24/2012, at 01:00 PM in Courtroom 9 (DLB) before Magistrate Judge Dennis L. Beck**. Time is excluded under the Speedy Trial Act for the reasons set forth on the record. The Court finds that good cause exists and that the ends of justice outweigh the interest of the public and the defendant in a speedy trial. XT Start: 8/22/2012 Stop: 9/24/2012. Government Counsel K. Sanchez present. Defense Counsel C. Lee present. Custody Status: Custody – FULLY SHACKLED. Court Reporter/CD Number: ECRO / O. Figueroa. (Timken, A) (Entered: 08/22/2012) |
| 08/23/2012 | 11 | DETENTION ORDER as to Albert Hood signed by Magistrate Judge Sheila K. Oberto on 8/23/2012. (Timken, A) (Entered: 08/23/2012) |
| 08/27/2012 | 12 | TRANSCRIPT REQUEST for proceedings held on 08/22/2012 before Judge Hon. Sheila K. Oberto. (Lee, Charles) (Entered: 08/27/2012) |
| 08/28/2012 | 13 | ARREST WARRANT RETURNED Executed on 8/15/2012 as to Albert Hood. (Martin–Gill, S) (Entered: 08/28/2012) |
| 08/28/2012 | 14 | APPEAL FROM MAGISTRATE JUDGE DECISION to District Court re 11 Detention Order. (Lee, Charles) (Entered: 08/28/2012) |
| 08/29/2012 | 15 | BRIEFING SCHEDULE re 14 Appeal of Magistrate Judge Decision to District Court – ATY as to *Albert Hood*. Date of appeal of *8/28/2012*. (Martin–Gill, S) (Entered: 08/29/2012) |
| 08/29/2012 | 16 | TRANSCRIPT REQUEST for proceedings held on 8/22/2012 before Judge Sheila K. Oberto, (Lee, Charles) (Entered: 08/29/2012) |
| 09/04/2012 | 17 | TRANSCRIPT of Proceedings as to Albert Hood (1) held on **8/22/2012**, before Magistrate Judge Sheila K. Oberto. **DETENTION HEARING** filed by ECRO Otilia Figueroa, Phone number 559–499–5928 E–mail ofigueroa@caed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 9/27/2012. Redacted Transcript Deadline set for 10/5/2012. Release of Transcript Restriction set for 12/3/2012. (Figueroa, O) (Entered: 09/04/2012) |
| 09/14/2012 | 18 | STIPULATION and PROPOSED ORDER for resetting briefing schedule and evidentiary hearing; defense motion due by September 18, 2012; government response due by October 2, 2012; defense reply due by October 9, 2012; evidentiary hearing set for October 15, 2012 at 1:30 P.M. re 11 Detention Order, 15 Briefing Schedule – Appeal from Appeal from Mag Decision, 14 Appeal of Magistrate Judge Decision to District Court – ATY. (Lee, Charles) (Entered: 09/14/2012) |
| 09/14/2012 | 19 | ORDER as to Albert Hood, ( Motions filed by 9/18/2012., Responses due by 10/2/2012., Replies due by 10/9/2012., Motion Hearing on Defendant's Motion to Revoke Detention Order is set for 10/15/2012 at 01:30 PM in Courtroom 2 (AWI) before Chief Judge Anthony W. Ishii.) signed by Chief Judge Anthony W. Ishii on 9/14/12. (Nazaroff, H) (Entered: 09/14/2012) |
| 09/18/2012 | 20 | MOTION to REVOKE *Detention Order Pursuant to 18 U.S.C. § 3145(b); Points and Authorities; Exhibit* by Albert Hood. Motion Hearing set for 10/15/2012 at |

| | | 01:30 PM in Courtroom 2 (AWI) before Chief Judge Anthony W. Ishii. (Attachments: # 1 Exhibit A: Letter)(Lee, Charles) (Entered: 09/18/2012) |
|---|---|---|
| 09/18/2012 | 21 | STIPULATION and PROPOSED ORDER for continuance of status conference hearing to October 15, 2012, at 1:30 p.m. before The Hon. Anthony W. Ishii re 10 Detention Hearing, Set Deadlines/Hearings,,,,,, 20 MOTION to REVOKE *Detention Order Pursuant to 18 U.S.C. § 3145(b); Points and Authorities; Exhibit.* (Lee, Charles) (Entered: 09/18/2012) |
| 09/20/2012 | 22 | STIPULATION and ORDER to continue Status Conference Hearing, signed by Magistrate Judge Dennis L. Beck on 9/20/2012. ( Status Conference as to Albert Hood (1) previously set for 9/24/2012 has been **CONTINUED to 10/15/2012 at 01:30 PM in Courtroom 2 (AWI) before Chief Judge Anthony W. Ishii**) (Figueroa, O) (Entered: 09/20/2012) |
| 10/10/2012 | 23 | OPPOSITION by USA to 20 MOTION to REVOKE *Detention Order Pursuant to 18 U.S.C. § 3145(b); Points and Authorities; Exhibit.* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Sanchez, Kimberly) (Entered: 10/10/2012) |
| 10/15/2012 | 24 | MINUTES (Text Only) for proceedings held before Chief Judge Anthony W. Ishii: MOTION HEARING as to Albert Hood held on 10/15/2012 Bruce Hood sworn and testified. Defnedant's Motion to Revoke Detention Order is argued and denied. Status Conference set for 12/10/2012 at 01:00 PM in Courtroom 9 (DLB) before Magistrate Judge Dennis L. Beck.) XT Start: 10/15/12 Stop: 12/10/12, Government Counsel K. Sanchez present. Defense Counsel C. Lee present. Custody Status: (C). Court Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 10/17/2012) |
| 10/18/2012 | 25 | TRANSCRIPT of Proceedings as to Albert Hood, DEFENDANT'S MOTION TO REVOKE DETENTION ORDER, held on 10/15/2012, before Chief Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 11/8/2012. Redacted Transcript Deadline set for 11/19/2012. Release of Transcript Restriction set for 1/17/2013. (Thomas, G) (Entered: 10/18/2012) |
| 10/29/2012 | 26 | MINUTES (Text Only) for proceedings held before Magistrate Judge Dennis L. Beck: BAIL REVIEW HEARING as to Albert Hood NOT HELD on 10/29/2012. After brief oral argument, the court advised the parties that it would refer the matter to the district court for further review/consideration. Bail Review Hearing set for 11/5/2012 at 10:00 AM in Courtroom 2 before Chief Judge Anthony W. Ishii. Government Counsel K. Sanchez present. Defense Counsel C. Lee present. Custody Status: Custody– Fully Shackled. Court Reporter/CD Number: ECRO/ O. Figueroa. (Arellano, S.) (Entered: 10/30/2012) |
| 11/05/2012 | 27 | MINUTES (Text Only) for proceedings held before Senior Judge Anthony W. Ishii: BAIL REVIEW as to Albert Hood held on 11/5/2012. Defendant is to be released on $20,000 Personal Surety, $75,000 net equity property bond with numerous terms and conditions. Property bond to be approved by U.S. Attorney prior to release. Government Counsel K. Sanchez present. Defense Counsel C. Lee present. Custody Status: (C). Court Reporter/CD Number: ECRO. (Nazaroff, H) (Entered: 11/07/2012) |
| 12/10/2012 | 28 | MINUTES (Text Only) for proceedings held before Magistrate Judge Dennis L. Beck: STATUS HEARING as to Albert Hood held on 12/10/2012. Defense counsel requested a continuance in order to review the plea offer with the defendant. Status Conference set for 1/14/2013 at 01:00 PM in Courtroom 8 (BAM) before Magistrate Judge Barbara A. McAuliffe. Custody status shall remain the same. XT Start: 12/10/2012 Stop: 1/14/2013, Time is to be excluded under the Speedy Trial Act in that good cause exists and that the ends of justice outweigh the interest of the public and the defendant in a speedy trial. For the reasons set forth on the record, the continuance requested is granted for good cause and the Court finds the ends of justice outweigh the interest of the public and the defendant in a speedy trial.Government Counsel K Servatius for K Sanchez present. Defense Counsel Charles Lee present. Custody Status: (C) Fully Shackled. Court |

| | | Reporter/CD Number: K Hooven. (Hernandez, M) (Entered: 12/12/2012) |
|---|---|---|
| 01/14/2013 | 29 | NOTICE of ATTORNEY APPEARANCE: Linden Arlan Lindahl appearing for Albert Hood. (Lundstrom, T) (Entered: 01/15/2013) |
| 01/14/2013 | 30 | MINUTES (Text Only) for proceedings held before Magistrate Judge Barbara A. McAuliffe on 1/14/2013: Peggy Sasso for Charles Lee, request Fed Def be relieved as counsel, since Atty Lindahl has been retained – So Ordered. 2nd STATUS CONFERENCE as to Albert Hood held. Atty Lindahl just came onto the case, request continuance to go through dfts file; no objections by govt. Parties request a continuance for another Status Conference and waived excludable time – So Ordered. **3rd STATUS CONFERENCE set for 3/25/2013 at 01:00 PM in Courtroom 8 (BAM) before Magistrate Judge Barbara A. McAuliffe**. Excludable started as to Albert Hood: XT Start: 1/14/2013 Stop: 3/25/2013. Time is to be excluded under the Speedy Trial Act in that good cause exists and that the ends of justice outweigh the interest of the public and the defendant in a speedy trial. For the reasons set forth on the record, the continuance is granted for good cause and the Court finds the ends of justice outweigh the interest of the public and the defendant in a speedy trial. *NOTE: Atty Lindahl needs to submit a Substitution of Attorneys and Order for the Courts approval, electronically on or before Jan. 31, 2013*. Government Counsel Kim Sanchez present. Defense Counsel Peggy Sasso and Linden Lindahl present. Custody Status: in Custody – present. Court Reporter/CD Number: ECRO – O. Figueroa. (Herman, H) (Entered: 01/18/2013) |
| 01/30/2013 | 31 | SUBSTITUTION of ATTORNEY – PROPOSED, submitted by Albert Hood. (Zepeda, Francine) (Entered: 01/30/2013) |
| 01/31/2013 | 32 | ORDER SUBSTITUTING ATTORNEY signed by District Judge Anthony W. Ishii on 1/30/2013. *Added attorney Linden A. Lindahl and terminated attorneys Charles J. Lee and Francine Zepeda for Defendant Albert Hood*. (Jessen, A) (Entered: 01/31/2013) |
| 03/25/2013 | 33 | MINUTES (Text Only) for proceedings held before Magistrate Judge Barbara A. McAuliffe on 3/25/2013: 3rd STATUS CONFERENCE as to Albert Hood held. Defense – still engaged to resolve; govt – having problem with sentencing guidelines. Parties request a continuance for another Status Conference and waived excludable time – So Ordered. **4th STATUS CONFERENCE set for 5/13/2013 at 01:00 PM in Courtroom 3 before Magistrate Judge Barbara A. McAuliffe**. Excludable started as to Albert Hood: XT Start: 3/25/2013 Stop: 5/13/2013. Time is to be excluded under the Speedy Trial Act in that good cause exists and that the ends of justice outweigh the interest of the public and the defendant in a speedy trial. For the reasons set forth on the record, the continuance requested is granted for good cause and the Court finds the ends of justice outweigh the interest of the public and the defendant in a speedy trial. Government Counsel Kim Sanchez present. Defense Counsel Linden Lindahl present. Custody Status: in Custody – present. Court Reporter/CD Number: Karen Hooven. (Herman, H) (Entered: 03/26/2013) |
| 05/13/2013 | 34 | MINUTES (Text Only) for proceedings held before Magistrate Judge Barbara A. McAuliffe on 5/13/2013: 4th STATUS CONFERENCE as to Albert Hood held. Defense request dates for a Jury Trial, Trial Confirmation hearing &motion schedule. Parties waived excludable time – So Ordered. Motions filed by 6/10/2013; Opposition filed by 6/24/2013; Reply filed by 7/8/2013. *MOTIONS and TRIAL CONFIRMATION HEARING set for 7/15/2013 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii*. JURY TRIAL set for 7/30/2013 at 08:30 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. Excludable started as to Albert Hood: XT Start: 5/13/2013 Stop: 7/30/2013. Time is to be excluded under the Speedy Trial Act in that good cause exists and that the ends of justice outweigh the interest of the public and the defendant in a speedy trial. For the reasons set forth on the record, the continuance requested is granted for good cause and the Court finds the ends of justice outweigh the interest of the public and the defendant in a speedy trial. Government Counsel Melanie Alsworth for Kim Sanchez present. Defense Counsel Jackie Rodriguez for Linden Lindahl present. Custody Status: in Custody – present. Court Reporter/CD Number: ECRO – O. Figueroa. (Herman, H) (Entered: 05/14/2013) |

| 05/16/2013 | 35 | PRETRIAL ORDER signed by District Judge Anthony W. Ishii on 5/14/2013. (Sant Agata, S) (Entered: 05/16/2013) |
|---|---|---|
| 07/15/2013 | 36 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: Trial Confirmation as to Albert Hood held on 7/15/2013. XT Start: 7/15/13 Stop: 9/10/13, Jury Trial set for 7/30/13 is continued to 9/10/2013 at 08:30 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii., Trial Confirmation Hearing set for 9/3/2013 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.) Government Counsel: K. Sanchez present. Defense Counsel: L. Lindahl present. Custody Status: (C). Court Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 07/16/2013) |
| 09/03/2013 | 38 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: TRIAL CONFIRMATION HEARING as to Albert Hood held on 9/3/2013. The Jury Trial currently set for 9/10/2013 has been *VACATED* and a new trial date has been set. **Trial Confirmation Hearing set for 10/7/2013 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii; Jury Trial set for 10/16/2013 at 08:30 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii**. XT Start: 9/3/2013 Stop: 10/16/2013. Government Counsel: Kim Sanchez present. Defense Counsel: L. Lindahl present. Custody Status: Custody. Court Reporter/CD Number: Gail Thomas. (Figueroa, O) (Entered: 09/05/2013) |
| 09/04/2013 | 37 | PRETRIAL ORDER; RULES of CONDUCT as to Albert Hood, signed by District Judge Anthony W. Ishii on 9/4/13. *Trial Confirmation and Jury Instruction Hearing set for 10/7/2013 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii, Jury Trial set for 10/16/2013 at 08:30 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.* (Gonzalez, R) (Entered: 09/04/2013) |
| 10/02/2013 | 39 | MINUTE ORDER: Due to the unavailability of the court, the Trial Confirmation hearing date of October 7, 2013 is continued to October 9, 2013 at 10:00 a.m. for Albert Hood. (Entered: 10/02/2013) |
| 10/07/2013 | 40 | MOTION IN LIMINE *to Exclude Evidence of a Necessity Defense and Deny a Jury Instruction on Necessity* by USA as to Albert Hood. Motion Hearing set for 10/9/2013 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Sanchez, Kimberly) (Entered: 10/07/2013) |
| 10/08/2013 | 41 | PROPOSED JURY INSTRUCTIONS by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/08/2013) |
| 10/08/2013 | 42 | PROPOSED JURY INSTRUCTIONS by USA as to Albert Hood. (Attachments: # 1 Exhibit Jury Instructions)(Sanchez, Kimberly) (Entered: 10/08/2013) |
| 10/08/2013 | 43 | TRIAL BRIEF by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/08/2013) |
| 10/09/2013 | 44 | PROPOSED VERDICT submitted by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/09/2013) |
| 10/09/2013 | 45 | PROPOSED VOIR DIRE by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/09/2013) |
| 10/09/2013 | 46 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: Trial Confirmation held on 10/9/2013. Defendant Response to Motion in Limine is due by 10/10/2013., Further Trial Confirmation Hearing set for 10/15/2013 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.COUNSEL ARE TO NOTIFY THE COURT NO LATER THAN 4:00 P.M. ON THURSDAY OCTOBER 10TH ON WHETHER OR NOT THE TRIAL WILL PROCEED. Government Counsel: K. Sanchez present. Defense Counsel: L. Lindahl present. Custody Status: (C). Court Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 10/09/2013) |
| 10/15/2013 | 47 | STIPULATION *Joint Statement of the Parties* by USA. (Sanchez, Kimberly) (Entered: 10/15/2013) |
| 10/15/2013 | 48 | EXHIBIT LIST by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/15/2013) |

351

| 10/15/2013 | 49 | WITNESS LIST by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/15/2013) |
|---|---|---|
| 10/15/2013 | 51 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: TRIAL CONFIRMATION and MOTIONS IN LIMINE HEARING as to Albert Hood held on 10/15/2013. Jury trial confirmed– 2 day estimate. No opposition by defense to USA's Motion in Limine (Doc. 40 ); motion granted. Government Counsel: K. Sanchez present. Defense Counsel: L. Lindahl present. Custody Status: Custody. Court Reporter/CD Number: Gail Thomas. (Arellano, S.) (Entered: 10/16/2013) |
| 10/16/2013 | 50 | PROPOSED JURY INSTRUCTIONS by USA as to Albert Hood. (Sanchez, Kimberly) (Entered: 10/16/2013) |
| 10/16/2013 | 52 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: JURY TRIAL as to Albert Hood held on 10/16/2013. Brief discussion with counsel re trial logistics/scheduling. Jury selection held; jury impanelled and sworn. Jury instructions/admonitions given by the court. Opening statements by plaintiff and defendant. Plaintiff's witnesses: Officer Kenneth Webb and Sgt. Joey Alvarez sworn/testified. Plaintiff's exhibits admitted: 1–A, 1–H, 2, 1–H.1. 2:14 PM: Plaintiff rested. Defense witness: Albert Hood (defendant) sworn/testified. Defense exhibits admitted: A to H. 3:22 PM: Defense rested. Plaintiff's rebuttal witnesses: Officer Kenneth Webb and Sgt. Joey Alvarez (previously sworn). 3:40 PM: Jury retired for the evening. Outside the presence of the jury, the court discussed trial logistics/scheduling, jury instructions, and verdict form with counsel. 3:55 PM: Court in recess. **Jury Trial (Day 2) set for 10/17/2013 at 08:30 AM in Courtroom 2 before District Judge Anthony W. Ishii.** Government Counsel: K. Sanchez present. Defense Counsel: L. Lindahl present. Custody Status: Custody. Court Reporter/CD Number: Gail Thomas. (Arellano, S.) (Entered: 10/16/2013) |
| 10/17/2013 | 53 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: JURY TRIAL, DAY 2, as to Albert Hood held on 10/17/2013. Jury instructions reviewed and revised outside the presence of the jury. Trial resumes with government rebuttal witness Staci Szatmari who was sworn and testified. The government rests. Defense sur–rebuttal witness Albert Lee Hood, Jr., sworn and testified. Defense rests. Jury instructions given. Closing arguments made. Final jury instructions given. Court security officer sworn. Jury deliberations begin at 10:30 AM. Jury verdict reached at 11:20 AM. Jury verdict read in open court with defendant being found guilty. The jury was polled, thanked, and excused. SENTENCING set for 12/23/2013 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. Government Counsel: Kimberly Sanchez present. Defense Counsel: Linden Lindahl present. Custody Status: Custody. Court Reporter/CD Number: Gail Thomas. (Rooney, M) (Entered: 10/17/2013) |
| 10/17/2013 | 54 | COURT'S EXHIBIT/WITNESS LIST. (Rooney, M) (Entered: 10/17/2013) |
| 10/17/2013 | 55 | JURY INSTRUCTIONS as to Albert Hood. (Lundstrom, T) (Entered: 10/21/2013) |
| 10/17/2013 | 56 | VERDICT as to Albert Hood (1) Guilty on Count 1 Albert Hood (1). (Lundstrom, T) (Entered: 10/21/2013) |
| 11/18/2013 | 57 | *(TO BE VIEWED BY ASSIGNED COUNSEL ONLY)* DISCLOSED PRESENTENCE INVESTIGATION REPORT (DRAFT) as to Albert Hood. Informal objections shall not be submitted via CM/ECF and shall be in compliance with the sentencing schedule and pursuant to Local Rule 460. (Orndoff, G) (Entered: 11/18/2013) |
| 12/09/2013 | 58 | SENTENCING PRESENCE INVESTIGATION REPORT (FINAL) as to Albert Hood. (Attachments: # 1 No Objection Letter)(Orndoff, G) (Entered: 12/09/2013) |
| 12/20/2013 | 59 | TRANSCRIPT of Proceedings as to Albert Hood (1), held on **8/15/2012**, before Magistrate Judge Jennifer L. Thurston. **ARRAIGNMENT AND PLEA RE INDICTMENT HEARING** filed by ECRO Otilia Figueroa, Phone number 559–499–5928 E–mail ofigueroa@caed.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be |

|  |  | obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 1/10/2014. Redacted Transcript Deadline set for 1/21/2014. Release of Transcript Restriction set for 3/20/2014. (Figueroa, O) (Entered: 12/20/2013) |
|---|---|---|
| 12/20/2013 | 60 | STIPULATION and PROPOSED ORDER for Continuance of Sentencing by USA. (Sanchez, Kimberly) (Entered: 12/20/2013) |
| 12/20/2013 | 61 | Stipulation to continue Sentencing; ORDER,signed by District Judge Anthony W. Ishii on 12/20/2013. **Sentencing currently set for 12/23/2013 has been CONTINUED to 2/10/2014 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.** (Figueroa, O) (Entered: 12/20/2013) |
| 02/05/2014 | 62 | STIPULATION and PROPOSED ORDER for Continuing Sentencing Hearing by USA. (Sanchez, Kimberly) (Entered: 02/05/2014) |
| 02/06/2014 | 63 | STIPULATION and ORDER Continuing Sentencing, signed by District Judge Anthony W. Ishii on 2/5/2014. *Sentencing RESET for 2/18/2014 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.* (Jessen, A) (Entered: 02/06/2014) |
| 02/18/2014 | 64 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: SENTENCING held on 2/18/2014 for Albert Hood (1), Count 1, Custody 96 months; S/A $100; S/R 36 months; Fine is waived; Appeal Rights were given. Attorney Linden Arlan Lindahl terminated in case as to Albert Hood. Federal Defender is apppointed for Appeal purposes. DEFENDANT TERMINATED. CASE CLOSED Government Counsel: K. Sanchez Defense Counsel: L. Lindahl Custody Status: Custody. Court Reporter: Gail Thomas. (Kusamura, W) (Entered: 02/18/2014) |
| 02/21/2014 | 65 | NOTICE of ATTORNEY APPEARANCE: Marc C Ament appearing for Albert Hood. Attorney Ament, Marc C added. (Ament, Marc) (Entered: 02/21/2014) |
| 02/25/2014 | 66 | CLERK'S NOTICE: Attn: Marc Ament regarding docket entry 65 Notice of Attorney Appearance. ***WRONG DOCUMENT ATTACHED*** Your filing is entitled NOTICE OF ATTORNEY APPEARANCE, however, the actual document attached is NOTICE OF APPEAL. Please re−file your document using the correct event "NOTICE OF APPEAL". If you need assistance, please contact the CM/ECF help desk at 866−884−5444, or refer to the CM/ECF User's Manual on the court's website. (Martin−Gill, S) (Entered: 02/25/2014) |
| 02/26/2014 | 67 | NOTICE of APPEAL by Albert Hood. (Ament, Marc) (Entered: 02/26/2014) |
| 02/26/2014 | 68 | APPEAL PROCESSED to Ninth Circuit re 67 Notice of Appeal filed by Albert Hood. Filed dates for Notice of Appeal *2/26/2014*, Complaint *12/5/2011* and Appealed Order / Judgment *10/17/2013*. Court Reporter: *Gail Thomas*. *Fee Status: Not Paid − Billed* Bill for fees due sent to *Albert Hood* (Attachments: # 1 Appeal Information, # 2 Bill for Appeal Fee) (Sant Agata, S) (Entered: 02/26/2014) |
| 02/26/2014 | 69 | JUDGMENT and COMMITMENT as to Albert Hood signed by District Judge Anthony W. Ishii on 11−443. (Kusamura, W) (Entered: 02/26/2014) |
| 02/26/2014 | 70 | USCA CASE NUMBER 14−10092 for 67 Notice of Appeal filed by Albert Hood. (Martin−Gill, S) (Entered: 02/26/2014) |
| 02/28/2014 | 71 | CLERK'S NOTICE of DOCKET CORRECTION re 68 Appeal Processed to USCA − CR, ***Please Disregard Bill for Appeal Fees Due, Issued In Error, fees not due.*** (Gonzalez, R) (Entered: 02/28/2014) |
| 04/18/2014 | 72 | JUDGMENT RETURNED Executed on 3/17/2014 as to Albert Hood. (Lundstrom, T) (Entered: 04/18/2014) |
| 04/23/2014 | 73 | TRANSCRIPT REQUEST before Judge ishii, (Attachments: # 1 Appendix TDOF page 2)(Ament, Marc) (Entered: 04/23/2014) |
| 04/24/2014 | 74 | ORDER of USCA as to 67 Notice of Appeal filed by Albert Hood; The appellants motion to allow the court reporter file the transcript late is construed as a motion for leave to file a late transcript designation order at the district court. So construed, |

| | | the motion is granted nunc pro tunc. (Fahrney, E) (Entered: 04/28/2014) |
|---|---|---|
| 05/19/2014 | 75 | TRANSCRIPT of Proceedings as to Albert Hood, TRIAL CONFIRMATION and MOTIONS IN LIMINE, held on 10/15/2013, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/9/2014. Redacted Transcript Deadline set for 6/19/2014. Release of Transcript Restriction set for 8/18/2014. (Thomas, G) (Entered: 05/19/2014) |
| 05/19/2014 | 76 | TRANSCRIPT of Proceedings as to Albert Hood, JURY TRIAL, DAY 1, held on 10/16/2013, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/9/2014. Redacted Transcript Deadline set for 6/19/2014. Release of Transcript Restriction set for 8/18/2014. (Thomas, G) (Entered: 05/19/2014) |
| 05/19/2014 | 77 | TRANSCRIPT of Proceedings as to Albert Hood, JURY TRIAL, DAY 2, held on 10/17/2013, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/9/2014. Redacted Transcript Deadline set for 6/19/2014. Release of Transcript Restriction set for 8/18/2014. (Thomas, G) (Entered: 05/19/2014) |
| 05/19/2014 | 78 | TRANSCRIPT of Proceedings as to Albert Hood, SENTENCING, held on 2/18/2014, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 6/9/2014. Redacted Transcript Deadline set for 6/19/2014. Release of Transcript Restriction set for 8/18/2014. (Thomas, G) (Entered: 05/19/2014) |

## <u>CERTIFICATE OF SERVICE</u>

UNITED STATES OF AMERICA,  )    U.S.C.A. No. 14-10092
        *Plaintiff-Appellee,*  )    U.S.D.C. No. 1:11-cr-00443 AWI
        )
    v.    )
        )
ALBERT HOOD  )
        *Defendant-Appellant,*  )
_____)

      I hereby certify that on July 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

      I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

      Dated: July 3, 2014        */s/ Marc C. Ament*_____
                              Marc C. Ament